UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

Case No. 22-1198 (L)

(2:20-cv-00278)

_____

DON BLANKENSHIP

       Plaintiff-Appellant

v.

NBCUNIVERSAL, LLC; CNBC, LLC

       Defendants-Appellees

and

DOES 1-50, inclusive

       Defendant

_____

Case No. 22-1207

(2:19-cv-00236)

_____

DON BLANKENSHIP

       Plaintiff-Appellant

v.

FOX NEWS NETWORK, LLC; CABLE NEWS NETWORK, INC.; MSNBC CABLE LLC; 35TH INC.; WP COMPANY LLC, d/b/a The Washington Post; DOES 1-50, inclusive; MEDIAITE, LLC; FISCALNOTE, INC., d/b/a Roll Call; NEWS AND GUTS, LLC; THE CHARLESTON GAZETTE-MAIL; AMERICAN

676474.1

BROADCASTING COMPANIES, INC.; TAMAR AUBER; GRIFFIN CONNOLLY; ELI LEHRER

       Defendants-Appellees

and

DOES 1-50, inclusive

       Defendant

_____

Appeal from the United States District Court
for the Southern District of West Virginia at Charleston

_____

**JOINT APPENDIX**

**VOLUME XVI of XXI – PAGES 4353 to 4644**

_____

| | DOCUMENT DESCRIPTION | DATE | ECF NO. | VOLUME | PAGE |
|---|---|---|---|---|---|
| 316. | Defendant Fox News Network, LLC's Surrebuttal In Support of Summary Judgment – Exhibit F: Excerpts from Deposition Transcript of Andrew Napolitano taken on April 15, 2021 | 12/10/2021 | 1059-6 | XVI | 4353 |
| 317. | Defendant 35th PAC's Motion for Summary Judgment | 05/24/2021 | 892 | XVI | 4370 |
| 318. | Defendant 35th PAC's Motion for Summary Judgment – Exhibit 1: Affidavit of Charles Gantt | 05/24/2021 | 892-1 | XVI | 4373 |
| 319. | Defendant 35th PAC's Motion for Summary Judgment – Exhibit 2: Affidavit of James Eckert | 05/24/2021 | 892-2 | XVI | 4375 |
| 320. | Defendant 35th PAC's Motion for Summary Judgment – Exhibit 3: Stipulated Dismissal With Prejudice | 05/24/2021 | 892-3 | XVI | 4379 |
| 321. | Defendant 35th PAC's Motion for Summary Judgment – Exhibit 4: Defendant 35th PAC's Responses and Objections to Plaintiff's First Set of Interrogatories and Second Request for Production of Documents | 05/24/2021 | 892-4 | XVI | 4382 |

| | DOCUMENT DESCRIPTION | DATE | ECF NO. | VOLUME | PAGE |
|---|---|---|---|---|---|
| 322. | Defendant 35th PAC's Motion for Summary – Exhibit 5: Plaintiff Don Blankenship's Response to First Set of Interrogatories by Defendant 35th PAC | 05/24/2021 | 892-5 | XVI | 4401 |
| 323. | Defendant 35th PAC's Motion for Summary Judgment – Exhibit 6: Plaintiff Don Blankenship's Response to First Set of Requests for Admission by Defendant 35th PAC | 05/24/2021 | 892-6 | XVI | 4421 |
| 324. | Defendant 35th PAC's Motion for Summary Judgment – Exhibit 7: Proposed Order Granting 35th PAC's Motion for Summary Judgment | 05/24/2021 | 892-7 | XVI | 4433 |
| 325. | Defendant 35th PAC's Memorandum In Support of Motion for Summary Judgment | 05/24/2021 | 893 | XVI | 4434 |
| 326. | Plaintiff's Response to Motion for Summary Judgment of 35th PAC | 06/07/2021 | 914 | XVI | 4455 |
| 327. | Plaintiff's Response to Motion for Summary Judgment of 35th PAC – Exhibit 1: Article "Pro-Morrisey super PAC received contribution from indicted Giuliani associates" by Alex | 06/07/2021 | 914-1 | XVI | 4457 |

| | DOCUMENT DESCRIPTION | DATE | ECF NO. | VOLUME | PAGE |
|---|---|---|---|---|---|
| | Thomas dated October 10, 2019 | | | | |
| 328. | Plaintiff's Memorandum in Opposition to 35th PAC's Motion for Summary Judgment | 06/07/2021 | 916 | XVI | 4459 |
| 329. | Reply In Support of 35th PAC's Motion for Summary Judgment | 06/14/2021 | 939 | XVI | 4466 |
| 330. | Defendant Eli Lehrer's Motion for Summary Judgment | 06/07/2021 | 898 | XVI | 4478 |
| 331. | Defendant Eli Lehrer's Motion for Summary Judgment – Exhibit 1: Excerpts from Deposition Transcript of Don Blankenship taken on April 29, 2021 | 06/07/2021 | 898-1 | XVI | 4481 |
| 332. | Defendant Eli Lehrer's Motion for Summary Judgment – Exhibit 2: Affidavit of Eli Lehrer | 06/07/2021 | 898-2 | XVI | 4492 |
| 333. | Defendant Eli Lehrer's Motion for Summary Judgment – Exhibit 3: Affidavit of Eli Lehrer | 06/07/2021 | 898-3 | XVI | 4495 |
| 334. | Defendant Eli Lehrer's Motion for Summary Judgment – Exhibit 4: Defendant Eli Lehrer's Answers to Plaintiff's First Set of Interrogatories | 06/07/2021 | 898-4 | XVI | 4498 |
| 335. | Defendant Eli Lehrer's Motion for Summary Judgment – Exhibit 5: | 06/07/2021 | 898-5 | XVI | 4501 |

| | DOCUMENT DESCRIPTION | DATE | ECF NO. | VOLUME | PAGE |
|---|---|---|---|---|---|
| | Plaintiff Don Blankenship's Responses to First Set of Requests for Admission by Defendant Eli Lehrer | | | | |
| 336. | Defendant Eli Lehrer's Motion for Summary Judgment – Exhibit 6: Plaintiff Don Blankenship's Responses to First Set of Interrogatories by Defendant Eli Lehrer | 06/07/2021 | 898-6 | XVI | 4506 |
| 337. | Defendant Eli Lehrer's Motion for Summary Judgment – Exhibit 7: Plaintiff Don Blankenship's Supplemental Responses to First Set of Interrogatories by Defendant Eli Lehrer | 06/07/2021 | 898-7 | XVI | 4509 |
| 338. | Defendant Eli Lehrer's Memorandum In Support of Motion for Summary Judgment | 06/07/2021 | 899 | XVI | 4514 |
| 339. | Memorandum of Law In Support of Plaintiff Don Blankenship's Opposition to Defendant Eli Lehrer's Motion for Summary Judgment | 06/21/2022 | 950 | XVI | 4538 |
| 340. | Memorandum of Law In Support of Plaintiff Don Blankenship's Opposition to Defendant Eli Lehrer's Motion for | 06/21/2022 | 950-1 | XVI | 4561 |

| | DOCUMENT DESCRIPTION | DATE | ECF NO. | VOLUME | PAGE |
|---|---|---|---|---|---|
| | Summary Judgment – Exhibit 1: Article "It's time to end W. Va. 'sore-loser' law" by Eli Lehrer dated May 25, 2018 | | | | |
| 341. | Memorandum of Law In Support of Plaintiff Don Blankenship's Opposition to Defendant Eli Lehrer's Motion for Summary Judgment – Exhibit 2: United States Sentencing Commission – Federal Sentencing: The Basics | 06/21/2022 | 950-2 | XVI | 4563 |
| 342. | Memorandum of Law In Support of Plaintiff Don Blankenship's Opposition to Defendant Eli Lehrer's Motion for Summary Judgment – Exhibit 3: Letter from Dr. Stan Smith to Mr. Eric Early re Assessment of Damages dated February 1, 2021 | 06/21/2022 | 950-3 | XVI | 4615 |
| 343. | Defendant Eli Lehrer's Reply to Opposition to Motion for Summary Judgment | 6/28/2021 | 960 | XVI | 4626 |
| 344. | Defendant Mediaite, LLC's Motion for Summary Judgment | 06/07/2021 | 900 | XVI | 4639 |
| 345. | Defendant Mediaite, LLC's Motion for Summary Judgment – | 06/07/2021 | 900-1 | XVI | 4643 |

| | DOCUMENT DESCRIPTION | DATE | ECF NO. | VOLUME | PAGE |
|---|---|---|---|---|---|
| | Exhibit 1: Affidavit of Tamar Auber | | | | |

# Exhibit F

**In the Matter Of:**

*Blankenship vs*

*Fox News Network*

---

*ANDREW NAPOLITANO*

*April 15, 2021*

---



USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 11 of 300

1           MR. SIMPKINS:  About

2    Mr. Blankenship, yes.

3           THE WITNESS:  Same answer.

4    BY MR. SIMPKINS:

5        Q.  Are you aware of any other efforts by

6    Villapiano other than the e-mails that was sent

7    to Karrah Kaplan, Robinson, et cetera, to get you

8    air time between April the 30th and the election?

9        A.  I have not.

10       Q.  Okay.  Who is Karrah Kaplan?

11       A.  You asked me that earlier.

12       Q.  Well, I am asking you again.

13           Who is Karrah Kaplan?

14           MR. REGAN:  Objection.

15           You can answer.

16           THE WITNESS:  She is a senior

17   producer or was at the time, for Martha

18   McCallum's show.

19           And you asked if she still has the

20   same job, and I said, "I think she does."

21   BY MR. SIMPKINS:

22       Q.  Okay.  Thank you.

23           MR. SIMPKINS:  We're going to move

24   on to -- I see, yeah.  We're going to move on to

25   Exhibit 4, Madam Court Reporter or Phil, can you

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 12 of 300

1    play Video Number 4, Exhibit Number 4, which is

2    the -- "Your World with Neil Cavuto," the video

3    segment.

4                    And Shawn, do you have an issue

5    with us skipping to the minute mark, eight

6    minutes and 43 seconds?  Or do you want us to

7    play the entire video segment?

8                    MR. REGAN:  I -- let me -- let me

9    talk to the Judge for a moment.

10                   MR. SIMPKINS:  Okay.

11                   (Off-the-record discussion.)

12                   MR. REGAN:  Jeff, we would prefer

13   to play the whole exhibit if we're going to ask

14   him questions about it.  I know it will take a

15   few minutes.

16                   MR. SIMPKINS:  Shawn, we're not

17   going to ask anything in regards to the first

18   eight minutes and 43 seconds.  For economy

19   purposes and time and efficiency, you know, not

20   waste eight minutes and 43 seconds of everybody's

21   time but if you are adamant.

22                   MR. REGAN:  If you want to tell me

23   what the questions are, I guess we can think

24   about that.  But I don't -- I mean I am not

25   expecting you to do that.  But, you know, one

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 13 of 300

176

```
1    follows from the other.  So, it seems to be

2    presumed that it's all relevant and in context.

3              MR. SIMPKINS:  Okay.  We'll play

4    the whole thing.

5              MR. REGAN:  I don't -- I don't know

6    how limited your questions are or what they are.

7              MR. SIMPKINS:  I'm not going to

8    tell you what my questions are.

9              MR. REGAN:  Okay.

10             MR. SIMPKINS:  I'm going to tell

11   you that none of them has to do with the first

12   eight minutes and 43 seconds of the video.

13             MR. REGAN:  No. But the whole --

14   the whole rest of the video has to do with the

15   first eight minutes and 43 seconds.

16             MR. SIMPKINS:  Okay.  We'll play

17   the whole thing.

18             MR. REGAN:  I think we should play

19   it.

20             (Deposition Exhibit 4 plays as

21   follows:)

22             MR. CAVUTO:  All right.  We're told

23   the State says he can't do it, but he is.  West

24   Virginia businessmen Don Blankenship is launching

25   a third-party candidacy for the West Virginia
```

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 14 of 300
Case 2:19-cv-00236 Document 1059-6 Filed 12/10/21 Page 6 of 17 PageID #: 18608

1  Senate seat despite coming in third in that

2  Republican primary.

3            He joins us right now to explain

4  why.

5            Mr. Blankenship, very good to have

6  you.  Why are you doing this?

7            MR. BLANKENSHIP:  Well, because I

8  think I'll make a better senator than either of

9  the other two candidates, and I think I can win.

10           MR. CAVUTO:  All right.  So when

11  you hear the tow of Goodwin, the State Attorney

12  General Patrick Morrisey, say that you could cost

13  Republicans this potential senate seat pick-up,

14  you say what?

15           MR. BLANKENSHIP:  Well, I say,

16  Number 1, when I was running in the primary, they

17  said I was running solely for -- to be vengeful

18  against Senator Manchin.

19           And now, they are saying I'm

20  running to cause Senator Manchin to win.  Neither

21  of which are true.  I'm running to win.

22           MR. CAVUTO:  All right, but you

23  must know that you have better odds of taking

24  votes away from the Republican candidate than the

25  Democratic incumbent; right?

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 15 of 300

Andrew Napolitano - April 15, 2021

178

1          MR. BLANKENSHIP:  I'm not 100

2    percent sure of that, because the Democrats are

3    very fed up with Senator Manchin.  And there are

4    a lot of Democrats that are in Southern West

5    Virginia in the mining fields where I'm very well

6    known and very well respected.

7          MR. CAVUTO:  So having placed

8    third, do you think in that race that you could

9    have really have much of an impact in this one

10   even if you were allowed to run as a third-party

11   candidate?

12          MR. BLANKENSHIP:  Well, I'm pretty

13   comfortable that I'm going to be allowed to run.

14   I think the law is very clear of that.  It's a

15   100 percent chance if it's decided based on the

16   law.  And I think I can win --

17          MR. CAVUTO:  They said the law is

18   not that clear on that.  Because there is a sore

19   loser feature.  And you would be deemed a sore

20   loser.  You say that's wrong?

21          MR. BLANKENSHIP:  My attorneys tell

22   me that's wrong.  So, I guess we'll find out.

23   But based on the law, I'm confident that we will

24   be on the ballot.  And if we are, I think we've

25   got an excellent chance of winning, both against

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 16 of 300

Andrew Napolitano - April 15, 2021

179

```
1    Morrisey and Manchin, because of their flawed
2    past.
3                  MR. CAVUTO:  Has Mr. Morrisey, the
4    Attorney General, reached out to you or you to he
5    after the -- after the primary?
6                  MR. BLANKENSHIP:  No.  I have not
7    talked to him.  Last time I talked to him was, I
8    think, after the debate.  But I -- on Fox.  But I
9    am not 100 percent sure.  I may have spoken to
10   him one more I'm after that.
11                 MR. CAVUTO:  Have you spoken to, to
12   Senator Manchin?
13                 MR. BLANKENSHIP:  No.  I haven't
14   spoken to Senator Manchin in probably in seven or
15   eight years.
16                 You know, Senator Manchin was, if
17   you recall, came out and said I had blood on my
18   hands after the explosion.
19                 And of course, it's of great
20   interest to me to hear all this talk about the
21   Department of Justice and being so crooked in all
22   these issues that it had.  And it was the
23   Department of Justice that indited me on three
24   felonies but couldn't convict me on any.
25                 And it's very disappointing that
```

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 17 of 300

180

1    the news media, and this network as well,

2    continues to tell people I'm a felon, which, I've

3    never been convicted of a felony.  I'm probably

4    less likely to be a felon than anyone given that

5    I was investigated for four and a half years.

6    And they couldn't find anything.

7                    MR. CAVUTO:  So what are you if

8    you've served time in jail?

9                    MR. BLANKENSHIP:  A misdemeanor.

10   The only misdemeanor to serve time at a felon

11   prison in California.  So I think that should

12   tell us something as well when they're sending

13   misdemeanors to prison so they can't continue to

14   communicate for a year is -- is pretty telling.

15                   MR. CAVUTO:  You don't -- there are

16   those that would disagree with that analysis

17   saying it's a little bit bigger than a

18   misdemeanor when 29 people are killed in a mining

19   accident in 2010 for which you, your company, at

20   one point was held accountable for violating

21   safety standards and the rest.

22                   You don't agree with in that?  And

23   obviously you felt that way afterwards.  But that

24   would be a little more than a misdemeanor; right?

25                   MR. BLANKENSHIP:  Well, if

Andrew Napolitano - April 15, 2021

181

1    you -- if you stretch it that far, you know, the

2    government blew up the coal mine.  So it's

3    natural that the government wanted to cover up

4    what really happened in that regard.

5              MR. CAVUTO:  Did you violated

6    safety standards at your company?  Wasn't that

7    the thrust of it, that you violated safety

8    standards; and that's what prompted all of this

9    and you to go to jail?

10             MR. BLANKENSHIP:  No.  I've never

11   violated a safety standard, myself, you know.

12             Coal companies have lots of

13   violations, but this mine was pretty much

14   average.  It had less than one violation per

15   inspector day over two and a half years.

16             But both the media and the

17   government made it out that it was some

18   extraordinary number.  It was actually 20 percent

19   less than the mine next door and 20 percent more

20   after I left the company.

21             So, it's an easy story for the

22   media and the government to tell, but it's

23   untrue.

24             MR. CAVUTO:  Mr. Blankenship, I'm

25   just wondering now:  If you pursue this,

USCA4 Appeal: 22-1198    Doc: 59        Filed: 05/25/2022    Pg: 19 of 300

1    obviously, you have raised concerns among Senate

2    Republicans who think this is a potential pickup

3    for them, including Mitch McConnell who had hoped

4    that you would lose.  And he had his wish.  I

5    think he sent you a pretty snarky reminder after

6    that.  Is this as much to go after Mitch

7    McConnell?

8                    MR. BLANKENSHIP:  No.  It's to go

9    after the establishment.  They are bankrupting

10   the country.

11                   MR. CAVUTO:  Who is the

12   establishment?  Who is the establishment?

13                   MR. BLANKENSHIP:  They're keeping

14   people in poverty.  They're destroying jobs.

15                   Well, it's both the Republicans and

16   the Democrats.  You know, you've got a situation

17   where they basically are more interested in their

18   individual parties and their individual authority

19   than they are in the country.  And somebody needs

20   to stand up against it.  And since I've been so

21   abused by the government to the extent of being

22   falsely charged, falsely tried and then sent to

23   prison as a misdemeanor, I figure I'm the guy

24   that is -- is very motivated to stand up against

25   this nonsense.

USCA4 Appeal: 22-1198    Doc: 59       Filed: 05/25/2022   Pg: 20 of 300

Andrew Napolitano - April 15, 2021

183

1          MR. CAVUTO:  But a couple of weeks

2     ago, you were the establishment; right?  You were

3     running for the Republican nomination?

4          MR. BLANKENSHIP:  It's the same --

5     it's the same -- it's the same government

6     that's -- I'm sorry?

7          MR. CAVUTO:  A couple of weeks ago,

8     you were the establishment, you were running for

9     the Republican nomination.

10          Now, it just seems that after

11     failing to get it --

12          MR. BLANKENSHIP:  Well --

13          MR. CAVUTO:  -- and placing third,

14     you're bitter and you're angry.  And now you're

15     non-establishment, and you're running apart from

16     those parties; right?

17          MR. BLANKENSHIP:  Well, again, you

18     can say that, but that's not true.  I ran on the

19     platform of not voting for Mitch McConnell and on

20     the platform of balancing the budget and on the

21     platform of stopping the efforts to police the

22     world, which West Virginians believe in.

23          MR. CAVUTO:  But didn't West

24     Virginians vote accordingly --

25          MR. BLANKENSHIP:  Fox News --

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 21 of 300

184

1           MR. CAVUTO:  -- didn't West

2   Virginians vote accordingly and say whatever the

3   merits of your argument, sir, you were not their

4   cup of tea, they opted for someone else.  You

5   were third.

6           MR. BLANKENSHIP:  Well, they --

7   they didn't run on the facts.  They ran on what

8   Fox News and others were saying that I was a

9   felon, including you know, President Trump's

10  son --

11          MR. CAVUTO:  That was hardly a

12  mistruth -- just to be clear, are you saying that

13  West Virginia residents and voters were duped,

14  the ones who opted for two other candidates were

15  duped?

16          MR. BLANKENSHIP:  Yes.  I'm saying

17  that they were mislead by everything from the

18  President's son to six or seven Republican

19  senators to the Department of Justice.  And a

20  whole host of other people because everyone

21  joined into this lie about my having something to

22  do with the explosion.

23          I was never even tried for anything

24  to do with the explosion.  And that President

25  Obama claimed that he knew what happened at the

USCA4 Appeal: 22-1198    Doc: 59       Filed: 05/25/2022    Pg: 22 of 300

197

1    that sends a signal that it was a felony.

2              I don't know how Manslaughter could

3    not be a felony even though we all know he was

4    not charged and was not convicted of

5    Manslaughter.

6    BY MR. SIMPKINS:

7         Q.   Okay.  Just so I'm clear, you stated on

8    "Outnumbered" that he was convicted -- or he went

9    to jail for Manslaughter but on Cavuto, you

10   said -- you classified him as a convicted felon.

11             MR. REGAN:  Objection.

12             THE WITNESS:  On Cavuto I

13   characterized what I had said on "Outnumbered" as

14   a "convicted felon."

15   BY MR. SIMPKINS:

16        Q.   Any reason you didn't say "Manslaughter"

17   on Cavuto's episode?

18        A.   I don't know.

19        Q.   Okay.  So your correction on the May

20   25th was still not accurate, Judge; is that

21   correct?

22        A.   Your own client in the same interview

23   accused me of calling him a "felon" which at that

24   point, had not been the case.

25             So, I am not the only person using

Andrew Napolitano - April 15, 2021

230

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  CHARLESTON DIVISION
 3   DON BLANKENSHIP,      §
                          §
 4        Plaintiff,      §
                          §
 5   v.                   § Case No.:  2:19-cv-00236
                          §
 6   FOX NEWS NETWORK,     §
     L.L.C., et al.       §
 7                        §
          Defendants.     §
 8
          REMOTE VIDEOTAPED ORAL DEPOSITION OF
 9              ANDREW PETER NAPOLITANO
10                  April 15, 2021

11
          I, Suzanne Kelly, RDR, CRR, in and for the State
12   of Texas hereby certify to the following:

13        That the witness, ANDREW PETER NAPOLITANO, was
     duly sworn by the officer and that the transcript of
14   the videotaped oral deposition is a true record of the
     testimony given by the witness;
15
          That the deposition transcript was submitted on
16   the _____ day of _____, 2021, to the witness for
     examination, signature and return to Suzanne Kelly by
17   the _____ day of _____, 2021;

18        That the amount of time used by each party at the
     deposition is as follows:
19
          Mr. Simpkins:  Three hours and 34 minutes used;
20
          That pursuant to the information given to the
21   deposition officer at the time said testimony was
     taken, the following includes counsel for all parties
22   of record:

23

24

25
```

www.LexitasLegal.com/Premier     Lexitas          888-267-1200
4367

231

```
 1   Jeffery S. Simpkins, Esq.
     SIMPKINS LAW
 2   102 E. 2nd Avenue
     Williamson, West Virginia 25661
 3   304.235.2735
     simpkinslawoffice@gmail.com
 4
     Matthew Heins, Esq.
 5   WILLIAMS & CONNOLLY, L.L.P.
     725 12th Street NW
 6   Washington, D.C. 20005
     202.434.5073
 7   mheins@wc.com
 8   BreiAnne Varner Redd, Esq.
     DICKIE McCAMEY
 9   2001 Main Street
     Suite 501
10   Wheeling, West Virginia 26003-2854
     304.233.1022
11   bredd@dmclaw.com
12   Jared M. Tully, Esq.
     FROST BROWN TODD, L.L.C.
13   United Bank Building
     500 Virginia Street, East
14   Suite 1100
     Charleston, West Virginia 25301
15   304.348.2404
     jtully@fbtlaw.com
16
     Shawn Patrick Regan, Esq.
17   HUNTON ANDREWS KURTH, L.L.P.
     200 Park Avenue
18   New York, New York 10166
     212.309.1046
19   sregan@HuntonAK.com
20   J. Zak Ritchie, Esq.
     HISSAM FORMAN DONOVAN RITCHIE, P.L.L.C.
21   707 Virginia Street East
     Suite 260
22   Charleston, West Virginia 25301
     304.615.2887
23   zritchie@hfdrlaw.com
24
25
```

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 25 of 300
Case 2:19-cv-00236   Document 1059-6   Filed 12/10/21   Page 17 of 17 PageID #: 18619

Andrew Napolitano - April 15, 2021

232

```
 1   Caesar Kalinowski, IV, Esq.
     DAVIS WRIGHT TREMAINE
 2   920 Fifth Avenue
     Suite 3300
 3   Seattle, Washington 98104
     206.757.8282
 4   caesarkalinowski@dwt.com
 5       I further certify that I am neither counsel for,
     related to, nor employed by any of the parties or
 6   attorneys in the action in which this proceeding was
     taken, and further that I am not financially or
 7   otherwise interested in the outcome of the action.
 8       In witness whereof, I have this date subscribed my
     name on this ___ day of _____, 2021.
 9
10
11                  Suzanne Kelly
                    <%signature%>
12                  Suzanne Kelly, RDR, CRR
                    Expiration Date:  12-31-18
13                  LEXITAS
                    Firm Registration No. 736
14                  Suite 118
                    999 Old Eagle School Road
15                  Wayne, Pennsylvania 19087-1707
                    215.494.7650
16
     JOB NO.:  2021-787438
17
18
19
20
21
22
23
24
25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DON BLANKENSHIP,                     )
                                     )
            Plaintiff,               )
                                     )
      v.                             )          Civil Action No.: 2:19-cv-00236
                                     )
FOX NEWS NETWORK LLC, et al.,        )
                                     )
            Defendants.              )


**35TH PAC'S MOTION FOR SUMMARY JUDGMENT**

Defendant 35th PAC, pursuant to Federal Rule of Civil Procedure 56, respectfully moves for summary judgment in its favor and dismissing all claims brought against it in this matter, together with such further relief as this Court may deem just and proper.

The grounds for this motion are set forth in the accompanying memorandum of law. The exhibits in support of this motion are in the accompanying attached exhibits.

WHEREFORE, 35th PAC respectfully requests that the Court grant its motion for summary judgment in its favor and to dismiss all claims brought against it in this matter, together with such further relief as this Court may deem just and proper.

Respectfully submitted this 24th day of May, 2021.


*/s/ Zachary M. Wallen*
Zachary M. Wallen, Esquire
WV ID #11594
Chalmers & Adams LLC
zwallen@chalmersadams.com
301 South Hills Village Drive

Suite LL200-420
Pittsburgh, PA 15241
Tel.: (412) 200-0842
Fax: (412) 235-5001

*Attorney for Defendant*
*35th PAC*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DON BLANKENSHIP,                          )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )       Civil Action No.: 2:19-cv-00236
                                          )
FOX NEWS NETWORK, LLC,                    )
et al.,                                   )
                                          )
                    Defendants.           )


**CERTIFICATE OF SERVICE**

I, Zachary M. Wallen, certify that on May 24, 2021, a true and correct copy of the foregoing was served via CM/ECF on all counsel of record in this action registered to receive CM/ECF notification.


/s/ Zachary M. Wallen
Zachary M. Wallen, Esquire
WV ID #11594
Chalmers & Adams LLC
zwallen@chalmersadams.com
301 South Hills Village Drive
Suite LL200-420
Pittsburgh, PA 15241
Tel.: (412) 200-0842
Fax: (412) 235-5001

*Attorney for Defendant*
*35th PAC*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | |
|---|---|
| DON BLANKENSHIP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Civil Action No.: 2:19-cv-00236 |
| | ) |
| FOX NEWS NETWORK LLC, et al., | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF CHARLES GANTT

Comes now the affiant, Charles Gantt, who being duly sworn, deposes and says:

1) I am a resident of the Commonwealth of Massachusetts and am an experienced professional in providing treasury services to political action committees and other fundraising driven organizations. I perform these services through Bulldog Compliance, a DBA of Red Curve Solutions, LLC, a Massachusetts limited liability company, of which I am the Senior Vice President.

2) Since March 2017, I have provided treasury services to 35th PAC, f/k/a 35th, Inc. In fulfillment of Bulldog Compliance's treasury services contract, I serve as 35th PAC's Treasurer and was 35th PAC's sole corporate officer at the time of the events giving rise to this lawsuit.

3) My responsibilities as Treasurer of 35th PAC consist of keeping the organization's financial records and filing all required reports with the Federal Election Commission.

4) As my role solely deals with 35th PAC's financial affairs, I was not responsible for any of the communications of 35th PAC, which were made by other members of the client team. I did not have any involvement with the Tweet giving rise to this lawsuit.

5) At no point during the 2018 West Virginia Senate campaign did I engage in a conspiracy

with the NRSC, Kevin McLaughlin, or any other person or organization to defame Don Blankenship
or to engage in false light invasion of privacy.

6) To the best of my knowledge as the Treasurer of 35th PAC and the sole corporate officer
of 35th PAC at the time of the events in question, no other person connected with 35th PAC engaged
in any sort of conspiracy with the NRSC, Kevin McLaughlin, or any other person or organization to
defame Don Blankenship or to engage in false light invasion of privacy.

Charles Gantt

Sworn to and subscribed
before me this ⎯⎯day of May, 2021.

Notary Public
My Commission Expires:



EDWARD D. STEVENSON
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
June 21, 2024

Page 2 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DON BLANKENSHIP,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )        Civil Action No.: 2:19-cv-00236
                                          )
FOX NEWS NETWORK LLC, et al.,             )
                                          )
            Defendants.                   )

### AFFIDAVIT OF DAVID JAMES ECKERT

Comes now the affiant, David James Eckert, who being duly sworn, deposes and says:

1) I am a resident of the State of North Carolina and am an experienced political communications professional having worked in a variety of capacities for a number of political campaigns and committees since 2008. I am known professionally as D.J. Eckert.

2) In late 2017, through my company DJE Consulting, LLC, I was engaged to provide strategic consulting services, and to serve as the Executive Director, of 35th Inc, an independent expenditure-only political committee registered with the Federal Election Commission. I was contracted to provide such services to 35th Inc. through the November 2018 General Election.

3) The purpose of 35th Inc. was to create independent expenditure communications and messaging in support of 35th Inc.'s preferred candidate for U.S. Senate from West Virginia, Attorney General Patrick Morrisey.

4) In compliance with the requirements of federal campaign finance law concerning coordination, 35th Inc. operated independently from Attorney General Morrisey's campaign and any political party committee, such as the Republican National Committee ("RNC") or National

Page 1 of 4

Republican Senatorial Committee ("NRSC").

5) My role as Executive Director was to be responsible for the day-to-day operations of the 35th Inc., including operating 35th Inc.'s social media accounts, including its Twitter account (@35thPAC).

6) It was a part of 35th Inc.'s usual practices and procedures for all of its communications to be vetted by legal counsel prior to being disseminated, in order to ensure that all such communications were legally correct and contained all disclaimers required by federal law.

7) In the leadup to the 2018 Primary Election, 35th Inc.'s focus was to support the candidacy of Attorney General Patrick Morrisey and to educate voters about the record of his main opponent, then-Congressman Evan Jenkins. In addition, 35th Inc. created some communications highlighting the record of Don Blankenship, another opponent of Attorney General Morrisey in that race.

8) As a part of my duties for 35th Inc., I was responsible for monitoring news stories concerning the West Virginia Senate Election. From that, I was aware of Don Blankenship's criminal conviction and subsequent incarceration in connection with the Upper Big Branch Mine disaster.

9) I recall reading news articles describing Don Blankenship as having been a felon as a result of his criminal conviction. I do not expressly recall which particular articles I read, but they were the types of articles in newspapers and other media sources that I would have found in a Google search or that would have been shared by others across social media.

10) I am not a lawyer and I did not review the court pleadings in connection with Mr. Blankenship's criminal case.

11) On April 10, 2018, in response to a Tweet made by Mr. Blankenship, 35th Inc. authored a Tweet that said "You are a convicted felon hurting West Virginia families. That's why

@realDonald    Trump    administration    won't    help    you    #wvsen

https://www.wvgazettemail.com/news/trump-doj-urges-court-to-not-hear-blankenship-

appeal/article_ee34035c-568a-508f-a2b8-a1f4a1865fa5.html"

12) The hyperlink in 35th Inc.'s Tweet linked to an article in the Charleston Gazette-Mail

about Mr. Blankenship's appeal of his criminal conviction.

13) The reference to Mr. Blankenship as a "felon" was based on what we believed to have

been Mr. Blankenship's criminal status following Mr. Blankenship's conviction in federal court,

and was based on our team's research into Mr. Blankenship's biography and his criminal

conviction.  This Tweet and the link to the Charleston Gazette-Mail article was an attempt to

accurately highlight Mr. Blankenship's legal status based on how we understood it as of April 10,

2018, as it pertained to Mr. Blankenship's qualifications to serve as U.S. Senator from West

Virginia.

14) I had no knowledge that Mr. Blankenship's criminal conviction may not have classified

Mr. Blankenship as a "felon" for purposes of how that term is defined under federal and West

Virginia law.

15) I do not recall whether the April 10, 2018 Tweet was vetted by 35th Inc.'s legal counsel

prior to being disseminated, although that would have been 35th Inc.'s usual practice and

procedure.

16) The communication did not knowingly incorrectly refer to Mr. Blankenship as a felon,

as it is my practice as an experienced communications professional to always seek to make accurate

statements in my organization's communications.

17) When 35th Inc. later learned that there was some dispute over whether Mr. Blankenship

could be correctly and accurately described as a "felon", 35th Inc. never again referred to Mr.

Blankenship as a "felon" in any of 35th Inc.'s subsequent Twitter posts.  For example, on May 6,

2018, a Tweet 35th Inc. posted referencing Mr. Blankenship referred to Mr. Blankenship as "a convicted criminal" in order to refer to Mr. Blankenship's criminal conviction in an unambiguously correct manner.

18) At no point during the 2018 West Virginia Senate campaign did I engage in a conspiracy with the NRSC, Kevin McLaughlin, or any other person or organization to defame Don Blankenship or to engage in false light invasion of privacy.

19) To the best of my knowledge as the Executive Director of 35th Inc. at the time of the events in question, no other person connected with 35th Inc. engaged in any sort of conspiracy with the NRSC, Kevin McLaughlin, or any other person or organization to defame Don Blankenship or to engage in false light invasion of privacy.

David James Eckert

Sworn to and subscribed
before me this 24 day of May, 2021.

Notary Public
My Commission Expires:

CINTIA J. DIAZ CUBAS
NOTARY PUBLIC
MECKLENBURG COUNTY
NORTH CAROLINA
MY COMMISSION EXPIRES 12/10/2025

Page 4 of 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

DON BLANKENSHIP,

     *Plaintiff*,

v.                         Case No. 1:20-cv-00429

KEVIN MCLAUGHLIN, *et al.*,

     *Defendants*.

## STIPULATED DISMISSAL WITH PREJUDICE
## UNDER FED. R. CIV. P. 41(a)(1)(A)(ii)

Plaintiff Don Blankenship, together with defendant Kevin McLaughlin, hereby stipulate

that all claims against McLaughlin in the above-captioned action be voluntarily dismissed with

prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).

Date:  December 11, 2020          Respectfully Submitted,

DON BLANKENSHIP              KEVIN MCLAUGHLIN

| | |
|---|---|
| By: */s/ M. F. Connell Mullins, Jr.* | */s/ Nikki L. McArthur* |
| M. F. Connell Mullins, Jr. (VSB No. 47213) | Michael A. Carvin* |
| Kasey L. Hoare (VSB No. 92289) | David S. Torborg* |
| Spotts Fain PC | Anthony J. Dick* |
| 411 East Franklin Street, Suite 600 | Nikki L. McArthur (Va. Bar No. 84174) |
| Richmond, Virginia 23219 | Stephen J. Kenny* |
| (804) 697-2000 (Telephone) | JONES DAY |
| (804) 697-2100 (Facsimile) | 51 Louisiana Ave., NW |
| cmullins@spottsfain.com | Washington, DC, 20001-2113 |
| khoare@spottsfain.com | Tel.: 202-879-3939 |
| | Fax: 202-626-1700 |
| Jeremy Gray* | macarvin@jonesday.com |
| Peter Scott* | dstorborg@jonesday.com |
| Lisa Zepeda* | ajdick@jonesday.com |
| Zachary Gidding* | nmcarthur@jonesday.com |
| Saam Takaloo* | skenny@jonesday.com |
| Padideh Zargari* | |
| Early Sullivan Wright Gizer & McRae LLP | * *Pro hac vice* |
| 6420 Wilshire Blvd., 17th Floor | |
| Los Angeles, CA 90048 | *Counsel for Defendant Kevin McLaughlin* |

323.301.4660
jgray@earlysullivan.com
pscott@earlysullivan.com
lzepeda@earlysullivan.com
zgidding@earlysullivan.com
stakaloo@earlysullivan.com
pzargari@earlysullivan.com

Jeffrey Scott Simpkins*
Simpkins Law Office
102 East Second Avenue
Williamson, WV 25661
304-235-2735
Fax: 304/235-2737
simpkinslawoffice@gmail.com

*Pro hac vice*

*Counsel for Plaintiff Don Blankenship*

## CERTIFICATE OF SERVICE

I certify that on December 11, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated: December 11, 2020                                    */s/ Nikki L. McArthur*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | | |
|---|---|---|
| DON BLANKENSHIP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2:19-cv-00236 |
| | ) | |
| HONORABLE ANDREW NAPOLITANO | ) | |
| (RET.), et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT 35TH PAC'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTEROGATORIES AND SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant 35th PAC ("35th PAC") serves the following objections and responses (collectively, "Responses") to Plaintiff Don Blankenship's First Set of Interrogatories and Second Request for Production of Documents ("Requests"):[1]

Each of Plaintiff's Requests, including the Definitions and instructions, are subject to the general objections set forth below. These general objections form a part of 35th PAC's Responses even though they may not be specifically referred to in each Response. Failure to incorporate any of these general objections into any specific Response should not be construed as a waiver. 35th PAC's Responses reflect its best information at this point in the case.

## GENERAL OBJECTIONS

1.      35th PAC objects to Plaintiff's Requests to the extent they expand upon, differ from, contradict, or seek to impose obligations in addition to those set forth in the Federal Rules

---

[1] 35th PAC was served with an initial request for production of documents in May 2020 (the "1st RFP").  While this new set of requests is not numbered "second", the Requests were the second request for production of documents made by Plaintiff and are referred to herein accordingly.

or Local Rules of this Court. 35th PAC also objects to each definition and instruction in the Requests to the extent that any definition or instruction seeks to impose obligations inconsistent with or in addition to those imposed by the Federal Rules, the Local Rules, and orders of the Court governing discovery in this case.

2.      35th PAC objects to the Requests to the extent that they are overly broad, unduly burdensome, or unwarranted.

3.      35th PAC objects to each Request to the extent it is vague, ambiguous, or not stated with reasonable particularity, including but not limited to containing words and/or phrases that are not defined, thereby rendering the Request overbroad, vague, and ambiguous

4.      35th PAC objects to each Request to the extent it does not specify dates and thus is overly broad and ambiguous.

5.      35th PAC objects to each Request to the extent it seeks irrelevant information and to the extent that the Requests seek to elicit information that is neither relevant nor proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

6.      35th PAC objects to each Request to the extent that it seeks to elicit information that is relevant to claims or defenses only as to defendants in this case other than 35th PAC.

7.      35th PAC objects to the Requests to the extent that they seek information protected from discovery by the attorney-client privilege and/or work product doctrine. 35th PAC objects to the extent that Plaintiff defines "35th PAC" and "Defendant" to include "attorneys" or otherwise intends to require 35th PAC to reveal information protected from discovery by the attorney-client privilege and/or work product doctrine. In addition, 35th PAC

objects to the Requests to the extent they seek information protected under any privilege recognized under federal or applicable state law, including but not limited to any applicable constitutional, statutory or common law protection for political affiliations, speech, and activities. Any disclosure of privileged information would be inadvertent and should not be deemed a waiver of any privilege.

8.     35th PAC objects to each Request to the extent that it seeks information that is or may be confidential or information otherwise protected by any right of privacy. Such information will not be provided. 35th PAC objects to the extent that there is no stipulated protective order on file in this proceeding.

9.     35th PAC objects to each Request to the extent that it seeks proprietary business information, trade secrets, or other confidential information. Such information will not be provided. 35th PAC objects to the extent that there is no stipulated protective order on file in this proceeding.

10.     35th PAC objects to each Request to the extent that it seeks information from persons, companies, or entities other than 35th PAC. 35th PAC further objects to the extent each Request seeks information not within 35th PAC's custody, control, or possession.

11.     35th PAC objects to all Requests to the extent they seek information that could be more easily obtained or may have already been obtained from other parties. To this extent, the Requests are overbroad and unduly burdensome.

12.     35th PAC objects generally to the Requests to the extent that they seek to have 35th PAC furnish information and identify documents that are a matter of the public record, and therefore, are equally available to Plaintiff as they are to 35th PAC on grounds that such request imposes an unreasonable or undue expense on 35th PAC.

13.     35th PAC objects to each Request to the extent it seeks information that cannot be

obtained by 35th PAC.

14.    35th PAC objects to producing documents that cannot be located after a reasonable search.

15.    35th PAC objects to producing electronically stored information that is not reasonably accessible because of undue burden or costs.

16.    35th PAC will not deem Plaintiff's Requests to be continuing and will not automatically supplement its responses thereto, except that supplementation will be provided as is specifically required by the Federal Rules.

17.    By these Responses, 35th PAC does not, and does not intend to: (1) waive any objections as to the admissibility of evidence or the competency of, relevancy of, materiality of, or privilege attaching to any information disclosed in these responses; or (2) waive the right to object to other discovery requests or undertakings involving or reflecting the subject matter requested herein. These Responses do not constitute, nor should they be construed as, admissions with respect to the relevance or admissibility of any evidence or document identified herein, or the truth or accuracy of any statement, characterization, or other information contained in such document. 35th PAC expressly does not concede the relevance or materiality of any of these responses or the subject matter to which they refer.

18.    35th PAC reserves the right to object on any ground at any time to a demand for further responses to Plaintiff's Requests or to further Requests.

19.    These Responses to the Requests are based upon information currently known or believed to be true by 35th PAC. 35th PAC reserves the right to modify or supplement its Objections and Responses upon completion of its discovery, internal investigation, and preparation for the trial of this matter, and to use at trial, or in any motion or deposition, any documents, facts, or supporting evidence of any sort later developed or discovered.

USCA4 Appeal: 23-1198      Doc: 59         Filed: 05/25/2022      Pg: 42 of 300

## SPECIFIC OBJECTIONS AND RESPONSES

**Interrogatories**

**Interrogatory No. 1:** Identify every person who provided answers to these interrogatories.

      **RESPONSE:** Charles Gantt, 35th PAC's Treasurer. Information was also provided by 35th PAC's legal counsel.

**INTERROGATORY NO. 2:** Identify the person who published the tweet by Defendant on or about 10 April 2018 that falsely described Plaintiff as a "convicted felon."

      **RESPONSE:** Based on the allocation of duties at the time of the tweet in question, 35th PAC believes that the tweet was made by its vendor, D.J. Eckert. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 3:** Identify the person who authorized publication of the tweet by Defendant on or about 10 April 2018 that falsely described Plaintiff as a "convicted felon."

      **RESPONSE:** To the best of 35th PAC's knowledge and belief, the tweet was solely made by 35th PAC's vendor, D.J. Eckert. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 4:** Identify every person and/or organization that was/were consulted regarding the tweet by Defendant on or about 10 April 2018 that falsely described Plaintiff as a "convicted felon" prior to publication.

      **RESPONSE:** 35th PAC is not aware of any additional people and/or organizations that were consulted regarding the tweet by 35th PAC on or about April 10, 2020 describing Plaintiff as a convicted felon, prior to the tweet's publication. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 5:** Identify every person who has information about the tweet published by Defendant on or about 10 April 2018 that falsely described Plaintiff as a "convicted felon".

**RESPONSE:** 35th PAC objects to this question to the extent it seeks information subject to attorney-client or First Amendment privilege. Subject to and notwithstanding the foregoing objection, 35th PAC is not aware of any individuals other than those listed in 35th PAC's initial disclosures who have any information related to this action. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 6:** Identify every source that Defendant relied upon to describe Plaintiff as a "convicted felon" in the tweet published by Defendant on or about 10 April 2018.

**RESPONSE:** As 35th PAC believes that the tweet in question was sent by a third-party vendor whose services had concluded at the time of the commencement of this litigation, 35th PAC is not aware of what particular sources that vendor may have relied upon as the basis for the tweet's content, as that information is outside of 35th PAC's knowledge, custody, control, or possession. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 7:** Identify every person or organization that Defendant communicated with regarding the false description of Plaintiff as a "convicted felon" in the tweet published by Defendant on or about 10 April 2018.

**RESPONSE:** 35th PAC objects to this question as impermissibly vague, as it is not clear whether Plaintiff is seeking direct communications, which would be fully subsumed by 35th PAC's Responses to Interrogatories 4 and 5, or whether Plaintiff is seeking information as to who received the tweet in question. 35th PAC also objects to this interrogatory to the extent Plaintiff seeks information subject to attorney-client or First Amendment privilege. 35th PAC further objects to the extent this interrogatory seeks a listing of 35th Inc.'s Twitter followers as of April 10, 2018, as such a request is overly burdensome and disproportionate to the scope of the litigation. Subject to and notwithstanding the foregoing objections, 35th PAC is not aware of any individuals other than

those listed in 35th PAC's initial disclosures and its counsel who have any information related to this action. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 8:** Identify every person who notified Defendant that Plaintiff was a misdemeanant before the Defendant published the tweet which falsely described Plaintiff as a "convicted felon" on or about 10 April 2018.

> **RESPONSE:** 35th PAC objects to this question to the extent it seeks information subject to attorney-client privilege or the work-product doctrine. Subject to and notwithstanding the foregoing, 35th PAC is not aware of any specific individuals "who notified Defendant that Plaintiff was a misdemeanant before the Defendant published the tweet  . . ." 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 9:** Identify every person who notified Defendant that Plaintiff was a misdemeanant after the Defendant published the tweet which falsely described Plaintiff as a "convicted felon" on or about 10 April 2018.

> **RESPONSE:** 35th PAC objects to this question to the extent it seeks information subject to attorney-client privilege or the work-product doctrine. Subject to and notwithstanding the foregoing objection, 35th PAC is not aware of any specific individuals "who notified Defendant that Plaintiff was a misdemeanant after the Defendant published the tweet  . . ." 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 10:** Summarize in detail every policy and procedure followed by Defendant to ensure the accuracy of published content.

> **RESPONSE:** 35th PAC hired outside third-party vendors who were responsible for the conduct of the PAC's social media activities, including the tweet that is the subject of this litigation.  35th PAC's vendors were required to exercise the duty of reasonable care in the conduct

of their services to 35th PAC. 35th PAC also had the standard practice of having legal counsel review all of its communications prior to dissemination. Defendant 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 11:** Summarize in detail why Defendant did not issue a corrective tweet after falsely describing Plaintiff as a "convicted felon" in the tweet published by Defendant on or about 10 April 2018

     **RESPONSE:** As noted above, 35th PAC hired outside third-party vendors who were responsible for the conduct of the PAC's social media activities. Further, 35th PAC is a wound-down political committee, whose limited records are largely financial in nature.  As such, 35th PAC has no direct knowledge or records as to why any particular decisions were made concerning 35th PAC's social media accounts. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 12:** Summarize in detail all communications regarding Plaintiff between Defendant and West Virginia Attorney General Patrick Morrisey ("Morrisey"), including Morrisey's employees, agents, and/or surrogates.

     **RESPONSE:** 35th PAC has no records of, or any direct knowledge of any communications regarding Plaintiff between itself and Attorney General Morrisey, or any of Attorney General Morrisey's employees, agents, and/or surrogates, other than privileged communications about legal compliance between their respective legal counsel. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 13:** Summarize in detail all communications between Defendant and Morrisey, including Morrisey's employees, agents, and/or surrogates, regarding the tweet published by Defendant on or about 10 April 2018 that falsely described Plaintiff as a "convicted felon".

     **RESPONSE:** 35th PAC objects to this request is duplicative of, or subsumed within,

Interrogatory No. 12. 35th PAC incorporates herein its response to Interrogatory No. 12.

**INTERROGATORY NO. 14:** Summarize in detail all communications regarding Plaintiff between Defendant and the National Republican Senatorial Committee "NRSC").

 **RESPONSE:** 35th PAC has no records of, or any direct knowledge of any communications regarding Plaintiff between itself and the NRSC. 35th PAC would note that any such communication would have been barred by federal law. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 15**: Does Defendant have any knowledge and/or information regarding the "menu of options" created by the NRSC to defeat Plaintiff's candidacy in the 2018 West Virginia United States Senate primary election? If so, then summarize in detail the subject matter of the "menu of options" and identify the authors thereof.

 **RESPONSE:** No, 35th PAC does not possess any knowledge concerning an alleged "menu of options" created by the NRSC to defeat Plaintiff in the 2018 West Virginia United States Senate primary election, except to the extent such allegations have been made by Plaintiff during the course of this litigation. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 16:** Summarize in detail all communications regarding Plaintiff between Defendant and former NRSC Chairman Cory Gardner.

 **RESPONSE:** 35th PAC has no records of, or any direct knowledge of any communications regarding Plaintiff between itself, or any of its representatives, and Senator Cory Gardner. 35th PAC would note that any such communication would have been barred by federal law. Defendant 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 17:** Summarize in detail all communications regarding Plaintiff

between Defendant and former NRSC Executive Director Chris Hansen.

**RESPONSE:** 35th PAC has no records of, or any direct knowledge of any communications regarding Plaintiff between itself, or any of its representatives, and Chris Hansen. 35th PAC would note that any such communication would have been barred by federal law. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 18:** Summarize in detail all communications regarding Plaintiff between Defendant and former Senate Majority Leader Mitch McConnell.

**RESPONSE:** 35th PAC has no records of, or any direct knowledge of any communications regarding Plaintiff between itself, or any of its representatives, and Senator Mitch McConnell. 35th PAC would note that any such communication would have been barred by federal law. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 19:** Summarize in detail all communications regarding Plaintiff between Defendant and Benjamin Ottenhoff and/or Mountain Families PAC.

**RESPONSE:** 35th PAC has no records of, or any direct knowledge of any communications regarding Plaintiff between itself, or any of its representatives, and Benjamin Ottenhoff and/or Mountain Families PAC. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 20:** Summarize in detail all communications regarding Plaintiff between Defendant and Kevin McLaughlin.

**RESPONSE:** 35th PAC has no records of, or any direct knowledge of any communications regarding Plaintiff between itself, or any of its representatives, and Kevin McLaughlin. 35th PAC would note that any such communication would have been barred by federal law. Defendant 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 21:** Summarize in detail all communications regarding Plaintiff between Defendant and any other party defendant in this Civil Action.

**RESPONSE:** 35th PAC objects to this question to the extent it seeks information subject to attorney-client privilege or the work-product doctrine. Subject to and notwithstanding the foregoing objection, 35th PAC has no records of, or any direct knowledge of any communications regarding Plaintiff between itself, or any of its representatives, and any other party defendant in this Civil Action. Defendant 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 22:** Summarize in detail the involvement of Bulldog Compliance as follows: (a) How did Bulldog Compliance become involved with Defendant?; (b) What services did Bulldog Compliance render for Defendant; (c) Why was Charles Gantt chosen to be Defendant's treasurer.

**RESPONSE:** 35th PAC objects to this request as overbroad, irrelevant, and not likely to result in information relevant to this action. Notwithstanding and subject to the foregoing objection, Bulldog Compliance was hired by 35th PAC to provide treasury services since its formation in March of 2017. Charles Gantt, as Senior Vice President of Bulldog Compliance, frequently serves as treasurer for organizations for which Bulldog Compliance provides treasury services, as it facilitates organizational banking and related financial compliance.

**INTERROGATORY NO. 23:** Who solicited contributions to Defendant?

**RESPONSE:** 35th PAC objects to this request as overbroad, irrelevant, and not likely to result in information relevant to this action. Notwithstanding and subject to the foregoing objection, 35th PAC hired 1735 Group, LLC to provide fundraising services during the time that 35th PAC was an active organization. No one is presently providing fundraising services to 35th PAC, as 35th PAC intends to terminate upon the conclusion of this litigation. 35th PAC reserves the right to

supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 24:** Summarize in detail the methodology used by Defendant to solicit contributions.

**RESPONSE:** 35th PAC objects to this request as overbroad, irrelevant, and not likely to result in information relevant to this action. Notwithstanding and subject to the foregoing objection, per the fundraising agreement with 1735 Group, LLC, 1735 Group LLC was responsible for rendering the following services to 35th PAC: Provide prospective donor lists for approval; Organize calls and meeting with prospective donors, as well as upgrade donors as mutually agreed upon between Committee and Consultant, and handle all related follow-up; Organize and execute fundraising events when and where needed; Assist in directly raising money; and Work toward meeting and exceeding quarterly goals/benchmarks as mutually agreed upon between Committee and Consultant. Beyond the foregoing information, 35th PAC does not possess any additional relevant information that would enable it to respond to this question. As noted in its response to Interrogatory No. 23, 35th PAC's fundraising was undertaken by outside vendors, who are no longer under 35th PAC's direction or control. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 25:** Summarize in detail all communications regarding Plaintiff between Defendant and any other person or organization that contributed to Defendant.

**RESPONSE:** 35th PAC objects to this Request to the extent it seeks information protected by the First Amendment Privilege concerning political speech, affiliation, and activities, as it seeks information about the operations of a political committee, notwithstanding whether such information relates to Plaintiff's causes of action against 35th PAC for defamation, false light invasion of privacy, and conspiracy, and would have the potential to chill political speech. 35th PAC further objects to this request as overbroad, irrelevant, and not likely to result in information

relevant to this action, as "all" communications with donors concerning a political opponent of 35th PAC would not relate to Plaintiff's causes of action against 35th PAC for defamation, false light invasion of privacy, and conspiracy. Without waiving, and subject to, the foregoing objections, 35th PAC is not aware, or in possession of any records, of any communications with any donors concerning Plaintiff and the factual allegations disputed by 35th Inc. in this lawsuit. 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 26:** Identify every organization that rendered polling services for or on behalf of Defendant and/or Morrisey.

**RESPONSE:** 35th PAC objects to this request as overbroad, irrelevant, and not likely to result in information relevant to this action. Furthermore, 35th PAC objects to this interrogatory to the extent it seeks information related to the Morrisey campaign, which is outside of 35th PAC's custody, control, or possession. Subject to and notwithstanding the foregoing objections, 35th PAC employed the outside vendors, IMGE LLC, Harper Polling LLC, and Fabrizio Lee for polling services in 2017 and 2018.

**INTERROGATORY NO. 27:** Did Defendant conduct a political poll during the 2018 West Virginia United States Senate primary election in which respondents were hypothetically questioned whether they would vote for Plaintiff if Plaintiff was a "felon"?

**RESPONSE:** 35th PAC objects to this request as overbroad, irrelevant, and not likely to result in information relevant to this action. Notwithstanding and subject to the foregoing objection, 35th PAC does not possess any records or have any knowledge of conducting a political poll during the 2018 West Virginia United States Senate primary election in which respondents were hypothetically questioned whether they would vote for Plaintiff if Plaintiff was a "felon.  As noted previously in Interrogatory No. 26, 35th PAC's polling was undertaken by outside vendors, who are no longer under 35th PAC's direction or control. Defendant 35th PAC reserves the right to

supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 28:** Does Defendant have any knowledge and/or information regarding a political poll conducted during the 2018 West Virginia United States Senate primary election in which respondents were hypothetically questioned whether they would vote for Plaintiff if Plaintiff was a "felon"? If so, then identify the candidate or the organization that conducted the poll and the date thereof.

**RESPONSE:** 35th PAC objects to this request as overbroad, irrelevant, and not likely to result in information relevant to this action. Notwithstanding and subject to the foregoing objection, 35th PAC does not possess any records or have any knowledge of any political poll during the 2018 West Virginia United States Senate primary election in which respondents were hypothetically questioned whether they would vote for Plaintiff if Plaintiff was a "felon. Defendant 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 29:** Summarize in detail Defendant's policy regarding the usage of personal electronic devices for purposes related to Defendant's business.

**RESPONSE:** 35th PAC objects to this request as overbroad, irrelevant, and not likely to result in information relevant to this action. Notwithstanding and subject to the foregoing objection, 35th PAC notes that its operations were largely conducted by outside third-party vendors. 35th PAC did not specifically regulate the use of electronic devices by its vendors. Defendant 35th PAC reserves the right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 30:** Disclose the coverage limits of every insurance policy that provides Defendant with commercial liability insurance coverage.

**RESPONSE:** 35th PAC does not hold any such applicable policies, as was disclosed to Plaintiff in 35th PAC's initial 26(a)(1) disclosures.

**INTERROGATORY NO. 31:** Disclose the coverage limits of every insurance policy that

provides Defendant with commercial access and/or umbrella insurance coverage.

**RESPONSE:** 35th PAC does not hold any such applicable policies, as was disclosed to Plaintiff in 35th PAC's initial 26(a)(1) disclosures.

**Request for Production of Documents**

**REQUEST FOR PRODUCTION NO. 1**: Produce every publication of Defendant that references Plaintiff.

**RESPONSE:** 35th PAC objects to this request is duplicative of, or subsumed within, Plaintiff's 1st RFP, Request No. 1 ("Any and All Documents that Refer or Relate to Plaintiff."), and 35th PAC incorporates herein its Response to 1st RFP Request No. 1, as if set fully forth herein.

**REQUEST FOR PRODUCTION NO. 2**: Produce every document and/or all ESI that references Plaintiff.

**RESPONSE:** 35th PAC objects to this request is duplicative of, or subsumed within, Plaintiff's 1st RFP, Request No. 1 ("Any and All Documents that Refer or Relate to Plaintiff."), and 35th PAC incorporates herein its Response to 1st RFP Request No. 1, as if set fully forth herein.

**REQUEST FOR PRODUCTION NO. 3**: Produce every document and/or all ESI that describes Plaintiff as a "convicted felon."

**RESPONSE:** 35th PAC objects to this request is duplicative of, or subsumed within, Plaintiff's 1st RFP, Request No. 1 ("Any and All Documents that Refer or Relate to Plaintiff."), and 35th PAC incorporates herein its Response to 1st RFP Request No. 1, as if set fully forth herein.

**REQUEST FOR PRODUCTION NO. 4**: Produce every document and/or all ESI that references Plaintiff's misdemeanor conviction.

**RESPONSE:** 35th PAC objects to this request is duplicative of, or subsumed within, Plaintiff's 1st RFP, Request No. 1 ("Any and All Documents that Refer or Relate to Plaintiff."), and 35th PAC incorporates herein its Response to 1st RFP Request No. 1, as if set fully forth herein.

**REQUEST FOR PRODUCTION NO. 5**: Produce every document regarding the political poll commissioned by Morrisey and conducted by or on behalf of IMGE LLC and/or Public Opinion Strategies during 2018 West Virginia Republican United States Senate primary election.

**RESPONSE:** In addition to the its General Objections, which 35th PAC fully incorporates herein, 35th PAC objects as this Request as seeking privileged as well as irrelevant information. Without waiving, and subject to, the foregoing objections, 35th PAC has no responsive documents in its custody, control, or possession regarding "the political poll commissioned by Morrisey and conducted by or on behalf of IMGE LLC and/or Public Opinion Strategies during 2018 West Virginia Republican United States Senate primary election."

**REQUEST FOR PRODUCTION NO. 6**: Produce every document regarding any other internal political poll commissioned by Morrisey and conducted during the 2018 West Virginia Republican United States Senate primary election.

**RESPONSE:** In addition to the its General Objections, which 35th PAC fully incorporates herein, 35th PAC objects as this Request as seeking privileged as well as irrelevant information. Without waiving, and subject to, the foregoing objections, 35th PAC has no responsive documents in its possession, custody, or control regarding "any other internal political poll commissioned by Morrisey and conducted during the 2018 West Virginia Republican United States Senate primary election."

**REQUEST FOR PRODUCTION NO. 7**: Produce all polling data regarding every political poll commissioned by any candidate, person, or organization other than Defendant or Morrisey and

conducted during the 2018 West Virginia Republican United States Senate primary election.

**RESPONSE:** 35th PAC objects to this request is duplicative of, or subsumed within, Plaintiff's 1st RFP, Request No. 53 ("Any and All Documents that Refer or Relate to any polls, surveys or focus groups concerning the views of potential voters in the 2018 West Virginia Primary."), and 35th PAC incorporates herein its Response to 1st RFP Request No. 53, as if set fully forth herein.

**REQUEST FOR PRODUCTION NO. 8**: Produce every document filed by Defendant with the Federal Election Commission during the 2018 West Virginia Republican United States Senate primary election.

**RESPONSE:** In addition to the its General Objections, which 35th PAC fully incorporates herein, 35th PAC objects as this Request is overly broad, unduly burdensome, and seeks irrelevant information. Specifically, 35th PAC objects because Request No. 8 seeks to have 35th PAC furnish information and identify documents that are a matter of the public record, as every document filed by 35th PAC with the Federal Election Commission during the 2018 West Virginia Republican United States Senate primary election is on file with the Federal Election Commission, and therefore, are equally available to Plaintiff as they are to 35th PAC. As such, this request imposes an unreasonable and undue expense on 35th PAC.

Without waiving, and subject to, the foregoing objections, 35th PAC would direct Plaintiff to https://www.fec.gov/data/committee/C00635607/?tab=filings&cycle=2018 where every document filed by 35th PAC with the Federal Election Commission during the 2018 West Virginia Republican United States Senate primary election is available for public inspection and download.

**REQUEST FOR PRODUCTION NO. 9**: Produce a copy of every insurance policy that provides Defendant with commercial liability insurance coverage.

**RESPONSE:** 35th PAC does not hold any such applicable policies, as was disclosed to Plaintiff in 35th PAC's initial 26(a)(1) disclosures.

**REQUEST FOR PRODUCTION NO. 10**: Produce a copy of every insurance policy that provides Defendant with commercial excess and/or umbrella insurance coverage.

**RESPONSE:** 35th PAC does not hold any such applicable policies, as was disclosed to Plaintiff in 35th PAC's initial 26(a)(1) disclosures.

Respectfully submitted this 29th day of October, 2020.

*/s/ Zachary M. Wallen*
Zachary M. Wallen, Esquire
WV ID #11594
Chalmers & Adams LLC
zwallen@cpblawgroup.com
301 South Hills Village Drive
Suite LL200-420
Pittsburgh, PA 15241
Tel.: (412) 200-0842
Fax: (412) 235-5001

*Attorney for Defendant*
*35th PAC*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DON BLANKENSHIP,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        Civil Action No.: 2:19-cv-00236
                                    )
HONORABLE ANDREW NAPOLITANO         )
(RET.), et al.,                     )
                                    )
            Defendants.             )

## CERTIFICATE OF SERVICE

I, Zachary M. Wallen, certify that on October 29, 2020, a true and correct copy of the foregoing Defendant 35th PAC's Responses and Objections to Plaintiff's First Set of Interrogatories and Second Request for Production was electronically served on all counsel of record.

*/s/ Zachary M. Wallen*
Zachary M. Wallen, Esquire
WV ID #11594
Chalmers & Adams LLC
zwallen@cpblawgroup.com
301 South Hills Village Drive
Suite LL200-420
Pittsburgh, PA 15241
Tel.: (412) 200-0842
Fax: (412) 235-5001

*Attorney for Defendant*
*35th PAC*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

| | |
|---|---|
| DON BLANKENSHIP,<br><br>    Plaintiff,<br><br>vs.<br><br>FOX NEWS NETWORK, LLC, et al.<br><br>    Defendants. | Case No.: 2:19-cv-00236<br><br>[Hon. John T. Copenhaver, Jr.] |

## PLAINTIFF DON BLANKENSHIP'S RESPONSES TO FIRST SET OF INTERROGATORIES BY DEFENDANT 35TH PAC

Plaintiff Don Blankenship ("Plaintiff or "Mr. Blankenship") hereby responds and objects to the First Set of Interrogatories by Defendant 35th PAC ("Defendant" or "35th PAC") as follows:

## GENERAL OBJECTIONS

1.  Plaintiff hereby generally objects to these interrogatories to the extent they request or seek information protected from disclosure by the attorney-client privilege.

2.  Plaintiff hereby generally objects to these interrogatories to the extent they request or seek information protected from disclosure by the work product doctrine.

///

///

///

///

///

///

1

601897.1

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify all persons known to you, other than a person intended to be called as an expert witness at trial, who have personal knowledge of any of the facts or matters raised in this action and, for each person you identify, state the substance of their knowledge.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, discovery is in its early stages and thus, Plaintiff has not yet gathered all of the evidence which would be responsive to this interrogatory. Plaintiff expects to gather such evidence during the course of discovery. At present, Plaintiff is aware of the following information responsive to this interrogatory, which includes the numerous individuals listed in Plaintiff's Rule 26(a)(1)(A)(i) Initial Disclosures served in this action on August 20, 2020. Plaintiff reserves his right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 2:**

Identify all persons known to you, other than a person intended to be called as an expert witness at trial, who have personal knowledge of any of the facts or allegations made against Defendant 35th PAC in the First Amended Complaint, and for each person you identify, state the substance of their knowledge.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, discovery is in its early stages and thus, Plaintiff has not yet gathered all of the evidence which would be responsive to this interrogatory. Plaintiff expects to gather such evidence during the course of discovery. At present, Plaintiff is aware of the following information responsive to this interrogatory, which includes the numerous individuals listed in Plaintiff's Rule 26(a)(1)(A)(i) Initial Disclosures served in this action on

August 20, 2020. Plaintiff reserves his right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 3:**

If you contend that Defendant has, at any time, made an admission against interest with respect to any issue involved in this litigation, describe each such admission, including in your description of each admission: the date and place of the admission, the identity of the person(s) in whose presence the admission was made, the precise nature and content of the admission, the identity of any writing that refers to, relates to or embodies the admission, and the identity of each person with personal knowledge of the admission.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, discovery is in its early stages and thus, Plaintiff has not yet gathered all of the evidence which would be responsive to this interrogatory. Plaintiff expects to gather such evidence during the course of discovery. At present, Plaintiff does not recall any admission against interest made by Defendant with respect to this litigation. Plaintiff reserves his right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 4:**

Identify each person whom you will call as an expert witness at trial and, for each expert, state the subject matter on which the expert will testify, the expert's field or area of expertise, the substance of the findings and opinions as to which the expert will testify, a summary of the grounds for each opinion and the identity of any written draft or final report made by the expert concerning those findings and opinions.

//

//

3

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff identifies the following expert witness:  Dr. Stan V. Smith, Ph.D.  Plaintiff refers Defendant to Dr. Smith's Expert Report served on February 1, 2021 for a brief description of the subject matter about which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and the basis for each opinion as to which the expert is expected to testify.  Plaintiff reserves his right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 5:**

Describe all statements made by Defendant that are the bases for your claims against Defendant in this lawsuit, including the date on which the statement was published and the medium through which the statement was disseminated.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing, Plaintiff responds to this interrogatory as follows: As alleged in the First Amended Complaint, on April 10, 2018, Defendant responded to tweet by Mr. Blankenship with the following defamatory tweet:  "You are also a convicted felon hurting West Virginia families."

**INTERROGATORY NO. 6:**

Describe all communications that you had with any person (other than your attorneys) that refer or relate to Defendant's Tweet.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing, Plaintiff responds to this interrogatory as follows: As alleged in the First Amended Complaint, on April 10, 2018, Defendant responded to a tweet by Mr. Blankenship with the following defamatory tweet:  "You are also a convicted felon hurting

4

West Virginia families." Mr. Blankenship communicated directly with the major funders of 35th PAC and advised that this tweet was false. No correction was ever issued.

## INTERROGATORY NO. 7:

State all facts that support your contention contained in Paragraph 153 of the First Amended Complaint, that "at the time [Defendant's Tweet] was issued, the authors (and likely the PAC's top donors as well) knew that it was false, but nonetheless proceeded to publish because of their malice toward Mr. Blankenship."

## RESPONSE TO INTERROGATORY NO. 7:

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects that the request is overly broad, not sufficiently limited in scope, and otherwise inappropriate for an interrogatory in that, among other things, it calls for a narrative. Plaintiff further objects that this interrogatory seeks the mental impressions, conclusions, opinions, and/or legal theories of counsel. Plaintiff further objects that this is a contention interrogatory that need not be answered until after designated discovery has been completed pursuant to Rule 33(a)(2) of the Federal Rules of Civil Procedure. Plaintiff further objects that this interrogatory is premature insofar as discovery is in the preliminary stages, and Plaintiff has not yet taken depositions of any of Defendant's witnesses or any third parties.

Subject to and without waiver of the foregoing objections, discovery is in its early stages and thus, Plaintiff has not yet gathered all of the evidence of actual malice which would be responsive to this interrogatory. Plaintiff expects to gather such evidence during the course of discovery. At present, Plaintiff is currently aware of the following information responsive to this interrogatory:

Anyone who consulted the freely-available public records of Mr. Blankenship's trial and conviction (including previous accurate reports of Mr. Blankenship's acquittals by the Defendant media organizations themselves), would know that Mr. Blankenship was acquitted of all felony charges, that Mr. Blankenship was convicted only of a misdemeanor, and that Mr. Blankenship

5

has never been convicted of a felony, whether for manslaughter or any other reason.

For example and without limitation, in 2016 Plaintiff wrote a booklet entitled *American Political Prisoner*. He distributed the booklet to approximately 250,000 state governors, state legislators, state judges, federal judges, business leaders, and news media organizations. The booklet states on each of the first few pages that Plaintiff was convicted of a misdemeanor. The following individuals who are associated with the various defendants in the subject lawsuit who were sent a copy of Mr. Blankenship's booklet include at least the following: Chuck Todd (NBC News Political Director and Meet the Press Moderator), Dafio Linzer (NBC News and MSNBC Managing Editor of Politics), Sarah Baker (MSNBC Director of Booking), Chris Stirewalt (Fox News Politics Editor), Kathy Ardleig (Fox News Network Senior Political Programming Producer), Dana Bash (CNN host and anchor), Berlij Terrance (CNN Deputy Political Director).

In addition to the *American Political Prisoner* booklet, Plaintiff distributed thousands of emails to hundreds of news media organizations prior to the 2018 West Virginia primary election. He also tweeted that he was only convicted of a misdemeanor.

Furthermore, at the nationally-televised primary debate on Fox News on May 1, 2018, Mr. Blankenship addressed his conviction and imprisonment right out of the gate, stating in no uncertain terms: "I faced thirty years in prison for a fake charge, and I beat all three of the felonies. … It's incredible, they sent me to prison for a ***misdemeanor***." (Emphasis added.)

The foregoing evidence demonstrates that Defendant had actual knowledge of the falsity of its statements that Plaintiff is a "convicted felon," or acted with reckless and willful disregard of the truth or falsity of its statements.

Plaintiff reserves his right to supplement, amend, and/or update this response during the course of discovery.

**INTERROGATORY NO. 8:**

State all facts that support your contention contained in Paragraph 229 of the First Amended Complaint, that Defendant acted "with actual malice … reckless disregard and willful

6

disregard of the truth or falsity of the statements."

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates by reference his Response to Interrogatory No. 7 as if fully set forth herein.

**INTERROGATORY NO. 9:**

State all facts that support your contention contained in Paragraph 234 of the First Amended Complaint that Defendant "knew that [its] claims were untrue."

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff incorporates by reference his Response to Interrogatory No. 7 as if fully set forth herein.

**INTERROGATORY NO. 10:**

Identify and fully describe any and all "other business and opportunities" that you allege in Paragraph 24 of your First Amended Complaint that you were "prevented from pursuing" as a result of Defendant's Tweet.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects that this interrogatory is overly broad and not sufficiently limited in scope.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows: The harm to Plaintiff's reputation and/or Plaintiff's damages must be calculated in the context of his considerable past business achievements and his potential for success, but for Defendant falsely describing him as a "convicted felon." Plaintiff became the Chief Executive Officer of Massey Energy in 1992. At that point in time the company's revenues were about $150 million annually. Under Plaintiff's leadership over the next eighteen years, Massey Energy grew by a factor of more than 50 into a company with annual revenues of $7.8 billion. (By comparison, Jack Welch is lauded for, according to news reports, growing General Electric's market value from a $12 billion to $410 billion over twenty years, a factor of about 34.) Moreover, as a second

7

point of comparison, overall coal production in the United States remained essentially flat from 1990 to 2010.  Also, among other things, and without limitation, Plaintiff's leadership brought about a massive increase in employment for the industry's coal miners and others in the industry, as well as massive benefits to West Virginia's economy.

Prior to and during Plaintiff's tenure as Massey's CEO – and before he was defamed by Defendant – he was invited to serve, and in fact did serve, on the Board of Directors of Fluor Corporation.  He also served on the Board of Directors for Witco Chemical.  Also, before being defamed, Plaintiff declined other offers to serve on the board of directors of other companies in order to devote all of his energies to his duties as Massey's CEO and Chairman of the Board.

Under West Virginia defamation law, the false description of a person as a criminal, *i.e.*, a felon, is *per se* presumed to have caused damages.

The nature and amount of the economic and non-economic damages arising from the injury to Plaintiff's reputation will be the subject of expert testimony and Plaintiff's own testimony.

A component of the harm suffered by Plaintiff will be lost opportunities, business and otherwise.  By their nature, the precise nature of these lost opportunities is either difficult to quantify or otherwise unknown to Plaintiff.  In addition, the nature and scope of these lost opportunities will be subject to, among other things and without limitation, expert witness opinions and analyses, the Plaintiff's own testimony, as well as within the purview of jury assessment based on a combination of these discovery responses, expert witness opinions and analyses, and the jurors' own experiences.  As a consequence of Defendant's defamation and the ensuing harm to Plaintiff's reputation, he has been deprived of various opportunities (and their earning power), as discussed below.

Plaintiff's compensation from his time as Massey CEO alone is publicly available and is evidence of the value of compensation deprived him by the defamation at issue.

8

To the extent that Defendant published any defamatory statements prior to the May 8, 2018, West Virginia Primary, Plaintiff will also seek damages arising out of the effect of that defamation on the election.

As noted above, the calculation and assessment of the monetary value of the damages caused by Defendant's defamation will also be the subject of expert witness opinions and analyses.  Notwithstanding the foregoing, Mr. Blankenship would have had great opportunities to earn income from multiple sources but for the actions of Defendant, including but not limited to, loss of earnings in four (4) general categories:  (1) CEO in the Mining/Construction Industry; (2) Strategic Consultant; (3) Coal Broker/Entrepreneur; and (4) Board of Directors.  These lost opportunities are reasonably estimated to have cost Plaintiff tens, if not hundreds, of millions of dollars in lost income.  Each of these categories is discussed below and will be supplemented with additional information from Plaintiff's expert witness(es):

- CEO in the Mining/Construction Industry:  While at Massey Energy, Mr. Blankenship received multiple employment offers from other companies.  For example, he received an offer from Carl Smith, the former owner of Fola Coal, which was equivalent to $15 million in year 2020 dollars.  Massey Energy then matched and exceeded that offer to retain him.  Mr. Blankenship was named to the Board of Directors of Fluor, a global engineering and construction company, in 1997.  In 1999, Mr. Blankenship was asked to manage Fluor while its Chairman, Les McGraw, battled cancer.  Mr. Blankenship was approached to become the President of Fluor, but he declined, as he wanted to remain in West Virginia.  Mr. Blankenship was contacted by a headhunter to become the President of Raytheon in approximately 2000, but he again declined to remain at Massey Energy.

- Strategic Consultant:  The harm to Mr. Blankenship's reputation following the election has limited his ability to engage in business opportunities as a Strategic Consultant.  Mr. Blankenship would have been able to bring his business expertise

9

to companies across multiple industries, including mining, banking, and construction, in order to assist with cutting costs. He would have been able to assemble a team to assess companies and negotiate a percentage of the savings as compensation, and 10 percent of the savings would be a reasonable fee.

- <u>Board of Directors</u>: Mr. Blankenship had seats on three (3) boards while he was CEO at Massey Energy, and had opportunities to serve on additional boards during this time period.

- <u>Coal Broker</u>: Mr. Blankenship had a relationship with the steel industry, and while he was at Massey Energy had wanted to become a coal broker or start his own mining company later in his life. There have been several successful coal brokers, including Chris Cline, Ernie Thrasher, and Joseph Craft III, and Mr. Blankenship could have followed a similar path.

Plaintiff has also expended more than $10 million on efforts to prepare for his post-Massey business life and to restore his business reputation. Defendant's defamation has effectively undone those efforts and rendered that expenditure of funds largely useless. Plaintiff provides this response with the express caveat that he has not yet performed a formal calculation of these figures.

Plaintiff is unaware at this time of any specific "other business and opportunities" Plaintiff was prevented from pursuing as a result of Defendant's Tweet. Plaintiff will establish through expert testimony and by his own testimony that business organizations will not even consider hiring Plaintiff as a CEO or appointing Plaintiff to a corporate board after Plaintiff was falsely branded as a "felon" and/or "convicted felon" by Defendants. Business reputation has far more grounding in perception than in reality. As Warren Buffett has noted: "It takes 20 years to build a reputation and five minutes to ruin it." Thus, it would have been futile for Plaintiff to pursue "other business and opportunities" until Plaintiff's name was cleared through this lawsuit or otherwise.

10

Plaintiff reserves his right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 11:**

Itemize and show how you calculate the damages claimed by you in this action as a result of Defendant's Tweet.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiff incorporates by reference his Response to Interrogatory No. 10 as if fully set forth herein, as well as the Expert Report of Dr. Stan V. Smith, Ph.D, served on February 1, 2021. Plaintiff reserves his right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 12:**

Identify and fully describe what effect, if any, you allege Defendant's Tweet had on your 2018 Republican primary campaign, including how it had that effect, and all documents or evidence to support your allegation.

**RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff incorporates by reference his Response to Interrogatory No. 10 as if fully set forth herein, as well as the Expert Report of Dr. Stan V. Smith, Ph.D, served on February 1, 2021. Plaintiff reserves his right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 13:**

Describe any actions you took to address any alleged emotional distress that you allege you suffered as a result of Defendant's Tweet, including, but not limited to, any medical or psychological treatment you sought in connection with the alleged emotional distress and identify the providers of such medical or psychological treatment.

//

//

---

11

**RESPONSE TO INTERROGATORY NO. 13:**

Plaintiff incorporates by reference his Response to Interrogatory No. 4 as if fully set forth herein. Plaintiff has sustained emotional distress and insomnia as a result of Defendant's defamatory publications. Plaintiff was prescribed zolpidem tartrate (Ambien®) to treat the insomnia.

**INTERROGATORY NO. 14:**

Identify each and every individual who advised you that his/her opinion of you had changed based on Defendant's Tweet.

**RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects that the request is overly broad, not sufficiently limited in scope, and otherwise inappropriate for an interrogatory in that, among other things, it calls for a narrative.

Subject to and without waiver of the foregoing objections, discovery is ongoing and thus, Plaintiff has not yet gathered all of the evidence which would be responsive to this interrogatory. At present, Plaintiff is unaware of any specific individual that advised him that his/her opinion of him had changed based on Defendant's Tweet. However, Plaintiff claims that any individual who reviewed Defendant's Tweet falsely referring to him as a "felon" and/or "convicted felon" would have logically changed his/her opinion of Mr. Blankenship's reputation. Plaintiff reserves his right to supplement, amend, and/or update this response during the course of discovery.

**INTERROGATORY NO. 15:**

Identify each and every individual who read Defendant's Tweet and the date upon which they read it.

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects that the request is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objections, Plaintiff is unaware of "each and every individual who

read Defendant's Tweet." However, Plaintiff asserts that followers of Defendant's twitter account would have logically read Defendant's tweet. Plaintiff reserves his right to supplement, amend, and/or update this response during the course of discovery.

**INTERROGATORY NO. 16:**

Identify each and every tweet from any person referring to Plaintiff as a felon prior to April 10, 2018.

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects that the request is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objections, Plaintiff is unaware of "each and every tweet from any person referring to Plaintiff as a felon prior to April 10, 2018." Plaintiff reserves his right to supplement, amend, and/or update this response during the course of discovery.

**INTERROGATORY NO. 17:**

Identify all documents that support or relate to your claim that Defendant acted with actual malice or with reckless and willful disregard for the truth.

**RESPONSE TO INTERROGATORY NO. 17:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects that this interrogatory seeks the mental impressions, conclusions, opinions, and/or legal theories of counsel. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, the answer to this interrogatory may be determined by examining the documents and/or electronically stored information that Plaintiff has produced and/or will produce in this litigation, as the burden of deriving the answer to this interrogatory will be substantially the same for either party.

**INTERROGATORY NO. 18:**

State all facts that support your contention, if you are so contending, that Defendant conspired with any other person to defame you and identify all documents relating thereto.

13

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects that the request is overly broad, not sufficiently limited in scope, and otherwise inappropriate for an interrogatory in that, among other things, it calls for a narrative. Plaintiff further objects that this interrogatory seeks the mental impressions, conclusions, opinions, and/or legal theories of counsel. Plaintiff further objects that this is a contention interrogatory that need not be answered until after designated discovery has been completed pursuant to Rule 33(a)(2) of the Federal Rules of Civil Procedure. Plaintiff further objects that this interrogatory is premature insofar as discovery is in the preliminary stages, and Plaintiff has not yet taken depositions of any of Defendant's witnesses or any third parties.

Subject to and without waiver of the foregoing objections, discovery is in the early stages and, therefore, Plaintiff has not yet gathered all of the evidence of the conspiracy or coordinated effort to defame Plaintiff which would be responsive to this interrogatory. Plaintiff expects to gather such evidence during the course of discovery. At present, Plaintiff is aware of the following information responsive to this interrogatory:

This is a case of weaponized defamation in which Defendant and dozens of news media organizations collectively executed a "wrap-up smear" by falsely "merchandising" Mr. Blankenship as a "felon" and "convicted felon"[1] as Mr. Blankenship campaigned for the 2018 Republican nomination for the United States Senate.

Plaintiff reserves his right to supplement, amend, and/or update this response during the course of discovery.

**INTERROGATORY NO. 19:**

Identify the person or persons referred to in Paragraph 233 of the First Amended Complaint as "DOES 26-50"?

---

[1] *See https://www.youtube.com/watch?v=QWgCh2v10GM.*

**RESPONSE TO INTERROGATORY NO. 19:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, discovery is in its early stages and thus, Plaintiff has not yet gathered all of the evidence which would be responsive to this interrogatory. Plaintiff expects to gather such evidence during the course of discovery. At present, Plaintiff is unaware of the identities of "DOES 26-50" referenced in the First Amended Complaint. Plaintiff reserves his right to supplement, amend, and update this response during the course of discovery.

Dated: 18th of March 2021.                          Respectfully submitted,

                                                    **DON BLANKENSHIP**
                                                    **By Counsel**

                                                    **/s/ Jeremy Gray, Esq.**
                                                    **Jeremy Gray, Esq.**
                                                    **(CA State Bar No. 150075, *pro hac vice*)**
                                                    *EARLY SULLIVAN WRIGHT*
                                                    *GIZER & McRAE LLP*
                                                    **6420 Wilshire Blvd., 17th Floor**
                                                    **Los Angeles, CA 90048**
                                                    **323.301.4660**
                                                    **jgray@earlysullivan.com**

                                                    **/s/ Jeffrey S. Simpkins, Esq.**
                                                    **Jeffrey S. Simpkins, Esq.**
                                                    **WVSB #9806**
                                                    *SIMPKINS LAW*
                                                    **102 E. 2nd Ave.**
                                                    **Williamson, WV 25661**
                                                    **304.235.2735**
                                                    **simpkinslawoffice@gmail.com**

15

## VERIFICATION PAGE

STATE OF _Nevada_ )

                             )    SS:

COUNTY OF _Clark_ )

I, _Don Blankenship_ being first duly sworn according to law, hereby provide answers to the foregoing interrogatories pursuant to Rule 33 of the Federal Rules of Civil Procedure. To the extent that I have personal knowledge of the matters referred to in these answers, the information is true and accurate to the best of my knowledge and belief. As to any matters for which I do not have personal knowledge, these answers furnish such responsive information as is reasonably available to me and that I am informed and believe and, on such information and belief, state that these answers are true and accurate.

Signature: _Don Blankenship_

Print Name: _Don Blankenship_

STATE OF NEVADA
COUNTY OF CLARK
SUBSCRIBED AND SWORN BEFORE ME THIS
4ᵗʰ DAY OF _March_ 20 _21_ BY
_Don Blankenship_

_Darlene Tactacan_
NOTARY

DARLENE TACTACAN
Notary Public - State of Nevada
County of Clark
APPT. NO. 97-3665-1
My App. Expires Sept. 14, 2021

16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

DON BLANKENSHIP,

                Plaintiff,

    vs.

FOX NEWS NETWORK, LLC, et al.

                Defendants.

Case No.: 2:19-cv-00236

[Hon. John T. Copenhaver, Jr., Senior Judge]

### CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of March 2021, the foregoing **"Plaintiff Don Blankenship's Responses to First Set of Interrogatories by Defendant 35th PAC"** was served upon counsel by *regular U.S. mail and electronic mail.

Zachary Michael Wallen, Esq.
**CHALMERS & ADAMS**
Suite LL200-420
301 South Hills Village Drive
Pittsburgh, PA 15241
Tel: (412) 200-0842
*Email: zwallen@cpblawgroup.com*

*Attorney for Defendant 35th, Inc.*

Alison B Schary
Eric J. Feder
**DAVIS WRIGHT TREMAINE LLP**
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
New York, New York 10019
Tel.: (202) 973-4248
*Email: AlisonSchary@dwt.com*
*     EricFeder@dwt.com*

*Attorneys for Defendant American*
*Broadcasting Companies, LLC*

Kelli L. Sager (pro hac vice)
**DAVIS WRIGHT TREMAINE LLP**
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017
Tel.: (213) 633-6800
*Email: kellisager@dwt.com*

*Attorney for Defendant American*
*Broadcasting Companies, LLC*

Sean P. McGinley, Esq.
**DIPIERO SIMMONS MCGINLEY &**
**BASTRESS, PLLC**
P.O. Box 1631
Charleston, WV 25326-1631
Tel.: (304) 342-0133
*Email: Sean.McGinley@dbdlawfirm.com*

*Attorney for Defendant American*
*Broadcasting Companies, LLC*

17

J. Zak Ritchie
Ryan McCune Donovan
**HISSAM FORMAN DONOVAN**
  **RITCHIE PLLC**
P.O. Box 3983
Charleston, WV 25339
681-265-3802 office
304-982-8056 fax
*Email: zritchie@hfdrlaw.com*
        *rdonovan@hfdrlaw.com*

*Attorneys for Defendant Fox News Network,*
*LLC*

Elbert Lin
David Parker
**HUNTON ANDREWS KURTH LLP**
951 E. Byrd Street
Richmond, VA 23219
804-788-8200 office
804-788-8218 fax
elin@HuntonAK.com
dparker@HuntonAK.com

*Attorneys for Defendant Fox News Network,*
*LLC*

Brian A. Glasser
**BAILEY & GLASSER**
209 Capitol Street
Charleston, WV 25301-1386
304/345-6555
Fax: 304/342-1110
*Email: bglasser@baileyglasser.com*

*Attorneys for Defendant Cable News*
*Network, Inc.*

Shawn Patrick Regan
Silvia Ostrower
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
52nd Floor
New York, NY 10166
212.309.1046 office
212.309.1100 fax
*Email: sregan@hunton.com*
        *sostrower@huntonAK.com*

*Attorneys for Defendant Fox News Network,*
*LLC*

Kevin T. Baine
Stephen J. Fuzesi
Gloria Maier
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
kbaine@wc.com
sfuzesi@wc.com
gmaier@wc.com

*Attorneys for Defendant Cable News*
*Network, Inc., and WP Company LLC, d/b/a*
*The Washington Post*

Jared M. Tully, Esq.
Elise N. McQuain, Esq.
Alex Zurbuch, Esq.
**FROST BROWN TODD LLC**
500 Virginia Street East, Suite 1100
Charleston, WV 25301
304-345-0111 (phone)
304-345-0115 (fax)
*Email: jtully@fbtlaw.com*
        *emcquain@fbtlaw.com*
        *azurbuch@fbtlaw.com*

*Attorneys for Defendant MSNBC Cable, LLC*

18

Kevin T. Shook
Ryan Goellner
**FROST BROWN TODD**
Suite 2300
10 West Broad Street
Columbus, OH 43215-3484
614-559-7214
614-464-1211 (fax)
*Email: kshook@fbtlaw.com*
        *rgoellner@fbtlaw.com*

*Attorneys for Defendant MSNBC Cable, LLC*

John J. Polak
**ATKINSON & POLAK**
P.O. Box 549
Charleston, WV 25322-0549
304/346-5100
304/346-4678 (fax)
*jjpolak@amplaw.com*

*Attorneys for Defendants FiscalNote, Inc. and
Griffin Connolly*

Chris Vlahos
Jenna L. Harris
**Ritholz Levy Fields, LLP**
131 South 11th Street
Nashville, TN 37206
Phone: (615) 250-3939
*cvlahos@rlfllp.com*
*jharris@rlfllp.com*

*Attorney for Defendant News and Guts, LLC*

Allen M. Gardner
Sarah M. Gragert
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2270
Facsimile: (202) 637-2201
allen.gardner@lw.com
sarah.gragert@lw.com

*Attorneys for Defendants FiscalNote, Inc.
and Griffin Connolly*

Andrew Eisbrouch, Esq. (pro hac vice)
Kelsey Trainor, Esq.
**Mediaite, LLC**
1261 Broadway, Suite 606
New York, New York 10001
Tel: (201) 452-3990
*andrewe@abrams-media.com*
*Kelsey@abrams-media.com*

*Attorney for Defendants Mediaite, LLC and
Tamar Auber*

William D. Wilmoth
WV Bar No. 4075
**Steptoe & Johnson, PLC**
1233 Main Street, Suite 3000
Wheeling, WV 26003
Phone: (304) 231-0456
Fax: (304) 231-0456
*William.Wilmoth@Steptoe-Johnson.com*

*Attorney for Defendant News and Guts, LLC*

601897.1

Joseph S.D. Christof, Esq. (WV# 6277)
Melvin F. O'Brien, Esq. (WV# 6797)
BreiAnne Varner, Esq. (WV# 10894)
**DICKIE, MCCAMEY & CHILCOTE, L.C.**
2001 Main Street, Suite 501
Wheeling, WV 26003
Phone: 304-233-1022/Fax: 888-811-7144
*jchristof@dmclaw.com*
*mobrien@dmclaw.com*
*bvarner@dmclaw.com*

*Attorney for Defendant Eli Lehrer*

Harry S. Johnson
*Admitted Pro Hac Vice*
Whiteford, Taylor & Preston, LLP
7 St. Paul Street, Suite 1500
Baltimore, MD, 21202
410-347-8700
*hjohnson@wtplaw.com*

*Attorney for Defendant Eli Lehrer*

Jennifer S. Jackman
**Whiteford, Taylor & Preston, LLP**
1800 M. Street N.W., Suite 450N
Washington, D.C. 20036
202-659-6800
*jjackman@wtplaw.com*

*Attorney for Defendant Eli Lehrer*

Jim Heath
224 McCullough Blvd. N
Lake Havasu City, AZ 86403
Phone: (614) 390-7706
*jimheathtv@gmail.com*

*In Pro Per*

*Matt Howerton
90 Kingston Crossing, Apt 1303
Bossier City, LA 71111

*Chris Jones
299 Main Street
Salt Lake City, UT 84111

*/s/ Jeremy Gray*
Jeremy Gray, Esq.
(CA State Bar No. 150075, *pro hac vice*)
*EARLY SULLIVAN WRIGHT GIZER & McRAE LLP*
6420 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048
323.301.4660
*jgray@earlysullivan.com*

*/s/ Jeffrey S. Simpkins*
Jeffrey S. Simpkins (WVSB # 9806)
SIMPKINS LAW
102 E. 2nd Avenue
Williamson, West Virginia 25661
simpkinslawoffice@gmail.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

| | |
|---|---|
| DON BLANKENSHIP, | Case No.: 2:19-cv-00236 |
| Plaintiff, | [Hon. John T. Copenhaver, Jr.] |
| vs. | |
| FOX NEWS NETWORK, LLC, et al. | |
| Defendants. | |

### PLAINTIFF DON BLANKENSHIP'S
### RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION BY
### DEFENDANT 35TH PAC

Plaintiff Don Blankenship ("Plaintiff or "Mr. Blankenship") hereby responds and objects to the First Set of Requests for Admission by Defendant 35th PAC ("Defendant" or "35th") as follows:

### GENERAL OBJECTIONS

1.     Plaintiff hereby generally objects to these interrogatories to the extent they request or seek information protected from disclosure by the attorney-client privilege.

2.     Plaintiff hereby generally objects to these interrogatories to the extent they request or seek information protected from disclosure by the work product doctrine.

///

///

1

## RESPONSES TO REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Admit that on November 13, 2014 the United States filed a criminal indictment against you alleging criminal conspiracy to violate mine safety standards and SEC fraud charges.

### RESPONSE TO REQUEST FOR ADMISSION NO. 1:

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff objects to this request to the extent it requires the disclosure of attorney-client privileged or attorney work product information.  Plaintiff further objects to this request on the grounds that it seeks information already within Defendant's possession, custody and control.  Plaintiff further objects to this request on the grounds that it is vague and ambiguous.  Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

Plaintiff DENIES this request as stated.  Plaintiff ADMITS the following:  A Grand Jury meeting in Charleston, West Virginia, returned a four count Indictment against Mr. Blankenship on November 13, 2014.  Count One charged Mr. Blankenship with conspiracy to willfully violate mandatory mine safety and health standards under the Mine Act, Count Two alleged a conspiracy to defraud the United States by impeding the Mine Health Safety Administration (MSHA) in the administration and enforcement of mine safety and health laws, while Counts Three and Four alleged securities law violations.  On March 10, 2015, the Charleston Grand Jury returned a three count Superseding Indictment against Mr. Blankenship.  Counts One and Two of the original indictment were merged into superseding Count One.  The original Count Three became Count Two, and Count Four of the original indictment became Count Three in the superseding indictment.  *See United States v. Blankenship*, No. 5:14-CR-00244, 2015 WL 3687864, at *1 (S.D.W. Va. June 12, 2015).

### REQUEST FOR ADMISSION NO. 2:

Admit that in 2015, you were found guilty of the crime of conspiring to willfully violate mine safety standards.

2

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

Plaintiff ADMITS that in 2015 he was adjudicated guilty of Conspiracy to Willfully Violate Mine Health and Safety Standards—a misdemeanor violation of 30 U.S.C. § 820(d) and 18 U.S.C § 371.

**REQUEST FOR ADMISSION NO. 3:**

Admit you were sentenced to serve one year in federal prison for the crime of which you were convicted, to be followed by a year of supervised release.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

Plaintiff ADMITS that he was adjudicated guilty of Conspiracy to Willfully Violate Mine Health and Safety Standards—a misdemeanor violation of 30 U.S.C. § 820(d) and 18 U.S.C § 371 and committed to the custody of the United States Bureau of Prisons for a total term of twelve (12) months.

**REQUEST FOR ADMISSION NO. 4:**

Admit you were fined $250,000.00 for the crime of which you were convicted.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

Plaintiff ADMITS that he was adjudicated guilty of Conspiracy to Willfully Violate Mine Health and Safety Standards—a misdemeanor violation of 30 U.S.C. § 820(d) and 18 U.S.C § 371 and was fined the sum of $250,000.

3

**REQUEST FOR ADMISSION NO. 5:**

Admit that Plaintiff was frequently referred to as "a felon" and that Plaintiff's conviction in the Criminal Trial was frequently referred to as "a felony" both before and after Defendant's Tweet.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects to this request as impermissibly compound.  Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

Plaintiff ADMITS that he was falsely referred to as a "felon" on multiple occasions both before and after Defendant's Tweet on  April 10, 2018.

**REQUEST FOR ADMISSION NO. 6:**

Admit that no conspiracy relating to Plaintiff existed between Defendant and any other person or entity.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

DENY.

**REQUEST FOR ADMISSION NO. 7:**

Admit that "no common plan for the commission of the tort of defamation" existed between the Defendant and any other person or entity, as stated in Paragraph 233 of the First Amended Complaint.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

DENY.

---

4

**REQUEST FOR ADMISSION NO. 8:**

Admit that Defendant was not engaged in a conspiracy to "disseminate, and cause and/or encourage others to disseminate the false claim that Plaintiff was a 'felon' or 'convicted felon'" as alleged in Paragraph 234 of the First Amended Complaint.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

DENY.

**REQUEST FOR ADMISSION NO. 9:**

Admit that Defendant did not know that Plaintiff was a misdemeanant, rather than a felon or convicted felon, at the time of Defendant's Tweet referenced in Paragraph 153 of the First Amended Complaint.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

DENY.

**REQUEST FOR ADMISSION NO. 10:**

Admit that Defendant did not demonstrate actual malice in its making of the Tweet referenced in Paragraph 153 of the First Amended Complaint.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

DENY.

**REQUEST FOR ADMISSION NO. 11:**

Admit Plaintiff was not damaged by Defendant's Tweet in an amount that, "exceeds the jurisdictional minimum of this Court[,]" as alleged in Paragraph 237 of the First Amended

5

Complaint.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

DENY.

**REQUEST FOR ADMISSION NO. 12:**

Admit the Tweet referenced in Paragraph 153 of the First Amended Complaint did not proximately cause Plaintiff to lose any earnings.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

DENY.

**REQUEST FOR ADMISSION NO. 13:**

Admit the Tweet referenced in Paragraph 153 of the First Amended Complaint did not cause Plaintiff any emotional distress.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

DENY.

**REQUEST FOR ADMISSION NO. 14:**

Admit the Tweet referenced in Paragraph 153 of the First Amended Complaint did not cause any harm to your reputation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

DENY.

6

**REQUEST FOR ADMISSION NO. 15:**

Admit that Defendant currently has forty-two (42) Twitter followers.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects to this request on the grounds that it seeks information already within Defendant's possession, custody and control.  Plaintiff further objects to this request on the grounds that it is vague and ambiguous.  Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

As of February 18, 2021, Defendant had forty-two (42) Twitter followers.

**REQUEST FOR ADMISSION NO. 16:**

Admit that the "Conspiracy DOES" referenced in Paragraph 233 of the First Amended Complaint do not exist.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

7

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

     Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

     DENY.


Dated: 18th of March 2021.                                    Respectfully submitted,

                                           **DON BLANKENSHIP**
                                           **By Counsel**

                                        **/s/ Jeremy Gray, Esq.**
                                        **Jeremy Gray, Esq.**
                      **(CA State Bar No. 150075, *pro hac vice*)**
                               *EARLY SULLIVAN WRIGHT*
                                  *GIZER & McRAE LLP*
                          **6420 Wilshire Blvd., 17th Floor**
                              **Los Angeles, CA 90048**
                                  **323.301.4660**
                          **jgray@earlysullivan.com**


                          **/s/ Jeffrey S. Simpkins, Esq.**
                            **Jeffrey S. Simpkins, Esq.**
                                **WVSB #9806**
                                *SIMPKINS LAW*
                              **102 E. 2nd Ave.**
                          **Williamson, WV 25661**
                                **304.235.2735**
                        **simpkinslawoffice@gmail.com**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

DON BLANKENSHIP,

               Plaintiff,

vs.

FOX NEWS NETWORK, LLC, et al.

               Defendants.

Case No.: 2:19-cv-00236

[Hon. John T. Copenhaver, Jr., Senior Judge]

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of March 2021, the foregoing **"Plaintiff Don Blankenship's Responses to First Set of Requests for Admission by Defendant 35th PAC"** was served upon counsel by *regular U.S. mail and electronic mail.

Zachary Michael Wallen, Esq.
**CHALMERS & ADAMS**
Suite LL200-420
301 South Hills Village Drive
Pittsburgh, PA 15241
Tel: (412) 200-0842
*Email: zwallen@cpblawgroup.com*

*Attorney for Defendant 35th, Inc.*

Alison B Schary
Eric J. Feder
**DAVIS WRIGHT TREMAINE LLP**
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
New York, New York 10019
Tel.: (202) 973-4248
*Email: AlisonSchary@dwt.com*
      *EricFeder@dwt.com*

*Attorneys for Defendant American Broadcasting Companies, LLC*

Kelli L. Sager (pro hac vice)
**DAVIS WRIGHT TREMAINE LLP**
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017
Tel.: (213) 633-6800
*Email: kellisager@dwt.com*

*Attorney for Defendant American Broadcasting Companies, LLC*

Sean P. McGinley, Esq.
**DIPIERO SIMMONS MCGINLEY & BASTRESS, PLLC**
P.O. Box 1631
Charleston, WV 25326-1631
Tel.: (304) 342-0133
*Email: Sean.McGinley@dbdlawfirm.com*

*Attorney for Defendant American Broadcasting Companies, LLC*

9

J. Zak Ritchie
Ryan McCune Donovan
**HISSAM FORMAN DONOVAN
 RITCHIE PLLC**
P.O. Box 3983
Charleston, WV 25339
681-265-3802 office
304-982-8056 fax
*Email: zritchie@hfdrlaw.com
        rdonovan@hfdrlaw.com*

*Attorneys for Defendant Fox News Network,
LLC*

Elbert Lin
David Parker
**HUNTON ANDREWS KURTH LLP**
951 E. Byrd Street
Richmond, VA 23219
804-788-8200 office
804-788-8218 fax
elin@HuntonAK.com
dparker@HuntonAK.com

*Attorneys for Defendant Fox News Network,
LLC*

Brian A. Glasser
**BAILEY & GLASSER**
209 Capitol Street
Charleston, WV 25301-1386
304/345-6555
Fax: 304/342-1110
*Email: bglasser@baileyglasser.com*

*Attorneys for Defendant Cable News
Network, Inc.*

Shawn Patrick Regan
Silvia Ostrower
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
52nd Floor
New York, NY 10166
212.309.1046 office
212.309.1100 fax
*Email: sregan@hunton.com
        sostrower@huntonAK.com*

*Attorneys for Defendant Fox News Network,
LLC*

Kevin T. Baine
Stephen J. Fuzesi
Gloria Maier
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
kbaine@wc.com
sfuzesi@wc.com
gmaier@wc.com

*Attorneys for Defendant Cable News
Network, Inc., and WP Company LLC, d/b/a
The Washington Post*

Jared M. Tully, Esq.
Elise N. McQuain, Esq.
Alex Zurbuch, Esq.
**FROST BROWN TODD LLC**
500 Virginia Street East, Suite 1100
Charleston, WV 25301
304-345-0111 (phone)
304-345-0115 (fax)
*Email: jtully@fbtlaw.com
        emcquain@fbtlaw.com
        azurbuch@fbtlaw.com*

*Attorneys for Defendant MSNBC Cable, LLC*

10

Kevin T. Shook
Ryan Goellner
**FROST BROWN TODD**
Suite 2300
10 West Broad Street
Columbus, OH 43215-3484
614-559-7214
614-464-1211 (fax)
*Email: kshook@fbtlaw.com*
           *rgoellner@fbtlaw.com*

*Attorneys for Defendant MSNBC Cable, LLC*

John J. Polak
**ATKINSON & POLAK**
P.O. Box 549
Charleston, WV 25322-0549
304/346-5100
304/346-4678 (fax)
*jjpolak@amplaw.com*

*Attorneys for Defendants FiscalNote, Inc. and
Griffin Connolly*

Chris Vlahos
Jenna L. Harris
**Ritholz Levy Fields, LLP**
131 South 11th Street
Nashville, TN 37206
Phone: (615) 250-3939
*cvlahos@rlfllp.com*
*jharris@rlfllp.com*

*Attorney for Defendant News and Guts, LLC*

Allen M. Gardner
Sarah M. Gragert
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2270
Facsimile: (202) 637-2201
allen.gardner@lw.com
sarah.gragert@lw.com

*Attorneys for Defendants FiscalNote, Inc.
and Griffin Connolly*

Andrew Eisbrouch, Esq. (pro hac vice)
Kelsey Trainor, Esq.
**Mediaite, LLC**
1261 Broadway, Suite 606
New York, New York 10001
Tel: (201) 452-3990
*andrewe@abrams-media.com*
*Kelsey@abrams-media.com*

*Attorney for Defendants Mediaite, LLC and
Tamar Auber*

William D. Wilmoth
WV Bar No. 4075
**Steptoe & Johnson, PLC**
1233 Main Street, Suite 3000
Wheeling, WV 26003
Phone: (304) 231-0456
Fax: (304) 231-0456
*William.Wilmoth@Steptoe-Johnson.com*

*Attorney for Defendant News and Guts, LLC*

Joseph S.D. Christof, Esq. (WV# 6277)
Melvin F. O'Brien, Esq. (WV# 6797)
BreiAnne Varner, Esq. (WV# 10894)
**DICKIE, MCCAMEY & CHILCOTE, L.C.**
2001 Main Street, Suite 501
Wheeling, WV 26003
Phone: 304-233-1022/Fax: 888-811-7144
*jchristof@dmclaw.com*
*mobrien@dmclaw.com*
*bvarner@dmclaw.com*

*Attorney for Defendant Eli Lehrer*

Harry S. Johnson
*Admitted Pro Hac Vice*
Whiteford, Taylor & Preston, LLP
7 St. Paul Street, Suite 1500
Baltimore, MD, 21202
410-347-8700
*hjohnson@wtplaw.com*

*Attorney for Defendant Eli Lehrer*

Jennifer S. Jackman
**Whiteford, Taylor & Preston, LLP**
1800 M. Street N.W., Suite 450N
Washington, D.C. 20036
202-659-6800
*jjackman@wtplaw.com*

*Attorney for Defendant Eli Lehrer*

Jim Heath
224 McCullough Blvd. N
Lake Havasu City, AZ 86403
Phone: (614) 390-7706
*jimheathtv@gmail.com*

*In Pro Per*

*Matt Howerton
90 Kingston Crossing, Apt 1303
Bossier City, LA 71111

*Chris Jones
299 Main Street
Salt Lake City, UT 84111

*/s/ Jeremy Gray*
Jeremy Gray, Esq.
(CA State Bar No. 150075, *pro hac vice*)
*EARLY SULLIVAN WRIGHT GIZER & McRAE LLP*
6420 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048
323.301.4660
jgray@earlysullivan.com

*/s/ Jeffrey S. Simpkins*
Jeffrey S. Simpkins (WVSB # 9806)
SIMPKINS LAW
102 E. 2nd Avenue
Williamson, West Virginia 25661
simpkinslawoffice@gmail.com

12

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

DON BLANKENSHIP,                                    CIVIL ACTION NO. 2:19-cv-00236

                Plaintiff,

    v.                                             (Hon. John T. Copenhaver, Jr.,
                                 District Judge)

FOX NEWS NETWORK, LLC, *et al.*,

                Defendants.

## [PROPOSED] ORDER GRANTING 35TH PAC'S
## MOTION FOR SUMMARY JUDGMENT

IT IS HEREBY ORDERED that 35th PAC's Motion for Summary Judgment is

GRANTED.


Dated:_____, 2021            _____
                                     Hon. John T. Copenhaver, Jr.
                                     United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DON BLANKENSHIP,                          )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 )          Civil Action No.: 2:19-cv-00236
                                          )
FOX NEWS NETWORK LLC, et al.,             )
                                          )
              Defendants.                 )


**MEMORANDUM OF LAW IN SUPPORT OF
35TH PAC'S MOTION FOR SUMMARY JUDGMENT**


CHALMERS & ADAMS LLC

Zachary M. Wallen
WV ID #11594
zwallen@chalmersadams.com
301 South Hills Village Drive
Suite LL200-420
Pittsburgh, PA 15241
Tel.: (412) 200-0842
Fax: (412) 235-5001

Attorney for Defendant
35th PAC

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... I

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     STATEMENT OF FACTS ......................................................................... 1

III.    STANDARD OF REVIEW ........................................................................ 4

IV.     DISCUSSION ............................................................................................ 6

   A.   35TH PAC IS ENTITLED TO SUMMARY JUDGMENT ON THE FIRST CAUSE OF ACTION (DEFAMATION) ...........................................................................7

   B.   35TH PAC IS ENTITLED TO SUMMARY JUDGMENT ON THE SECOND CAUSE OF ACTION (CONSPIRACY TO COMMIT DEFAMATION) .......................................11

   C.   35TH PAC IS ENTITLED TO SUMMARY JUDGMENT ON THE THIRD CAUSE OF ACTION (FALSE LIGHT INVASION OF PRIVACY) ...........................................14

   D.   35TH PAC IS ENTITLED TO SUMMARY JUDGMENT ON THE FOURTH CAUSE OF ACTION (CONSPIRACY TO COMMIT FALSE LIGHT INVASION OF PRIVACY) ....................15

V.      CONCLUSION........................................................................................ 17

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................... 6, 7

*Blankenship v. Boston Globe Media Partners*,
  Case No. 2:19-cv-00589 (S.D.W. Va.) ................................................... 10

*Blankenship v. McLaughlin*, Case No. 1:20-cv-00429 (E.D. Va.) ........................... 10, 12

*Blankenship v. NBC Universal, LLC*,
  Case No. 2:20-cv-00278 (S.D.W. Va.) ................................................... 10

*Blankenship v. Trump*,
  Case No. 2:19-cv-00549 (S.D.W. Va.) ................................................... 10

*Bowen v. Union Concrete Pipe Co.*, 299 F. Supp. 1109 (S.D.W. Va. 1969) ................ 5

*Carr v. Forbes, Inc.*, 259 F.3d 273 (4th Cir. 2001) ............................................. 8

*Dunn v. Rockwell*, 689 S.E.2d 255 (W. Va. 2009) .......................................... 11, 12, 15

*Faulkner v. Carowinds Amusement Park*,
  867 F. Supp. 419 (S.D.W. Va. 1994) ................................................... 5

*Hanson v. First Nat'l Bank*,
  No. 5:10-cv-00906, 2021 U.S. Dist. LEXIS 102227, (S.D.W. Va. 2012) .................. 12, 15

*Hinerman v. Daily Gazette Co.*, 423 S.E.2d. 560 (W. Va. 1992) ............................... 6

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ........................................ 14

*O'Dell v. Stegall*, 703 S.E.2d 561 (W. Va. 2010) ............................................. 11

*Pritt v. Republican Nat. Comm.*, 557 S.E.2d 853 (W. Va. 2001) .............................. 6, 7

*Sheehan v. Saoud*, 650 F. App'x 143 (4th Cir. 2016) ....................................... 11

*Thompson Everett, Inc. v. National Cable Adver.*
  57 F.3d 1317 (4th Cir. 1995) ................................................... 5

*United States v. Blankenship*, 846 F.3d 663, 667 (4th Cir. 2017) ........................ 2

*Williams v. Griffin*, 952 F.2d 820 (4th Cir. 1991) ........................................ 5

## Other Authorities

Black's Law Dictionary 427 (7th Ed. 1999). ................................................... 6

F.R.C.P. 56(c). ................................................................................. 5

## I.    PRELIMINARY STATEMENT

In this action, Mr. Blankenship has made outsized allegations against 35th PAC for which he offers no factual support. Accordingly, this Court should grant summary judgment to 35th PAC on all of Mr. Blankenship's causes of action.

In and amongst numerous co-defendants, including multi-national media conglomerates and national political party committees, 35th PAC, a federal political committee, was included in this litigation based on having made a singular Tweet referring to Plaintiff as a "felon." From this *one Tweet*, Plaintiff accused 35th PAC of engaging of committing two separate torts—defamation and false light invasion of privacy—as well as having allegedly engaged in a conspiracy against Mr. Blankenship to commit both alleged offenses.

Despite being granted wide-ranging discovery, Plaintiff has not produced one scintilla of evidence to back up any of these claims. In fact, despite the required showing of actual malice in order to prove both of Plaintiff's defamation and false light claims, Plaintiff did not even bother deposing anyone connected with 35th PAC. Moreover, both of the named putative co-conspirators have been dismissed from this action, and Plaintiff has admitted that he cannot name anyone else alleged to have "conspired with" 35th PAC.

And while it is tempting to dismiss Plaintiff's action as merely that of an overreaching, vexatious litigant, it is important to realize what this action really is: an attempt to silence the constitutionally protected political speech of Plaintiff's political opponents. Accordingly, 35th PAC respectfully requests that this Court grant its motion for summary judgment.

## II.    STATEMENT OF FACTS

Plaintiff Don Blankenship is the former President and CEO of Massey Energy Company,

1

which was the largest coal producer in West Virginia during Mr. Blankenship's tenure. Am. Compl. ¶ 135 (ECF # 14). On April 5, 2010, there was an explosion at the Upper Big Branch Mine, which was owned and operated by Massey, causing the deaths of 29 miners. *Id.* ¶ 136. Mr. Blankenship was subsequently charged with conspiracy to willfully violate federal mine safety laws and to defraud federal mine safety regulators, as well as two securities-related offenses. *United States v. Blankenship*, 846 F.3d 663, 667 (4th Cir. 2017).

Following a six-week trial, a jury convicted Mr. Blankenship of conspiring to violate federal mine safety laws and acquitted him of the other charges. *Id.* The district court sentenced Blankenship to one year in federal prison and assessed a $250,000 fine, both of which were the maximum permitted by law. *Id.* Mr. Blankenship was released from federal prison in the spring of 2017. Am. Compl. ¶ 145. In January 2018, Mr. Blankenship announced that he would seek the Republican nomination to serve as a U.S. Senator from West Virginia. The primary election was scheduled for May 8, 2018.

Defendant 35th PAC was organized and formed as 35th, Inc.[1], an independent expenditure-only political committee on March 23, 2017, when the committee filed a Statement of Organization (FEC Form 1) with the Federal Election Commission ("FEC"). 35th Inc. Statement of Organization (filed March 23, 2017) (*available at* https://docquery.fec.gov/pdf/257/201703239051882257/201703239051882257.pdf). Charles Gantt was appointed as the Treasurer of the Committee on the FEC Form 1. *Id.* 35th Inc. later incorporated for liability purposes by filing Articles of Incorporation with the West Virginia

---

[1] 35th, Inc. later changed its name to 35th PAC on November 8, 2019, when it filed an amended Statement of Organization (FEC Form 1) with the FEC. *See* Notice of Name Change (ECF # 399). When referring to 35th PAC herein, we have typically used its current name, 35th PAC.  There are, however, also references to the committee's name at the time of the events giving rise to the lawsuit, 35th, Inc.

Secretary of State's Office on March 31, 2017.

35th PAC was formed for the purpose of creating independent expenditure communications and messaging in support of 35th PAC's preferred candidate for U.S. Senate from West Virginia in the 2018 General Election, Attorney General Patrick Morrisey. Exhibit 2 (Affidavit of David James Eckert) ¶ 3.

In late 2017, 35th PAC engaged D.J. Eckert, a/k/a David James Eckert, through his company DJE Consulting, LLC, to provide strategic consulting services, and to serve as 35th PAC's Executive Director. *Id*. at ¶ 2. As Executive Director, Mr. Eckert was responsible for the day-to-day operations of 35th PAC, including operating 35th PAC's social media accounts, including its Twitter account (@35thPAC). *Id*. at ¶ 5.

35th PAC focused its messaging efforts on educating the public about the records of Attorney General Morrisey, his principal opponent in the Primary Election, then-Congressman Evan Jenkins, and to a lesser extent, the Plaintiff. *Id*. at ¶ 7.

On April 10, 2018, in response to a Tweet made by Mr. Blankenship, 35th PAC authored a Tweet that said "You are a convicted felon hurting West Virginia families. That's why @realDonald Trump administration won't help you #wvsen https://www.wvgazettemail.com/news/trump-doj-urges-court-to-not-hear-blankenship-appeal/article_ee34035c-568a-508f-a2b8-a1f4a1865fa5.html."[2] *Id*. at ¶ 11. The reference to Mr. Blankenship as "a convicted felon" was based on Mr. Blankenship's 2015 conviction for his role in

---

[2] 35th PAC's Tweet linked to a 2017 article published by co-Defendant Charleston Gazette-Mail concerning the Plaintiff. Ken Ward, Jr. "Trump DOJ Urges Court to Not Hear Blankenship Appeal," CHARLESTON GAZETTE-MAIL, Aug. 25, 2017, *available at* https://www.wvgazettemail.com/news/trump-doj-urges-court-to-not-hear-blankenship-appeal/article_ee34035c-568a-508f-a2b8-a1f4a1865fa5.html.

3

the 2010 Upper Big Branch Mine Disaster. *Id.* at ¶ 13.

Mr. Blankenship filed this lawsuit in Mingo County Circuit Court on March 14, 2019, and one of the defendants subsequently removed the case to federal court. Mr. Blankenship alleged four separate causes of action as to 35th PAC: 1) that 35th PAC committed the tort of defamation through its April 10, 2018 Tweet (Am. Compl. ¶ 153); 2) that "Defendants NRSC, 35th PAC, and Kevin McLaughlin, along with DOES 26-50 (the "Conspiracy Does," and together with NRSC, 35th PAC, and McLaughlin, the "Conspiracy Defendants"), and each of them, shared in a common plan for the commission of the tort of defamation . . ." Am. Compl. ¶ ¶ 233-234.; 3) that 35th PAC "published matter which placed Mr. Blankenship in a false light before the public, as set forth above, namely that Mr. Blankenship was a felon . . ." thereby committing the tort of false light invasion of privacy. Am. Compl. ¶ 239; and 4) 35th PAC, along with dismissed co-defendants Kevin McLaughlin and the NRSC, engaged in a conspiracy to commit false light invasion of privacy. Am. Compl. ¶ ¶ 246-249.

35th PAC filed its Answer on September 5, 2019, wherein it denied that it committed any of the offenses alleged by Mr. Blankenship and pled a series of affirmative defenses. Answer of 35th PAC (ECF # 304).

During discovery, Plaintiff served 35th PAC with 73 requests for production of documents and 30 interrogatories. ECF # 442 and # 577. Plaintiff did not depose, or seek to depose, any individual connected with 35th PAC.

III.    STANDARD OF REVIEW

Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." F.R.C.P. 56(c).

Where the court, having examined the pleadings, affidavits, interrogatories, answer and depositions, finds that no genuine issues of material fact are presented, disposition on motion for summary judgment is appropriate. *Bowen v. Union Concrete Pipe Co.*, 299 F. Supp. 1109, 1110 (S.D.W.Va. 1969).

> Summary judgment is appropriate only when, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. A fact is deemed "material" if proof of its existence or non-existence would affect the disposition of the case under applicable law. The entry of summary judgment is, upon motion, mandated against a party who fails to make a showing sufficient to establish the existence of an essential element of its case on which it will bear the burden of proof at trial.

*Faulkner v. Carowinds Amusement Park*, 867 F.Supp. 419, 422 (S.D.W.Va. 1994) (internal citations omitted).

A party is entitled to summary judgment if "the record as a whole could not lead a rational trier of fact to find for the non-movant." *Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991*)*. "At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Adver.,* 57 F.3d 1317, 1323 (4th Cir. 1995).

5

IV.    DISCUSSION

A.  35th PAC is Entitled to Summary Judgment on the First Cause of Action (Defamation)

In the First Cause of Action, Plaintiff alleges that 35th PAC committed the tort of defamation. Am. Compl. ¶ 153. As there is no evidence suggesting that 35th PAC's statement met the required legal elements of defamation, 35th PAC is entitled to summary judgment as to this Cause of Action.

As this Court has described previously in this case, "[d]efamation is '[a] false written or oral statement that damages another's reputation.'" Memorandum Opinion and Order, 3/31/20 (ECF # 398) at p. 16 (*quoting Pritt v. Republican Nat. Comm.*, 557 S.E.2d 853, 861 n.12 (W. Va. 2001) (*quoting* Black's Law Dictionary 427 (7th ed. 1999)). "West Virginia law identifies three types of plaintiffs in defamation cases: (1) public officials and candidates for public office, public figures, and (3) private individuals. *Id.* (citing Syl. Pt. 10, *Hinerman v. Daily Gazette Co.*, 423 S.E.2d 560, 564 (W. Va. 1992)).

This Court held that "the plaintiff in this case qualifies as a candidate for public office, and may also qualify as a public figure in West Virginia based on his 'prominence or notoriety.'" *Id.* at p. 17 (internal citations omitted).

"Public officials or candidates for public office must prove three elements by clear and convincing evidence in order to recover in a defamation action:

> (1) there was the publication of a defamatory statement of fact or a statement in the form of an opinion that implied the allegation of undisclosed defamatory facts as the basis for the opinion; (2) the stated or implied facts were false; and, (3) the person who uttered the defamatory statement either knew the statement was false or knew that he was publishing the statement in reckless disregard of whether the statement was false.

*Id.* (*quoting* Syl. Pt. 1, <u>Hinerman</u>, 423 S.E.2d at 563 (emphasis omitted)). "Public figures must

also prove actual malice." *Id.* (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244 (1986); Syl. Pt. 11, *Pritt*, 557 S.E.2d at 855).

Mr. Blankenship's defamation claim against 35th PAC is based on the singular April 10, 2018 Tweet: "You are a convicted felon hurting West Virginia families. That's why @realDonald Trump administration won't help you . . ." Am. Compl. ¶ 153.

Mr. Blankenship further alleges, without substantiation, that "[a]t the time this tweet was issued, the authors (and likely the PAC's top donors as well) knew that it was false, but nonetheless proceeded to publish because of their malice toward Mr. Blankenship." *Id.* Despite a lengthy discovery process, Mr. Blankenship has not satisfied by clear and convincing evidence the required legal elements of defamation, namely that 35th PAC "publi[shed] . . . a defamatory statement of fact or a statement in the form of an opinion that implied the allegation of undisclosed defamatory facts as the basis for the opinion; (2) the stated or implied facts were false[3]; and, (3) the person who uttered the defamatory statement either knew the statement was false or knew that he was publishing the statement in reckless disregard of whether the statement was false." Memorandum Opinion and Order, 3/31/20 (ECF # 398) at p. 17.

Plaintiff has not shown that 35th PAC acted with actual malice in this action. "To prevail in a defamation claim, plaintiffs who are . . . candidates for public office, or public figures must prove by clear and convincing evidence that the defendant made the defamatory statement with 'actual malice' – that is, 'with knowledge that it was false or with reckless disregard of whether

---

[3] In its Answer, 35th PAC also previously raised the affirmative defense that its Tweet was substantially true given Mr. Blankenship's criminal record. *See* Answer of 35th PAC at pp. 51-52 (ECF # 304). While 35th PAC wishes to preserve this issue for appeal, given that this Court has previously rejected this argument in its March 31, 2020 Memorandum and Order, when the defense was raised by other co-defendants, coupled with the complete absence of any evidence that 35th PAC acted with actual malice, 35th PAC focuses its argument herein on the requirement that Mr. Blankenship prove actual malice for both the defamation and false light invasion of privacy causes of action.

it was false or not.'" *Id*. at p. 23 (*citing New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). "Establishing actual malice is no easy task, because the defamation plaintiff bears the burden of proof by clear and convincing evidence." *Carr v. Forbes, Inc*. 259 F.3d 273, 282 (4th Cir. 2001).

"Actual malice is a subjective standard. The Supreme Court of Appeals of West Virginia has also recognized that: The greatest obstacle that a public official libel plaintiff must overcome is the First Amendment requirement that the publisher of a libel against a public official have a subjective appreciation at the time of publication that either (1) the defamatory statement is false or (2) the defamatory statement is being published in reckless disregard of whether it is false." Memorandum Opinion and Order, 3/31/20 (ECF # 398) at p. 22 (emphasis in original) (internal citations omitted).

Here, Mr. Blankenship has not produced any evidence that 35th PAC's Tweet was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). As such the First Cause of Action fails for failure to prove that 35th PAC acted with actual malice.[4]

The evidentiary record is unequivocal that 35th PAC did not have "knowledge that [the Tweet] was false or with reckless disregard of whether it was false or not.'" *Id*. In a sworn affidavit, 35th PAC's former Executive Director, D.J. Eckert, averred that "the reference to Mr. Blankenship as a 'felon' was based on what we believed to have been Mr. Blankenship's criminal status following Mr. Blankenship's conviction in federal court, and was based on our team's research into Mr. Blankenship's biography and his criminal conviction. This Tweet and the link to the *Charleston Gazette-Mail* article was an attempt to accurately highlight Mr.

---

[4] Likewise, Mr. Blankenship's false light invasion of privacy claim also fails due to Plaintiff's failure to show that 35th PAC acted with actual malice. *See* Section IV.C *infra*.

Blankenship's legal status based on how we understood it as of April 10, 2018, as it pertained to Mr. Blankenship's qualifications to serve as U.S. Senator from West Virginia." Exhibit 2 (Affidavit of David James Eckert) at ¶ 13.

Moreover, Mr. Eckert averred that he "had no knowledge that Mr. Blankenship's criminal conviction may not have classified Mr. Blankenship as a 'felon' for purposes of how that term is defined under federal and West Virginia law" and that 35th PAC did not "knowingly incorrectly refer to Mr. Blankenship as a felon . . ." *Id.* at ¶ ¶ 14, 16.

Mr. Blankenship has not produced any evidence that refutes the sworn affidavit of Mr. Eckert that 35th PAC believed its Tweet "accurately highlight[ed] Mr. Blankenship's legal status based on how we understood it as of April 10, 2018 . . ." *Id.* at ¶ 13. Mr. Blankenship did not depose or seek to depose anyone connected with 35th PAC in order to ascertain whether the Tweet was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.*, 376 U.S. at 280.

When questioned on this point in 35th PAC's interrogatories, Plaintiff could only offer wild speculation rather than evidence of 35th PAC acted with actual malice. First, Plaintiff suggested that "[a]nyone who consulted the freely-available public records of Mr. Blankenship's trial and conviction (including previous accurate reports of Mr. Blankenship's acquittals by the Defendant media organizations themselves), would know that Mr. Blankenship was acquitted of all felony charges, that Mr. Blankenship was convicted only of a misdemeanor . . ." Exhibit 5 (Plaintiff's Responses to First Set of Interrogatories by Defendant 35th PAC, Response to Interrogatory No. 7).

Here, while 35th PAC Executive Director D.J. Eckert "was aware of Don Blankenship's criminal conviction and subsequent incarceration in connection with the Upper Big Branch Mine

disaster", he is "not a lawyer and . . . did not review the court pleadings in connection with Mr. Blankenship's criminal case, but rather relied on "news articles describing Don Blankenship as having been a felon as a result of his criminal conviction." Exhibit 2 (Affidavit of David James Eckert) at ¶ ¶ 8-10. As this Court noted "[t]he plaintiff has named 105 individual and organizational defendants across the United States, including media organizations, political organizations, news anchors, writers, bloggers and individuals involved in politics" who published similar statements, so the idea that 35th PAC was not exposed to a bevy of information from reputable sources referring to Mr. Blankenship as a "felon" runs contrary to the very nature of this lawsuit. Memorandum Opinion and Order, 3/31/20 (ECF # 398) at p. 1.[5] Furthermore, Mr. Blankenship freely admits that he was "referred to as a 'felon' on multiple occasions both before and after Defendant's Tweet on April 10, 2018." Exhibit 6 (Don Blankenship Responses to Requests for Admission by Defendant 35th PAC at Response to Request for Admission No. 5).

In addition, Plaintiff cites to his self-published booklet as evidence of 35th PAC having acted with actual malice, a booklet for which he offers no evidence that anyone connected with 35th PAC possessed, let alone read. Exhibit 5 (Plaintiff's Responses to First Set of Interrogatories by Defendant 35th PAC, Response to Interrogatory No. 7).

Next, Plaintiff notes that he "distributed thousands of emails to hundreds of news media organizations prior to the 2018 West Virginia primary election. He also tweeted that he was only convicted of a misdemeanor." *Id*.  Plaintiff offers no evidence that 35th PAC received such an

---

[5] Mr. Blankenship has also filed similar defamation actions in this Court and other Courts across the country.  *See, e.g. Blankenship v. McLaughlin*, Case No. 1:20-cv-00429 (E.D. Va.); *Blankenship v. Boston Globe Media Partners*, Case No. 2:19-cv-00589 (S.D.W. Va.); *Blankenship v. Trump*, Case No. 2:19-cv-00549 (S.D.W. Va..); *Blankenship v. NBC Universal, LLC*, Case No. 2:20-cv-00278) (S.D.W. Va.).

email or that it was aware of, and had read, Plaintiff's alleged Tweet. *Id*.

Finally, Plaintiff cites to Mr. Blankenship's reference as to his misdemeanor conviction on the "the nationally-televised primary debate on Fox News on May 1, 2018 . . .", a debate that occurred **21 days after 35th PAC's Tweet**. *Id*.

Accordingly, given Mr. Eckert's sworn affidavit denying any knowledge that the Tweet may have been false, establishing a good faith basis for believing that the Tweet was truthful, and the absence of any evidence to the contrary, Mr. Blankenship's defamation claim summarily fails. As such, 35th PAC is entitled to summary judgment on the First Cause of Action.

B. 35th PAC is Entitled to Summary Judgment on the Second Cause of Action (Conspiracy to Commit Defamation)

As this Court has previously held in this matter, "a civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." Memorandum Opinion and Order, 3/31/20 (ECF # 398) at p. 29 (*citing* Syl. Pt. 8, *Dunn v. Rockwell*, 689 S.E.2d 255, 259 (W. Va. 2009)).

"The cause of action is not created by the conspiracy itself but by the wrongful acts done by the defendants to injure the plaintiff." *Id*. "A civil conspiracy is not a per se, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." *Id*. (*citing* Syl. Pt. 9, Dunn, 689 S.E.2d at 259.).

"A civil conspiracy must therefore be based on an underlying tort or wrong." *Id*. at 29-30 (*citing O'Dell v. Stegall*, 703 S.E.2d 561, 596 (W. Va. 2010)). "As such, courts in West Virginia dismiss civil conspiracy claims they are not supported by an underlying tort." *Sheehan v. Saoud*, 650 F. App'x 143, 153 (4th Cir. 2016).

"In order for a civil conspiracy to be actionable, the plaintiff must prove that the defendants have committed 'some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff.'" Memorandum Opinion and Order, 3/31/20 (ECF # 398) at p. 30 (*quoting Dunn*, 689 S.E.2d at 268–69).

"In order to succeed on his civil conspiracy claim, Plaintiff would need to establish that two or more persons agreed by concerted action to accomplish an unlawful purpose or a lawful purpose for unlawful means. Moreover, Plaintiff would need to point to evidence sufficient to create a genuine issue of material fact that 'the person who did not actually commit the tort shared a common plan for its commission with the actual perpetrators.'" *Hanson v. First Nat'l Bank*, No. 5:10-cv-00906, 2012 U.S. Dist. LEXIS 102227, at #41 (S.D.W. Va. Apr. 23, 2012) (*quoting Dunn*, 689 S.E.2d. at 68).

Here, there is simply no evidence of an underlying tort or any conspiracy involving 35th PAC. First, as discussed throughout this brief, and incorporated herein, 35th PAC did not commit any torts against Mr. Blankenship—neither defamation nor false light invasion of privacy.

Furthermore, Mr. Blankenship has not produced any evidence that 35th PAC engaged in a conspiracy with another party. First, the two named putative co-conspirators, Kevin McLaughlin and the NRSC, have previously been dismissed from this action and a related action in the Eastern District of Virginia. *See* Order Dismissing NRSC (ECF # 694); Exhibit 3 (Dismissal (E.D. Va.)). Moreover, prior to these dismissals, Magistrate Judge Aboulhosn, in reviewing NRSC's internal documents, was "unable to find any indication of defamation or participation in the alleged conspiracy or campaign to defame Plaintiff." Order (9/4/20, ECF # 562) at 7.

Indeed, Plaintiff has not produced any evidence that anyone connected with 35th PAC even interacted with Mr. McLaughlin or anyone from the NRSC during the events giving rise to

this lawsuit, let alone conspired with them. *See, e.g.*, Exhibit 4 (35th PAC Response to Plaintiff Interrogatories, Response to Interrogatory Nos. 14, 20) ("35th PAC has no records of, or any direct knowledge of any communications regarding Plaintiff between itself and the NRSC." "35th PAC has no records of, or any direct knowledge of any communications regarding Plaintiff between itself, or any of its representatives, and Kevin McLaughlin.")

When 35th PAC questioned Plaintiff on the identity of the unknown co-conspirators, Plaintiff stated that "[a]t present, Plaintiff is unaware of the identities of 'DOES 26-50' referenced in the First Amended Complaint." Exhibit 5 (Don Blankenship Response to Interrogatories, Response to Interrogatory No. 19). This is despite Mr. Blankenship having burdened 35th PAC with interrogatories and requests for production of documents related to its alleged interactions with countless individuals and groups in a scattershot attempt to produce some evidence of a conspiracy. *See* ECF # 442 and 557 (whereby Plaintiff served 35th PAC with 73 combined requests for production of documents and 30 interrogatories).

Contrastingly, by sworn affidavits, both Charles Gantt, 35th PAC's Treasurer, and D.J. Eckert, 35th PAC's former Executive Director, aver that they did not "engage in a conspiracy with the NRSC, Kevin McLaughlin, or any other person or organization to defame Don Blankenship" and that they were not aware of any "other person connected with 35th Inc. [who] engaged in any sort of conspiracy with the NRSC, Kevin McLaughlin, or any other person or organization to defame Don Blankenship. . ." Exhibit 1 (Affidavit of Charles Gantt) at ¶ ¶ 5-6; Exhibit 2 (Affidavit of David James Eckert) at ¶ ¶ 18-19.

As Plaintiff has not produced any evidence that 35th PAC engaged an underlying tort or in a conspiracy to defame the Plaintiff, and 35th PAC has produced sworn affidavits from multiple representatives denying such a conspiracy, 35th PAC is entitled to summary judgment on the

conspiracy to commit defamation allegations in Plaintiff's Second Cause of Action.

C.  35th PAC is Entitled to Summary Judgment on the Third Cause of Action (False Light Invasion of Privacy)

In the Third Cause of Action in the First Amended Complaint, Mr. Blankenship alleges that 35th PAC committed the tort of false light invasion of privacy by making the subject Tweet. Am. Compl. ¶ 239.

> Previously in this action, this Court has held that:
>
> In a false light invasion of privacy claim, the plaintiff must prove that: (1) the defendant gave publicity to a matter concerning the plaintiff that places the plaintiff before the public in a false light, (2) the publicity was widespread, (3) the matter of the publicity was false, (4) the false light in which the plaintiff was placed would be 'highly offensive to a reasonable person,' and (5) the defendant 'had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff' would be placed' (i.e., actual malice).

Memorandum Opinion and Order, 3/31/20 (ECF # 398) at pp. 27-28 (internal citations omitted). "False light invasion of privacy claims are similar to defamation claims in that both require the publication of false material regarding the plaintiff." *Id*. at p. 28. "West Virginia courts therefore treat false light privacy claims in essentially the same manner as they treat defamation claims. *Id*. (internal citations omitted).

Just as Mr. Blankenship's defamation claim fails for failure to prove actual malice on the part of 35th PAC, so too does Mr. Blankenship's false light invasion of privacy claim.

As discussed in greater length above and incorporated herein, the evidentiary record is unequivocal that 35th PAC did not have "knowledge that [the Tweet] was false or [acted] with reckless disregard of whether it was false or not." *New York Times Co.*, 376 U.S. at 280. In a sworn affidavit, 35th PAC's former Executive Director, D.J. Eckert, averred that "the reference to Mr. Blankenship as a 'felon' was based on what we believed to have been Mr. Blankenship's

criminal status following Mr. Blankenship's conviction in federal court, and was based on our team's research into Mr. Blankenship's biography and his criminal conviction.  This Tweet and the link to the *Charleston Gazette-Mail* article was an attempt to accurately highlight Mr. Blankenship's legal status based on how we understood it as of April 10, 2018, as it pertained to Mr. Blankenship's qualifications to serve as U.S. Senator from West Virginia." Exhibit 2 (Affidavit of David James Eckert) at ¶ 13. Mr. Blankenship can point to no factual evidence to the contrary—only abject conjecture. As such, 35th PAC is entitled to summary judgment on the Third Cause of Action, Mr. Blankenship's false light invasion of privacy claims.

D.  35th PAC is Entitled to Summary Judgment on the Fourth Cause of Action (Conspiracy to Commit False Light Invasion of Privacy)

Plaintiff's allegations that 35th PAC engaged in a conspiracy to commit false light invasion of privacy fail for the same reasons that his similar conspiracy to commit defamation claims also fails. *See* Section A.2 *supra*, incorporated fully herein.

"In order for a civil conspiracy to be actionable, the plaintiff must prove that the defendants have committed 'some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff.'" Memorandum Opinion and Order, 3/31/20 (ECF # 398) at p. 30 (*quoting Dunn*, 689 S.E.2d at 268–69).

"In order to succeed on his civil conspiracy claim, Plaintiff would need to establish that two or more persons agreed by concerted action to accomplish an unlawful purpose or a lawful purpose for unlawful means. Moreover, Plaintiff would need to point to evidence sufficient to create a genuine issue of material fact that 'the person who did not actually commit the tort shared a common plan for its commission with the actual perpetrators.'" *Hanson v. First Nat'l Bank*, No. 5:10-cv-00906, 2012 U.S. Dist. LEXIS 102227, at #41 (S.D.W. Va. Apr. 23, 2012) (*quoting Dunn*, 689 S.E.2d. at 68).

Just as in Plaintiff's other baseless conspiracy allegations, Plaintiff alleges that 35th PAC engaged in a conspiracy with the NRSC, Kevin McLaughlin, and unknown persons to commit false light invasion of privacy. Am. Compl. ¶ ¶ 246-249.

As discussed in greater detail above, Plaintiff has not produced any evidence that anyone connected with 35th PAC even interacted with Mr. McLaughlin or anyone from the NRSC during the pendency of the events giving rise to this lawsuit, let alone conspired with them.

And while 35th PAC questioned Plaintiff on the identity of the unknown co-conspirators, Plaintiff stated that "[a]t present, Plaintiff is unaware of the identities of "DOES 26-50" referenced in the First Amended Complaint." Exhibit 5 (Don Blankenship Response to Interrogatories at Page 15, Response to Interrogatory No. 19). This is despite Mr. Blankenship having queried 35th PAC on its interactions with countless individuals and groups in a scattershot attempt to produce some evidence of a conspiracy.

Contrastingly, by sworn affidavits, both Charles Gantt, 35th PAC's Treasurer, and D.J. Eckert, 35th PAC's former Executive Director, aver that they did not "engage in a conspiracy with the NRSC, Kevin McLaughlin, or any other person or organization to defame Don Blankenship or engage in false light invasion of privacy" and that they were not aware of any "other person connected with 35th Inc. [who] engaged in any sort of conspiracy with the NRSC, Kevin McLaughlin, or any other person or organization to defame Don Blankenship or engage false light invasion of privacy." Exhibit 1 (Affidavit of Charles Gantt) at ¶ ¶ 5-6; Exhibit 2 (Affidavit of David James Eckert) at ¶ ¶ 18-19.

As Plaintiff has not produced any evidence that 35th PAC engaged in a conspiracy to commit false light invasion of privacy against Mr. Blankenship, and 35th PAC has produced sworn affidavits from multiple representatives denying such a conspiracy, 35th PAC is entitled to

summary judgment on the conspiracy on the Fourth Cause of Action, Plaintiff's conspiracy to commit false light invasion of privacy allegations.

V.      CONCLUSION

   WHEREFORE, 35th PAC respectfully requests that the Court grant its motion for summary judgment in favor of 35th PAC.


   Respectfully submitted this 24th day of May, 2021.


                                    _/s/ Zachary M. Wallen_
                                    Zachary M. Wallen, Esquire
                                    WV ID #11594
                                    Chalmers & Adams LLC
                                    zwallen@chalmersadams.com
                                    301 South Hills Village Drive
                                    Suite LL200-420
                                    Pittsburgh, PA 15241
                                    Tel.: (412) 200-0842
                                    Fax: (412) 235-5001

                                    *Attorney for Defendant*
                                    *35th PAC*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DON BLANKENSHIP,                        )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        Civil Action No.: 2:19-cv-00236
                                        )
FOX NEWS NETWORK, LLC,                  )
et al.,                                 )
                                        )
                    Defendants.         )

## **CERTIFICATE OF SERVICE**

I, Zachary M. Wallen, certify that on May 24, 2021, a true and correct copy of the

foregoing was served via CM/ECF on all counsel of record in this action registered to receive

CM/ECF notification.

> /s/ Zachary M. Wallen
> Zachary M. Wallen, Esquire
> WV ID #11594
> Chalmers & Adams LLC
> zwallen@chalmersadams.com
> 301 South Hills Village Drive
> Suite LL200-420
> Pittsburgh, PA 15241
> Tel.: (412) 200-0842
> Fax: (412) 235-5001
>
> *Attorney for Defendant*
> *35th PAC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

DON BLANKENSHIP,
                Plaintiff,

v.                                          Civil Action No.: 2:19-cv-00236

FOX NEWS NETWORK, LLC, et al.,
                Defendants.

**PLAINTIFF'S RESPONSE TO MOTION
FOR SUMMARY JUDGMENT OF 35th PAC**

Plaintiff Don Blankenship responds as follows to the Motion for Summary Judgment of

Defendant 35th PAC.

     1. The publication at issue in this case constitutes defamation per se.

     2. General damages from the defamation per se are presumed.

     3. The supporting affidavit and surrounding circumstances provide sufficent evidence

from which a rational jury could find constitutional malice and the intent to injure the Defendant

Mr. Blankenship.

     **WHEREFORE,** Defendant 35th PAC's Motion for Summary Judgment should be

denied.

     Exhibit 1 is attached. A supporting memorandum is being submitted.


/s/ James M. Cagle
James M. Cagle (WV Bar No. 580)
1200 Boulevard Tower
1018 Kanawha Boulevard, East
Charleston, West Virginia 25301
Email: caglelaw@aol.com
Phone: (304) 342-3174
Fax: (304) 342-0448
*Counsel for Plaintiff Don Blankenship*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

DON BLANKENSHIP,

       Plaintiff,

v.                                                                          Civil Action No.: 2:19-cv-00236

FOX NEWS NETWORK, LLC, et al.,

       Defendants.

## CERTIFICATE OF SERVICE

The undersigned, counsel for the Plaintiff Don Blankenship, does hereby certify that a

true and correct copy of the *Plaintiff's Response to Motion for Summary Judgment of 35th PAC*

was served via electronic filing to all CM/ECF participants on the on this the 7th day of June,

2021.

/s/ James M. Cagle
James M. Cagle (WV Bar No. 580)
1200 Boulevard Tower
1018 Kanawha Boulevard, East
Charleston, West Virginia 25301
Email: caglelaw@aol.com
Phone: (304) 342-3174
Fax: (304) 342-0448
*Counsel for Plaintiff Don Blankenship*

# EXHIBIT 1

USCA4 Appeal: 22-1108    Doc: 59    Filed: 05/25/2022    Pg: 114 of 300





# Pro-Morrisey super PAC received contribution from indicted Giuliani associates

By Alex Thomas
October 10  2019 - 9:33 pm

CHARLESTON, W.Va. — Two Florida-based businessmen with ties to President Donald Trump's personal attorney face charges after allegedly violating federal campaign laws.

The men, Lev Parnas and Igor Fruman, made donations in a corporation's name to avoid reporting requirements. One of their donations went to a political action committee supporting West Virginia Attorney General Patrick Morrisey.

According to the U.S. Attorney's Office in the southern district of New York on Thursday, Parnas and Fruman attended political fundraising events in 2018 in hopes of accessing political figures. The office notes the men "sought to advance their personal financial interests," as well as the political interest of at least one Ukrainian official.

Parnas and Fruman made two political donations in May 2018: a $325,000 contribution to America First Action, a pro-Trump super PAC, and 35th Inc., a super PAC that spent millions of dollars as Morrisey was running for U.S. Senate.

35th Inc. spent around $7 million from its launch in March 2017 through December 2018, including $1.1 million directly supporting Morrisey. Parnas and Fruman made the donation on May 3, less than a week before West Virginia's primary election.

Parnas and Fruman reported political contributions under Global Energy Producers LLC, a purported liquefied natural gas import-export business. Records from the Federal Election Commission note Global Energy Producers is located in Boca Raton, Florida.

The U.S. Attorney's Office said the contributions did not come from Global Energy Producers' funds.

"Rather, the donations came from a private lending transaction between Fruman and third parties, and never passed through a GEP account," the office said. "Parnas and Fruman deliberately made the contributions in GEP's name in order to evade federal reporting requirements and to conceal that they were the true source of the contributions, including so as to hide from creditors the fact that they had access to funding."

Morrisey's office directed all questions to 35th Inc.

"35th Inc. PAC is an independent entity, and any questions should be directed to them," said Brian O'Neel, a spokesperson for the attorney general's office.

Charles Cann, the treasurer of 35th Inc., did not return MetroNews' request for comment.

35th Inc.'s mailing address notes all letters should be listed in care of law firm Clark Hill PLC at its Morgantown office. No comment from the law firm was returned by the time of publication.

The indictment also alleges Parnas and Fruman committed to raising $20,000 for a sitting congressman and asked the lawmaker for help in removing the American ambassador to Ukraine. NBC News reported the legislator is former Rep. Pete Sessions, R-Texas, who lost his re-election bid in last year's election cycle.

Leaders in the U.S. House of Representatives subpoenaed Parnas and Fruman for information regarding reports about their work as well as association with Rudy Giuliani. Giuliani and the men worked together to set up meetings with Ukrainian officials and discuss an investigation into former Vice President Joe Biden and his son Hunter.

"Your clients are private citizens who are not employees of the Executive Branch. They may not evade requests from Congress for documents and information necessary to conduct our inquiry," three House committee chairmen said.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

DON BLANKENSHIP,

      Plaintiff,

v.

                                   Civil Action No.: 2:19-cv-00236
                                   Hon. John T. Copenhaver, Jr., District Court

FOX NEWS NETWORK, LLC, et al.,

      Defendants.

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## 35TH PAC'S MOTION FOR SUMMARY JUDGMENT

---

Submitted by:
James M. Cagle (WV Bar No. 580)
1200 Boulevard Tower
1018 Kanawha Boulevard, East
Charleston, West Virginia 25301
Email: caglelaw@aol.com
Phone: (304) 342-3174
Fax: (304) 342-0448
*Counsel for Plaintiff Don Blankenship*

## Statement of Facts

Plaintiff Donald Blankenship was the Chairman and CEO of Massey Energy Company at the time when Massey was traded on the New York Stock Exchange. Massey was one of America's largest and most successful mineral extractors. A Massey subsidiary Performance Coal Company experienced a deadly explosion in April of 2010 at the Upper Big Branch (UBB) mine in Southern West Virginia. 29 Coal miners lost their lives in that tragic event.

In the late fall of 2015 Mr. Blankenship stood trial in the same District Court for charges **not related to the cause of that terrible explosion** as many have wrongfully believed. The trial was for accusations of securities law violations and a count of conspiracy to violate mandatory federal mine safety and health standards at UBB and conspiracy to defraud the federal government, Southern District of West Virginia case no. 5:14-cr-00244. The verdict returned at the conclusion of a 36 day trial was not guilty of any of the three felonies charged, but guilty on a single misdemeanor charge.[1] Mr. Blankenship lost his appeal, served his sentence and paid his fine.

In 2018 Mr. Blankenship was a candidate for the U.S. Senate. He ran as a Republican in the May, 2018 West Virginia primary. His candidacy was widely publicized. After losing in the primary he announced his intention to run as a third party candidate in the general election against incumbent Senator Manchin and the State's Attorney General who had won the Republican primary. The defamatory publication occurred in the context of the Senate race.

---

[1]The outcome of a motion to vacate the conviction under 28 U.S.C. §2255 was favorably recommended by a U.S. Magistrate Judge but denied by the District Court. That is under review in the Fourth Circuit Court of Appeals at this time, case no. 20-6330. It was determined that the prosecution had withheld more than 100 items of discoverable evidence which included much *Brady* material.

1

Defendant 35⁺ PAC is a federal political committee funded by contributions from very wealthy donors in this case by among others Bernard Marcus, cofounder head of Home Depot and others who seek advantages as being donors, see Exhibit 1. At the time pertinent hereto 35ᵗʰ PAC was supporting Mr. Blankenship's opponent West Virginia AG Patrick Morrisey in the Republican West Virginia primary for U.S. Senate, Affidavit Charles Grant ECF no. 892-1 paragraph 7. In response to a tweet sent by Mr. Blankenship about his own candidacy one David James Eckert of the PAC recklessly fired off the following Tweet as he explains in his affidavit.

On April 10, 2018, in response to a Tweet made by Mr. Blankenship, 35ᵗʰ PAC authored a Tweet that said **"You are a convicted felon hurting West Virginia families**. That's why @realDonald Trump administration won't help you."

In his affidavit Mr. Eckert essentially supplies the facts appropriate for denying the PAC's motion for summary judgment which the affidavit is intended to support. In ECF 892-2, paragraph 6 he states it was their "usual" practices and procedures for all of its communications to be vetted by legal counsel prior to dissemination, in order to ensure that all such communications were legally correct. . . Mr. Eckert states that he read (as did "our team's research") news article indicating that Mr. Blankenship was a felon or that his conviction was for a felony, paragraphs 9, 13. On the strength of the foregoing he then committed defamation per se.

### A.

### What 35ᵗʰ PAC Published Constitutes Defamation Per Se

In the District Court's Memorandum Opinion and Order of March 31, 2020, E.C.F. no. 398 the Court found:

"All the Defendants' statement identifying the Plaintiff as a 'felon' are materially false.

2

The term "felon" is an objective label with a clear meaning . . . a person either is or is not a felon; there is no in between or room for "substantial truth; Id, p. 22 of 80.

In West Virginia "written works [falsely] charging a person with the commission of any crime, whether a felony or a misdemeanor, are actionable without allegation or proof of special damages," Milan v. Long, 78 W.Va. 102, 88 S.E. 618 (1916). Calling one a convicted felon who is not such constitutes defamation per se.

> "Any printed or written publication falsely inputting to another a crime or moral delinquency *is actionable per se*, without proof of special damages," Colcord v. Gazette Pub. Co., 106 W.Va. 419, 145 S.E. 751 (1928) syl. pt. 2, italics added.

In Virginia as in West Virginia defamatory words which are actionable per se command that one who has been so defamed is *presumed to have suffered general damages, and any absence of actual injury is considered only in diminution of damages,"* Stamathis v. Flying J., 389 F. 3d 429, (4ᵇ Cir. 2004) 439-440 (2004)  The Fourth Circuit there emphasized that this body of law shows:

> "The extent to which Virginia law protects a person in his employment. . ." Id.

The Court affirmed both the general damages and punitive damages.

As the above demonstrates the findings and conclusions in the Court's Memorandum Opinion and Order is frankly sufficient to reject on its face 35ᵗʰ PAC's argument that they are entitled to summary judgment. The offending statement is defamation per se under settled law.


**B.**

**General Damages are Presumed Under Applicable Law**

3

4462

As stated abovewhere defamation per se exists West Virginia law presumes damages without allegation or proof of special damages, Milan; Colgord, supra. Under the Stamathis case the 4ᵗʰ Circuit has held the absence of actual injury is considered only in diminution. Thus, the damage element is sufficiently satisfied to avoid summary judgment.

## C.

### Malice and the Intent to Injure are Questions of Fact for a Jury to Decide

Constitutional malice and the intent to injure may be inferred from circumstantial evidence resulting in the need for a jury, Masson v. New Yorker Magazine. 501 U S. 496 (1991). The circumstantial evidence is that the author did nothing to investigate the accuracy of his published comments, claims he relied on legal vetting which appears dubious, as does his claim that he read that Mr. Blankenship was a felon in the Charleston Newspaper. In fact, he provided no corroboration of these claims of legal vetting and what he claims he read either with the motion or in the discovery response.

From the foregoing circumstances a rational jury could indeed should find malice and an intent to injure. Mr. Eckert's tweet mimics the personal nastiness that has plagued our politics in recent years. More specifically his false label of "felon" under these circumstances supplies facts as to the state of mind of the author which a rational jury not only could but would find to be both malice and intent to cause injury to Mr Blankenship's reputation and candidacy.

**WHEREFORE** the Plaintiff moves the Court to deny Defendant 35ᵗʰ PAC's Motion for

4

Summary Judgment as to defamation and false light invasion of privacy contained in Counts One

and Three of the Amended Complaint.


/s/ James M. Cagle
James M. Cagle (WV Bar No. 580)
1200 Boulevard Tower
1018 Kanawha Boulevard, East
Charleston, West Virginia 25301
Email: caglelaw@aol.com
Phone: (304) 342-3174
Fax: (304) 342-0448
*Counsel for Plaintiff Don Blankenship*

5

4464

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

DON BLANKENSHIP,

    Plaintiff,

v.                                                  Civil Action No.: 2:19-cv-00236
                                                    Hon. John T. Copenhaver, Jr., District Court

FOX NEWS NETWORK, LLC, et al.,

    Defendants.

## CERTIFICATE OF SERVICE

The undersigned, counsel for the Plaintiff Don Blankenship, does hereby certify that a

true and correct copy of the *Plaintiff's Memorandum in Opposition to 35th PAC'S Motion for*

*Summary Judgment* was served via electronic filing to all CM/ECF participants on the on this

the 7th day of June, 2021.

/s/ James M. Cagle
James M. Cagle (WV Bar No. 580)
1200 Boulevard Tower
1018 Kanawha Boulevard, East
Charleston, West Virginia 25301
Email: caglelaw@aol.com
Phone: (304) 342-3174
Fax: (304) 342-0448
*Counsel for Plaintiff Don Blankenship*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DON BLANKENSHIP,                          )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )          Civil Action No.: 2:19-cv-00236
                                          )
FOX NEWS NETWORK LLC, et al.,             )
                                          )
                    Defendants.           )


**REPLY IN SUPPORT OF**
**35TH PAC'S MOTION FOR SUMMARY JUDGMENT**


CHALMERS & ADAMS LLC

Zachary M. Wallen
WV ID #11594
zwallen@chalmersadams.com
301 South Hills Village Drive
Suite LL200-420
Pittsburgh, PA 15241
Tel.: (412) 200-0842
Fax: (412) 235-5001

Attorney for Defendant
35th PAC

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. I

I.      MR. BLANKENSHIP DOES NOT OPPOSE SUMMARY JUDGMENT AS TO
        THE SECOND (CONSPIRACY TO COMMIT DEFAMATION) AND FOURTH
        (CONSPIRACY TO COMMIT FALSE LIGHT INVASION OF PRIVACY)
        CAUSES OF ACTION IN THE AMENDED COMPLAINT ............................................ 1

II.     PLAINTIFF HAS NOT MET HIS EVIDENTIARY BURDEN TO SURVIVE
        SUMMARY JUDGMENT ON THE REMAINING CAUSES OF ACTION .................. 2

III.    PLAINTIFF'S TARDY AND PROCEDURALLY FLAWED ATTEMPT TO FILE
        A SECOND RESPONSE BRIEF DOES NOT CHANGE THE COURT'S
        SUMMARY JUDGMENT ANALYSIS .......................................................................... 6

IV.     CONCLUSION ................................................................................................................ 8

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................ 3, 5, 6

*Carr v. Deeds*, 453 F.3d 593 (4th Cir. 2006) ...................................................................... 7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 2, 3, 7

*Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657 (1989) ................................... 5

*Masson v. New Yorker Magazine*, 501 U.S. 496 (1991) .................................................... 4, 5

*Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1985) ......................... 2

*Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971) ............................................................ 5

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...................................................... 5

*Pritt v. Republican Nat. Comm.*, 557 S.E.2d 853 (W. Va. 2001) ..................................... 5

*Propst v. HWS Co.*, 148 F. Supp. 3d 506 (W.D.N.C. 2015) ........................................... 6

*Republican Party of Minnesota v. White*, 536 U.S. 765 (2002) ....................................... 5

*Zellers v. NexTech Northeast, LLC*, 533 Fed. Appx. 192 (4th Cir. 2013) ......................... 7

Defendant Don Blankenship's Response to 35th PAC's Motion for Summary Judgment (ECF # 913) and his supporting Memorandum of Law (ECF # 916) only further demonstrate the complete lack of evidence in support of any of Mr. Blankenship's allegations against 35th PAC in the Amended Complaint. Accordingly, 35th PAC's Motion for Summary Judgment should be granted in its entirety in favor of 35th PAC.

I.   <u>Mr. Blankenship does not oppose summary judgment as to the Second (conspiracy to commit defamation) and Fourth (conspiracy to commit false light invasion of privacy) causes of action in the Amended Complaint</u>

As an initial matter, Mr. Blankenship abandoned his baseless conspiracy allegations against 35th PAC, and does not oppose 35th PAC's Motion for Summary Judgment as it pertains to the claims Mr. Blankenship lodged in the Second and Fourth Cause of Action in the Amended Complaint, namely Conspiracy to Commit Defamation and Conspiracy to Commit False Light Invasion of Privacy.[1] [2] *See* Memorandum (ECF # 916) at p. 4-5 ("The Plaintiff moves the Court to deny Defendant 35th PAC's Motion for Summary Judgment as to defamation and to false light invasion of privacy contained in Counts One and Three of the Amended Complaint.").

As 35th PAC's Motion is unopposed as to the Second and Fourth Causes of Action in the Amended Complaint, namely Conspiracy to Commit Defamation and Conspiracy to Commit False Light Invasion of Privacy, those causes of actions may be summarily dismissed.

---

[1] This is far cry from the early stages of this case when Mr. Blankenship baselessly alleged that "35th PAC . . . played a key role in coordinating the efforts of some of the other defendants. Defendant 35th PAC is . . . one of the ringleaders of the cabal." Memorandum of Points and Authorities in Support of Motion to Remand to State Court (ECF # 6).

[2] Similarly, Mr. Blankenship only mentions his Third Cause of Action, False Light Invasion of Privacy, in passing at the end of his Memorandum (ECF # 916), having not opposed it in his Response (ECF # 913) or having addressed any of the requisite legal elements of the Cause of Action in his supporting Memorandum. As such, summary judgment as to the Third Cause of Action, False Light Invasion of Privacy is arguably unopposed, as well.

1

II.     <u>Plaintiff has not met his evidentiary burden to survive summary judgment on the remaining causes of action</u>

In its Motion for Summary Judgment, 35th PAC made two global contentions as to the remaining causes of action, defamation and false light invasion of privacy, both centered on the lack of evidence of actual malice in the evidentiary record.[3] First, 35th PAC argued that Mr. Blankenship has not presented *any* evidence, let alone the clear and convincing evidence required by law, that 35th PAC demonstrated actual malice when making the Tweet giving rise to this litigation. Second, 35th PAC offered evidence of its strident and consistent denials of having known the Tweet was false at the time of dissemination. *See*, *e.g.*, Affidavit of David James Eckert (ECF # 893-2); Answer of 35th PAC (ECF # 304); Defendant 35th PAC Responses and Objections to Plaintiff's First Set of Interrogatories and Second Set of Requests for Production of Documents (ECF # 893-4). As such, 35th PAC made a *prima facie* showing of the appropriateness of summary judgment, as there is no genuine issue of material fact on this issue.

While the moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the non-moving party must come forward with more than "mere speculation or the building of one inference upon another" to resist dismissal of the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1985).

---

[3] In its Answer, 35th PAC also raised the affirmative defense that its Tweet was substantially true given Mr. Blankenship's criminal record and continues to preserve this argument. *See* Answer of 35th PAC (ECF # 304) at pp. 51-52; Memorandum of Law in Support of Motion for Summary Judgment (ECF # 893) at p. 7. Given the complete absence of any evidence that 35th PAC acted with actual malice, however, 35th PAC focuses its summary judgment argument on the requirement that Mr. Blankenship prove actual malice for both the defamation and false light invasion of privacy causes of action.

If a nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322-23.

As in *Anderson v. Liberty Lobby, Inc.*, this case turns on whether there is any factual dispute as to whether 35th PAC acted with actual malice in making the subject Tweet. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S 242 (1986). "Where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson*, 477 U.S. at 255-56.

Here, rather than presenting any concrete evidence that 35th PAC acted with actual malice in the present case, Mr. Blankenship's opposition pleadings contain only the same conjecture and inuendo contained in the First Amended Complaint. At best Mr. Blankenship offers only "mere speculation" and "metaphysical doubt" as to the evidence cited in 35th PAC's Motion for Summary judgment. Notwithstanding his legal requirements to do so, Mr. Blankenship offers no evidence to prove that 35th PAC acted with actual malice in the present case.

Mr. Blankenship cannot "defeat [35th PAC]'s properly supported motion for summary judgment in a . . . libel case . . . without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and *b*y merely asserting that the jury might, and legally could, disbelieve the defendant's denial of . . . legal malice." *Anderson*, 477 U.S. at 256 (emphasis added).

3

4471

Here, Mr. Blankenship simply does not meet his burden. Mr. Blankenship only devotes two conclusory paragraphs on the last page of his five-page supporting Memorandum to discuss the issue of actual malice. Moreover, it is not clear from the Memorandum that Mr. Blankenship *understands* the legal meaning of "actual malice", let alone offers clear and convincing evidence of its existence in the present case.

In his pleadings, Mr. Blankenship confuses the typical contentiousness that one finds in a political campaign, something he refers to as "malice", with the legal term of art "actual malice." *See* Memorandum (ECF # 916) at p. 4. The only case that Mr. Blankenship cites regarding actual malice, *Masson v. New Yorker Magazine*, in fact, walks through this common layperson misconception. 501 U.S. 496 (1991).

"Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or motive arising from spite or ill will." *Id*. at 510. In an attempt to eliminate some of this confusion, the Supreme Court noted that "in place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity. This definitional principle must be remembered in the case before us." *Id*. at 511.

For evidence of 35th PAC's "knowledge of falsity or reckless disregard as to truth or falsity", Mr. Blankenship cites only to his own disbelief of the denials of 35th PAC, specifically that 35th PAC did not know that the Tweet was false at the time of its dissemination and to his doubts about the practices of 35th PAC. *See* Memorandum (ECF # 916) at p. 4. These "metaphysical doubt[s]" of Mr. Blankenship as to the truthfulness of 35th PAC's denials, for which he offers no supporting facts or corroboration, are simply not evidence of actual malice.

In the final paragraph of his Memorandum, Mr. Blankenship again "confuse[s] [actual

malice] with the concept of malice as an evil intent or motive arising from spite or ill will."
*Masson*, 501 U.S. at 510. Indeed, Mr. Blankenship shockingly seems to argue that simply
because the speech in question was "political," that it would be reasonable for a Court to infer
actual malice. Memorandum (ECF # 916) at p. 4.

This contention is of course wholly misguided as to Mr. Blankenship's burden of proof in
the present case, the case law on candidate for public office/public figure defamation, and
centuries of case law protecting the First Amendment right to engage in political speech. Indeed,
the First Amendment embodies "a profound national commitment to the principle that debate on
public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*,
376 U.S. 254, 270 (1964). It "has its fullest and most urgent application . . . to the conduct of
campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). Indeed,
"debate on the qualifications of candidates is at the core of our electoral process and of the First
Amendment freedoms." *Republican Party of Minnesota v. White*, 536 U.S. 765, 781 (2002).

This is why to prevail on a defamation or false light invasion of privacy claim, Mr.
Blankenship must prove by "clear and convincing evidence" that 35th PAC's Tweet was
materially false and that the defendant acted with "actual malice." *Masson*, 501 U.S. at 510, 516-
17 (1991); *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 659 (1989); *Pritt v.
Republican Nat'l Comm.*, 557 S.E.2d 853, 861 (W. Va. 2001).

As Mr. Blankenship's only evidence of 35th PAC's alleged "knowledge of falsity or
reckless disregard as to truth or falsity" of the subject Tweet are his own baseless doubts as to the
veracity of 35th PAC's denials, Mr. Blankenship has not carried his evidentiary burden to
survive 35th PAC's motion for summary judgment. *See Anderson*, 477 U.S. at 256 (Plaintiff
must offer "concrete evidence" . . . [rather than] merely asserting that the jury might, and legally

could, disbelieve the defendant's denial of . . . legal malice" in order to survive a defendant's motion for summary judgment."). As such, 35th PAC's motion for summary judgment should be granted in its entirety.

III.    <u>Plaintiff's tardy and procedurally flawed attempt to file a second response brief does not change the Court's summary judgment analysis</u>

Four days after Plaintiff's deadline to file a Response to 35th PAC's motion for summary judgment, Plaintiff, by other counsel, improperly sought to introduce new (albeit flawed and non-dispositive) evidence into the record via a *second* Response brief, thinly disguised as a Motion to Strike Portions of Affidavit of David James Eckert (ECF # 929).

Notwithstanding the fact that this motion is meritless, it is also in clear violation of this Court's Scheduling Order and the Rules of Civil Procedure. In the motion, Mr. Blankenship ostensibly seeks to strike portions of the Affidavit of David James Eckert, 35th PAC's former executive director, while actually seeking to improperly enter additional items into evidence in support of his opposition to 35th PAC's motion for summary judgment. *See id.* at Exhibits 1-5 (which, *inter alia*, includes an affidavit from Mr. Blankenship on a wide variety of issues unrelated to the Eckert Affidavit (ECF # 929-1); *see also* Scheduling Order (ECF # 444) (requiring all responsive pleadings to dispositive motions to be filed by June 7, 2021).

While 35th PAC plans, and expressly reserves the right, to file a separate response to Mr. Blankenship's motion detailing why its lateness and other procedural shortcomings[4] require its

---

[4] "[A] motion to strike is no longer the favored (or authorized) method of challenging the inadmissible nature of evidentiary submissions at the summary judgment stage. Since the 2010 amendment to the Federal Rules of Civil Procedure, a motion to strike is technically not available to motions for summary judgment; rather, courts should treat the issues raised by such a motion as objections to the evidence and, if the Court finds the objections have merit, the improper evidence may simply be disregarded by the Court." *Propst v. HWS Co.*, 148 F. Supp. 3d 506, 511 (W.D.N.C. 2015). Moreover, Mr. Blankenship not only did not previously raise any issues about the Eckert affidavit in his Response brief, Mr. Blankenship expressly *relied* on the Eckert affidavit that he now seeks to strike as his own evidence to support his opposition to

denial, 35th PAC wishes to briefly comment as to why Mr. Blankenship's eleventh-hour motion, even if granted, would have no procedural effect on this Court's analysis of 35th PAC's motion for summary judgment.

35th PAC, through its Answer and its responses to discovery, has consistently denied that it had knowledge that the Tweet was false at the time it was made. Mr. Blankenship, by contrast, offers no evidence, let alone clear and convincing evidence that 35th PAC acted with actual malice in its Tweet. As such, there is no genuine issue of material fact in the present case.

"There is no burden upon the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact. Rather, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Carr v. Deeds*, 453 F.3d 593, 608 (4th Cir. 2006) (internal citations omitted); *see also Zellers v. NexTech Northeast, LLC*, 533 Fed. Appx. 192, 200 (4th Cir. 2013) ("a complete failure of proof concerning an essential element of the plaintiff's case necessitates a grant of summary judgment in favor of the defendant.") (*citing Celotex*, 477 U.S. at 322-23).

"Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the summary judgment motion may, and should be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c) is satisfied." *Carr*, 453 F.3d at 608.

---

summary judgment. *See* Memorandum (ECF # 916) at p. 2 (discussing the Eckert Affidavit where "Mr. Eckert states that he read (as did 'our team's research') news article indicating that Mr. Blankenship was a felon or that his conviction was for a felony, paragraph 9, 13. On the strength of the foregoing he then committed defamation per se."); *id.* at p. 4 (citing the Eckert affidavit on the question of actual malice). Finally, the issues raised in the Motion to Strike are themselves meritless, as the subject paragraphs are all based on Mr. Eckert's personal knowledge.

As discussed above and in 35th PAC's Memorandum of Law in Support of its Motion for Summary Judgment, Mr. Blankenship's only "evidence" in the present case are the unfounded inferences and "metaphysical doubts" that he has about Mr. Eckert's sworn affidavit and 35th PAC's other denials of actual malice. Even if the subject paragraphs of the Eckert affidavit were disregarded, Mr. Blankenship would still have *no evidence* that 35th PAC acted with actual malice in the present case.

Accordingly, while Mr. Blankenship's Motion to Strike is an unfortunate eleventh-hour attempt by Mr. Blankenship to disguise a late-filed pleading, it has no effect on this Court's summary judgment analysis.

## IV.   Conclusion

WHEREFORE, 35th PAC respectfully requests that the Court grant its motion for summary judgment and enter an order dismissing this litigation as it pertains to Defendant 35th PAC.

Respectfully submitted this 14th day of June, 2021.

/s/ Zachary M. Wallen
Zachary M. Wallen, Esquire
WV ID #11594
Chalmers & Adams LLC
zwallen@chalmersadams.com
301 South Hills Village Drive
Suite LL200-420
Pittsburgh, PA 15241
Tel.: (412) 200-0842
Fax: (412) 235-5001

*Attorney for Defendant*
*35th PAC*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DON BLANKENSHIP,                          )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        Civil Action No.: 2:19-cv-00236
                                          )
FOX NEWS NETWORK, LLC,                    )
et al.,                                   )
                                          )
                    Defendants.           )

## CERTIFICATE OF SERVICE

I, Zachary M. Wallen, certify that on June 14, 2021, a true and correct copy of the
foregoing was served via CM/ECF on all counsel of record in this action registered to receive
CM/ECF notification.

                                    /s/ Zachary M. Wallen
                                    Zachary M. Wallen, Esquire
                                    WV ID #11594
                                    Chalmers & Adams LLC
                                    zwallen@chalmersadams.com
                                    301 South Hills Village Drive
                                    Suite LL200-420
                                    Pittsburgh, PA 15241
                                    Tel.: (412) 200-0842
                                    Fax: (412) 235-5001

                                    *Attorney for Defendant*
                                    *35th PAC*

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

DON BLANKENSHIP,                          *

      Plaintiff,                          *

v.                                        *       Civil Action No.: 2:19-cv-00236

HONORABLE ANDREW                          *
NAPOLITANO (RET.), *et al.*                       (Hon. John T. Copenhaver, Jr.,
                                          *       District Judge)
      Defendants.                         *

                    *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### DEFENDANT ELI LEHRER'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant Eli Lehrer ("Mr. Lehrer") respectfully moves this Court to grant summary judgment in favor of Mr. Lehrer for the reasons set forth in the Memorandum of Law in Support of Mr. Lehrer's Motion for Summary Judgment submitted herewith.  In accordance with Local Rule 7.1(a)(1), the exhibits to Mr. Lehrer's Motion and Memorandum of Law are attached to this Motion.

Dated:  June 7, 2021

                              Respectfully submitted,

                              */s/ BreiAnne Varner Redd*
                              Joseph S.D. Christof, Esq. (WV#6277)
                              Melvin F. O'Brien, Esq. (WV# 6797)
                              BreiAnne Varner Redd, Esq. (WV# 10894)
                              DICKIE, McCAMEY & CHILCOTE, L.C.
                              2001 Main Street, Suite 501
                              Wheeling, WV 26003
                              Phone: 304-233-1022
                              bredd@dmclaw.com

1

/s/  *Jennifer S. Jackman*_____

Jennifer S. Jackman
*Admitted Pro Hac Vice*
Whiteford, Taylor & Preston, LLP
1800 M. Street N.W., Suite 401
Washington, D.C. 20036
202-659-6800
jjackman@wtplaw.com

4479

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

DON BLANKENSHIP,                    *

     Plaintiff,                       *

v.                                  *          Civil Action No.: 2:19-cv-00236

HONORABLE ANDREW                    *
NAPOLITANO (RET.), *et al.*
                                    *

     Defendants.                      *

                                    *

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th of June 2021, a copy of the foregoing was filed using

CM/ECF, the Court's electronic notification system, which provided notice to all counsel of

record.

<div align="right">

/s/ *BreiAnne Varner Redd*
Joseph S.D. Christof, Esq. (WV#6277)
Melvin F. O'Brien, Esq. (WV# 6797)
BreiAnne Varner Redd, Esq. (WV# 10894)
DICKIE, McCAMEY & CHILCOTE, L.C.
2001 Main Street, Suite 501
Wheeling, WV 26003
Phone: 304-233-1022
bredd@dmclaw.com

</div>

**In the Matter Of:**

*BLANKENSHIP vs*

*FOX NEWS NETWORK*

---

*DON BLANKENSHIP*

*April 29, 2021*

---



EXHIBIT 1

USCA4 Appeal: 22-1198    Doc: 59       Filed: 05/25/2022    Pg: 138 of 300
Case 2:19-cv-00236  Document 898-1  Filed 06/07/21  Page 2 of 11 PageID #: 13759

Don Blankenship - April 29, 2021

92

1      **A.   Yes.**

2          Q.   And what was said?

3               MR. SIMPKINS:  Objection as to

4      form.

5      **A.   Well, the Upper Big Branch mine**

6   **explosion was talked about almost non-stop, at**

7   **any board or other conversation, from April 5,**

8   **2010 until December.**

9          **So, a lot was said at different**

10  **times.  So, I don't recall exactly what was**

11  **said that, you know, when he first informed me**

12  **about the -- or talked to me about the**

13  **retirement.**

14         Q.   So, when you said "informed you,"

15  did he -- did he express to you that the board

16  thought that it may be appropriate for you to

17  depart the company.  And that a graceful way

18  to do that might be for you to elect to

19  retire?

20              MR. SIMPKINS:  Objection as to

21      form.  Calls for speculation.

22      **A.   I think I would characterize it that**

23  **the direction that he and some members of the**

24  **board wanted to take, which was a divestiture,**

1    was different than the direction I thought

2    they should take.

3            And because of that disagreement, of

4    course, the aftermath of the tragedy, it made

5    sense, since we didn't agree, and et cetera,

6    for -- for me to retire.  Yes.

7        Q.   Okay.  So you did not initiate a

8    conversation with the board, or with any of

9    the directors, in which you suggested you were

10   interested in retiring?

11           MR. SIMPKINS:  Objection as to

12       form.

13       A.   I think from -- from the time Obama

14   was strong in his involvement in coal,

15   probably as far back as February of, maybe

16   2010 -- maybe even before that -- we were at

17   odds, if you will, some of us that were

18   operating Massey.  But mostly me and the

19   board, about the direction to take.

20           So, it wasn't a surprise to me that

21   we were separating, if you will, on the

22   strategy for the company.

23       Q.   What did the board believe this

24   strategy should be?

USCA4 Appeal: 22-1198    Doc: 59       Filed: 05/25/2022    Pg: 140 of 300

Don Blankenship - April 29, 2021

154

1   NBC Universal.  I'll be asking a group of

2   questions next.

3                In your testimony earlier, you

4   testified that you retired from Massey Energy

5   Company on December 31st 2010.  Correct?

6                MR. SIMPKINS:  Objection as to

7        form.

8        **A.   I don't know if I was specific,**

9   **December 31.  Whatever that document said.  I**

10  **agreed that it was at the end of 2010.  I**

11  **don't know if it was January 1, 2011; or**

12  **December 23, 2010; or December 31, 2010.**

13       Q.   Since your retirement, have you been

14  employed by anyone?

15       **A.   No.**

16       Q.   You remain to this day, retired.

17  Correct?

18       **A.   Yes.**

19       Q.   Since your retirement, have you

20  served as an independent contractor for

21  anyone?

22                MR. SIMPKINS:  Objection as to

23       form.

24       **A.   I don't think you would call it an**

USCA4 Appeal: 23-1198    Doc: 59       Filed: 05/25/2023    Pg: 141 of 300

1    independent contractor.  I've done a little

2    bit of -- brokered one boat, or two boats of

3    coal for client resources, I think that would

4    be about the extent of it.

5         Q.   But you haven't been a paid

6    independent contractor from -- since your

7    retirement, have you?

8         A.   I think that's correct.

9         Q.   Since your retirement, have you been

10   a paid consultant in any way?

11        A.   No.

12        Q.   Since your retirement, have you

13   served on any boards?

14        A.   No.

15        Q.   Have you pursued employment since

16   your retirement?

17        A.   No.

18        Q.   Why not?

19        A.   Because of the aftermath of the

20   tragedy and various other things.  Like the

21   non-compete agreement.  Being the subject of

22   an FBI investigation.  Being indicted, being

23   tried, being imprisoned, being in a half-way

24   house, and deciding that I should run for the

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 142 of 300
Case 2:19-cv-00236  Document 898-1  Filed 06/07/21  Page 6 of 11 PageID #: 13763

Don Blankenship - April 29, 2021

156

1    U.S. Senate.

2         Q.   So, the Upper Big Branch tragedy

3    impacted your interest in getting employment

4    or your ability to obtain employment?

5              MR. SIMPKINS:  Objection as to

6         form.

7         A.   I don't think the tragedy had much

8    impact.  The reporting on the tragedy had a

9    lot of impact.

10        Q.   So, the reporting on the Upper Big

11   Branch tragedy impacted your ability to obtain

12   employment after retirement?

13             MR. SIMPKINS:  Objection as to

14        form?

15        A.   I think it's fair to say that the --

16   the reporting -- the false reporting and the

17   FBI activity and public statements all had an

18   impact on my desire or likelihood of

19   successfully seeking employment, so there were

20   a lot of factors over that, I guess, about an

21   eight-year period, seven-year period.

22        Q.   And does that impact you still to

23   this day?

24        A.   I don't know.  You know, I mean --

USCA4 Appeal: 22-1198    Doc: 59       Filed: 05/25/2022    Pg: 143 of 300
Case 2:19-cv-00236  Document 898-1   Filed 06/07/21   Page 7 of 11 PageID #: 13824

Don Blankenship - April 29, 2021

262

1   cetera.

2          But 12 out of 12 jurors, having

3   heard the truth, instead of what you guys

4   said, found me not guilty of three felony

5   charges.

6      Q.   And is it your view that the more

7   than half of the respondents who did believe

8   you were guilty, were solely influenced by

9   what you have characterized as false

10  information from the media and the Government?

11          MR. SIMPKINS:  Objection as to

12      form.

13          You can answer.

14     A.   Yeah.  I wouldn't say "were solely."

15  I would say that the number would not have

16  been anywhere near 51 percent, or 57 percent,

17  or whatever.

18          Had the media simply told the truth,

19  and come out and asked questions like,

20  "Mr. Present Obama, how do you know who's

21  responsible?  No one's been back underground

22  yet."

23          Or asked the question that I was

24  raising at that time.  Was it natural gas?  Or

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 144 of 300

Don Blankenship - April 29, 2021

348

1    your prison term?

2        A.    I think it was early May of 2016.

3        Q.    And where were you incarcerated?

4        A.    The Taft prison, in Taft,

5    California.  Which is near Bakersfield.

6        Q.    And you served your entire sentence

7    there, except for the period of time when you

8    were in custody at a half-way house?

9              Is that correct?

10       A.    Yes.

11       Q.    And how many other inmates were

12   incarcerated at the Taft facility -- and I

13   understand there were two -- two parts of that

14   facility.

15             But, how many other inmates

16   were incarcerated at the Taft -- in the Taft

17   facility, at that time, as best you recall?

18       A.    I was told 2,400.  Of course, I

19   don't know.

20       Q.    And everyone else who was

21   incarcerated there, had been convicted of a

22   felony, as far as you know.  Correct?

23       A.    Yes.

24       Q.    Let me rephrase that.  Let me be

USCA4 Appeal: 22-1198    Doc: 59        Filed: 05/25/2022    Pg: 145 of 300

Don Blankenship - April 29, 2021

451

1    Charleston has requested an interview with you

2    for tomorrow.  Please let me know how you

3    would like to respond."

4              Do you see that?

5        A.   Yes.

6        Q.   And, Sir, could you read into the

7    record, your response?

8        A.   "No.  Too busy."

9        Q.   Okay.

10             MR. FUZESI:  I think we're at

11        the good stopping point for now.  To take

12        a 10-minute break.

13             THE VIDEOGRAPHER:  Going off

14        the record.  The time is 7:52 p.m.

15        Eastern.  Off the record.

16          (Short break.)

17             THE VIDEOGRAPHER:  The time is

18        8:06 p.m. Eastern.  Back on the record.

19   BY MR. FUZESI:

20        Q.   Mr. Blankenship, do you recall that

21   in March of 2018, one publication, Politico,

22   referred to you as "The most hated man in

23   West Virginia?"

24        A.   I don't recall that.  It wouldn't

Don Blankenship - April 29, 2021

452

1   surprise me.  They wouldn't be the first to

2   say that.

3       Q.  Okay.  And, in fact, you, yourself,

4   referred to yourself as the most hated man in

5   Mingo County?

6       A.  Yeah.  About 36 years ago --

7           MR. SIMPKINS:  Objection as to

8       form.  I think that's a misstatement.

9       A.  I don't know.  Thirty-six years ago,

10  I said something close to that.  I recall, you

11  know, it was during the violent strike.  I

12  mean, when people are shooting at you, you

13  assume that.

14          MR. FUZESI:  Let's look at --

15      all right.  Let's go to tab 516, please.

16      Exhibit 516.

17      (Exhibit 516 marked for identification)

18          THE WITNESS:  Okay.

19          MR. FUZESI:  I promise I don't

20      have 516 tabs.

21          THE WITNESS:  Well, they may

22      have that many tomorrow.  It's okay if

23      they do.  It's great to get to tell you

24      guys the truth.

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 147 of 300
Case 2:19-cv-00236   Document 898-1   Filed 06/07/21   Page 11 of 11 PageID #: 13768

Don Blankenship - April 29, 2021

453

```
 1   BY MR. FUZESI:

 2        Q.   Mr. Blankenship, we've marked

 3   Exhibit 516 here.  Do you see this is a

 4   Politico story, dated March 26th 2018?

 5        A.   Yes.

 6        Q.   And at -- it's headlined, "Can the

 7   Most Hated Man in West Virginia Win?"  Do you

 8   see that?

 9        A.   Yes.

10        Q.   And that's an article about you?

11             MR. SIMPKINS:  I'll object to

12        foundation.

13             You can answer.

14             THE WITNESS:  I didn't get the

15        question.

16             MR. FUZESI:  Is that an article

17        about you, Sir?

18             THE WITNESS:  Is that an

19        article?  What was the last part?

20             MR. SIMPKINS:  About you.

21             MR. FUZESI:  About you.  About

22        you, Mr. Blankenship.

23             THE WITNESS:  Yes.  I guess so.

24        I haven't read it, but it says:
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**DON BLANKENSHIP**

     Plaintiff

v.                                                    Civil Court Action No: 2:19-CV-00236

**HONORABLE ANDREW
NAPOLITANO (RET.)**, *et al.*

     **Defendants**

---

**AFFIDAVIT**

ELI LEHRER, being first duly sworn, deposes and says:

    1.    My name is Eli Lehrer. I am over eighteen years of age and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit and these facts are true and correct.

    2.    I am the President of R Street Institute, a nonprofit, nonpartisan, public policy research organization which I co-founded in 2012.

    3.    I am not an employee of *The Charleston Gazette* nor have I ever been an employee of *The Charleston Gazette*.

    4.    Through multiple media outlets, I became familiar with Don Blankenship's attempt to run for the Republican nomination, his loss and his attempt to re-register as a Constitution Party candidate so he could run in the General Election in West Virginia.

    5.    Prior to writing the Op-Ed, I reviewed multiple written news and opinions reports, Facebook and other internet sites, saw multiple reports on television and listened to radio programming during which Plaintiff was described as a "convicted felon" from sources I trusted.

EXHIBIT 2

I had no knowledge that Mr. Blankenship had only been convicted of a misdemeanor. I believed the references I read, saw and heard from major media outlets referring to Mr. Blankenship as a convicted felon to be true, based on the fact that I trusted these sources and my general understanding that his conviction arose from a deadly mine explosion. I would not have referred to Mr. Blankenship as a felon if I did not believe it to be true.

6.       In May 2018, I wrote an opinion editorial that was published by *The Charleston Gazette* on or about May 24, 2018, titled "*It's time to end West Virginia's 'sore loser' laws*" (the "Op-Ed").

7.       After writing the Op-Ed, I followed the process I typically follow when I author articles, including a peer-review process. As part of the peer review process, the draft Op-Ed was reviewed by R Street communications staff for clarity, substance of arguments and other generally accepted writing standards. No one identified any issues with regard to the accuracy of the characterization of Mr. Blankenship as a "convicted felon."

8.       On or about May 25, 2018, *The Charleston Gazette* published the Op-Ed. Before publishing the Op-Ed, *The Charleston Gazette* did not alert me to any error with its contents or use of the word "felon", nor were any edits suggested to me concerning the use of the word "felon."

9.       Within 24 hours of the initial publication, *The Charleston Gazette* issued a correction that stated:    "CORRECTION: An earlier version of this column incorrectly characterized Blankenship's conviction. He was convicted of conspiring to violate federal mine safety standards, which is a misdemeanor."

10.     I did not intend to cause harm to Mr. Blankenship. To the contrary, I was advocating on his behalf. The Op-Ed I wrote defended Mr. Blankenship's desire to continue his

Senate campaign and to oppose the "sore loser" law. The article was written after Mr. Blankenship lost the primary election and I advocated for him to be able to continue in the election, despite his loss. My motivation in writing the Op-Ed was to defend Mr. Blankenship's desire to continue his campaign for Senate and, more importantly, make a case against the Sore Loser Law that Mr. Blankenship and I both objected to.

11. The Op-Ed was the first and only article I ever wrote regarding Mr. Blankenship on any topic whatsoever. Moreover, the focus of the Op-Ed was on Sore Loser Laws – not Mr. Blankenship.

12. I do not subscribe to *The Charleston Gazette* and I did not review *The Charleston Gazette* articles relating to Mr. Blankenship's conviction or acquittals before writing the Op-Ed.

13. I never read Mr. Blankenship's booklet, *American Political Prisoner,* or any tweets or emails from Mr. Blankenship. I have no knowledge of ever receiving any of these publications from Mr. Blankenship and do not believe I was ever a recipient of such items.

14. I did not watch the primary debate on Fox News on May 1, 2008.

15. Prior to writing the Op-Ed, I had never met Mr. Blankenship and I had no ill-will toward him.

ELI LEHRER
Elias Rothenberg-Lehrer

State of D.C.    County of WASHINGTON D.C.
Subscribed and sworn before me on 06-02 2021
(Date)
(Notary Signature)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTHERN DISTICT OF WEST VIRGINIA
AT CHARLESTON

**DON BLANKENSHIP**

    **Plaintiff**

v.

**HONORABLE ANDREW**
**NAPOLITANO (RET.), et al.**

    **Defendants**

                        **Civil Court Action No: 2:19-CV-00236**

## AFFIDAVIT

ELI LEHRER, being first duly sworn, deposes and says:

    1.    My name is Eli Lehrer. I am over eighteen years of age and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit and these facts are true and correct.

    2.    The article attached hereto is a true and correct copy of the Op-ed that I wrote that was published in *The Charleston Gazette* on May 25, 2018.

    3.    The Correction attached hereto is a true and correct copy of the Correction that was issued on May 26, 2018.

                        *Eli Lehrer*

                        ELI LEHRER

STATE OF VIRGINIA
COUNTY OF FAIRFAX
THE FOREGOING INSTRUMENT WAS
SUBSCRIBED AND SWORN BEFORE ME
THIS DAY OF _6/1/21_
BY _Ellia Abraham Rothenberg -_
_Lehrer_
NOTARY PUBLIC
COMMISSIONS EXPIRES
        _11/2/2024_

LISA SOMSAAT SMITH
COMMISSION EXPIRES
11-30-2023
REGISTRATION
# 7883761
NOTARY PUBLIC
COMMONWEALTH
OF VIRGINIA

EXHIBIT 3

4495

LEHRER 00008

# inion

CHARLESTON
Daily Mail

wvgazettemail.com/Opinion/DailyMail | twitter.com/DM_Opinion

5A





## It's time to end W.Va. 'sore-loser' law

Laws that preclude candidates from 3rd-party ballots are unjust



Eli Lehrer
CONTRIBUTING
COLUMNIST

Farmer coal executive, convicted felon and self-described "Trumpier-than-Trump" West Virginia candidate Don Blankenship wants to remain in his U.S. Senate race after losing the Republican primary.

Right now, however, West Virginia statutes dubbed "sore loser" laws appear to make it impossible for Blankenship to take the Constitution Party line as he wants to. While there are plenty of reasons to disagree with Blankenship's positions, he ought to be allowed to stay in the race and the laws that forbid people who have lost a primary from running should face repeal.

Some background first. West Virginia, like 46 other states, makes it impossible for someone who has lost a party primary to appear on the ballot in the general election as an independent or minor party candidate. These sore-loser laws mean, by and large, that party primary voters, not the party's supporters as a whole, pick the candidates that appear on general election ballots.

Since passionate supporters who have the most extreme beliefs tend to vote in primaries, this means candidates who lose to more polarizing, pandering positions frequently fair better in those early contests.

Even worse, the system is very prone to manipulation. In 2012, for example, Missouri Democrat Claire McCaskill ran ads calling Todd Akin a "true conservative," designed to boost the chances of her very conservative (and poorly system) Republican opponent. The ads helped Akin win the primary and, once he did, McCaskill's team launched effective attacks against Akin, making hay over his misogynistic comment about "legitimate rape."

The outcome? A state that was trending Republican re-elected a Democrat handily. This probably wouldn't have happened without sore-loser laws. The general result of plays like these is that both parties' Congressional delegations are more extreme than their median voter and — surprisingly — held in low esteem by the public. Current support for Democrats in Congress is only a little over a third whereas

Republicans barely cling to 28 percent support.

The people who have won general elections after losing a primary give a strong indication that a repeal of sore loser laws would give American a better, less polarized Congress.

Almost universally respected centrist Democrat Joseph Lieberman managed to remain in the Senate in 2003 after losing a Democratic primary to a far-left candidate only because his home state, Connecticut, is one of the four without sore-loser policies.

Likewise, sitting Sen. Lisa Murkowski (R-Alaska) won as a write-in candidate after losing her primary to an even more conservative senator. But this was possible only because her sky-high name recognition and Alaska's very small population made a write-in campaign feasible.

Both Murkowski and Lieberman ranked among the most thoughtful and consistently bipartisan members of the body. The academic research bears this out: a study led by the University of Wisconsin's Barry Burden showed that sore loser laws account for about 10 percent all ideological division in Congress.

For those who think that a repeal of sore-loser laws would cause chaos on the ballot or result in the election of people with questionable pasts like Blankenship, there's little evidence this would happen. Candidates who can't win

a primary will rarely be able to attract the money or support to win a general.

And, of course, they'll have the huge disadvantage of having to re-create the get-out-the-vote infrastructure that parties provide to their candidates. Most candidates who run in a general election after losing a primary flame out pretty quickly.

For example, when New York's Betsy McCaughey (who was elected lieutenant governor as a Republican) ran in and lost that state's Democratic primary and then entered the general election under the banner of the Liberal Party (New York has no sore loser laws), she received a mere 1.7 percent of the vote. And this happened despite universal name recognition and a strong initial infusion of campaign cash from a wealthy husband.

Blankenship, who finished third in a low-turnout Republican primary, is much more likely to end up like McCaughey than Lieberman or Murkowski. But there's no doubt that he speaks for a portion of West Virginians.

Even if Blankenship isn't the type of person most would like to see in the Senate, he deserves the same chance to run as any other citizen. The sore-loser laws he opposes are, indeed, unjust.

Eli Lehrer is the president of the R Street Institute, a conservative think tank.

---

## Good first step for new prison reform

Plan deals with recidivism in economic and



Star Parker
SYNDICATED

evaluating the likelihood of the prisoner reoffending a crime. The profiling also establishes a basis for programs and job training to assist in rehabilitation of these individuals.

Several high-profile Black Caucus Democrats, including Senators Kamala Cory Booker and Representatives John Lewis and Sheila

---

## est Virginia story to tell

to people outside b for all of us

Journal

challenge the state's media to out West Virginia.

there to see flaws in these articles, work here, many of us still we do.

the place. But that doesn't at this and that.

's why most people go somewhat away. And whether we travsevered park or to the scenic — it's still away from the

news story, Tourism Commission staff writer Rusty Marks that because we spend less money to city that is Wild, Wonderful Heaven, both catchy slogans of

ive stereotypes that exist said. "We've really let other 's not always one we want to

atement, but we would also arries our own people tell aren't

notice is right. We have a

ns for trout fishing, of white-ntains to climb.

village, an array of fairs and r and plenty of great food

es and on. But you see, that's each of us, as well as outsid-

nnoal West Virginians. And aw the state with rose-colored orme to celebrate and promote laws.

ly. Can we do better? There's home. And it's pretty darn

learned to live with more round us, learning to be thankwilling to share the good news

ts outsiders is a job for all of the need to spend more money in and outside the state. The s seek more promotional money at address as soon as possi-

work together to spread the West Virginia is a great place

## and against chools

students who ullying of others

encer, Wheeling News Register

e murderous rampage by a high school in Santa Fe, Texased. But this week, the acd the boy may have been bul-

have investigated allegations eachers or coaches, and found on. But what about bullying

illings by students and those blamed on an "outsider" prob-



## CORRECTIONS

■ A column by Eli Lehrer on
the Daily Mail opinion page in
Friday's Gazette-Mail incorrectly
characterized the criminal con-
viction of former Massey Energy
head Don Blankenship. He was
convicted of a misdemeanor

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

| | |
|---|---|
| **DON BLANKENSHIP,** | * |
| **Plaintiff,** | * |
| **v.** | *  **Civil Action No.: 2:19-cv-00236** |
| **HONORABLE ANDREW** | * |
| **NAPOLITANO (RET.),** *et al.* | * |
| **Defendants.** | * |
| | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DEFENDANT ELI LEHRER'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

COME NOW the Defendant, Eli Lehrer ("Defendant"), through undersigned counsel, with his Answers to Plaintiff, Don Blankenship's First Set of Interrogatories and in support thereof states as follows:

A.  These Answers have been prepared with the assistance of counsel.  Therefore, the word choice of an answer may not be the exact word choice of the answering party.

B.  Since these Interrogatories are continuing in nature, and the Plaintiff's investigation into the matter inquired by of these Interrogatories is continuing, the answering party reserves the right to supplement, either by addition or deletion, these Responses.

C.  The information supplied in these Responses is not based solely on the knowledge of the executing party, but includes knowledge of the party, its agents, representatives and, unless privileged, its attorneys.

1

EXHIBIT 4

https://www.washingtonexaminer.com/tag/donald-trump?source=%2Fopinion%2Fex-con-don-blankenship-is-running-for-senate-as-a-mini-trump-in-west-virginia-he-didnt-bother-to-vote-in-2016. Defendant further relied on other written news and opinion reports, Facebook and other internet sites, as well as other reports he saw on television and heard on the radio, the specifics of which he cannot currently recall. There may have been other sources as well, but Defendant cannot currently recall the specifics of additional sources.

**INTERROGATORY NO. 4**:  Summarize in detail Defendant's motive for writing the article published in the Charleston Gazette-Mail on or about 25 May 2018 which falsely described Plaintiff as a "convicted felon."

**OBJECTION AND ANSWER**: Defendant objects to this Interrogatory as to Plaintiff's representation that the article "falsely described Plaintiff as a 'convicted felon.'"  Defendant states that the subject statement was substantially true. Subject to and without waiving this objection, Defendant's motive for writing the subject article was to defend Plaintiff's desire to continue his campaign for Senate after losing the primaries and, more importantly, make a case against the "sore-loser" law that Plaintiff objected to.

**INTERROGATORY NO. 5:**  Identify the person who prompted Defendant to write the article published in the Charleston Gazette-Mail on or about 25 May 2018 which falsely described Plaintiff as a "convicted felon."

**OBJECTION AND ANSWER**: Defendant objects to this Interrogatory as to Plaintiff's representation that the article "falsely described Plaintiff as a 'convicted felon.'" Defendant states that the subject statement was substantially true. Subject to and without waiving this objection, Defendant was not prompted by any person to write his article and decided to author the article on his own volition.

**INTERROGATORY NO. 6:**  Summarize in detail every policy and procedure followed by Defendant to ensure the accuracy of published content.

**ANSWER**: Defendant was under no established policy that relates to the accuracy of published opinion content. Defendant wrote this article in his personal capacity and followed the process he typically follows when he authors articles, including a peer-review process for clarity, substance of arguments, and other generally accepted writing standards

**INTERROGATORY NO. 7:**  Summarize in detail all communications between Defendant and the Charleston Gazette-Mail regarding Defendant's article before publication.

**ANSWER**: Pursuant to Fed. R. Civ. Proc. 33(d), *see* LEHRER 00010-12 of Defendant's Document Production, previously produced.

**INTERROGATORY NO. 8:**  Summarize in detail all communications between Defendant and the Charleston Gazette-Mail regarding Defendant's article after publication.

**ANSWER**: Defendant does not recall having any subsequent communications with the Charleston Gazette-Mail regarding Defendant's article after publication.

**INTERROGATORY NO. 9**:  Summarize in detail all communications between Defendant and Addison Mitchell (Mitch) McConnell Jr. regarding Plaintiff.

**OBJECTION AND ANSWER**: Defendant objects to this Interrogatory on the grounds that it is overly broad in time and scope. Specifically, this Interrogatory, as phrased, seeks all communications related to Plaintiff, without limitation and regardless of the topic as it relates to Plaintiff.  Information, which is unrelated to the issues and claims in this litigation, are irrelevant and not discoverable. Subject to and without waiving this objection, Defendant did not have any communications with Addison Mitchell (Mitch) McConnell Jr. regarding Plaintiff.

**INTERROGATORY NO. 10**:  Summarize in detail all communications between Defendant and Joseph (Joe) Manchin III regarding Plaintiff.

**OBJECTION AND ANSWER**: Defendant objects to this Interrogatory on the grounds that it is overly broad in time and scope. Specifically, this Interrogatory, as phrased, seeks all

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

DON BLANKENSHIP,

               Plaintiff,

      vs.

FOX NEWS NETWORK, LLC, et al.

          Defendants.

Case No.: 2:19-cv-00236

[Hon. John T. Copenhaver, Jr.]

---

**PLAINTIFF DON BLANKENSHIP'S
RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION
BY DEFENDANT ELI LEHRER**

---

Plaintiff Don Blankenship ("Plaintiff or "Mr. Blankenship") hereby responds and objects to the First Set of Requests for Admission by Defendant Eli Lehrer ("Defendant" or "Mr. Lehrer") as follows:

## GENERAL OBJECTIONS

1.     Plaintiff hereby generally objects to these requests to the extent they request or seek information protected from disclosure by the attorney-client privilege.

2.     Plaintiff hereby generally objects to these requests to the extent they request or seek information protected from disclosure by the work product doctrine.

///

///

///

587127.1

EXHIBIT 5

Plaintiff is without sufficient information to admit or deny this request and, on that basis, DENIES the request. Plaintiff refers Defendant to the language of 18 U.S.C. § 820, which speaks for itself.

**REQUEST FOR ADMISSION NO. 10:**

Admit that Defendant's Article did not affect the outcome of the West Virginia Republican primary for the United States Senate, held on May 8, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff objects to this request to the extent it requires the disclosure of attorney-client privileged or attorney work product information. Plaintiff further objects to this request on the grounds that it seeks information not within Plaintiff's possession, custody and control. Plaintiff further objects to this request on the grounds that it is vague and ambiguous. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

ADMIT.

**REQUEST FOR ADMISSION NO. 11:**

Admit that no third party advised you that their opinion of you had changed based on Defendant's Article.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff objects to this request to the extent it requires the disclosure of attorney-client privileged or attorney work product information. Plaintiff further objects to this request on the grounds that it seeks information not within Plaintiff's possession, custody and control. Plaintiff further

objects to this request on the grounds that it is vague and ambiguous.  Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

ADMIT.

**REQUEST FOR ADMISSION NO. 12:**

Admit that prior to May 24, 2018, you had been referred to as a "felon" more than fifty (50) times in the Media.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

ADMIT.

**REQUEST FOR ADMISSION NO. 13:**

Admit that you did not suffer any harm to your reputation as a result of Defendant's Article.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff objects to this request to the extent it requires the disclosure of attorney-client privileged or attorney work product information.  Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

DENY.

**REQUEST FOR ADMISSION NO. 14:**

Admit that the damage to your reputation that you describe in the First Amended Complaint occurred before May 24, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects to this request on the grounds that it is vague and ambiguous.  Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

ADMIT.

**REQUEST FOR ADMISSION NO. 20:**

Admit that Defendant's Article argued against sore loser laws.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects to this request on the grounds that it is vague and ambiguous.  Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

Plaintiff is without sufficient information to admit or deny this request and, on that basis, DENIES the request.  Plaintiff refers Defendant to the Article, which speaks for itself.

**REQUEST FOR ADMISSION NO. 21:**

Admit that Defendant's Article stated that there was no doubt that you speak for a portion of West Virginians.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects to this request on the grounds that it is vague and ambiguous.  Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

Plaintiff ADMITS that the subject Article states, in relevant part, that "there's no doubt that he speaks for a portion of West Virginias."

**REQUEST FOR ADMISSION NO. 22:**

Admit that Defendant's Article stated that you deserve "the same chance to run as any other citizen."

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

ADMIT.

**REQUEST FOR ADMISSION NO. 23:**

Admit that Defendant Lehrer does not reside in West Virginia.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects to this request on the grounds that it seeks information already within Defendant's possession, custody and control.  Subject to and without waiver of the foregoing objections, Plaintiff responds as follows:

 Plaintiff is without sufficient information to admit or deny this request and, on that basis, DENIES the request.

**REQUEST FOR ADMISSION NO. 24:**

Admit that you do not have knowledge of any facts that relate to Defendant Lehrer being domiciled in West Virginia.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects to this request on the grounds that it seeks information already within

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

| | |
|---|---|
| DON BLANKENSHIP, | Case No.: 2:19-cv-00236 |
| Plaintiff, | [Hon. John T. Copenhaver, Jr.] |
| vs. | |
| FOX NEWS NETWORK, LLC, et al. | |
| Defendants. | |

---

## PLAINTIFF DON BLANKENSHIP'S RESPONSES TO FIRST SET OF INTERROGATORIES BY DEFENDANT ELI LEHRER

---

Plaintiff Don Blankenship ("Plaintiff or "Mr. Blankenship") hereby responds and objects to the First Set of Interrogatories by Defendant Eli Lehrer ("Defendant" or "Mr. Lehrer") as follows:

### GENERAL OBJECTIONS

1.      Plaintiff hereby generally objects to these interrogatories to the extent they request or seek information protected from disclosure by the attorney-client privilege.

2.      Plaintiff hereby generally objects to these interrogatories to the extent they request or seek information protected from disclosure by the work product doctrine.

<div align="center">1</div>

585329.1

EXHIBIT 6

**RESPONSE TO INTERROGATORY NO. 12.:**

Plaintiff incorporates by reference his Response to Interrogatory No. 9 as if fully set forth herein. Plaintiff has sustained emotional distress and insomnia as a result of Defendant's defamatory publications. Plaintiff was prescribed zolpidem tartrate (Ambien®) to treat the insomnia.

**INTERROGATORY NO. 13.:**

Identify each and every individual who advised you that their opinion of you had changed based on Defendant's Article.

**RESPONSE TO INTERROGATORY NO. 13.:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects that the request is overly broad, not sufficiently limited in scope, and otherwise inappropriate for an interrogatory in that, among other things, it calls for a narrative.

Subject to and without waiver of the foregoing objections, discovery is in the early stages and thus, Plaintiff has not yet gathered all of the evidence which would be responsive to this interrogatory. Plaintiff expects to gather such evidence during the course of discovery. At present, Plaintiff is currently aware of the following information responsive to this interrogatory: Plaintiff claims that every person who reviewed the article referenced in Paragraph 212 of the First Amended Complaint falsely referring to him as a "convicted felon" could have changed their opinion of Mr. Blankenship's reputation. Plaintiff reserves his right to supplement, amend, and/or update this response during the course of discovery.

**INTERROGATORY NO. 14.:**

Identify each and every individual who read Defendant's Article and the date upon which they read it.

**RESPONSE TO INTERROGATORY NO. 14.:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects that the request is overly broad, not sufficiently limited in scope, and otherwise inappropriate for an interrogatory. Plaintiff further objects that this interrogatory is premature insofar as discovery is in its preliminary stages, and Plaintiff has not yet taken depositions of any of Defendant's witnesses or any third parties. Subject to and without waiver of the foregoing objections, Plaintiff has not yet gathered all of the evidence which would be responsive to this interrogatory. At present, Plaintiff does not have sufficient information to identify "each and every individual who read Defendant's Article and the date upon which they read it." Plaintiff reserves his right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 15.:**

Identify all documents that support or relate to your claim that Defendant Lehrer acted with actual malice or with reckless and willful disregard for the truth.

**RESPONSE TO INTERROGATORY NO. 15.:**

Plaintiff incorporates by reference his Response to Interrogatory No. 9 as if fully set forth herein. Subject to and without waiver of the foregoing objections, discovery is in the early stages. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, the answer to this interrogatory may be determined by examining the documents and/or electronically stored information that Plaintiff has produced and/or will produce in this litigation, as the burden of deriving the answer to this interrogatory will be substantially the same for either party.

**INTERROGATORY NO. 16.:**

State all addresses that you contend Defendant Lehrer resided in within West Virginia.

15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

DON BLANKENSHIP,

                    Plaintiff,

          vs.

FOX NEWS NETWORK, LLC, et al.

                    Defendants.

Case No.: 2:19-cv-00236

[Hon. John T. Copenhaver, Jr.]

---

**PLAINTIFF DON BLANKENSHIP'S SUPPLEMENTAL RESPONSES
TO FIRST SET OF INTERROGATORIES BY DEFENDANT ELI LEHRER**

---

Plaintiff Don Blankenship ("Plaintiff or "Mr. Blankenship") hereby provides the following Supplemental Responses and Objections to the First Set of Interrogatories by Defendant Eli Lehrer ("Defendant" or "Mr. Lehrer") as follows:

**GENERAL OBJECTIONS**

1.      Plaintiff hereby generally objects to these interrogatories to the extent they request or seek information protected from disclosure by the attorney-client privilege.

2.      Plaintiff hereby generally objects to these interrogatories to the extent they request or seek information protected from disclosure by the work product doctrine.

//

//

//

//

1

597714.1

## SUPPLEMENTAL RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 6:**

Describe all communications that you had with any person (other than your attorneys) that refer or relate to Defendant's Article.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6.:**

Plaintiff incorporates by reference his Supplemental Response to Interrogatory No. 7 as if fully set forth herein. Although discovery is still in its nascent stages, a preliminary review of Plaintiff's electronically-stored information shows that Plaintiff had non-privileged communications referring or relating to Defendant's Article with at least the following person(s):

Kirsten Saavedra and James Lea. *See e.g.*, Bates Numbers DB084342-DB084344; DB088347; DB089241.

Plaintiff reserves his right to supplement, amend, and update this response during the course of discovery.

**INTERROGATORY NO. 7.:**

State all facts that support your contention contained in Paragraph 229 of the First Amended Complaint, that Defendant acted "with actual malice … reckless disregard and willful disregard of the truth or falsity of the statements."

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7.:**

Plaintiff adopts the General Objections by reference as if fully set forth verbatim herein. Plaintiff further objects that the request is overly broad, not sufficiently limited in scope, and otherwise inappropriate for an interrogatory in that, among other things, it calls for a narrative. Plaintiff further objects that this interrogatory seeks the mental impressions, conclusions, opinions, and/or legal theories of counsel. Plaintiff further objects that this is a contention

2

interrogatory that need not be answered until after designated discovery has been completed pursuant to Rule 33(a)(2) of the Federal Rules of Civil Procedure. Plaintiff further objects that this interrogatory is premature insofar as discovery is in the preliminary stages, and Plaintiff has not yet taken the deposition of Defendant or any of Defendant's witnesses. Plaintiff further objects that this interrogatory requests the premature disclosure of information pertaining to expert witness opinions and/or analyses, which is not yet required at this juncture pursuant to Rule 26(a)(2)(d) of the Federal Rules of Civil Procedure, the Scheduling Order, and other applicable statutes, rules, or orders.

Subject to and without waiver of the foregoing objections, discovery is in its early stages and thus, Plaintiff has not yet gathered all of the evidence of actual malice which would be responsive to this interrogatory. Plaintiff expects to gather such evidence during the course of discovery. At present, Plaintiff is currently aware of the following information responsive to this interrogatory:

Defendant Lehrer is an experienced political journalist. Defendant is President of R Street Institute, a public policy research organization ("think tank"), and is a contributing editor of *National Affairs.* Defendant has previously worked as a reporter at *The Washington Times*, as senior editor of The American Enterprise Institute's magazine, as a visiting fellow in the Center for Judicial and Legal Studies at the Heritage Foundation, and as a speechwriter to then-Senate Majority Leader Bill Frist (R-TN). Defendant's work has appeared in dozens of newspapers including, *The New York Times, The Washington Post, USA Today,* and *Miami Herald.* Defendant also wrote regularly for *The Weekly Standard* prior to its closing in 2018.

Charleston Gazette-Mail had published numerous accurate reports about Plaintiff's felony acquittals and misdemeanor conviction before Defendant published the defamatory statement

<div align="center">3</div>

about Plaintiff in Charleston Gazette-Mail.  In fact, Charleston Gazette-Mail reported extensively on Plaintiff's criminal proceedings, including Plaintiff's misdemeanor conviction and appeal.  For example and without limitation, Charleston Gazette-Mail published an article on December 3, 2015, entitled "Blankenship Guilty of One Count, Not Guilty on Two Other," which states in relevant part:  "The count Blankenship was convicted of, conspiring, is a ***misdemeanor*** for which he could face up to one year in prison."  (Emphasis added.)

In addition to the above, freely-available public records documenting Plaintiff's trial and conviction (including previous accurate reports of Mr. Blankenship's acquittals by the Defendant media organizations themselves) were readily available to Defendant.  For example and without limitation, in 2016 Plaintiff wrote a booklet entitled *American Political Prisoner* that was to approximately 250,000 state governors, state legislators, state judges, federal judges, business leaders, and news media organizations.  The booklet explicitly states on each of the first few pages that Plaintiff was convicted of a misdemeanor.  In addition to the *American Political Prisoner* booklet, Plaintiff published numerous emails and tweets to hundreds of news media organizations prior to and during the 2018 West Virginia primary election specifying that Plaintiff was convicted of a misdemeanor.

Furthermore, at the nationally-televised primary debate on Fox News on May 1, 2018, Plaintiff addressed his conviction and imprisonment right out of the gate, stating in no uncertain terms: "I faced thirty years in prison for a fake charge, and I beat all three of the felonies. … It's incredible, they sent me to prison for a ***misdemeanor***."  (Emphasis added.)

There is legally sufficient evidence substantiating that Defendant either had actual knowledge of the falsity of his defamatory statement or that Defendant purposely avoided the truth by acting with reckless and willful disregard of the truth or falsity of defamatory statement.  Thus,

4

Defendant intended to cause injury to Plaintiff by publishing the defamatory statement.

Plaintiff reserves his right to supplement, amend, and/or update this response during the course of discovery.

## INTERROGATORY NO. 8.:

State all facts that support your contention contained in Paragraph 232 of the First Amended Complaint that Defendant Lehrer "intended to cause injury to Mr. Blankenship by publishing their false defamatory statements."

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8.:

Plaintiff incorporates by reference his Supplemental Response to Interrogatory No. 7 as if fully set forth herein.

Dated:  February 8, 2021.

Respectfully submitted,

**DON BLANKENSHIP**
**By Counsel**

**/s/ Jeremy Gray, Esq.**
**Jeremy Gray, Esq.**
**(CA State Bar No. 150075, *pro hac vice*)**
*EARLY SULLIVAN WRIGHT*
*GIZER & McRAE LLP*
**6420 Wilshire Blvd., 17th Floor**
**Los Angeles, CA 90048**
**323.301.4660**
**jgray@earlysullivan.com**

**/s/ Jeffrey S. Simpkins, Esq.**
**Jeffrey S. Simpkins, Esq.**
**WVSB #9806**
*SIMPKINS LAW*
**102 E. 2nd Ave.**
**Williamson, WV 25661**
**304.235.2735**
**simpkinslawoffice@gmail.com**

5

597714.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

DON BLANKENSHIP,                          *

      Plaintiff,                        *

v.                                        *          Civil Action No.: 2:19-cv-00236

HONORABLE ANDREW                          *
NAPOLITANO (RET.), *et al.*
                                          *
      Defendants.                       *

*   *   *   *   *   *   *   *   *   *   *   *   *

### DEFENDANT ELI LEHRER'S MEMORANDUM OF LAW IN SUPPORT OF HIS
### MOTION FOR SUMMARY JUDGMENT

Joseph S.D. Christof, Esq. (WV#6277)
Melvin F. O'Brien, Esq. (WV# 6797)
BreiAnne Varner Redd, Esq. (WV# 10894)
DICKIE, McCAMEY & CHILCOTE, LC
2001 Main Street, Suite 501
Wheeling, WV 26003
Phone: 304-233-1022
bredd@dmclaw.com

*Counsel for Defendant Eli Lehrer*

Jennifer S. Jackman, Esq.
*Admitted Pro Hac Vice*
Whiteford, Taylor & Preston, LLP
1800 M. Street N.W., Suite 401
Washington, D.C. 20036
202-659-6800
jjackman@wtplaw.com

*Counsel for Defendant Eli Lehrer*

# TABLE OF CONTENTS

I. INTRODUCTION ...............................................................................................1

II. STATEMENT OF MATERIAL FACTS NOT IN DISPUTE .........................2

III. STANDARD OF REVIEW ...........................................................................10

IV. ARGUMENT .................................................................................................11

    A.  Plaintiff's Defamation Claim Fails as a Matter of Law ...........................11

        *1.*  There was no Actual Malice. .............................................................12

            *a.  There is <u>no</u> evidence of actual malice.* ...............................13

            *b.  There was no reckless disregard or willful disregard for the truth.* .................13

            *c.  Mr. Lehrer did not intend to injure Plaintiff.* .................15

        *2.*  There is no evidence of damages arising from Mr. Lehrer's publication. .................16

    B.  Plaintiff's False Light Claims Fails as a Matter of Law ...........................17

CONCLUSION ....................................................................................................18

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
    47 U.S. 242 (1986) ...................................................................................10

*Beale v. Hardy,*
    769 F.2d 213 (4th Cir. 1985) ................................................................10

*Bell v. Nat'l Republican Cong. Comm.,*
    187 F. Supp. 2d 605 (S.D. W. Va. 2002) .............................................17

*Carr v. Forbes, Inc.,*
    259 F.3d 273 (4th Cir. 2001) ................................................................12

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ...............................................................................10

*Crump v. Beckley Newspapers, Inc.,*
    320 S.E. 2d 70 (W. Va. 1983) .........................................................15, 17

*FDIC v. Cashion,*
    720 F.3d 169 (4th Cir. 2013) ................................................................10

*Giles v. Kanawha Cty. Bd. of Educ., No. 17-0139,* 2018 WL 300605 (W. Va. Jan. 5, 2018).......18

*Hanks Communications, Inc. v. Connaughton,*
    491 U.S. 657 (1989) .........................................................................12, 14

*Hinerman v. Daily Gazette Co.,*
    423 S.E.2d 560 (W. Va. 1992) ..............................................................11

*Horne v. WTVR, LLC,*
    893 F.3d 201 (4th Cir. 2018) ................................................................12

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) ...............................................................................10

*Milan v. Long,*
    88 S.E. 618 (W. Va. 1916) ....................................................................16

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ...............................................................................12

*News & Observer Publ'g v. Raleigh-Durham Airport Auth.,*
   597 F.3d 570 (4th Cir. 2010) ..................................................................10

*Pritt v. Republican Nat. Comm.,*
   557 S.E.2d 853 (W. Va. 2001) ................................................................11

*Richard H. v. Rachel B.,* 2019 WL 6998331 (W. Va. Dec. 20, 2019).............................17

*Sprouse v. Clay Commc'n Inc.,*
   211 S.E.2d 674 (W. Va. 1975) ........................................................12, 15

*St. Amant v. Thompson,*
   390 U.S. 727 (1968) .................................................................................12

*Taylor v. W. Va. Dep't of Health & Human Res.,*
   288 S.E. 2d 295 (W. Va. 2016) ...............................................................17

*United States v. Blankenship,*
   846 F.3d 663 (4th Cir. 2017) ....................................................................2


## RULES

Fed. R. Civ. P. 56(a)-(c) ..............................................................................10

W. Va. Code Ann. § 3-5-23.................................................................................7

## I.    **INTRODUCTION**

Plaintiff, Don Blankenship ("Plaintiff"), the self-described "most hated man in Mingo County, West Virginia," who served one year in a federal penitentiary reserved for felons after being convicted of a crime relating to violation of mine safety standards that resulted in a mine explosion that killed 29 men, filed this action alleging (1) Defamation and (2) Invasion of Privacy against dozens of defendants after they mistakenly referred to him as a felon when, in fact, he was a misdemeanant.   Within months after his release from federal prison, Plaintiff decided to run for the 2018 U.S. Senate race as the Republican candidate in West Virginia and lost the primary election.  Due to Plaintiff's history, his political run was widely reported in the press and over the course of several months, he was publicly referred to as a convicted felon more than 50 times by major news outlets including, *inter alia,* Fox News, CNN, NPR, and MSNBC.

After Plaintiff lost the primary election, he attempted to run as a Constitution Party Candidate but was prohibited from doing so by a "Sore Loser Law."  Defendant, Eli Lehrer ("Defendant" or "Mr. Lehrer"), agreed with Plaintiff that the Sore Loser Law should not prevent him from running in the general election and wrote an opinion editorial ("op-ed") that was published in *The Charleston Gazette*, arguing that Plaintiff should be allowed to continue his campaign.  In reliance on the prior reports that Mr. Lehrer heard in the media describing Plaintiff as a convicted felon, Mr. Lehrer mistakenly called Plaintiff a convicted felon, though this mistake was corrected within 24 hours.

Summary Judgment should be entered in favor of Mr. Lehrer on both counts as there is no genuine dispute of material fact and Mr. Lehrer is entitled to judgment as a matter of law.  First, there is no evidence of actual malice, which must be proven by clear and convincing evidence. Second, there is no evidence of an intent to injure.  Third, there is no evidence of resulting injury.

Fourth, with regard to the invasion of privacy count, Mr. Lehrer did not "give publicity" to the claim that Plaintiff was a convicted felon. For the reasons that follows, summary judgment must be awarded in favor of Mr. Lehrer.

## II.    <u>STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>

In 2018, Plaintiff was one of several Republican candidates in the primary election vying to be the next United States Senator for West Virginia. First Amended Complaint ("FAC"), ¶ 2. Prior to his candidacy for Senator, Plaintiff was the CEO of Massey Energy. FAC, ¶ 7.   In 2010, a tragic explosion occurred at Massey's Upper Big Branch Mine, taking the lives of twenty-nine miners. FAC, ¶ 8. Following the explosion, Plaintiff was indicted by a federal grand jury for three separate felonies and a misdemeanor relating to the explosion. FAC, ¶ 9. The federal prosecution went to trial in October 2015, and Plaintiff was convicted of conspiring to willfully violate federal mine safety laws. *United States v. Blankenship,* 846 F.3d 663, 667 (4th Cir. 2017).

As a result of his conviction, on April 6, 2016, Plaintiff was fined $250,000.00 then sentenced and sent to federal prison for one (1) year. FAC, ¶¶ 11, 144. According to Plaintiff, he was the only prisoner at Taft Prison in California who was not convicted of a felony. FAC, ¶ 144. <u>See</u> <u>also</u> Ex. 1 at 348:15-348:12. Mr. Blankenship was released from federal prison in the spring of 2017 and then served time in a halfway house. FAC, ¶ 145.

In January 2018, Plaintiff announced his plans to run as a Republican for the United States Senate seat for West Virginia. FAC, ¶ 146. This generated substantial media coverage. During the time period of January 26, 2018 through May 24, 2018, there were more than fifty (50) publications via newspaper, social media and television that identified Plaintiff as a "convicted felon" or "felon:"

1. On January 26, 2018, Political Commentator, Zack Colman, referred to Plaintiff as a "convicted felon" in a tweet. FAC, ¶ 149.

2. On March 30, 2018, the Democratic Senatorial Campaign Committee published an article referring to Plaintiff as an "ex-felon". FAC, ¶ 152.

3. On April 10, 2018, 35th PAC called Plaintiff a "convicted felon" in a tweet. FAC, ¶ 153.

4. On April 10, 2018, *The National Law Journal* published an article referring to Plaintiff as a "convicted felon."  FAC, ¶ 154.

5. On April 15, 2018, Fox News aired a segment during which Judge Napolitano reported that Plaintiff "went to jail for manslaughter." FAC, ¶ 156.

6. On April 16, 2018, MSNBC referred to Plaintiff as a "felonious coal baron" in a tweet. FAC, ¶ 169.

7. On April 23, 2018, MSNBC aired a segment wherein Chris Hayes referred to Mr. Blankenship as a "convicted felon." FAC, ¶ 170.

8. On April 25, 2018, Fox News reported that Plaintiff went to jail for manslaughter." FAC, ¶ 16.

9. On April 25, 2018, Down With Tyranny posted an article referring to Plaintiff as a "felon." FAC, ¶ 159.

10. On April 29, 2018, CNN News reported that Plaintiff was a "convicted felon." FAC, ¶ 13.

11. On May 2, 2018, CNN aired a segment wherein S.E. Cupp referred to Plaintiff as a "felon."  FAC, ¶ 171.

12. On May 3, 2018, *The Washington Times* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 162.

13. On May 3, 2018, *Mediaite* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 164.

14. On May 4, 2018, NPR published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 165.

15. On May 5, 2018, MSNBC aired a segment wherein Joy Reid identified Plaintiff as a "convicted felon." FAC, ¶ 172.

16. On May 7, 2018, Fox News aired a segment wherein Neil Cavuto referred to Plaintiff as a "convicted felon." FAC, ¶ 166.

17. On May 7, 2018, Fox News aired a different segment wherein Stephanie Hamill referred to Plaintiff as a "convicted felon." FAC, ¶ 167.

18. On May 7, 2018, Fox News aired a segment wherein John Layfield referred to Plaintiff as a "felon." FAC, ¶ 168.

19. On May 7, 2018, Fox News aired a segment wherein Bradley Blakeman referred to Plaintiff as a "felon." FAC, ¶ 168.

20. On May 7, 2018, CNN aired a segment wherein S.E. Cupp referred to Plaintiff as a "convicted felon." FAC, ¶ 174.

21. On May 7, 2018, *Roll Call* published an article that referred to Plaintiff as a "convicted felon." FAC, ¶ 175.

22. On May 7, 2018, *The Guardian* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 176.

23. On May 7, 2018, *News and Guts* published an article referring to Plaintiff as "a felon." FAC, ¶ 177.

24. On May 7, 2018, Holly Figueroa O'Reilly made two tweets referring to Plaintiff as a "felon." FAC, ¶ 178.

25. On May 7, 2018, CNN aired a segment wherein Joe Lockhart referred to Plaintiff as a "convicted felon." FAC, ¶ 179.

26. On May 7, 2018, *Watuaga Watch* posted an article referring to Plaintiff as a "felon." FAC, ¶ 180.

27. On May 8, 2018, *LA Times* published an article referring to Plaintiff as a "felon." FAC, ¶ 181.

28. On May 8, 2018, *Market Watch* published an article referring to Plaintiff as an "ex-felon." FAC, ¶ 182.

29. On May 8, 2018, Chris Jones referred to Plaintiff as a "convicted felon" in a tweet. FAC, ¶ 183.

30. On May 8, 2018, *Splinter* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 184.

31. On May 8, 2018, Jim Heath identified Plaintiff as a "convicted felon" in a tweet. FAC, ¶ 185.

32. On May 8, 2018, the *New York Daily News* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 186.

33. On May 8, 2018, *The National* published an article referring to Plaintiff's conviction as a "felony." FAC, ¶ 187.

34. On May 8, 2018, *The Daily Beast* published an article identifying Plaintiff as a "felon." FAC, ¶ 188.

35. On May 8, 2018, *The Washington Post* published an article referring to Plaintiff as a "felon." FAC, ¶ 189.

36. On May 9, 2018, MSNBC aired a segment wherein Chris Hayes referred to Plaintiff as a "convicted felon." FAC a,¶ 191.

37. On May 9, 2018, *The Weekly Standard* published an article referring to Plaintiff as a "felon." FAC, ¶ 192.

38. On May 9, 2018, *Esquire* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 193.

39. On May 9, 2018, *The Hayride* published an article referring to Plaintiff as a "convicted felon." FAC; ¶ 194.

40. On May 9, 2018, Now This Politics broadcasted a video referring to Plaintiff as "convicted felon." FAC, ¶ 195.

41. On May 9, 2018, Fox Business broadcasted a segment wherein Elizabeth McDonald referred to Plaintiff as a "racist felon." FAC, ¶ 196.

42. On May 9, 2018, *The New Hampshire Union Leader* published an article referring to Plaintiff as a "felon." FAC, ¶ 197.

43. On May 10, 2018, *Breitbert* published an article describing Plaintiff as a "convicted felon." FAC, ¶ 198.

44. On May 10, 2018, *The Hill* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 199.

45. On May 10, 2018, *Wonkette* published an article referring to Plaintiff as a "racist felon." FAC, ¶ 200.

46. On May 11, 2018, *Daily Mail* published an article referring to Plaintiff as "convicted felon." FAC, ¶ 201.

47. On May 12, 2018, *The Guardian* published an article referring to Plaintiff as "convicted felon." FAC; ¶ 202.

48. On May 14, 2018, *Vice* published an article referring to Plaintiff as "convicted felon." FAC, ¶ 204.

49. On May 16, 2018, *the 74* published an article referring to Plaintiff as a "felon." FAC, ¶204.

50. On May 16, 2018, *The Washington Times* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 205.

51. On May 17, 2018, NBCNews.com published an article referring to Plaintiff as "convicted felon." FAC, ¶ 206.

52. On May 21, 2018, Breakfast Media published a tweet referring to Plaintiff as a "convicted felon."  FAC, ¶ 207.

53. On May 22, 2018, the *Associated Press* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 208.

54. On May 24, 2018, *The Sacremento Bee* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 209.

55. On May 24, 2018, *The Observer* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 210.

56. On May 24, 2018, *York Daily Record* published an article referring to Plaintiff as a "convicted felon." FAC, ¶ 211.

Plaintiff lost his bid to be the Republican nominee for the West Virginia U.S. Senate race on

May 8, 2018.  FAC, ¶ 190. W. Va. Code § 3-5-23 is known as a "Sore Loser Law" that prohibits

parties who lose a primary election and from changing their voter registration to a minor party

organization in order to take advantage of later filing deadlines and allow their name to be on the general election ballot. Under the Sore Loser Law, Plaintiff was prohibited from running as a Constitution Party candidate in the Republican Primary Election since he lost the Republican Primary.

Mr. Lehrer is the President of R Street Institute, a nonprofit, nonpartisan, public policy research organization which he co-founded in 2012 in Washington, D.C. Ex. 2, ¶ 2. Mr. Lehrer is not and has never been employed by *The Charleston Gazette*. Ex. 2, ¶ 3. Through multiple media outlets, Mr. Lehrer became familiar with Plaintiff's attempt to run for the Republican nomination, his loss and his attempt to re-register as a Constitution Party candidate so he could run in the General Election. Ex. 2, ¶ 4. Mr. Lehrer had also read, seen and heard multiple major media outlets he trusted refer to Plaintiff as a convicted felon, which he believe to be true based on the facts he knew and the media reporting. Ex. 2, ¶ 5.

In May 2018, Mr. Lehrer wrote an op-ed that argued that the West Virginia Sore Loser Law should be repealed and that Plaintiff should be allowed to run as a Constitution Party candidate in the General Election. Ex. 2, ¶ 6. See also Ex. 3. Mr. Lehrer's original op-ed referred to Plaintiff as a "convicted felon." At the time Mr. Lehrer wrote the op-ed, he relied on the trusted news reports he had seen and listened to that identified Plaintiff as a "convicted felon" and he had no knowledge that Plaintiff had actually only been convicted of a misdemeanor. Ex. 2, ¶ 5. This belief was bolstered by Mr. Lehrer's understanding that Plaintiff's conviction arose from a deadly mine explosion. Ex. 2. ¶ 5. To be clear, when Mr. Lehrer wrote the op-ed, he understood and believed that Plaintiff was indeed a convicted felon. Ex. 2, ¶ 5.

After writing his op-ed, Mr. Lehrer followed the process he typically follows when he authors articles, including a peer-review process for clarity, substance of arguments and other generally accepted writing standards. Ex. 2, ¶ 7. <u>See</u> <u>also</u> Ex. 4, No. 6. As part of the peer review process, Mr. Lehrer's draft op-ed was reviewed by R Street communications staff for clarity, substance of arguments and other generally accepted writing standards. Ex. 2, ¶ 7. No one identified any issues with regard to the accuracy of Mr. Lehrer's characterization of Plaintiff as a "convicted felon." Ex. 2, ¶ 7.

On or about May 25, 2018, *The Charleston Gazette* published Mr. Lehrer's op-ed. Ex. 2, ¶ 8. Prior to publication, no one from *The Charleston Gazette* raised any concerns regarding the op-ed to Mr. Lehrer. Ex. 2, ¶ 8. Mr. Lehrer, who does not and has never lived in West Virginia, does not subscribe to *The Charleston Gazette* and did not review *The Charleston Gazette* articles relating to Plaintiff's conviction or acquittals before writing his op-ed. Ex. 2, ¶ 12. Therefore, Mr. Lehrer had no knowledge that *The Charleston Gazette* had purportedly previously reported that Plaintiff was only convicted of a misdemeanor. Within 24 hours of the initial publication, *The Charleston Gazette* issued a correction that stated:

> "CORRECTION: An earlier version of this column incorrectly characterized Blankenship's conviction. He was convicted of conspiring to violate federal mine safety standards, which is a misdemeanor." Ex. 2, ¶ 9.

By the time Mr. Lehrer's op-ed was published, Plaintiff had already lost the Primary election. Ex. 2, ¶ 10. Plaintiff admits that Mr. Lehrer's article did not affect the outcome of the West Virginia Republican primary for the United States Senate, held on May 8, 2018. Ex. 5, No. 10.

Plaintiff concedes that despite months of discovery, he "do[es]'n't have any evidence of what anybody [*i.e.,* any of the defendants] knew at the time they made the statement[s] at issue. Ex. 1, 262:14-21. Mr. Lehrer never read Plaintiff's booklet, *American Political Prisoner,* or Plaintiff's tweets and emails that he purportedly sent to governors, legislators, judges, business leaders and news media organizations. Ex. 2, ¶ 13. Mr. Lehrer has no knowledge of ever receiving any of these publications from Plaintiff and does not believe he was ever a recipient of such items. Ex. 2, ¶ 13. Mr. Lehrer did not watch the primary debate on Fox News on May 1, 2008. Ex.2, ¶ 14. Mr. Lehrer's op-ed advocated for Plaintiff's position though it did refer to Plaintiff as a "convicted felon." Ex. 2, ¶ 10.

Mr. Lehrer did not intend to cause harm to Plaintiff. Ex. 2, ¶ 10. To the contrary, Mr. Lehrer was advocating on Plaintiff's behalf. Ex. 2, ¶ 10. Mr. Lehrer's motivation in writing the op-ed was to defend Plaintiff's desire to continue his campaign for Senate after losing the primaries and, more importantly, make a case against the Sore Loser Law that Plaintiff objected to. Ex. 2, ¶ 10. See also Ex. 4, No. 4. The op-ed was the first and only article Mr. Lehrer ever wrote regarding Plaintiff on any topic whatsoever. Ex. 2, ¶ 11. Moreover, the focus of the op-ed was on Sore Loser Laws – not Plaintiff. Ex. 2, ¶ 11. Prior to writing the op-ed, Mr. Lehrer had never met Plaintiff and had no ill-will toward him. Ex. 2, 15.

Mr. Lehrer's op-ed advocated for Plaintiff to be allowed to run in the general election. The op-ed argued that "there's no doubt that [Plaintiff] speaks for a portion of West Virginians" and that Plaintiff deserved "the same chance to run as any other citizen." Ex. 5, Nos. 21-22.

Plaintiff is unable to identify a single person who read Mr. Lehrer's op-ed, let alone who read it before the correction issued. Ex. 6, No. 14. Plaintiff admits that no third party advised him that

their opinion of him had changed based on Mr. Lehrer's op-ed. Ex. 5, No. 11. Plaintiff further admits that before May 25, 2018, he had been referred to as a "felon" more than 50 times in the media. Ex. 5, No. 12.

After the mine explosion, Plaintiff was forced out of Massey Coal. Ex. 1, 92:14-93:16. Since his departure from Massey in December 2010, Mr. Blankenship has not sought, been offered, or obtained *any* employment or served on *any* corporate boards of directors. Ex. 1, 154:13-156:1. Plaintiff has described himself as "the most hated man in Mingo County." Ex. 1, 451-53.

## III.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)-(c); *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999). A "material fact" is a fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 47 U.S. 242, 248 (1986); *News & Observer Publ'g v. Raleigh-Durham Airport Auth.,* 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013).

While the moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the non-moving party must come forward with more than "mere speculation or the building of one inference upon another" to resist dismissal of the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, (1986); *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). If a nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be

granted because "a complete failure of proof concerning an essential element. . . . necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322-23.

## IV.    ARGUMENT

There is no genuine dispute of material fact and Defendant Lehrer is entitled to judgment as a matter of law on both counts asserted against him.  First, there is no evidence of malice, let alone clear and convincing evidence.  The undisputed record shows that Mr. Lehrer's reference to Plaintiff as a felon occurred after over 50 other publications reported the same information over the course of several months and Mr. Lehrer believed that this statement was true.  Second, there is no evidence of an intent to injure.  To the contrary, when the article is read as a whole, it is clear that Mr. Lehrer was advocating that Plaintiff should be allowed to run in the general election.  Third, there is no evidence of resulting injury.  Plaintiff's damages are primarily focused on his primary election loss and Mr. Lehrer's op-ed was published after he lost the primary.  Moreover, Plaintiff cannot identify a single person who read the op-ed, let alone changed their opinion on Plaintiff, the self-described "most hated man in Mingo County" because of the article. Finally, for the same reasons that the defamation claim fails, so too does the privacy claim.  In addition to those reasons, the claim fails because Mr. Lehrer did not "give publicity" to the claim that Plaintiff was a convicted felon.  Rather, this had been reported over 50 times in major media outlets <u>before</u> Mr. Lehrer's op-ed.

### A.  <u>Plaintiff's Defamation Claim Fails as a Matter of Law.</u>

Defamation is a "false written or oral statement that damages another's reputation." *Pritt v. Republican Nat. Comm.,* 557 S.E.2d 853, 861 (W. Va. 2001).  In West Virginia, there are three types of plaintiffs in defamation cases:  (1) public officials and candidates for public office; (2) public figures; and (3) private individuals.  *Hinerman v. Daily Gazette Co.,* 423 S.E.2d 560, 564

(W. Va. 1992).  The record in this case clearly establishes that Plaintiff was a candidate for public office and a public figure.

To succeed on his candidate for public office defamation claim, Plaintiff must prove that (1) there was a publication of a defamatory statement; (2) the stated facts were false; and (3) Defendant Lehrer published the statement with **actual malice**. *Id.* at 563.  See also *Pritt,* supra at 861-63. As part of the actual malice prong, a candidate for public office must also prove that (1) the statements were made with reckless and willful disregard for the truth and (2) with the intention to injure the plaintiff.  *Id.*  See also and *Sprouse v. Clay Commc'n Inc.,* 211 S.E.2d 674, 681 (W.Va. 1975).  Plaintiff must prove actual malice by **clear and convincing** evidence that Mr. Lehrer made the defamatory statement with knowledge that it was false or with reckless disregard of whether it was false or not.  *New York Times Co. v. Sullivan,* 376 U.S. 254, 280 (1964).

"Reckless disregard" may be found if "the defendant entertained serious doubts as to the truth of his publication.  Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968). "Establishing actual malice is no easy task, because the defamation plaintiff bears the burden of proof by clear and convincing evidence." *Carr v. Forbes, Inc.,* 259 F.3d 273, 282 (4th Cir. 2001).  A defendant's reliance on trustworthy sources does not support a finding of actual malice.  *Horne v. WTVR, LLC,* 893 F.3d 201, 211 (4th Cir. 2018), *cert. denied.,* 139 S. Ct. 823 (2019).  Moreover, the "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688,  (1989).

1. <u>There was no Actual Malice.</u>

Plaintiff's claim for defamation fails as a matter of law because the record is void of *any* evidence of malice on the part of Mr. Lehrer, let alone clear and convincing evidence. In his deposition, Plaintiff admitted that he had no evidence of what anyone knew at the time they characterized him as a convicted felon. As no reasonable jury could find that Mr. Lehrer exercised actual malice when he wrote the op-ed, Plaintiff's claims fail.

   a.   There is <u>no</u> evidence of actual malice.

There is no evidence in the record of actual malice. When asked in interrogatories to state all facts to support his contention that Mr. Lehrer acted with actual malice or in reckless and willful disregard of the truth or falsity of the statements, Plaintiff identified no supporting facts.  Ex. 7, No. 7.  Instead, Plaintiff alleged that Mr. Lehrer is "an experienced political journalist" and that *The Charleston Gazette* published numerous accurate reports about Plaintiff's felony acquittals. In addition, Plaintiff referenced his own emails, tweets, booklet (*American Prisoner)* and the May 1, 2018 Fox News debate in a failed attempt to impute knowledge of his misdemeanor status to Mr. Lehrer.  Ex. 7, No. 7.

The undisputed record shows that Mr. Lehrer did not read and *Charleston Gazette* articles or any of Plaintiff's published reports, emails, or tweets. Ex. 2, ¶¶ 12 and 13.  Moreover, the "mere presence" of previous *Charleston Gazette* articles accurately reporting about Plaintiff's convictions does not establish that <u>Mr. Lehrer</u> knew that his characterization of Plaintiff as a felon was false since this does not show what <u>Mr. Lehrer's</u> knowledge or state of mind was when writing the article. *New York Times,* 376 U.S. at 287.  To be clear, the undisputed record shows that Mr. Lehrer understood and believed at the time he wrote the article that Plaintiff was a convicted felon and had never read Plaintiff's *American Political Prisoner* booklet, emails or tweets.

   b.   *There Was No Reckless Disregard or Willful Disregard for the Truth.*

There is no evidence of reckless or willful disregard for the truth. The undisputed record shows that Mr. Lehrer's belief that Plaintiff was a convicted felon was reasonable and that he had no doubts that his reference to same was accurate.

> i.   More than 50 publications reported that Plaintiff was a convicted felon before Mr. Lehrer's op-ed.

Mr. Lehrer's op-ed was published on or about May 25, 2018. By the time Mr. Lehrer wrote the op-ed, multiple major news media outlets including, *inter alia*, Fox News, CNN, MSNBC, *Associated Press*, *Washington Time*s, and *Washington Post* had reported that Plaintiff was a convicted felon. Indeed, by May 25, 2018, the characterization of Plaintiff as a felon had been published more than fifty (50) times in social media, television, online and in print. Mr. Lehrer read and listened to these reports and understood, based upon the reporting, that Plaintiff had been convicted of a felony arising from his involvement in the 2010 mine disaster, particularly since he spent one year in a federal prison. His reliance on these trusted sources when writing his op-ed does not support a finding of malice. *Harte-Hanks,* supra.

> ii.   Plaintiff spent one year in a federal prison reserved for felons.

Although Plaintiff was convicted of a misdemeanor, the misdemeanor was for conspiring to willfully violate federal mine-safety laws after one of the deadliest mine explosions in history led to the deaths of 29 men. Plaintiff spent a full year in a federal prison and was fined $250,000. According to Plaintiff, he was the only misdemeanant in that penitentiary. Mr. Lehrer's understanding that Plaintiff (who spent a year in federal prison for his actions that contributed to the multiple deaths) was a felon, was reasonable given the circumstances.

> iii.   Mr. Lehrer's op-ed was reviewed internally and externally before publication.

Mr. Lehrer's op-ed was reviewed both internally and externally before publication. Plaintiff does not claim that Mr. Lehrer deviated from any generally acceptable standards for writing op-ed articles and the record is devoid of any evidence regarding same.[1]  To the contrary, the record shows that Mr. Lehrer (the President of R Street) forwarded his draft article to R Street's communications and editorial staff for review.  Although changes were proposed (and made), none of the changes related to the reference to Plaintiff as a "convicted felon."  The op-ed was then forwarded to *The Charleston Gazette* for review before it was published.  *The Charleston Gazette* did not question or change the reference to Plaintiff as a convicted felon.

### c.  Mr. Lehrer did not intend to injure Plaintiff.

Plaintiff cannot meet his burden in showing that Mr. Lehrer intended to injure him.  The Supreme Court of Appeals requires candidates for office to prove that the false statement was not only published with willful and reckless disregard for the truth but also "published with a deliberate intent to injure." *Sprouse,*, 211 S.E. 2d at 679.  In reviewing the op-ed, the Court must consider the article as a whole and cannot view the allegedly defamatory words in isolation.  *Crump v. Beckley Newspapers, Inc.,* 320 S.E. 2d 70, 87 (W. Va. 1983). Instead, they must be viewed in the context of the entire article. *Id.*  When reviewing the op-ed as a whole and viewing the allegedly defamatory words in the context of the entire article, no reasonable finder of fact could find that Mr. Lehrer intended to injure Plaintiff. Rather, the op-ed advocated for Plaintiff and argued that the Sore Loser Laws should not apply and that he should be permitted to run as a Constitution Party candidate.  The fact that Mr. Lehrer was trying to convince readers to allow Plaintiff to

---

[1] Notably, Plaintiff did not identify an expert to establish what the generally accepted standards were or that there was a deviation of same.

continue his campaign eliminates the possibility of a finding of actual malice as there was no intention to injure.

As there is absolutely no evidence of actual malice, let alone clear and convincing evidence, Plaintiff's claim for defamation fails as a matter of law.

### 2. There is no evidence of damages arising from Mr. Lehrer's publication.

To succeed on his claim, Plaintiff is required to prove that he was injured as a result of Mr. Lehrer's conduct. "Special damages cannot be recovered" without "proof of loss or damages as a consequence of the publication." *Milan v. Long*, 88 S.E. 618, 620 (W. Va. 1916). He has not met this burden. First, Plaintiff's damages claim is based on the fact that he lost the primary election. It is undisputed that Ms. Lehrer's publication occurred <u>after</u> Plaintiff lost the election and <u>after</u> more than 50 news reports and social media postings called him a convicted felon. Second, Plaintiff was unable to identify a single person who read the op-ed, let alone changed their opinion of Plaintiff, who describes himself as "the most hated man in Mingo County" as a result of the op-ed. Ex. 5, No. 14. Third, although Plaintiff seeks more than $900 million in lost business opportunities, Plaintiff has not identified a single business opportunity that he lost due to Mr. Lehrer's op-ed (that was corrected within 24 hours of publication.) To the contrary, it is undisputed that after Plaintiff was forced out of his position as CEO of Massey Coal, he never sought nor was offered any other employment or board positions. To be clear, Plaintiff had not worked, in *any* capacity, in the more than seven years leading up to Mr. Lehrer's op-ed – including the time period before his federal conviction.

### i. The statement is not defamatory *per se.*

Mr. Lehrer's misstatement was not defamatory *per se* and Plaintiff is not entitled to presumed damages which are only allowed when the statement is "so obviously and materially

harmful to reputational interests" that damages can be presumed. *Bell v. Nat'l Republican Cong. Comm.,* 187 F. Supp. 2d 605, 616 (S.D. W. Va. 2002).   Although Mr. Lehrer erroneously referenced Plaintiff as a convicted felon, this label was not materially false.  Although convicted of only a misdemeanor, Plaintiff served one year in a federal prison – purportedly as the only non-felon in the prison – for his role in the Massey mine explosion that killed 29 miners.  Here, the falsity of the statement was only a "matter of degree" and as such, damages may not be presumed. *Richard H. v. Rachel B.,* 2019 WL 6998331 at *1 (W. Va. Dec. 20, 2019) (referencing plaintiff as a "thief, drug dealer, arsonist and murderer" did not give rise to presumed damages when plaintiff was not a murderer since the falsity "was only a matter of degree.")

As there is no evidence of resulting injuries and injuries cannot be presumed, Plaintiff's defamation claim fails as a matter of law.

**B.  Plaintiff's False Light Claims Fails as a Matter of Law.**

Mr. Lehrer is entitled to judgment as a matter of law on the false light claim. In order to succeed on a claim for false light invasion of privacy, Plaintiff must prove that (1) Mr. Lehrer gave publicity to a matter concerning Plaintiff that places the Plaintiff before the public in a false light; (2) the publicity was widespread; (3) the matter was false; (4) the false light would be highly offensive to a reasonable person; and (5) Mr. Lehrer had knowledge of or acted in reckless disregard as to the falsity of the matter (actual malice).  *Taylor v. W. Va. Dep't of Health & Human Res.,* 288 S.E. 2d 295, 315-16 (W. Va. 2016). While false light claims are similar to defamation claims they differ in that the tort requires proof of widespread publicity and that the matter at issue was "offensive to a reasonable person." *Crump,* 320 S.E. 2d at 87.  That said, the two torts are treated in essentially the same manner.  *Id.*

Mr. Lehrer did not "give publicity" let alone widespread publicity to Plaintiff's alleged status as a convicted felon because that misstatement had already been <u>widely</u> publicized before his op-ed was published. *Giles v. Kanawha Cty. Bd. of Educ., No. 17-0139,* 2018 WL 300605 at *5 (W. Va. Jan. 5, 2018). In this case, more than 50 other journalists, pundits, bloggers, and tweeters had referred to Plaintiff as a convicted felon before Mr. Lehrer's op-ed was published. *Id.* Moreover, there is no evidence in the record of any person who read the op-ed before it was corrected the next day and Plaintiff, when asked, could not identify a single person. As the record is void of any evidence that *any* person read the article, Plaintiff cannot meet his burden of proving widespread publicity.

As explained in detail above, Plaintiff's claim for false light invasion of privacy must fail because the statement – "convicted felon" – is substantially true and Plaintiff has not pled any facts to support his conclusory allegation that Defendant acted with actual malice or a reckless disregard for the truth. Therefore, Plaintiff's claim for false light invasion of privacy fails as a matter of law and must be dismissed.

## **CONCLUSION**

For the reasons stated above, Defendant respectfully requests that this Court grant Defendant's Motion for Summary Judgment and enter judgment in favor of Eli Lehrer on all claims asserted against him with prejudice and for such other relief this Court deems appropriate.

Dated: June 7, 2021

Respectfully submitted,

/s/ *BreiAnne Varner Redd*

Joseph S.D. Christof, Esq. (WV#6277)
Melvin F. O'Brien, Esq. (WV#6797)
BreiAnne Varner Redd, Esq.  (WV #10894)
DICKIE, MCCAMEY & CHILCOTE, L.C.
2001 Main Street, Suite 501
Wheeling, WV  26003
Phone: 304-233-1022/Fax: 888-811-7144
bredd@dmclaw.com
*Counsel for Defendant, Eli Lehrer*

/s/ *Jennifer S. Jackman*

Jennifer S. Jackman
*Admitted Pro Hac Vice*
Whiteford, Taylor & Preston, LLP
1800 M. Street N.W., Suite 401
Washington, D.C. 20036
202-659-6800
jjackman@wtplaw.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

DON BLANKENSHIP,                    *

     Plaintiff,               *

v.                                  *        Civil Action No.: 2:19-cv-00236

HONORABLE ANDREW                    *
NAPOLITANO (RET.), *et al.*
                                    *

     Defendants.              *

                                    *

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th of June 2021, a copy of the foregoing was filed using

CM/ECF, the Court's electronic notification system, which provided notice to all counsel of

record.

/s/ BreiAnne Varner Redd
Joseph S.D. Christof, Esq. (WV#6277)
Melvin F. O'Brien, Esq. (WV# 6797)
BreiAnne Varner Redd, Esq. (WV# 10894)
DICKIE, McCAMEY & CHILCOTE, L.C.
2001 Main Street, Suite 501
Wheeling, WV 26003
Phone: 304-233-1022
bredd@dmclaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

DON BLANKENSHIP,

      Plaintiff,

v.                                  Civil Action No. 2:19-cv-00236

FOX NEWS NETWORK, LLC, et al.,

      Defendants.

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF DON BLANKENSHIP'S OPPOSITION TO
## DEFENDANT ELI LEHRER'S MOTION FOR SUMMARY JUDGMENT

---

SIMPKINS LAW OFFICE LLC
Jeffrey S. Simpkins ESQ
WVSB #9806
102 E 2nd AVE
Williamson WV 25661
304.235.2735
simpkinslawoffice@gmail.com
304.235.2735

EARLY SULLIVAN WRIGHT
GIZER & McRAE LLP
Jeremy Gray ESQ
CASB #1500750
6420 Wilshire BLVD 17th FL
Los Angeles CA 90048
jgray@earlysullivan.com
323.301.4660

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ————————————————————————— 1

STATEMENT OF DISPUTED FACTS ———————————————————— 3

STANDARD OF REVIEW ————————————————————————— 4

ARGUMENT ——————————————————————————————— 5

I.   Lehrer published the defamatory statement with actual malice
     in reckless disregard of the truth —————————————————— 5

     A.   Lehrer's "bandwagon" defense is irrelevant ————————————— 8

     B.   Lehrer cannot rationalize his defamatory statement ——————— 9

     C.   Lehrer's research methodology was purposely deficient ————— 9

     D.   Lehrer intended to injure Blankenship ——————————— 10

II.  Blankenship sustained damages from Lehrer's defamatory
     publication ——————————————————————————————— 11

     A.   Blankenship sustained special damages ——————————————— 11

     B.   Blankenship is entitled to general damages as a matter
          of law ———————————————————————————————— 12

III. Lehrer's defamatory publications placed Blankenship in a false
     light ———————————————————————————————————— 15

CONCLUSION ————————————————————————————————— 16

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) .............................................................................4,5

*Bustos v. A&E Television Networks,*
646 F.3d 762 (10th Cir. 2011) ................................................ 14

*Chafin v. Gibson,*
576 S.E.2d 361 (W. Va. 2003) ...............................................14

*Colcord v. Gazette Publ'g. Co.,*
145 S.E. 751 (W. Va. 1928) ...................................................14

*D.C. v. Heller,*
554 U.S. 570 (2008) ...................................................................11

*Denny v. Seaboard Lacquer, Inc.,*
487 F.2d 485 (4th Cir. 1973) ......................................................8

*First Nat'l Bank of West Hamlin v. Maryland Cas. Co.,*
354 F.Supp. 189 (S.D.W. Va. 1973) ..........................................5

*Fitzgerald v. Penthouse Int'l, Ltd.,*
691 F.2d 666 (4th Cir. 1982) ......................................................8

*Garrison v. Louisiana,*
379 U.S. 64 (1964) .......................................................................7

*Hanlon v. Chambers,*
464 S.E.2d 741 (W. Va. 1995) ...................................................4

*Harte-Hanks Commc'ns v. Connaughton,*
491 U.S. 657 (1989) .....................................................................6

*Herbert v. Lando,*
441 U.S. 153 (1979) .....................................................................7

*Hinerman v. Daily Gazette Co.,*
423 S.E.2d 560 (W. Va. 1992) ....................................... 6,7,10,11

*Hutchinson v. Proxmire,*
  443 U.S. 111 (1979) --------------------------------------------------------- 7

*Kaelin v. Globe Commc'ns Corp.,*
  162 F.3d 1036 (9th Cir. 1998) -------------------------------------------- 14

*Long v. Egnor,*
  346 S.E. 2d 778 (W. Va. 1986) --------------------------------------------- 6

*Matherly v. Andrews,*
  859 F.3d 264 (4th Cir. 2017) ----------------------------------------------- 4

*Mauck v. City of Martinsburg,*
  280 S.E.2d 216 (W. Va. 1981) --------------------------------------------- 14

*Milan v. Long,*
  78 W. Va. 102 (1916) --------------------------------------------------------- 15

*Myers v. The Telegraph,*
  773 N.E.2d 192 (Ill. App. Ct. 2002) --------------------------------------- 13

*Nat'l Life Ins. Co. v. Phillips Publ'g., Inc.,*
  793 F.Supp. 627 (D.MD. 1992) ---------------------------------------------- 7

*New York Time Co. v. Sullivan,*
  376 U.S. 254 (1964) ----------------------------------------------------------- 6

*Pauley v. Combustion Engineering, Inc.,*
  F. Supp. 759 (S.D.W. Va. 1981) --------------------------------------------- 4

*Powderridge Unit Owners Ass'n v. Highland Props., Ltd.,*
  474 S.E.2d 872 (W. Va. 1996) ------------------------------------------------ 4

*Prince v. Pittston Co.,*
  63 F.R.D. 28 (S.D.W. Va. 1974) --------------------------------------------- 4

*Pritt v. Republican Nat. Comm.,*
  557 S.E.2d 853 (W. Va. 2001) ------------------------------------------------ 5

*Raynor v. Pugh,*
  817 F.3d 123 (4th Cir. 2016) ------------------------------------------------- 5

*Richard H. v. Rachel B.,*
  No. 18 1004 at 5 (W. Va. Dec. 20, 1919) --------------------------------- 14, 15

*Sprouse v. Clay Commc'n, Inc.*,
   211 S.E.2d 674 (W. Va. 1975) ------------------------------------------- 5,7,11

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ----------------------------- - ---------------------------- ----------7

*State ex rel. Suriano v. Gaughan*,
   480 S.E.2d 548 (1996) ------------------------------------------------------------6

*Taylor v. W. Virginia Dep't of Health & Human Res.*,
   788 S.E.2d 295 (W. Va. 2016) -------------------------------------------------15

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013) ----------------------------------------------- 13

*United States v. McCane*,
   573 F.3d 1037 (10th Cir. 2009) ------------------- ------------------------- --------13

**RULES**

Fed. R. Civ. P. 56(a) ------------------------------------------------------------4

## PRELIMINARY STATEMENT

Defendant Eli Lehrer ("Lehrer") seeks summary judgment even though he wrongly identified Plaintiff Don Blankenship ("Blankenship") as a "convicted felon" in an op-ed published in the *Charleston Gazette-Mail* on 25 May 2018. Ex. 1.

Lehrer claims that he relied on "trusted news reports" for the false information. ECF No. at 7. However, Lehrer fails to specifically identify the exact sources of the disinformation. The inability to recall the genesis of defamatory statement places Lehrer's credibility into question.

The *Charleston Gazette-Mail* was the obvious best source of available information about Blankenship's criminal history. Even so, Lehrer concedes that he did not read the various *Charleston Gazette-Mail* reports about Blankenship's misdemeanor conviction and felony acquittals. ECF No. 898-2 at ¶ 12. The omission of the *Charleston Gazette-Mail* as a primary source, as well as reputable national news sources, was an extreme departure from professional publication standards and purposeful avoidance of the truth.

Lehrer disingenuously alleges that he was "advocating on [Blankenship's] behalf" and was motivated "to defend [Blankenship's] desire to continue his campaign for Senate ..." *Id.* at 9. However, Lehrer's reference to Blankenship as a "convicted felon" was gratuitous for an op-ed ostensibly focused on critiquing "sore loser" laws *Id.* at 9. Moreover, Lehrer also extraneously wrote that Blankenship "isn't the type of person most would like to see in the Senate." Ex. 1. As English poet and dramatist John Gay wrote: "An open foe may prove a curse, but a pretended

1

friend is worse."

Blankenship can and will establish special damages through expert testimony and by his own testimony. Moreover, Blankenship is entitled to general damages as a matter of law because Lehrer's reference to Blankenship as a "convicted felon" was materially false and defamation per se.

Lehrer's defamatory statement placed Blankenship in a false light before the public. Blankenship had never been misidentified as a "convicted felon" in the *Charleston Gazette-Mail* before Lehrer's op-ed. Certainly, it would be highly offensive to a reasonable person who has never been convicted of a felony to be referred to as a "convicted felon" in a prominent newspaper. There are cumulative evidentiary factors that indicate Lehrer acted in reckless disregard as to the falsity of the defamatory publication.

In summary, Lehrer's amnesia regarding the origin of the defamatory statement, lackadaisical research methodology, and pejorative commentary cumulatively provide a legally sufficient factual basis for a jury to reasonably conclude that Lehrer published the defamatory statement with actual malice in reckless disregard of the truth. Moreover, there is evidence showing that Blankenship sustained special and general damages as a proximate result of Lehrer's defamatory publication. Finally, there is a legally sufficient proof in support of Blankenship's false light claim.

Accordingly, Lehrer's motion for summary judgment should be denied as a matter of law.

## STATEMENT OF DISPUTED MATERIAL FACTS

Blankenship disputes the following statements of fact:

- Lehrer "read, seen, and heard multiple major media outlets he trusted refer to [Blankenship] as a convicted felon, which he believed to be true based on the facts he knew and the media reporting." *See* ECF No. 899 at 7.

- Lehrer "relied on the trusted news reports he had seen and listened to that identified [Blankenship] as a 'convicted felon' and he had no knowledge that [Blankenship] had actually only been convicted of a misdemeanor." *Id.*

- Lehrer "understood and believed that [Blankenship] was indeed a convicted felon." *Id.*

- Lehrer "did not review *The Charleston Gazette* articles relating to [Blankenship's] conviction or acquittals before writing the op-ed." *Id.*

- Lehrer "had no knowledge that *The Charleston Gazette* had purportedly previously reported that [Blankenship] was only convicted of a misdemeanor." *Id.*

- Lehrer "did not intend to cause harm to [Blankenship]. *Id.* at 9.

- Lehrer "was advocating on [Blankenship's] behalf. *Id.*

- Lehrer's "motivation in writing the op-ed was to defend [Blankenship's] desire to continue his campaign for Senate after losing the primaries and, more importantly, make a case against the Sore Loser Law that [Blankenship] objected to." *Id.*

- Lehrer "had no ill-will toward [Blankenship]." *Id.*

- Blankenship "was forced out of Massey Coal." *Id.*

3

## STANDARD OF REVIEW

"The function of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof to determine whether a trial is actually required." *Powderridge Unit Owners Ass'n v. Highland Props., Ltd.,* 474 S.E.2d 872, 877 (W. Va. 1996)(quoting *Hanlon v. Chambers,* 464 S.E.2d 741, 748 (W. Va. 1995)). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Moreover, "[s]ummary judgment is available only in those cases where it is not only perfectly clear that there exists no dispute as to the facts, but also where there is no dispute as to any conclusions or inference which may reasonably be drawn therefrom." *Pauley v. Combustion Engineering, Inc.,* 528 F. Supp. 759, 765 (S.D.W. Va. 1981). In sum, "[i]t is well settled that summary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." *Prince v. Pittston Co.,* 63 F.R.D. 28, 32 (S.D.W. Va. 1974).

At the summary judgment stage, a trial judge's function is to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Matherly v. Andrews,* 859 F.3d 264, 279 (4th Cir. 2017). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling

4

on a motion for summary judgment." *Liberty Lobby,* 477 U.S. at 255. "[W]here affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." *Raynor v. Pugh,* 817 F.3d 123, 130 (4th Cir. 2016).

The evidence must be viewed "in the light most favorable to the party opposing the motion [for summary judgment] and give to that party the benefit of all favorable inferences that may reasonably be drawn from the evidence." *First Nat'l Bank of West Hamlin v. Maryland Cas. Co.,* 354 F. Supp. 189, 192 (S.D.W. Va. 1973) However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 256. "The mere scintilla of evidence" in favor of the nonmovant party is insufficient to withstand summary judgment. *Id.* at 252.

The "clear and convincing" evidentiary standard applies to the summary judgment inquiry in constitutional defamation cases. *Id.* at 255.

## ARGUMENT

I.    **Lehrer published the defamatory statement with actual malice in reckless disregard of the truth.**

Defamation is "[a] false written or oral statement that damages another's reputation." *Pritt v. Republican Nat. Comm.,* 557 S.E.2d 853, 861 n 12 (W. Va. 2001). A statement is defamatory if it tends to "reflect shame, contumely, and disgrace" upon the subject of the statement.  Syl. Pt. 1, *Sprouse v. Clay Commc'n, Inc.,* 211 S.E.2d 674, 679 (W. Va. 1975).

5

A candidate for public office must prove the following elements recover damages in a defamation action:

> (1) there was the publication of a defamatory statement of fact or a statement in the form of an opinion that implied the allegation of undisclosed defamatory facts as the basis for the opinion; (2) the stated or implied facts were false; and (3) the person who uttered the defamatory statement either knew the statement was false or knew that he was publishing the statement in reckless disregard of whether the statement was false.

Syl. Pt. 1, *Hinerman v. Daily Gazette Co.*, 423 S.E.2d 560, 563 (W. Va. 1992). "Thus, to sustain a cause of action for defamation, a [candidate for public office], after establishing the existence of a an allegedly defamatory statement, must prove that the statement was (1) false and (2) published with actual malice[.]" *Chafin v. Gibson*, 576 S.E.2d 361, 366 (W. Va. 2003).

As a candidate for public office with "prominence or notoriety" and a history of "commenting upon public matters" and engaging in political advocacy, Blankenship qualifies as an "public figure" in this case. *See State ex rel. Suriano v. Gaughan*, 480 S.E.2d 548 (1996). A public figure must prove by clear and convincing evidence that the defamatory statements were published with actual malice. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 375-76 (1964); *see also Long v. Egnor*, 346 S.E.2d 778, 783 (W. Va. 1986). The actual malice standard "requires at a minimum that a defamatory statement is published with reckless disregard for the truth." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).

Proving that a defamatory statement was published with reckless disregard for the truth requires "sufficient evidence to permit the conclusion that the

defendant actually had a 'high degree of awareness of . probable falsity.'" *Id.* 491

U.S. at 688 (citing *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964). However, "reckless

disregard" is a concept that "cannot be fully encompassed in one infallible

definition. Inevitably, its outer limits will be marked out through case-by-case

adjudication …" *St. Amant v. Thompson,* 390 U.S. 727, 730 (1968).

"[A] plaintiff is entitled to prove the defendant's state of mind through

circumstantial evidence." *Id.* at 668 (citing *Herbert v. Lando,* 441 U.S. 153, 160 (1979));

*See also Sprouse,* 211 S.E.2d at 689 90. (actual malice can be established by

cumulative evidence) For example, an "extreme departure from professional

publishing standards" may support a conclusion of reckless disregard of the truth.

*Id.* at 667-68, 693; *See also Sprouse,* 211 S.E.2d at 687 (a departure from objectively

reporting the news can be considered in determining whether there was a willful

disregard of the truth.). Partisanship and other motives may also be considered in

the determination of "whether a subjective realization that the statement was false

or a subjective realization that the statement was being published recklessly existed

at the time the statement was published." *See Hinerman,* 423 S.E.2d at 573

Determining actual malice is a question of *scienter* that "does not readily lend

itself to summary disposition" because the determination requires a "subjective

evaluation" of the defendant's state of mind. *See Hutchinson v. Proxmire,* 443 U.S.

111, 120, n. 9 (1979)(recognizing that actual malice "does not readily lend itself to

summary disposition" since it "calls a defendant's state of mind into question.");

*Nat'l Life Ins. Co. v. Phillips Publ'g., Inc.,* 793 F.Supp. 627, 632 (D.MD. 1992)("Under

Rule 56, where possibly subjective evaluations are at issue, as here where a determination of whether defendants acted with actual malice is at issue, the Fourth Circuit has cautioned against a court taking those determinations away from a jury"). Consequently, "[w]here state of mind is at issue, summary disposition should be sparingly used." *See Denny v. Seaboard Lacquer, Inc.*, 487 F.2d 485, 491 (4th Cir. 1973); *See also Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d. 666, 670-671 (4th Cir. 1982)(denying summary judgment because "plaintiff can meet his burden of proving that the defendants had actual doubts about the accuracy of the information they published and that their failure to make an adequate investigation will reveal a reckless disregard for the truth.")

### A.    Lehrer's "bandwagon" defense is irrelevant.

Lehrer substantially relies on a "bandwagon" defense to justify his false reference to Blankenship as a "convicted felon." In fact, approximately four pages or 22% of Lehrer's memorandum of law is used to recite from Blankenship's First Amended Complaint the defamatory publications that Blankenship endured as if the rule of law gives wrongdoers a free pass if others are guilty of the same unlawful conduct. Lehrer disregards the countless reputable news sources such as *The New York Times, The Wall Street Journal, USA Today*, Reuters, Forbes, CBS News, NPR, and others that correctly reported Blankenship's misdemeanor conviction and accurately identified Blankenship as a misdemeanant. Lehrer is the President of R Street Institute, a public policy research organization, and must be held to a higher subjective standard than *argumentum ad populum*.

8

### B.    Lehrer cannot rationalize his defamatory statement.

Lehrer rightly concedes that Blankenship was convicted of a misdemeanor. Blankenship was not charged in connection with the fatalities resulting from the Upper Big Branch mine explosion. ECF No. 398 at 2. Therefore, Lehrer exacerbates his prior defamatory publication with innuendo that Blankenship was incarcerated "for actions that contributed to the multiple deaths." ECF No. 899 at 14. Lehrer attempts to rationalize the defamatory publication by stating that Blankenship "spent a full year" in a federal prison. However, the average prison sentence for federal offenders is 52 months, which is more than 400% longer than Blankenship's sentence. Ex. 2 at 24. There is a substantial difference between a typical felony penalty and the maximum misdemeanor penalty in the federal criminal justice system.

### C.    Lehrer's research methodology was purposely deficient.

Lehrer next defends his defamatory publication by claiming that it was reviewed by others prior to publication. However, neither Lehrer nor his reviewers fact-checked the op-ed by reviewing the numerous accurate reports of Blankenship's misdemeanor conviction and felony acquittals in the *Charleston Gazette-Mail*. Lehrer's op-ed was going to be published in the *Charleston Gazette-Mail*. It is unfathomable that Lehrer declined to use the *Charleston Gazette-Mail* as a reference source for his op-ed.

Lehrer also elected not to use *The New York Times, The Wall Street Journal,* Reuters, CBS News, and other reputable news sources that correctly reported

9

Blankenship's misdemeanor conviction and felony acquittals. The injudicious research methodology employed by Lehrer was an extreme departure from professional publication standards and can only be explained as the purposeful avoidance of the truth.

### D.    Lehrer intended to injure Blankenship.

Lehrer and the other media defendants cite to *Sprouse* and erroneously claim that West Virginia law requires proof of both actual malice and "intent to injure" in defamation suits prosecuted by public officials and political candidates. ECF No. 899 at 12,15; *see also* ECF 883 at 11-12; ECF No. 885 at 3, 12, 19, ECF No. 887 at 1, 11, 19-20; ECF No. 889 at 15, 21; ECF No. 891 at 19; ECF No. 901 at 5, 9, ECF No. 904 at 5, 7, 11; ECF No. 934 at 2; ECF No. 936 at 15; ECF No. 938 at 4; ECF No. 940 at 12. However, this court has previously recognized that "public officials or candidates for public office must prove three elements by clear and convincing evidence to recover in a defamation action:

> (1) there was the publication of a defamatory statement of fact or a statement in the form of an opinion that implied the allegation of undisclosed defamatory facts as the basis for the opinion; (2) the state or implied facts were false; and (3) the person who uttered the defamatory statement either knew the statement was false or knew that he was publishing the statement in reckless disregard of whether the statement was false.

*Hinerman* 423 S.E.2d at 563 (emphasis omitted). ECF No. 398 at 17. Moreover, this court cited to *Sprouse* but did not subscribe to the purported additional element of "intent to injure" that Lehrer and the other media defendants incorrectly argue is an essential element of a defamation action.

10

This court should reject Lehrer's invitation to supplement the essential elements of a defamation claim promulgated in *Hinerman*. At the outset, it is important to analyze *Sprouse* in context. Indeed, the *Sprouse* court emphasized that the case presented a question of first impression whether a newspaper's decision to join with a political candidate to intentionally discredit the opponent was evidence relevant to proving actual malice. *See Sprouse* 211 S.E.2d at 680. Critically, the standard articulated in *Sprouse* to determine actual malice was the same standard later articulated in *Hinerman. See Hinerman* 423 S.E.2d at 563.

In any event, it was pointless for Lehrer to identify Blankenship as a "convicted felon" or speculate that Blankenship "isn't the type of person most would like to see in the Senate" in an article focused on sore loser laws. Thus, the inclusion of the needless denigrations reveals Lehrer's personal enmity toward Blankenship and an intent to injure Blankenship's reputation.

Accordingly, a jury could reasonably conclude from cumulative evidentiary factors that Lehrer published the defamatory statement with actual malice in reckless disregard of the truth.

**II. Blankenship sustained damages from Lehrer's defamatory publication.**

    **A. Blankenship sustained special damages.**

Blankenship can and will establish special damages through expert testimony and by his own testimony. Stan V. Smith PhD, a forensic economist, has issued a report that Blankenship has sustained the following impairment of future earning capacity damages:

<div align="center">11</div>

- $197,218,122 – $254,647,877 (CEO);
- $97,766,336 – $175,394,301 (strategic consultant);
- $10,269,025 – $17,115,042 (board of directors); and
- $333,790,703 - $667,581,406 (coal broker).

*See* Ex. 3 at 4-9. Smith's opinions were rendered to a reasonable degree of economic certainty in accordance with generally accepted standards with the field of economics. *Id.* at 10.

Lehrer contends that Blankenship has not sustained or proven special damages as a consequence of Lehrer's defamatory publication. However, Smith's substantive opinions concerning Blankenship's impaired earning capacity were formulated from materials and information routinely relied upon by economics experts. *Id.* at 10. Furthermore, Blankenship did not seek employment between his retirement from Massey Energy and the defamatory publications for the following reasons:

- retirement agreement non-competition clause (2011-2012);

- indictment > trial > sentencing (2014-2016);

- federal custody (2016-2017); and

- United States Senate campaign (2017-2018).

It is axiomatic that employment as a CEO or strategic consultant, board memberships, and business opportunities as a coal broker or in private equity ventures is now unavailable to Blankenship after being branded as a "felon" and "convicted felon" by Lehrer and the other media defendants.

> **B.**      **Blankenship is entitled to general damages as a matter of law.**

Lehrer's defamatory reference to Blankenship as a "convicted felon"

12

unquestionably had a different effect on the mind of viewers in comparison to

Blankenship's misdemeanor conviction. As reflected in the Memorandum Opinion

and Order, this court has deemed that Lehrer's reference to Blankenship as a

"convicted felon" were materially false as a matter of law:

> All the defendants' statements identifying the plaintiff as a
> "felon" are materially false. The term "felon" is an objective
> label with a clear legal meaning — having been convicted of a
> crime with a term of imprisonment of more than one year. A
> person either is or is not a felon; there is no in between or room
> for "substantial truth." The United States Code clearly outlines
> the difference between a felony and a misdemeanor even when
> the criminal statute does not clarify the category of the crime.
> The different consequences associated with being a felon,
> including that "felons can suffer numerous restrictions on their
> constitutional rights," further underscore that the two
> categories are distinct. *See United States v. Chovan*, 735 F.3d
> 1127, 1145 (9th Cir. 2013)(Bea, J., concurring); *See also D.C. v.
> Heller*, 554 U.S. 570, 631 (2008)(discussing that felons may be
> "disqualified" from exercising Second Amendment rights);
> *United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir.
> 2009)(Tymkovich, J., concurring)("After all, felons lose out on
> fundamental rights such as voting and serving on juries, and face
> discrimination that need only survive rational basis review.") The
> court also agrees that "society at large views a 'felon' far
> differently than a person who has committed an offense
> resulting in a misdemeanor conviction." *See Myers v. The
> Telegraph*, 773 N.E 2d 192, 198 (Ill. App. Ct. 2002).

ECF No. 398 at 22.

The distinction between a misdemeanor and a felony is unmistakable. A

misdemeanor is viewed as a "petty" or "minor" offense, infraction, citation, or

ticket. In contrast, a felony is perceived as "serious" or "major" crime. Misdemeanor

prosecutions define the criminal experience from millions of Americans. The sheer

scale of the number of misdemeanants and acquaintances of misdemeanants

indicate that those who viewed Lehrer's defamatory publication had a common understanding of the disparity between a misdemeanor and a felony. Therefore, it is disingenuous to characterize Lehrer's defamatory publication as simply mislabeling Blankenship's misdemeanor conviction.

Regardless, the effect on the mind of the viewer is generally a jury question. *See Bustos v. A&E Television Networks*, 646 F.3d. 762, 767 (10th Cir. 2011)("Unsurprisingly, deciding the materiality of a falsehood often requires a jury. Whether a particular misstatement is likely to injure the plaintiff's reputation in the mind of a reasonable member of the community is often best decided by reasonable members of the community."); *See also Kaelin v. Globe Commc'ns Corp.,* 162 F.3d 1036, 1040 (9th Cir. 1998)("[s]o long as a publication is reasonably susceptible of a defamatory meaning, a factual question for the jury exists.").

A statement falsely imputing a person with the commission of a crime are actionable as defamation per se according to West Virginia case law. *See Mauck v. City of Martinsburg,* 280 S.E.2d 216, 219, n. 3 (W. Va. 1981)("At common law, defamation per se includes only imputations of a crime of moral turpitude ...); *See also Colcord v. Gazette Publ'g. Co.,* 145 S.E. 751, 753 (W. Va. 1928)("Any printed or written publication imputing to another a crime or moral delinquency is actionable per se, without proof of damages). This court has already ruled that Lehrer's defamatory statement referencing Blankenship as a "convicted felon" is "defamatory per se because [it] impute a felony conviction." ECF No. 398 at 19-20.

Lehrer's reliance on *Richard H.* is misplaced and entirely distinguishable from

14

this case. It is indisputable that Blankenship is not a "convicted felon." Again, this court has previously ruled that Lehrer's defamatory statement identifying Blankenship as a "convicted felon" was materially false. Therefore, the falsity of Lehrer's defamatory publication is considerably greater than "a matter of degree." *See Richard H. v. Rachel B.*, No. 18-1004 at 5 (W. Va. Dec. 20, 2019).

"Where words are actionable per se, it is not necessary to aver and prove special damages in order to entitle the plaintiff to general damages. The law implies all such damages are the natural and probable consequences of the words so spoken or written in all cases where the words are actionable per se." Syl. Pt. 2, *Milan v. Long*, 78 W. Va. 102 (1916). Blankenship is clearly entitled to general damages as a matter of law.

Accordingly, a jury could reasonably conclude that Blankenship sustained special damages and general damages from Lehrer's defamatory publication.

III.    Lehrer's defamatory publications placed Blankenship in a false light.

A false light invasion of privacy claim requires the following elements of proof: (1) the defendant gave publicity to a matter concerning the plaintiff that places the plaintiff before the public in a false light; (2) the publicity was widespread; (3) the matter of the publicity was false; (4) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (5) the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed. *See Taylor v. W. Virginia Dep't of Health & Human Res.*, 788 S.E.2d 295, 315-16 (W. Va. 2016).

15

Although Blankenship had been the target of unfavorable publicity prior to the defamatory publications, he had never been falsely identified as a "convicted felon" in the *Charleston Gazette-Mail* prior to Lehrer's defamatory op-ed. The *Charleston Gazette-Mail* is the largest newspaper in the State of West Virginia by circulation.[1] Therefore, the false publicity was widespread throughout the Mountain State and beyond. Of course, any reasonable person who was not convicted of a felony would be highly offended by being branded as a "convicted felon" in a prominent newspaper. Cumulative evidence substantiates that Lehrer published the defamatory statement disregard as to the falsity thereof and the false light in which Blankenship was placed.

Accordingly, a jury could reasonably conclude that the defamatory publication placed Blankenship in a false light.

## CONCLUSION

A jury can reasonably conclude from cumulative evidentiary factors that Lehrer published the defamatory statement with actual malice in reckless disregard of the truth. Moreover, there is legally sufficient evidence to validate that Blankenship sustained special and general damages as a proximate result of Lehrer's defamatory publication. Finally, there is a legally sufficient proof in support of Blankenship's false light claim. For the foregoing reasons, summary judgment should be denied to Lehrer as a matter of law.

---

[1] See https://fullintel.com/top-media-outlets/the-top-10-west-virginia-cally-newspapers-by-circulation.

16

## RELIEF REQUESTED

Wherefore, Blankenship respectfully requests that summary judgment be denied to Lehrer and such other relief deemed to be appropriate under the circumstances.

DON BLANKENSHIP
By Counsel

/s/ Jeffrey S. Simpkins
Jeffrey S. Simpkins ESQ
WVSB #9806
*SIMPKINS LAW*
102 E. 2nd AVE
Williamson, WV 25661
304.235.2735
simpkinslawoffice@gmail.com

/s/ Jeremy Gray
Jeremy Gray ESQ
CASB #150075 *pro hac vice*
EARLY SULLIVAN WRIGHT
GIZER & McRAE LLP
6420 Wilshire BLVD 17th FL
Los Angeles CA 90048
323.301.4660
jgray@earlysullivan.com

17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

DON BLANKENSHIP,

     Plaintiff,

v.                                                          Civil Action No. 2:19-cv-00236


FOX NEWS NETWORK, LLC, et al.,

     Defendants.

---

## CERTIFICATE OF SERVICE

---

    I hereby certify that I electronically filed the foregoing "Memorandum of

Law in Support of Plaintiff Don Blankenship's Opposition to Defendant Eli

Lehrer's Motion for Summary Judgment" with the Clerk of Court using the CM/ECF

system which will send notice to all CM/ECF participants.

    Date: 21 June 2021


/s/ Jeffrey S. Simpkins
Jeffrey S. Simpkins ESQ
WVSB #9806
*SIMPKINS LAW*
102 E. 2nd AVE
Williamson, WV 25661
304.235.2735
simpkinslawoffice@gmail.com

# EXHIBIT #1

Charleston Gazette-Mail, Friday, May 25, 2018    **5A**

# inion

CHARLESTON
## Daily Mail
wvgazettemail.com/Opinion/DailyMail | twitter.com/DM_Opinion

## est Virginia
## story to tell

to people outside
b for all of us

*Journal*

challenge the state's media to
cast West Virginia.

dare to see flaws in those ar-
re, work here, many of us
until we die.

the place. But that doesn't
d this and that.

t's why most people go some-
s away. And whether we tran-
nmont park or to the scenic
— It's still away from the

mves story, Tourism Commis-
taff writer Rusty Marks that
ecause we spend less money to
nty that is Wild, Wonderful
eaven, both catchy slogans of

ive stereotypes that exist
said. "We've really let other
I'm not always one we want to

nterest, but we would also ar-
cies our own people tell aren't

ntke is right. We have a

m for trout fishing, of white-
ntainr to climb
slings, an array of fairs and
r and plenty of great food

an and on. But you see, that's
r each of us, as well as outsid-

neat West Virginians. And
w the state with rose-colored
nue to celebrate and premote
have.

ty. Can we do better? There's
here. And it's pretty darn

learned to live with more
ement us, learning to be thank-
willing to share the good news

to outsiders is a job for all of
the need to spend more man-
h and outside the state. The
needs more promotional man-
nt address as soon as possi-

work together to spread the
West Virginia is a great place

## and against
## schools

students who
ullying of others

ence, *Wheeling News-Register*

r murderous rampage by a
high school in Santa Fe, Tex-
ued. But this week, the so-
d the boy may have been bul-

ave investigated allegations
eachers or coaches, and found
en. But what about bullying

illings by students and those
floored on as "outsider" men-




# It's time to end W.Va. 'sore-loser' law

**Laws that preclude
candidates from
3rd-party ballots
are unjust**


Eli
Lehrer
Contrarian
Columnist

ormer coal executive,
convicted felon and
self-described "Trump-
er-than-Trump" West Virginia
candidate Don Blankenship
wants to remain in his U.S.
Senate race after losing the
Republican primary.

Right now, however, West
Virginia statutes dubbed "sore-
loser" laws appear to make it
impossible for Blankenship to
take the Constitution Party
line as he wants to. While
there are plenty of reasons to
disagree with Blankenship's
positions, he ought to be al-
lowed to stay in the race and
the laws that forbid people
who have lost a primary from
running should face repeal.

Some background first. West
Virginia, like 45 other states,
makes it impossible for some-
one who has lost a party
primary to appear on the
ballot in the general election
as an independent or minor
party candidate. These
sore-loser laws mean, by and
large, that party primary vot-
ers, not the party's supporters
as a whole, pick the candi-
dates that appear on general
election ballots.

Since passionate supporters
we have the most extreme

beliefs tend to vote in prima-
ries, this means candidates
who have to court polarizing,
pandering positions frequently
fare better in these early con-
tests.

Even worse, the system is
very prone to manipulation. In
2012, for example, Missouri
Democrat Claire McCaskill,
ran ads calling Todd Akin a
"true conservative," designed
to boost the chances of her
very conservative (and poorly
spoken) Republican opponent.
The ads helped Akin win the
primary and once he did,
McCaskill's team launched
effective attacks against Akin,
making hay over his misogy-
nistic comment about "legiti-
mate rape."

The outcome? A state that
was trending Republican
re-elected a Democrat hand-
ily. This probably wouldn't
have happened without
sore-loser laws. The general
result of plays like these is
that both parties' Congressio-
nal delegations are more ex-
treme than their modian
voter and — unsurprisingly
— at least as unknown by the
public. Current support for
Democrats in Congress is only
a little over a third whereas

Republicans barely cling to 24
percent support.

The people who have won
general elections after losing
a primary give a strong indi-
cation that a repeal of sore
loser laws would give Ameri-
cans a better, less polarized
Congress.

Almost universally respect-
ed centrist Democrat Joseph
Lieberman managed to remain
in the Senate in 2006 after
losing a Democratic primary
to a far-left candidate only
because his home state, Con-
necticut, is one of the few
without sore-loser policies.

Likewise, sitting Sen. Lisa
Murkowski (R-Alaska) won as
a write-in candidate after
losing her primary to an even
more conservative senator.
But this was possible only
because her sky-high name
recognition and Alaska's very
small population made a
write-in campaign feasible.

Both Murkowski and Lieber-
man ranked among the most
thoughtful and consistently
bipartisan members of the
body. The academic research
bears this out: a study led by
the University of Wisconsin's
Barry Burden showed that
sore loser laws account for
about 10 percent all ideologi-
cal division in Congress.

For those who think that a
repeal of sore-loser laws
would cause chaos on the
ballot or result in the election
of people with questionable
pasts like Blankenship, there's
little evidence this would hap-
pen. Candidates who can't win

a primary will rarely be able
to attract the money or sup-
port to win a general.

And, of course, they'll have
the huge disadvantage of hav-
ing to re-create the get-out-
the-vote infrastructure that
parties provide to their can-
didates. Most candidates who
run in a general election after
losing a primary flame out
pretty quickly.

For example, when New
York's Peter McConghey (who
was elected lieutenant gover-
nor as a Republican) ran in
and lost that state's Demo-
cratic primary and then en-
tered the general election
under the banner of the Lib-
eral Party (New York has no
sore loser laws), she received
a mere 1.7 percent of the
vote. And that happened de-
spite universal name recogni-
tion and a strong initial infu-
sion of campaign cash from a
wealthy husband.

Blankenship, who finished
third in a low-turnout Repub-
lican primary, is much more
likely to end up like Mc-
Conghey than Lieberman or
Murkowski. But there's no
doubt that he simply for a
portion of West Virginians.

Even if Blankenship isn't
the type of person most would
like to see in the Senate, he
deserves the same chance to
run as any other citizen. The
sore-loser laws he appears
are, indeed, unjust.

Eli Lehrer is the president of the
R Street Institute, a conservative
think tank.

# Good first step for new prison reform

**Plan deals with
recidivism in
economic and**


Star
Parker
Syndicated

evaluating the likelihood of the
prisoner reconstituting a crime.
The profiling also establishes a
basis for programs and job
training to assist in rehabilita-
tion of these individuals

Several high-profile Black
Caucus Democrats, including
Senators Kamala Harris, Cory
Cory Booker and Representa-
tives John Lewis and Sheila

R 00008

# EXHIBIT #2



# Federal Sentencing: The Basics

UNITED STATES SENTENCING COMMISSION



**United States Sentencing Commission**
One Columbus Circle, N.E. Suite 2-500
Washington, DC 20002
www.ussc.gov

*Disclaimer:* This document serves as an update to the August 2015 publication authored by the Commission's staff. It is offered to assist in understanding and applying the sentencing guidelines, related federal statues, and rules of procedure. The information in this document does not necessarily represent the official position of the Commission, and it should not be considered definitive or comprehensive. The information in this document is not binding upon the Commission, courts, or parties in any case.



November 2018

Federal Sentencing: The Basics – 2018

# Table of Contents

| I. | Introduction | 1 |
|---|---|---|
| II. | The Evolution of Federal Sentencing Since the 1980s | 1 |
| III. | Overview of the Federal Sentencing Process | 5 |
| | A. Guilty Pleas and Plea Bargains | 5 |
| | B. Presentence Interview | 6 |
| | C. Presentence Report and Objections | 6 |
| | D. Sentencing Hearing | 7 |
| IV. | The Nature of a Federal Sentence | 8 |
| | A. Types of Sentences Available By Statute | 8 |
| | B. The Booker Three-Step Process in Sentencing | 11 |
| | C. "Relevant Conduct" as the "Cornerstone" of the Guideline System | 12 |
| V. | Basic Guideline Application | 13 |
| | A. Application Instructions | 13 |
| | B. Applying the Guidelines | 15 |
| | C. Chapter Four "Overrides" | 18 |
| | D. Departures and Variances | 18 |
| | E. Fines | 19 |
| | F. Supervised Release Under the Guidelines | 20 |
| VI. | Appellate Review of Sentences | 20 |
| VII. | Violations of the Conditions of Probation and Supervised Release | 21 |
| VIII. | Guideline Amendment Process | 22 |
| | A. The Amendment Cycle | 22 |
| | B. Retroactivity of Amendments | 23 |
| IX. | A Brief Overview of Sentencing Data | 24 |
| | A. The Commission's Collection and Analysis of Sentencing Data | 24 |
| | B. Snapshot of Federal Offenses and Offenders | 24 |
| X. | Conclusion | 25 |
| | Endnotes | 27 |
| | Attachments | 42 |

United States Sentencing Commission ⚖

▪ ⚖


Federal Sentencing: The Basics – 2018

<div style="background:#9B1B1B; color:white; padding:20px;">

# Federal Sentencing: The Basics

</div>

## I. Introduction

This paper provides an overview of the federal sentencing system. For historical context, it first briefly discusses the evolution of federal sentencing during the past four decades, including the landmark passage of the Sentencing Reform Act of 1984 (SRA),[1] in which Congress established a new federal sentencing system based primarily on sentencing guidelines, as well as key Supreme Court decisions concerning the guidelines. It then describes the nature of federal sentences today and the process by which such sentences are imposed. The final parts of this paper address appellate review of sentences; the revocation of offenders' terms of probation and supervised release; the process whereby the United States Sentencing Commission (the Commission) amends the guidelines; and the Commission's collection and analysis of sentencing data.

## II. Evolution of Federal Sentencing Since The 1980s

Before the federal sentencing guidelines went into effect on November 1, 1987, federal judges imposed "indeterminate" sentences with virtually unlimited discretion within broad statutory ranges of punishment, and the United States Parole Commission would thereafter decide when offenders were actually released from prison on parole.[2] The Supreme Court has recognized that "the broad discretion of sentencing courts and parole [officials] had led to significant sentencing disparities among similarly situated offenders."[3] As found by members of Congress who enacted the SRA: "[E]ach judge [was] left to apply his own notions of the purposes of sentencing, . . . As a result, every day federal judges mete[d] out an unjustifiably wide range of sentences to offenders with similar histories, convicted of similar crimes, committed under similar circumstances."[4]

In response to both concern regarding sentencing disparities and also a desire to promote transparency and proportionality in sentencing, Congress created the United States Sentencing Commission, a bipartisan expert agency located in the judicial branch.[5] The Commission is composed of up to seven voting members, including a chair, who are nominated by the President and must be confirmed by the Senate. No more than four Commissioners can be from the same political party, and at least three Commissioners must be federal judges.[6]

United States Sentencing Commission

The SRA directs the Commission to establish sentencing policies and practices in two primary ways: (1) by promulgating (and regularly amending) the federal sentencing guidelines; and, (2) by issuing reports to Congress that recommend changes in federal legislation related to sentencing. The SRA also directs the Commission to establish a data collection and research program for the purpose of serving as "a clearinghouse and information center" concerning sentencing-related issues and to establish a training branch to provide education about federal sentencing practices to federal judges, prosecutors, defense counsel, and probation officers.[7]

The Commission has a staff of approximately 100 attorneys, social scientists and other professionals with expertise in criminal justice and sentencing, led by the Commission's Staff Director. The staff's organization reflects the various statutory functions in the SRA and includes, among others, the Offices of General Counsel (OGC), Research and Data (ORD), Education and Sentencing Practice (OESP), and Legislative and Public Affairs (OLPA).

The SRA and contemporaneous federal sentencing legislation created a fundamentally different sentencing system from the prior system, with the guidelines being the central feature and with parole no longer available for offenders convicted of offenses committed on or after November 1, 1987.[8] Congress specifically directed the Commission to create guidelines that increased existing penalties for "many" types of cases, such as "serious" white collar offenses and violent offenses.[9] Before the initial set of guidelines was promulgated, Congress also enacted statutes creating mandatory minimum penalties for several commonly prosecuted drug-trafficking and firearms offenses[10] and prohibiting probation for certain offenders.[11]

USCA4 Appeal: 23-1198    Doc: 59    Filed: 05/25/2022    Pg: 226 of 300

With respect to the sentencing process itself, the SRA (in 18 U.S.C. § 3553(a)) sets forth seven factors that a sentencing court must consider:

### Seven Factors to be Considered at Sentencing

(1) *the nature and circumstances of the offense and the history and characteristics of the defendant;*

(2) *the need for the sentence imposed to reflect the four primary purposes of sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation;*

(3) *the kinds of sentences available (e.g., whether probation is prohibited or a mandatory minimum term of imprisonment is required by statute);*

(4) *the sentencing range established through application of the sentencing guidelines and the types of sentences available under the guidelines;*

(5) *any relevant "policy statements" promulgated by the Commission;[12]*

(6) *the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and*

(7) *the need to provide restitution to any victims of the offense.[13]*

Significantly, two of the seven factors in section 3553(a) are the guidelines and the policy statements promulgated by the Commission, and the remaining five reflect factors that the Commission itself considers in promulgating the guidelines and policy statements.[14] As the Supreme Court has recognized, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale."[15]

The SRA specifically directed the Commission to do three things in drafting guidelines that significantly narrowed the degree of sentencing discretion previously possessed by judges: (1) create a "detailed set of sentencing guidelines" that addresses "all important variations that commonly may be expected in criminal cases, and that reliably breaks cases into their relevant components and assures consistent and fair results";[16] (2) prohibit or limit consideration of several personal characteristics of defendants regarding sentencing;[17] and (3) significantly limit the breadth of the individual sentencing ranges within the guidelines' sentencing table such that "the maximum of the range . . . shall not exceed the minimum of the range by more than the greater of 25 percent or six months" (commonly referred to as the "25 percent rule").[18] These limitations were created for the primary purpose of providing "certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted disparities among defendants with similar records who have been found guilty of similar criminal conduct . . . ."[19]

In the SRA as enacted, courts were required to sentence defendants within the applicable guideline range unless either the Commission had created a permissible basis for a "departure" from the range or there existed "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission

United States Sentencing Commission ⚖️

in formulating the guidelines that should result in a sentence outside of the applicable range.[ ] Departures from the range were limited in order to reflect Congress's desire for general uniformity in sentencing of similarly situated offenders, without consideration of several offender characteristics deemed irrelevant to the sentencing decision, including "socio-economic status."[81]

In 1987, the original Commission responded to Congress's directives in the SRA with the first *Guidelines Manual* containing a detailed set of guidelines and policy statements that included a sentencing table (discussed *infra* in Part V.B.5) with much narrower sentencing ranges than the larger statutory sentencing ranges governing federal crimes.[82] For instance, in a bank robbery case in which the indictment does not allege that the defendant used a dangerous weapon, the statutory range of punishment is zero to 20 years, while a typical guideline range in such a case is much narrower (e.g., 78-97 months).[83]

In 2005, in *United States v. Booker*,[84] the Supreme Court declared that the existing guideline system violated the Constitution by permitting judges to find facts that raised the guideline range by a preponderance of the evidence (as opposed to juries making such findings beyond a reasonable doubt). The Court in *Booker* remedied the constitutional defect by striking the provisions of the SRA that made the guidelines "mandatory;" the result was a judicially modified guideline system that the Court described as "effectively advisory."[85] After *Booker*, courts use a three-step process—discussed below in Part IV.B.— in which they properly calculate and consider the guidelines as well as any relevant policy statements, along with the other five statutory factors in 18 U.S.C. § 3553(a) (set forth above), in deciding what sentence to impose within the broader statutory range of punishment.[86]

The Court repeatedly has stressed that the advisory guidelines remain the "starting point and the initial benchmark" in the federal sentencing process and, moreover, "district courts must . . . remain cognizant of them throughout the sentencing process."[87] As the Court has stated, "[t]hese requirements mean that in the usual sentencing . . . the judge will . . . impose a sentence within [the applicable] guidelines range," as such range is "the Federal Government's authoritative view of the appropriate sentence for specific crimes."[88] "The *Booker* remedy, while not the system Congress enacted [in 1984], was designed to continue to move sentencing in Congress's preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary."[89]

Consistent with the Court's description of the role of the guidelines after *Booker*, the guidelines have proved to be "the lodestone of sentencing" in federal court.[90] Sentencing data since 2005 show that, although the "within-range" rate of sentences has decreased, it has remained steady, at around 50 percent of cases, in recent years.[91] It is also notable that, of those cases in which below-range sentences are imposed, around 40 percent of them are the result of grounds for downward departure specifically recognized by the *Guidelines Manual*, including for defendants' "substantial assistance to the authorities" or guilty pleas pursuant to an "Early Disposition" Program (departures discussed *infra* in

4  ⚖️



Part V.D.).[32] Moreover, the average sentence imposed for all cases has closely tracked the average guideline range—both before and after *Booker*.[33]

According to a 2014 survey of federal district judges, most judges believed that the guidelines generally increased certainty and fairness in meeting the purposes of punishment and reduced unwarranted sentencing disparities. A majority of judges also favored the current guideline system over alternative systems.[34]

By 2018, over 1.8 million defendants had been sentenced under the guidelines.[35] There also have been tens of thousands of federal appeals involving the guidelines and nearly three dozen Supreme Court decisions concerning the guidelines. It is no exaggeration to say that the guidelines are a central feature of the federal criminal justice system.

## III. Overview of the Federal Sentencing Process

The federal sentencing process typically begins well before the formal imposition of a sentence. It involves a lengthy adversarial process that revolves around the presentence report (PSR), which includes a proposed application of the sentencing guidelines. At the sentencing hearing, the court must resolve any objections to the PSR and also engage in the "*Booker* three-step process" in accordance with 18 U.S.C. § 3553.

### A. Guilty Pleas and Plea Bargains

For the overwhelming majority of federal defendants, the sentencing process actually begins before the formal sentencing phase of the case. In recent years, 97 percent of federal defendants convicted of a felony or Class A misdemeanor offense are adjudicated guilty based on a guilty plea rather than on a verdict at a trial.[36] As a result, in a typical case involving a guilty plea, some but not all of the facts relevant to sentencing are established at the guilty plea hearing. Although a "factual basis" for the specific offense or offenses to which the defendant pleads guilty is provided to the court,[37] a more complete recitation of the relevant sentencing facts usually is contained in a subsequent PSR (discussed *infra* in Part III.C.).

At the guilty plea hearing, the court must advise the defendant of not only the statutory range of punishment but also "the court's obligation to calculate the applicable sentencing-guideline range and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a)."[38] Many defendants who plead guilty do so as the result of plea agreement with the prosecution, and some plea agreements contain the parties' agreement about the application of the sentencing guidelines in the defendant's case.[39]

Unlike civil cases, where district judges may participate in settlement discussions, a judge in a federal criminal case "must not participate in [plea bargain] discussions" between the parties, although the "parties must disclose the plea agreement in open court when the plea is offered . . . ."[40] The court must decide whether to accept or reject the

United States Sentencing Commission 

proposed plea agreement, including whether to be bound by any plea agreement pursuant to Rule 11(c)(1)(C) that specifies a particular sentence. To the extent that a plea agreement contains "stipulations relevant to sentencing," such stipulations must not be misleading and instead must "set forth the relevant facts and circumstances of the actual offense conduct."[41] The Commission "recommends that the court defer acceptance of the plea agreement until the court has reviewed the presentence report," which typically is prepared *after* the guilty plea hearing and which often will provide a more fulsome recitation of the facts relevant to the sentencing guidelines calculation and the other § 3553(a) factors.[42]

## B. Presentence Interview

After a defendant is convicted, whether by way of a guilty plea or a verdict at trial, a federal probation officer typically conducts a presentence interview of the defendant. At the presentence interview, the probation officer may ask questions about a wide variety of matters concerning the defendant's offense or offenses of conviction and related uncharged criminal conduct, criminal history, personal history (including family history and substance abuse history), financial circumstances, and numerous other issues potentially related to the court's sentencing decision.[43]

Counsel for the defendant must be given notice of and the opportunity to attend the presentence interview.[44] A defendant may invoke his or her constitutional right to remain silent during the interview,[45] although failure to provide truthful information about the offense or offenses of conviction may result in denial of credit for "acceptance of responsibility"[46] at sentencing[47] (an issue discussed *infra* in Part V.B.3.).

## C. Presentence Report and Objections

After conducting the presentence interview as well as an independent investigation of the offense and the defendant's background, the probation officer prepares a PSR.[48] The PSR contains not only information about the offense and offender but also the statutory range of punishment and a calculation of the relevant sentencing guidelines (with a corresponding guideline sentencing range), as well as any bases that may exist for imposing a sentence outside of the applicable range.[49] The defense and prosecution must be provided a copy of the PSR at least 35 days before sentencing and must submit any objections (factual or legal in nature) within 14 days and otherwise may respond to the PSR (typically in the form of a sentencing memorandum).[50] The PSR is a confidential document that may not be disclosed to the public and must be filed under seal.[51] Together with a PSR, a probation officer also submits to the court a confidential sentencing recommendation (which, unless the court wishes to do so, need not be disclosed to the parties).[52]

The Federal Bureau of Prisons (BOP) also uses the PSR, in determining the offender's "classification as an inmate . . ., choosing an appropriate treatment program, [and] deciding eligibility for various programs."[53] Additionally, the PSR is used to inform the conditions and methods of supervision of an offender on probation or supervised release.[54]

6  ⚖

## D. Sentencing Hearing

Although not as formal as trial proceedings, federal sentencing hearings are adversarial proceedings governed by procedural rules contained primarily in Rule 32 of the Federal Rules of Criminal Procedure and Chapter Six of the *Guidelines Manual*. A district court must allow the defendant and counsel for both parties—and, in appropriate cases, victims[55]—to provide input before a sentence is imposed.[56] Furthermore, at the court's discretion, it may allow the parties to call witnesses and present evidence about disputed facts or other matters (*e.g.*, mitigating or aggravating factors).[57]

If a court is contemplating "departing" from the applicable guideline range, sufficient presentence notice to the parties is required (whether from the court, in the PSR, or in pleadings). However, such specific presentence notice is not required if the court "varies," rather than "departs," from the applicable range based on information contained in the PSR or otherwise known to the parties.[58] The difference between a "departure" and a "variance" is discussed in Part V.D. below.

Neither the Federal Rules of Evidence[59] nor constitutional provisions related to evidentiary matters (*e.g.*, the Confrontation Clause of the Sixth Amendment) apply at sentencing.[60] Therefore, the court may consider hearsay and other types of information that would not be admissible during a trial.[61] However, the Commission has stated that information considered by a court at sentencing must have "sufficient indicia of reliability to support its probable accuracy."[62] Under Federal Rule of Criminal Procedure 32, the court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."[63] In resolving factual disputes, the court ordinarily applies the preponderance of the evidence standard.[64]

After the court orally pronounces sentence, the court must complete two documents— the "Judgment in a Criminal Case" and the "Statement of Reasons" (SOR) (both of which are contained in AO Form 245B)—that memorialize what the judge orally pronounced in court. The judgment specifies the sentence (the term of probation or imprisonment, any term of supervision release following imprisonment and the conditions thereof, and any financial penalties). The judgment is entered into the record as a publicly accessible document. The SOR, which in the vast majority of districts is a sealed part of the record and thus is not publicly accessible, provides information about whether the court's sentence was within or outside of the applicable guideline range and also provides the specific reasons for a sentence imposed outside of that range (including whether the defendant provided substantial assistance to the prosecution in the investigation or prosecution of another person).[65]

At the conclusion of the sentencing hearing, the court must advise the defendant of his right to appeal, including the right to proceed *in forma pauperis* on appeal and the right to appointed appellate counsel in the event the defendant is indigent.[66] A defendant

United States Sentencing Commission 

may waive the right to appeal as part of a voluntary plea agreement, which will generally be enforced on appeal (resulting in a dismissal of the appeal).[67] Appellate review will be discussed in Part VI below.

Within 30 days of the entry of the written judgment in the record, the court must submit copies of the judgment and SOR, along with the PSR, the charging document, and any plea agreement, to the Sentencing Commission (in furtherance of the Commission's data collection and analysis duties).[68] In most districts, the chief district judge has delegated that responsibility to the United States Probation Office.

# IV. The Nature of A Federal Sentence

What follows is a discussion of the nature of a federal sentence in felony and Class A misdemeanor cases[69]—first with respect to the statutory framework governing sentencing and then with respect to the guidelines framework.

## A. Types of Sentences Available by Statute

### 1. Probation or Prison

There are a variety of components of a federal sentence, one or more of which apply in every case. The primary component—some form of deprivation of liberty, either probation or incarceration—is imposed in over 99 percent of cases.[70] Where probation is authorized, the maximum term allowable is five years and, in the case of a felony offense, a minimum one-year term is required.[71] Various conditions of probation exist, including certain "mandatory" conditions (e.g., a defendant may not illegally possess a controlled substance) and a long list of potential "discretionary" conditions, which must be "reasonably related" to the nature of the offense, the defendant's history and characteristics, or the relevant purposes of punishment.[72]

The majority of federal penal statutes do not require a term of imprisonment and, instead, authorize either a term of probation or a term of imprisonment. There are two exceptions: (1) penal statutes carrying a mandatory minimum term of imprisonment[73] (unless one of two exceptions applies—a "substantial assistance" departure or application of the "safety valve"—which will be discussed in Part IV.A.2. below); and (2) penal statutes expressly prohibiting probation, even though they do not require imposition of a particular term of imprisonment.[74] Federal penal statutes that provide for potential terms of imprisonment are classified according to the maximum term available—ranging from Class A felonies (with a maximum punishment of life imprisonment) to Class E felonies (with maximum terms in excess of one year of imprisonment and not more than five years of imprisonment), and Class A misdemeanors (with a maximum of one year of imprisonment) to Class C misdemeanors (with a maximum of 30 days of imprisonment).[75]

8   ⚖

Although the Sentencing Reform Act of 1984 prospectively abolished parole, federal prisoners may earn "good-time credit," which can reduce an offender's term of imprisonment by up to 54 days for each year the offender has engaged in appropriate behavior in federal prison.[76] In order to be eligible for such credit, an offender must receive a prison sentence in excess of 12 months.[77] For that reason, it is not uncommon for courts impose a prison sentence of 12 months and one day (which, with good-time credit, will result in an actual term served of a little more than ten months).[78]

In addition to allowing early release based on good-time credit, the BOP also may allow offenders (other than deportable aliens and certain other classes of offenders) to serve the final portion of their sentences—up to 12 months—in a halfway house and/or in home detention (with a maximum period of six of the 12 months, or ten percent of the offender's sentence, whichever is less, in home detention).[79] Eligible non-violent offenders with substance abuse histories also may have their prison sentences reduced by up to one year (depending on the length of their sentences) if they successfully complete a 500-hour residential drug abuse program (RDAP).[80] Finally, the Director of the Bureau of Prisons is authorized to request the sentencing court to release a prisoner before the end of his or her term of imprisonment in limited situations related to the prisoner's advanced age, terminal illness, or other "extraordinary and compelling" circumstances.[81]

### 2. Mandatory Minimum Sentences and Relief from Them

Approximately one-fifth of all federal defendants are convicted of an offense that carries a mandatory minimum prison sentence.[82] Such offenses include drug-trafficking crimes involving certain types and quantities of drugs, the use of a firearm during a crime of violence or drug-trafficking offense, and a felon's illegal possession of a firearm after having been convicted of three violent felonies or serious drug-trafficking offenses.[83] In creating sentencing guidelines applicable to such offenses, the Commission accounted for congressionally-mandated minimum penalties in formulating corresponding sentencing guideline ranges.[84]

There are two ways that a sentencing court can impose a sentence below an otherwise applicable statutory mandatory minimum: (1) if the prosecution files a motion[85] based on the defendant's "substantial assistance" to the prosecution in the investigation or prosecution of another person, pursuant to 18 U.S.C. § 3553(e); and (2) in certain drug-trafficking cases, if the defendant qualifies for the statutory "safety valve" contained in 18 U.S.C. § 3553(f). Unlike a substantial assistance departure—which applies to all types of federal offenses carrying a mandatory minimum penalty—the safety valve statute only applies in cases in which a defendant faces a mandatory minimum penalty after being convicted of certain types of drug-trafficking offenses. Section 3553(f) contains the five criteria governing a court's decision whether a defendant qualifies for the safety valve; it typically applies only to lower-level, non-violent drug offenders.[86]

In addition to the statutory safety valve, the guidelines contain a related but separate safety valve provision, which requires a court to reduce an eligible drug-trafficking

⚖  9



offender's guidelines offense level by two levels (assuming the defendant satisfies the same five criteria).[87] Note that, unlike the statutory safety valve, the guidelines safety valve applies even if a defendant has not been convicted one of the drug-trafficking offenses specified in section 3553(f) that carries a mandatory minimum.[88]

### 3. Financial Penalties

Federal law provides for three primary types of financial penalties—fines, restitution, and special assessments—which can be imposed in addition to imprisonment or probation.[89] In cases in which a statute does not require imprisonment, a fine may be imposed as a stand-alone sentence.[90]

Unless a particular penal statute provides for a specific maximum fine, the maximum amount depends on the class of felony or misdemeanor in the count(s) of conviction.[91] Restitution in a criminal case is different from restitution in a civil case. In a criminal case, restitution refers to compensatory damages for a victim's losses, while restitution in a civil case seeks to disgorge a defendant's unjust enrichment.[92] A special assessment is a standard fee assessed for each count of conviction (*e.g.*, $100 per felony count and $50 per Class A misdemeanor count).[93] In certain cases, criminal restitution, where applicable, is mandatory, as is the special assessment.[94] Upon motion of the prosecution, however, the court may remit a fine or special assessment.[95]

### 4. Supervised Release

As noted, a major change brought about by the SRA was the prospective abolition of parole in the federal system. Defendants convicted of an offense committed on or after November 1, 1987, are required to serve their federal prison sentences without early release on parole.[96] In the place of parole, Congress created supervised release as a form of "post-confinement monitoring."[97] However, unlike parole—which was substituted for a portion of the term of imprisonment imposed by the court—a supervised release term is served *in addition to* the term of imprisonment.[98] Congress did not create supervised release as a form of punishment and, instead, primarily intended it to protect the public and "facilitate the reintegration of the defendant into the community."[99] With certain statutory exceptions, which require terms of supervised release,[100] courts have "the freedom to provide . . . supervision for those, and only those, who need[] it" upon release from prison.[101] Like terms of probation, terms of supervised release have both mandatory and discretionary conditions of supervision.[102]

Revocation of terms of supervised release (and probation), in the event that offenders violate their conditions of supervision, is discussed below in Part VII.

### 5. Apprendi and Its Progeny

The Supreme Court's landmark 2000 decision in *Apprendi v. New Jersey*[103] and its progeny have had a significant impact on the statutory (and guideline) framework governing federal sentencing. In *Apprendi*, which was a precursor to the Court's 2005 decision in *Booker*[104] discussed above, the Court held that: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

10

maximum must be submitted to a jury, and proved beyond a reasonable doubt" or admitted by the defendant in his plea of guilty.[105] Thus, facts such as the quantity of drugs in a drug-trafficking case or the defendant's use of a dangerous weapon during a robbery—which can raise the statutory maximum punishment[106]—must be charged in an indictment and proved to a jury beyond a reasonable doubt (or admitted by the defendant in pleading guilty) in order to raise the statutory maximum penalty. The Court has extended its holding in *Apprendi* to facts that trigger a mandatory minimum sentence of imprisonment[107] and facts that raise a statutory maximum fine.[108] Therefore, any fact (except a defendant's prior conviction) that raises the statutory minimum or maximum penalty otherwise applicable must be proved to a jury beyond a reasonable doubt unless the defendant admits to that fact during his or her guilty plea.

## B. The *Booker* Three-Step Process in Sentencing

After the Supreme Court's decision in *Booker*, just as before it, a sentencing court must correctly calculate a defendant's guideline range and then consider whether there is any basis set forth in the *Guidelines Manual* to "depart" from the range. However, the practical effect of *Booker* was to add a third step in the sentencing process—namely, the court's decision whether, after considering *all* of the factors in 18 U.S.C. § 3553(a), a sentence outside of the applicable guideline range should be imposed as a "variance."[109] This *Booker* "three-step process" requires "respectful consideration"[110] of the *Guidelines Manual* in all three steps:

1. in initially calculating the sentencing range;

2. in considering policy statements or commentary in the *Guidelines Manual* about departures from the guideline range; and

3. in considering *all* of the § 3553(a) factors (which include the guidelines, commentary, and any relevant policy statements in the *Guidelines Manual*) in deciding what sentence to impose, whether within the applicable range, or whether as a departure or as a variance (or as both).[111]

This three-step process illustrates the respective roles of both the Commission and the courts in federal sentencing, both as envisioned by Congress (in the SRA) and as modified by the Supreme Court (in *Booker*). The application of this three-step process will be set forth in more detail in Part V.

**Booker Three-Step Process**



The Court calculates the sentencing range provided in the *Guidelines Manual*.

The Court considers policy statements or commentary in the *Guidelines Manual* about departures.

The Court considers 18 U.S.C. § 3553(a) factors in deciding what sentence to impose.

⚖ 11

United States Sentencing Commission 

## C. "Relevant Conduct" as the "Cornerstone" of the Guideline System

Before elaborating on the three-step process, it is important to understand what has become known as a "cornerstone" of the federal sentencing system—"relevant conduct."[112] Relevant conduct is a defendant's actual conduct—and not simply the conduct for which he or she was convicted—that is considered, along with the defendant's conduct reflected in the count or counts of conviction, to calculate his or her sentencing guideline range.[113] "The Commission ultimately settled on a system that blends the constraints of the offense of conviction with the reality of the defendant's actual offense conduct in order to gauge the seriousness of that conduct for sentencing purposes."[114] The Commission's decision to factor in relevant conduct into the guidelines system is consistent with the pre-guidelines practice of federal sentencing judges[115] and was intended to reduce the effect of prosecutorial charging decisions that do not reflect the defendant's actual conduct on the court's sentencing decision.[116]

Relevant conduct specifically encompasses a defendant's "real offense conduct" (and certain types of conduct of coconspirators, whether or not charged as such) before, during, and after the commission of the offense or offenses of conviction. For most types of federal offenses, relevant conduct also includes other offenses committed as part of the "same course of conduct or common scheme or plan."[117] Such conduct need not have been formally charged or proved at a trial (or admitted by a defendant in a guilty plea), so long as the sentencing judge finds the relevant conduct by a preponderance of the evidence using information that has sufficient indicia of reliability.[118] Such relevant conduct is considered in the application of various factors in the *Guidelines Manual*—such as in determining whether a defendant used a dangerous weapon during a bank robbery;[119] in calculating the amount of loss in the fraud guideline[120] and the drug quantity in the drug-trafficking guideline;[121] and in determining whether a felon who unlawfully possessed a firearm used the firearm in connection with another felony offense.[122]

12

⚖️  Federal Sentencing: The Basics – 2018

# V. Basic Guideline Application

The *Guidelines Manual* has eight chapters, which are summarized as follows:

- Chapter One: Definitions, Application Instructions, and General Policies
- Chapter Two: Offense-Specific Guidelines
- Chapter Three: Adjustments for General Aggravating and Mitigating Factors and Adjustments for Multiple Counts of Conviction
- Chapter Four: Criminal History Calculation Rules and "Overrides"
- Chapter Five: Departures and Sentencing Options (including the Sentencing Table)
- Chapter Six: Sentencing Procedures
- Chapter Seven: Violations of the Conditions of Probation and Supervised Release
- Chapter Eight: Sentencing of Organizations

Chapter Two—which contains guidelines for hundreds of federal offenses—is the longest portion of the *Guidelines Manual*.

## A. Application Instructions

Section 1B1.1 sets forth instructions for using the eight chapters of the *Guidelines Manual*. For sentencings of individual (as opposed to organizational) defendants for their offenses of conviction, only Chapters One through Six apply. For revocations of offenders' terms of probation or supervised release, Chapter Seven applies. For the sentencing of organizational defendants, Chapter Eight applies.

As discussed above, a federal probation officer does the initial guidelines calculations in the PSR, which is submitted to the court after counsel for the defense and prosecution are given the opportunity to respond to the probation officer's proposed guideline application.

A summary of the steps in the guideline application process, for individual defendants sentenced for their offenses of conviction, is as follows:

- Determine which Chapter Two offense guideline applies by consulting Appendix A of the *Guidelines Manual*.
- After the proper Chapter Two guideline is identified, calculate the "offense level" from that guideline through consideration of the applicable "base offense level" (BOL) combined with any "specific offense characteristics" (SOCs) (which are aggravating and mitigating factors related to a particular offense type). Chapter One's provisions concerning "relevant conduct" are sometimes used to determine the BOL and usually used to determine the applicable SOCs.

United States Sentencing Commission   ⚖

- Determine whether there are any additional "adjustments" to the offense level based on the provisions in Chapter Three, which addresses general aggravating and mitigating factors that are common across offense types. Relevant conduct also must be considered in determining whether any Chapter Three adjustments apply. Chapter Three also has provisions for adjusting a defendant's offense level based on multiple counts of conviction in certain types of cases.

- Calculate the defendant's "criminal history points" according to Chapter Four's provisions. Based on the criminal history score, the defendant is placed in the appropriate "Criminal History Category" (CHC).[192]

- Identify the sentencing guideline range in the Chapter Five's Sentencing Table by locating the cell in the table that is at the intersection of the defendant's offense level and CHC. (The Sentencing Table is set forth as Attachment A, infra.) Chapter Five's provisions also address what types of sentences a court may impose (e.g., probation or imprisonment), according to the location of the defendant's applicable sentencing range in one of the four Zones (A-D) of the Sentencing Table.[194]

- Finally, consider possible grounds for a "departure" or "variance" from the applicable guideline range.[195] Departures and variances are further discussed below in Part V.D.


The SRA requires a court to use the version of the *Guidelines Manual* in effect on the date of sentencing.[196] One exception to the rule is that the Ex Post Facto Clause of the Constitution prevents retroactive application of amended guidelines that increased the applicable sentencing range after the offense was completed.[197] In such a case, the version of the guidelines in effect on the date of the offense must be used.[198] The determination of whether the earlier version of the *Manual* carries a lower penalty range is made under the "one-book rule." That rule compares the guideline range for the version of the *Manual* in effect at sentencing with the version of the *Manual* in effect on the last date of the offense of conviction, applying each *Manual* in its entirety rather than applying portions of different versions of the *Manual*.[200]

'4  ⚖

## B. Applying the Guidelines

What follows is an illustration of the application of the *Guidelines Manual* to a short hypothetical case involving a defendant convicted of a single count of bank robbery in violation of 18 U.S.C. § 2113(a), which carries a statutory maximum of 20 years of imprisonment but does not carry any mandatory minimum penalty. The facts of that hypothetical case are below:

### Bank Robbery Case Hypothetical

*The defendant entered a federally-insured bank and approached a teller while brandishing a realistic-looking toy gun. He demanded all the money that she and other tellers had and handed the teller a bag in which to place the money. The teller gave the defendant $25,000. No one was injured during the robbery. Nor did the defendant physically restrain anyone or force anyone to move to a different location within or outside the bank. After the teller gave the defendant the bag of money, the defendant ran out of the bank and got into a car being driven by another person, who drove away from the bank at a normal rate of speed. Shortly thereafter, based on an eyewitness's description of the getaway car, police officers stopped the car without a chase and arrested the defendant and the getaway driver.*

*Both individuals confessed to their roles in the bank robbery. The police officers recovered the $25,000 and returned it to the bank. The co-defendant (the defendant's nephew) was determined to be a 16-year old juvenile and was not prosecuted in federal court. A federal grand jury indicted the defendant for a single count of bank robbery. At the time of the robbery, the defendant had two prior state convictions for offenses committed as an adult: (1) a conviction for felony assault, for which he had received a six-month jail sentence 11 years before the robbery, and (2) a felony conviction for distributing a small amount of cocaine to an undercover officer one year before the robbery, for which he had received a five-year term of probation. The defendant pleaded guilty to the charge without the benefit of a plea agreement with the prosecution.*

### 1. Determine the Applicable Chapter Two Guideline

The first step in applying the guidelines is to identify the applicable Chapter Two guideline, which is done by looking at Appendix A of the *Guidelines Manual* and determining from the statute of conviction which guideline applies. In this case, for a bank robbery conviction under 18 U.S.C. § 2113(a), the applicable guideline is USSG §2B3.1 (robbery), which is set forth as Attachment B to this paper.

United States Sentencing Commission ⚖

### 2. Calculate the Chapter Two Offense Level

Turning to §2B3.1, the next step is to determine the appropriate BOL. Some guidelines contain multiple BOLs, although §2B3.1 contains a single BOL of 20. Next, determine whether any SOCs apply, including by consulting any pertinent commentary in the application notes following the guideline,[130] which may offer interpretive aids regarding the SOCs. Based on the facts in this hypothetical case, the following three SOCs in §2B3.1 apply:

- §2B3.1(b)(1): +2 because money was taken from a "financial institution";
- §2B3.1(b)(2): +3 because the defendant brandished a "dangerous weapon" (discussed below); and
- §2B3.1(b)(7)(B): +1 because the "loss" exceeded $20,000 but was less than $95,000 (discussed below).

The determination that a toy gun qualifies as a "dangerous weapon" is made by reference to the commentary following §2B3.1, which states that the definition of "dangerous weapon" includes "an instrument" that "closely resembles . . . an instrument capable of inflicting death or bodily injury."[131]  Note that, although the indictment in this case did not charge the defendant with using a dangerous weapon during the robbery (which, if it had, would have raised the statutory maximum to 25 years under 18 U.S.C. § 2113(d)), the sentencing court must apply the SOC if the court finds by a preponderance of the evidence that the defendant in fact brandished a toy gun during the robbery.[132]  Although the $25,000 was returned to the bank, it still qualifies as "loss" for purpose of the guideline because the guideline's commentary states that, "'[l]oss means the value of the property *taken*, damaged, or destroyed."[133]  Assuming no other SOCs apply, the defendant's total Chapter Two offense level would be 26 (20 + 2 + 3 + 1).

### 3. Calculate the Offense Level after Chapter Three Adjustments

The next step in the guideline application process is to determine whether any adjustments in Chapter Three of the Guidelines Manual apply.

- Because the defendant had recruited and directed an accomplice (the getaway driver) before the robbery, the defendant receives a 2-level upward adjustment pursuant to USSG §3B1.1(c) (Aggravating Role)[134]— bringing his offense level to 28.
- Because the defendant used a minor as the getaway driver, 2 additional levels are added pursuant to USSG §3B1.4 (Using a Minor to Commit a Crime),[135] which brings the defendant's offense level to 30.
- If the defendant has "accepted responsibility" for the offense by pleading guilty in a timely manner and admitting the conduct constituting the offense of conviction, his offense level is reduced by either 2 or 3 levels under §3E1.1 (Acceptance of Responsibility).  The third level of reduction

> requires a motion from the prosecution pursuant to §3E1.1(b).
> Assuming he receives a 3-level downward adjustment, the defendant's
> final offense level would be 27.

Note that, just as with the application of Chapter Two SOCs, a sentencing court determines whether Chapter Three adjustments apply based not only on the conduct for which a defendant was convicted but also on any relevant conduct proved by a preponderance of the evidence.

### 4. Determine the Criminal History Category

After determining the hypothetical robbery defendant's offense level, the next step is to calculate the defendant's criminal history points, which in turn determine his Criminal History Category, by applying the criminal history rules in Chapter Four of the *Guidelines Manual*. As a general rule, criminal history points are based on the length of a sentence imposed for a prior conviction in a local, state, or federal court[137] and whether the defendant committed the instant federal offense while still serving a sentence in another case (*e.g.*, the defendant was on probation or parole).[137] There are certain exceptions to these general rules, though. Some prior offenses fall outside of Chapter Four's time limits,[138] several types of minor offenses are excluded from consideration,[139] and prior juvenile convictions may be counted only if they occurred within five years of the defendant's commission of the instant federal offense.[140]

Based on the defendant's two prior convictions, his criminal history calculations would be as follows.

- He would receive no criminal points for his assault conviction because it falls outside Chapter Four's time limits (as he received a six-month sentence over ten years before committing the bank robbery).[141]

- Because his prior drug-trafficking conviction falls well within the time limits, it would receive one point based on the length of sentence imposed (*i.e.*, less than 60 days) and an additional two points based on the fact that the defendant was on supervision (*i.e.*, probation) at the time of the bank robbery offense.[142]

Three criminal history points would place the defendant in CHC II on the Sentencing Table (discussed below).

### 5. Determine the Guideline Sentencing Range from the Sentencing Table

Based on an offense level of 27 and a CHC of II, the applicable guideline sentencing range is 78-97 months, as reflected in the guidelines' Sentencing Table, which is attached as Attachment A to this paper. Note that the guideline sentencing range is well within the broader statutory range of punishment of 0-240 months (0-20 years) under the statute of conviction, 18 U.S.C. § 2113(a). In some other cases, a defendant's guideline range is constrained by either a statutory mandatory minimum penalty (raising the "floor") or a

United States Sentencing Commission 

statutory maximum penalty (lowering the "ceiling").[143] Because the robbery defendant's range falls in Zone D of the Sentencing Table, the only type of sentence provided under the guidelines is a term of imprisonment as opposed to any alternative to imprisonment.[144]

## C. Chapter Four "Overrides"

For a small percentage of defendants, the application of their guideline ranges is not determined solely by the offense levels established in Chapters Two and Three and their Criminal History Categories established in Chapter Four, Part A. Instead, it is determined by application of four special "override" provisions in Chapter Four, Part B, and one special provision in the Chapter Three Adjustments. Chapter Four, Part B has four such provisions: Career Offender (§4B1.1); Criminal Livelihood (§4B1.3); Armed Career Criminal (§4B1.4); and Repeat and Dangerous Sex Offender Against Minors (§4B1.5). Sections 4B1.1, 4B1.4, and 4B1.5, which can impact both the offense level and the Criminal History Category, are aimed at serious recidivist defendants whose instant convictions are for violence or drug-trafficking, firearms, or sex offenses against minors. The resulting guideline ranges generally call for lengthy terms of imprisonment for such offenders. Section 4B1.3 applies to a defendant whose instant offense was part of pattern of criminal conduct engaged in as the defendant's livelihood and ensures a minimum offense level if not achieved by application of Chapters Two and Three. The sole Chapter Three override is the terrorism adjustment (§3A1.4), which impacts both the offense level and the Criminal History Category. If a defendant's guideline range resulting from one of the override provisions is higher than the range otherwise applicable, the override range applies.

## D. Departures and Variances

After determining the defendant's guideline sentencing range, the court must determine whether one or more "departure" factors set forth in the guideline commentary or policy statements in the *Guidelines Manual* warrant consideration for imposing a sentence outside of the range. Departures—upward and downward—are addressed in various places in the *Guidelines Manual*. Many offense-specific bases for departures are in the commentary following the guidelines in Chapter Two;[145] bases for departures concerning an offender's criminal history are addressed in Chapter Four;[146] and many generic bases for departure are set forth in policy statements in Chapter Five.[147] A complete list of departure provisions in all chapters is set forth at the very end of the *Guidelines Manual* (immediately following the Index). These provisions specify the circumstances under which a departure would be appropriate in the discretion of the court.

Grounds for departure typically are either "discouraged" or "encouraged."[148] The *Guidelines Manual* also provides that certain bases for departure are prohibited.[149] A court has broad discretion to depart based on "encouraged" grounds, has more limited discretion to depart based on "discouraged" grounds (*i.e.*, may only do so within the limits set forth in the policy statements), and has no discretion to depart based on a prohibited basis. Finally, §5K2.0(a)(1) provides that, with the exception of certain offense types (such as sexual offenses

18

against children), a court may depart based on aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration" by the Commission in "formulating" the guidelines that, "in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different" from that called for by the *Guidelines Manual*.

Two of the most common grounds for downward departures, that have occurred both before and after *Booker*, are ones that the prosecution must raise by way of a motion for downward departure (and thereby differ from other grounds for downward departure, which can be raised by the defense, the prosecutor, or by the court *sua sponte*). Those two "government-sponsored" grounds are: (1) the defendant provided the prosecution with "substantial assistance in the investigation or prosecution of another person" (§5K1.1);[150] and (2) the defendant participated in an "Early Disposition" (or "fast-track") Program, in a district in which the Attorney General and the district's United States Attorney have authorized such a departure (§5K3.1). In recent years, a "substantial assistance" or "fast-track" downward departure (or both) occurred in around one-fifth of all federal cases.[151] Such below-range sentences are not only sponsored by the prosecution but also explicitly authorized by the *Guidelines Manual*.

The final step of the three-step process is for the court to consider *all* of the applicable factors in 18 U.S.C. § 3553(a)—including factors from the first two steps (*i.e.*, the guideline range and any bases for departure in the *Guidelines Manual*)—"taken as a whole," and impose a sentence.[152] As the Supreme Court has observed, "[t]he fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."[153]

A final guiding principle is for a court to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.[154] This provision in the SRA is referred to as the "parsimony" clause.[155] It is explicitly set forth in the Introductory Commentary in Chapter 5, Part A of the *Guidelines Manual* as a reminder to sentencing judges.

### E. Fines

In addition to addressing whether a court should impose a sentence of probation or imprisonment, the *Guidelines Manual* also provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to be become able to pay a fine."[156] The fine guideline also contains a table containing fine ranges that correspond to the final guidelines offense level applicable to a defendant.[157]

Under the guidelines, a fine-only sentence is authorized only for a defendant whose sentencing range is 0-6 months.[158] However, the guidelines recommend that, "[i]f . . . the fine is not paid in full at the time of sentencing, . . . the court sentence the defendant to a term of probation, with payment of the fine as a condition of probation."[159]

⚖ 19

United States Sentencing Commission 

## F. Supervised Release under the Guidelines

The guidelines provide that, if a defendant receives a term of imprisonment in excess of one year, the court generally should impose a term of supervised release, even if not required by statute.[160] The guidelines also specify ranges of supervised release depending on the class of the offense of conviction.[161] With respect to non-citizen defendants—who, as discussed below in Part IX.B. have been around 40 percent of all federal offenders in recent years—the Commission recommends that courts not impose a term of supervised release for such defendants if they likely will be deported after serving their terms of imprisonment, unless required by statute.[162] For sex offenders, the Commission recommends the maximum statutory term of supervision available, which for most sex offenders is a life term of supervised release.[163]

# VI. Appellate Review of Sentences

Before the Sentencing Reform Act of 1984, there was virtually no appellate review of federal sentences.[164] Along with creating the sentencing guideline system, the SRA provided for significant appellate review of guideline sentences.[165] Since the guidelines went into effect, tens of thousands of federal defendants have appealed their sentences, while prosecution appeals have occurred in a much smaller number of cases.[166]

After *Booker*, a federal appellate court reviews a sentence for "reasonableness" using an abuse of discretion standard.[167] Such reasonableness review actually encompasses two types of review—"procedural" reasonableness review and "substantive" reasonableness review. As the Supreme Court has explained:

> Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. . . . [In the case of a sentence imposed outside of the guideline range, the appellate court] may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.[168]

As a part of an appellate court's review for "procedural" reasonableness, if the appellant properly preserved the issue for appeal, the court engages in *de novo* review of pure legal questions concerning guideline application and reviews the district court's underlying

⚖️  Federal Sentencing: The Basics – 2018

findings of fact for "clear error."[169]  In order for a sentence to be deemed procedurally reasonable, the district court should have properly calculated the applicable guideline range (as the "starting point" in the *Booker* three-step process) and addressed all of the parties' "non-frivolous arguments" about why a sentence should have been imposed outside the range.[170]  Even if a defendant did not properly preserve a guidelines application issue for appeal, a federal appellate court ordinarily must deem a guideline miscalculation as reversible "plain error" if the district court sentenced the defendant based on an incorrectly calculated guideline range.[171]

Regarding "substantive" reasonableness, the Supreme Court has permitted (but not required) federal circuit courts to apply a rebuttable "presumption of reasonableness" in reviewing a district court's decision to impose a sentence within the applicable guidelines range.[172]  "[T]he presumption reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case."[173]  Such a presumption of reasonableness is applicable only to a federal appellate court's review of a district court's sentence; it may not be applied by a district court in determining whether to impose a within-range sentence.[174]

Furthermore, the fact that a district court imposed a sentence outside of the applicable guideline range does not trigger a presumption of unreasonableness on appeal.[175]  The Court also has stated that "a district court's decision to vary from the advisory Guidelines may attract greatest respect when it is based on the particular facts of a case" as opposed to a general disagreement with a particular "policy" embodied in a provision of the *Guidelines Manual*.[176]

## VII.  Violations of the Conditions of Probation and Supervised Release

In Chapter Seven of the *Guidelines Manual*, the Commission promulgated policy statements addressing a district court's decision of whether to revoke or modify a defendant's term of probation or supervised release upon a finding of a violation of one or more conditions of supervision.  Chapter Seven classifies violations of the conditions of supervision (as "A," "B," or "C" grade violations), recommends when courts should revoke the term of supervision,[177] and recommends terms of imprisonment for the different grades of violations, in the event a court revokes.[178]  The Revocation Table used in revocation cases—set forth in §7B1.4—is different from the more complex Sentencing Table appearing in Chapter Five that governs original sentencings.  The Revocation Table contains two axes—one based on the seriousness of the violation (*i.e.*, the grade) and the other based on the offender's original Criminal History Category (as determined at the original sentencing hearing).[179]

⚖️ 21



At a revocation hearing, a court is governed by the preponderance of the evidence standard and may find that an offender committed a new law violation as a basis for revocation even if the offender was not convicted of the new offense.[180] In deciding whether to revoke and, if so, whether to impose a sentence of imprisonment as recommended by Chapter Seven's policy statements, a court must consider not only those policy statements but also the factors in 18 U.S.C. § 3553(a), to the extent that they are applicable.[181]

In cases where offenders have allegedly violated the conditions of their supervision, district courts are governed by statutory provisions[182] that at times operate in a different manner than Chapter Seven's policy statements. In particular, those statutory provisions may require revocation in certain cases that Chapter Seven does not, such as when an offender possessed a controlled substance or refused to take a court-ordered drug test.[183] For violations of supervised release, the statutory maximum term of imprisonment upon revocation depends on the classification of the underlying offense of conviction at the original sentencing proceeding.[184] For violations of probation, the maximum term of imprisonment upon revocation is the statutory maximum of the underlying offense of conviction at the original sentencing hearing.[185]

On appeal, a district court's sentence imposed upon revocation is reviewed with at least as much deference as exists in appellate review of a court's imposition of an original sentence.[186] A district court abuses its discretion by not considering Chapter Seven's policy statements in a revocation proceeding, yet a court need not follow the policy statements' recommendations regarding revocation or sentence length.[187]

## VIII. Guideline Amendment Process

In enacting the SRA, Congress envisioned that the Commission would regularly amend the guidelines to reflect various changes in circumstances.[188] Since the guidelines went into effect in 1987, the Commission has promulgated more than 800 amendments to the *Guidelines Manual*.[189]

### A. The Amendment Cycle

The guideline "amendment cycle" begins in the late spring of each year. The Commission normally begins the cycle by issuing a list of policy "priorities"—published in the Federal Register (FR) and also made available on the Commission's website (*www.ussc.gov*)—and invites specific stakeholder groups (*e.g.*, the Criminal Law Committee of the Judicial Conference, the Federal Public Defender community, the Criminal Division of the United States Department of Justice, and the Commission's various advisory groups) as well as the general public to comment on those priorities. Thereafter, the Commission publishes "proposed amendments" for consideration and solicits comment from the stakeholder groups and general public.[190] The Commission then holds a public hearing on proposed amendments and hears from various witnesses, including representatives of the stakeholder groups. Thereafter, typically in April, the Commission votes on whether to adopt any of the proposed amendments.



⚖ Federal Sentencing: The Basics – 2018

By statute, no later than May 1st the Commission must submit the amendments it has voted to promulgate along with "reasons for amendment" (contained in Appendix C to the *Guidelines Manual*) to Congress, which has 180 days to decide whether to modify or disapprove them. If Congress does not pass legislation (signed by the President) modifying or disapproving amendments by November 1st, the amendments become effective on that date. On rare occasion, Congress has authorized the Commission to promulgate "emergency amendments" which can be passed on an expedited basis outside of the regular amendment cycle.[191] Since 1987, Congress has enacted legislation rejecting only two guideline amendments promulgated by the Commission.[192]



## B. Retroactivity of Amendments

If an amendment to the guidelines potentially lowers the sentencing range for offenders, the Commission must decide whether to apply the amendment retroactively to offenders already serving sentences of imprisonment.[193] If the Commission votes for retroactivity of such an amendment, the eligible offenders can apply to their original sentencing courts for the benefit of such retroactive amendment.[194] Courts are afforded discretion in deciding whether to grant the offenders' petitions seeking to benefit from a retroactive amendment, but, if they choose to exercise that discretion, must reduce the offender's sentence within the limits imposed by §1B1.10. The Supreme Court has held that, when a court elects to reduce an offender's sentence based on a retroactive guideline amendment, the court may not engage in a full-fledged resentencing under 18 U.S.C. § 3553(a) and, instead, must impose a new sentence that modifies the original sentence in a manner consistent with the retroactive amendment.[195] As of 2018, the Commission has voted to give retroactive effect to 30 of its over 800 amendments.[196]

⚖ 23



# IX.  A Brief Overview of Sentencing Data

## A. The Commission's Collection and Analysis of Sentencing Data

The SRA requires the Commission to "establish a research . . . program . . . for the purpose of . . . serving as a clearinghouse and information center for the collection, preparation, and dissemination of information on Federal sentencing practices" and also to "collect systematically and disseminate information concerning [federal] sentences actually imposed."[197] The Commission, through its Office of Research and Data, has carried out these duties in a variety of ways, including by publishing annual *Sourcebooks of Federal Sentencing Statistics* and several other publications concerning federal sentencing.[198] The Commission's data analysis results from its collection of sentencing documents in virtually all federal cases in which a sentence was imposed after a judge applied the *Guidelines Manual*.[199] Commission staff analyze such documentation and create an annual data file of numerous data-points about guidelines use and offender and offense characteristics from which the Commission may engage in empirical research about offender and offense characteristics as well as federal sentencing practices.[200]

## B. Snapshot of Federal Offenses and Offenders

In recent years, approximately 65,000 to 86,000 federal offenders have been sentenced for felonies and Class A (non-petty) misdemeanor offenses annually.[201] Approximately 30 percent are convicted of drug-trafficking offenses (usually involving marijuana, methamphetamine, powder cocaine, crack cocaine, or heroin). Likewise, approximately 30 percent of federal offenders today are convicted of immigration offenses (*e.g.*, illegally reentering to the United States after being deported or smuggling aliens into the country). Fraud and other "white-collar" offenses make up approximately 12 percent of federal offenses today, and firearms offenses (*e.g.*, being a felon in possession of a firearm or using a firearm in connection with a drug-trafficking or violent offense) account for approximately 12 percent of cases. Sex offenses (*e.g.*, sexual assaults and child pornography offenses) and violent offenses (*e.g.*, bank robbery) make up a relatively small percentage of the federal caseload.[202]

Approximately nine out of ten federal offenders today receive sentences of imprisonment, while one out of ten is sentenced to probation (including probation with a condition of home detention or community confinement).[203] The average prison sentence for federal offenders today is 52 months.[204] The average prison sentence for offenders convicted of an offense carrying a mandatory minimum penalty is 110 months, while the average prison sentence for offenders convicted of an offense not carrying a mandatory minimum penalty is 28 months.[205] The federal prison population today is approximately 181,000 inmates.[206]

Of those offenders who receive terms of imprisonment, 86.0 percent also receive terms of supervised release. Of those offenders who receive terms of supervised release, on average they receive a 47-month term of supervised release.[207] The "revocation

⚖️  Federal Sentencing: The Basics – 2018

rate"—defined as the percentage of offenders whose federal supervision was revoked (because of either the commission of a new criminal offense or a "technical" violation) in relation to the total supervision cases closed each year—has been around 30 percent in recent years.[208] The average sentence of imprisonment imposed upon revocation is slightly less than one year.[209]

Federal offenders, other than in their gender (almost nine out of ten are males), are a diverse group today in terms of demographic characteristics. With respect to racial identity, 21.5 percent of offenders are White, 21.1 percent are Black, and 53.2 percent are Hispanic. At the time of sentencing, nearly half



**Distribution of Offenders Receiving Sentencing Options**
*Fiscal Year 2017*

of federal offenders have not completed high school, while one-fifth have at least some college education. The average age of federal offenders at the time of sentencing is 37 years.[210] In recent years, over 40 percent of all federal offenders have been non-citizens, who generally face deportation after their release from federal custody. Nearly two-thirds of all federal offenders have a prior criminal record counted under Chapter Four of the *Guidelines Manual*, and nearly one-third of all federal offenders have significant criminal records (defined as six or more criminal history points).[211]

## X. Conclusion

This paper has covered all of the major aspects of the federal sentencing system, including the guidelines and policy statements in the *Guidelines Manual*, statutes and court rules, and relevant decisions of the Supreme Court. It has discussed the evolution of federal sentencing from the pre-SRA era to the present day and explained how the current system seeks to promote transparency, certainty, and proportionality in sentencing, while at the same time avoiding unwarranted sentencing disparities.

Various resources for members of the federal judicial branch, federal sentencing practitioners, and members of the public are available on the Commission's website, *www.ussc.gov*. In addition, the Commission operates a public "HelpLine" for questions concerning federal sentencing during regular business hours at 202-502-4545.

⚖️  25

United States Sentencing Commission ⚖

⚖

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 250 of 300
Case 2:19-cv-00236  Document 950-2  Filed 06/21/21  Page 32 of 52 PageID #: 16214

⚖  Federal Sentencing: The Basics – 2018

## Endnotes

1      Pub. L 98–473, 98 Stat. 1987 (1984).

2      Mistretta v. United States, 488 U.S. 361, 363-64 (1989) (describing the federal sentencing system before the SRA).

3      Peugh v. United States, 569 U.S. 530, 535 (2013).

4      S. Rep. No. 98-225, at 38 (1983), *reprinted in* 1984 U.S.C.C.A.N., 3182. The Senate Judiciary Committee's report (hereafter "Senate Report") is the primary legislative history of the SRA. *See Mistretta*, 488 U.S. at 366.

5      *See* Dorsey v. United States, 567 U.S. 260, 265 (2012) (". . . [T]he Sentencing Reform Act of 1984 . . . sought to increase transparency, uniformity, and proportionality in sentencing."); *see also Mistretta*, 488 U.S. at 379 ("Developing proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate.").

6      *See* 28 U.S.C. § 991(a). Biographies of the current Commissioners are available at http://www.ussc.gov/about/commissioners/about-commissioners. A list of past Commissioners is available at http://www.ussc.gov/about/commissioners/former-commissioner-information.

7      *See* 28 U.S.C. § 994; *see also* 28 U.S.C. § 995(a)(12)-(20). Henceforth, unless otherwise noted, all citations to the United States Code (U.S.C.) and United States Sentencing Guidelines (USSG) will be to the 2018 edition of the U.S.C. and the 2018 edition of the USSG. This paper follows the conventions for guidelines citations set forth in the *Guidelines Manual* (*see id.* at ii).

8      *Mistretta*, 488 U.S. at 368.

9      21 U.S.C. § 994(m); *see also* SENATE REPORT, *supra*, at 76-79, 116, 177-78.

10      The Anti-Drug Abuse Act of 1986, which created mandatory minimum prison sentences for many drug-trafficking offenses – *see* 21 U.S.C. § 841(b) – went into effect for offenses committed on or after October 27, 1986. Pub. L. No. 99–570, 100 Stat. 3207 (1986). The Armed Career Criminal Act, *see* 18 U.S.C. § 924(e), which created a 15-year mandatory minimum prison sentence for certain recidivist felons who possess firearms, was enacted along with the Sentencing Reform Act on October 12, 1984. Pub. L. No. 98–473, 98 Stat. 2185 (1984). Section 924(c) of title 18, which created mandatory minimum penalties ranging from 5 to 30 years for offenders who use firearms during drug-trafficking offenses or crimes of violence, went into effect in 1984 (for violent offenses) and 1986 (for drug-trafficking offenses). Pub. L. No. 98–473, 98 Stat. 2138 (1984); Pub. L. No. 99–308, 100 Stat. 449 (1986).

11      *See* 18 U.S.C. § 3561(a)(1) (prohibiting probation for offenders convicted of Class A and B felonies). Section 3561 was enacted as part of the Sentencing Reform Act of 1984. *See* United States v. Daiagi, 892 F.2d 31, 32 (4th Cir. 1989).

12      The SRA mentions both "guidelines" and "policy statements." The Commission incorporated both in the *Guidelines Manual*, along with interpretive "commentary" (concerning both the guidelines and policy statements). See Stinson v. United States, 508 U.S. 36, 41 (1992).

13      18 U.S.C. § 3553(a)(1)-(7).

14      *See* 21 U.S.C. § 991(b)(1)(A) (requiring the Commission to consider the § 3553(a) factors in

⚖ 27

United States Sentencing Commission ⚖

promulgating guidelines and policy statements).

15      See Rita v. United States, 551 U.S. 338, 348 (2007).

16      See — Breyer, supra, at 16f; see also id. at 169 (directing that the guidelines should "reflect every important factor relevant to sentencing.").

17      See 28 U.S.C. § 994(f) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders."), and (e) ("The Commission shall assure that the guidelines and policy statements, in recommending a term of imprisonment or length of a term of imprisonment, reflect the general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant."). The SRA likewise clearly intended that sentencing judges would generally not be permitted to depart from applicable guideline ranges based on aggravating or mitigating factors about which the guidelines restricted or limited departures (including those related to offenders' personal characteristics). See 28 U.S.C. § 991(b)(1)(B) (directing the Commission to create a sentencing system that would "maintain[] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices").

18      See 28 U.S.C. § 994(b)(2).

19      28 U.S.C. § 991(b)(1)(B); see also 28 U.S.C. § 994(f).

20      18 U.S.C. § 3553(b)(1); see also Mistretta, 488 U.S. at 367 (noting that the SRA "ma[de] the Sentencing Commission's guidelines binding on the courts").

21      See generally USSG, Ch. 5, Pt. H.

22      For a thorough history of the initial Commission, see Brent E. Newton and Dawinder S. Sidhu, The History of the Original United States Sentencing Commission. 45 Hofstra L. Rev. 1167 (2017).

23      See infra pages 17-18.

24      543 U.S. 220 (2005).

25      Id. at 245-46.

26      Id. at 264-65.

27      Gall v. United States, 552 U.S. 38, 49-50 n.6 (2007); see also Rosales-Mireles v. United States, 138 S. Ct. 1897, 1903-04, 1905 (2018); Molina-Martinez v. United States, 136 S. Ct. 1338, 1349 (2016).

28      Peugh, 569 U.S. at 542-545 (citation and internal quotation marks omitted).

29      Id. at 536-37.

30      Id. at 544.

31      See U.S. Sent. Comm'n, Sourcebook of Federal Sentencing Statistics S-53 (2017) (Table N) (noting that 49.1% of all federal sentences fall within the applicable guideline range); Sourcebook of Federal Sentencing Statistics S-59 (Table N) (2013) (noting that 51.2% of all federal sentences fall within the applicable guideline range). Henceforth, the Commission's annual Sourcebooks will be cited as follows: "[Year] Sourcebook."

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2023    Pg: 252 of 300
Case 2:19-cv-00236   Document 950-2   Filed 06/21/21   Page 34 of 52 PageID #: 16216

Federal Sentencing: The Basics  2018

32      For instance, in 2017, of all below-range sentences, 40.9 percent were pursuant to USSG §§5K1.1 (substantial assistance departure) or 5K3.1 (early disposition departure).  See 2017 Sourcebook at S-60 (Table N).  Such departures are discussed in Part VI.D, infra.

33      See U.S. Sentencing Commission, Report on the Continuing Impact of United States v. Booker on Federal Sentencing, Part A, at 60 (2012); see also Peugh, 569 U.S. at 544 ("[T]he Sentencing Commission's data indicate that, when a Guidelines range moves up or down, offenders' sentences move with it.")

34      See U.S. Sentencing Commission, Results of 2014 Survey of United States District Judges, http://www.ussc.gov/sites/default/files/pdf/research-and-publication/research-projects-and-surveys/surveys/20140925_Judges_Survey.pdf (2015) (Tables 44 and 45) (noting a majority of judges either "strongly agree" or "somewhat agree" that the federal sentencing guidelines have increased certainty and fairness in meeting the purposes of sentencing, and have reduced unwarranted sentencing disparities; also noting that 77% of district judges favor the current guideline system over alternative sentencing systems).

35      See Patti B. Saris et al., Lessons Learned from Thirty Years Ago. 46 Houston L. Rev. 1163, 1166 (2017) (noting "1.7 million offenders" were sentenced under the guidelines through fiscal year 2016).  Over 100,000 additional offenders have been sentenced since January 1, 2017.  See 2017 Sourcebook at S-31 (Tab. 12) (66,873 defendants sentenced in FY2017); U.S. Sentencing Comm'n, Quarterly Data Report (Second Quarter, FY2018), at 2 (Tab. 1) (39,860 defendants sentenced in first two quarters of FY2018).

36      See, e.g., 2017 Sourcebook, at S-26 (Figure C) (noting that 97.2% of federal offenders who were sentenced under the guidelines pleaded guilty); 2013 Id. at 4 (fig. 6K, at S-22 (Figure C) (noting that 97.1% of federal offenders who were sentenced under the guidelines pleaded guilty).

37      Fed. R. Crim. P. 11(b)(3) (requiring a "factual basis" for the guilty plea).

38      Fed. R. Crim. P. 11(b)(1)(M).

39      Rule 11(c)(1) describes the two primary types of plea agreements related to the sentencing guidelines, whereby the prosecution agrees either

. . . (B) [to] recommend, or . . . not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request does not bind the court); or

(C) . . . that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

Fed. R. Crim. P. 11(c)(1)(B) & (C).  A third type of plea agreement exists under Rule 11(c)(1)(A) – the prosecution's agreement to dismiss or not bring certain charges and, instead, allow a defendant to plead guilty to other charges.  Such a plea agreement does not directly concern the sentencing guidelines, although in some cases a guilty plea to a charge with a lower statutory maximum can reduce a defendant's sentencing exposure by reducing the statutory maximum term of imprisonment below what would otherwise be the applicable sentencing range under the guidelines.  See USSG §5G1.1(a)(1) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."); see also USSG §6B1.2(a) ("In the case of a plea agreement that includes the dismissal of any charges or an agreement not to pursue potential charges (Rule 11(c)(1)(A)), the court may accept the agreement if the court determines, for reasons stated on the record, that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines.").

United States Sentencing Commission ⚖️

40    Fed. R. Crim. P. 11(c)(3) & (4).

41    USSG §6B1.4(a); see also id., comment. (n.1) ("This provision requires that, when a plea agreement contains a stipulation of fact, the stipulation must fully and accurately disclose all factors relevant to the determination of the sentence.").

42    USSG §6B1.1, comment. (n.1).

43    See, e.g., Kenneth Greenblatt, *What You Should Know Before Your Client's Interview: A Former Federal Probation Officer's Perspective*, THE CHAMPION (Nov. 2007).

44    See Fed. R. Crim. P. 32(e)(2).

45    See Mitchell v. United States, 526 U.S. 314, 326-27 (1999) (defendant maintains the Fifth Amendment privilege against self-incrimination not only during guilt-innocence phase of trial but also during the sentencing phase).

46    USSG §3E1.1 (Acceptance of Responsibility).

47    See, e.g., United States v. Cohen, 171 F.3d 796, 805-06 (3d Cir. 1999) (citing Corbitt v. New Jersey, 439 U.S. 212 (1978)). According to the commentary following USSG § 3E1.1, a defendant need only "truthfully admit[]" the "conduct comprising the offense(s) of conviction" and need not admit relevant conduct beyond the offense(s) of conviction. However, a defendant should not receive credit for acceptance of responsibility if he or she "falsely denied" or "frivolously contested" any relevant conduct for which the defendant is accountable. USSG § 3E1.1, comment. (n.1). Yet, "the fact that a defendant's challenge [to relevant conduct] is unsuccessful does not necessarily establish that it was either a false denial or frivolous." *Id.*

48    See Fed. R. Crim. P. 32(c)(1)(A) ("The probation officer must . . . submit a report to the court before it imposes sentence . . ."); see generally 8 GUIDELINES JUDICIARY POLICY PROBATION AND PRETRIAL SERVICES (Part D: Presentence Investigation Report) (commonly called "Monograph 107").

49    See Fed. R. Crim. P. 32(c).

50    See Fed. R. Crim. P. 32(a)-(f).

51    See United States v. Smith, 992 F. Supp. 743, 750 (D.N.J. 1998).

52    Fed. R. Crim. P. 32(e)(3).

53    U.S. Dep't of Justice v. Julian, 486 U.S. 1, 5 (1988).

54    Tess Lopez, *Making the Sentencing Process Work for You*, 23 CRIM. JUST. 58, 60 (2009) ("The prosecutor's part is the only document that follows the [defendant] through the Bureau of Prisons process, and the information it contains will affect the [defendant's] classification level, eligibility for programs, and designation; it also influences the risk level and level of supervision provided by the probation officer upon the [defendant's] release from custody.").

55    See 18 U.S.C. § 3771(a)(4) (providing for crime victims with the "right to be reasonably heard at any public proceeding in the district court involving . . . sentencing").

56    See Fed. R. Crim. P. 32(i).

57    *Id.*

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2022    Pg: 254 of 300
Case 2:19-cv-00236   Document 950-2   Filed 06/21/21   Page 36 of 52 PageID #: 16218

Federal Sentencing: The Basics · 2018

57    See Irizarry v. United States, 553 U.S. 708 (2008); Burns v. United States, 501 U.S. 129 (1991).

58    Fed. R. Evid. 1101(d)(3).

59    See Williams v. New York, 337 U.S. 241 (1949).

61    18 U.S.C. § 3661, see also People v. United States, 562 U.S. 476, 480 (2011) ("This Court has long recognized that sentencing judges 'exercise a wide discretion' in the types of evidence they may consider when imposing sentence and that '[h]ighly relevant — if not essential — to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics' Williams v. New York, 337 U.S. 241, 246–247 (1949). Congress codified this principle at 18 U.S.C. § 3661, which provides that '[n]o limitation shall be placed on the information a sentencing court may consider 'concerning the [defendant's] background, character, and conduct.' and at § 3553(a), which sets forth certain factors that sentencing courts must consider, including 'the history and characteristics of the defendant.' § 3553(a)(1) ")

62    USSG §6A1.3(b).

63    Fed. R. Crim. P. 32(i)(3)(B).

64    USSG §6A1.3, comment.; see also McMillan v. Pennsylvania, 177 U.S. 79, 91-92 (1986) (holding that due process does not require sentencing factors to be proved by more than a preponderance of the evidence)

65    See 18 U.S.C. § 3553(b)(2); 28 U.S.C. § 994(w)(1); see also United States v. Jenny, 663 F.3d 415, 422 n.3 (6th Cir. 2011).

66    See Fed. R. Crim. P. 32(j); see also White v. Johnson, 180 F.3d 648, 652 (5th Cir. 1999).

67    See, e.g., United States v. Schmidt, 47 F.3d 188, 190 (7th Cir. 1995).

68    28 U.S.C. § 994(w)(1).

69    The guidelines do not apply to petty misdemeanor offenses (i.e., offenses carrying a statutory maximum term of incarceration of six months or less). See USSG §1B1.9. Petty misdemeanor cases are typically handled by federal magistrate judges pursuant to 28 U.S.C. § 636(a)(4).

70    See 2017 Sourcebook, at S-49 (Fig. D & n.7) (noting that probation or imprisonment was imposed on 66,389 or 99.4%, of the 66,873 cases in fiscal year 2017).

71    See 18 U.S.C. § 3561(c) (providing that, for a felony offense, not less than one nor more than five years of probation may be imposed, for a misdemeanor not more than five years of probation may be imposed).

72    See 18 U.S.C. § 3563(b).

73    See, e.g., 18 U.S.C. § 924(c) (setting forth mandatory minimum statutory penalties for using a firearm in course of a drug trafficking offense or crime of violence); 21 U.S.C. § 841(b)(1) (setting forth mandatory minimum statutory penalties for drug-trafficking involving certain types and quantities of drugs).

74    See, e.g., 18 U.S.C. § 3561(a)(1) (prohibiting probation for all individuals of Class A and B felonies); see also 18 U.S.C. § 3559(a)(1) & (2) (defining Class A and B felonies as offenses that are punishable by a maximum of life imprisonment (for Class A) or by 25 years or more of imprisonment (for Class B). Offenses such as bank fraud and armed bank robbery are Class B felonies. See 18 U.S.C. §§ 1344 & 2113(d).

31

United States Sentencing Commission 

75      See 18 U.S.C. § 3559(a).

76      See 18 U.S.C. § 3624(a), see also Barber v. Thomas, 560 U.S. 474 (2010).

77      See 18 U.S.C.A. § 3624(b)(1).

78      See, e.g., United States v. Steele, 652 Fed. App'x 100, 101 (3d Cir. 2017).

79      See 18 U.S.C.A. § 3624(e).

80      See 18 U.S.C. § 3621(a)(2)(B); 28 CFR § 550.55; see also Lopez v. Davis, 531 U.S. 230 (2001).

81      See 18 U.S.C. § 3582(c); 28 U.S.C. § 994(t); USSG §1B1.13. This mode of early-release is referred to as "compassionate release."

82      See U.S. SENTENCING COMM'N, AN OVERVIEW OF MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 6 (2017) (hereafter 2017 MANDATORY MINIMUM REPORT).

83      See 18 U.S.C. § 924(c) & (e) (firearms offenses), 21 U.S.C. § 841(b) (drug-trafficking offenses).

84      See REPORT TO THE CONGRESS: MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 53 (2011) (hereafter 2011 MANDATORY MINIMUM REPORT) ("Congress charged the Commission with promulgating guidelines that are 'consistent with all pertinent provisions' of federal law and with providing sentencing ranges that are 'consistent with all pertinent provisions' of title 18, United States Code.' To that end, the Commission has incorporated mandatory minimum penalties into the guidelines since their inception, and has continued to incorporate new mandatory minimum penalties as enacted by Congress.") (citing 28 U.S.C. § 994(a) & (b)).

85      See Melendez v. United States, 518 U.S. 120 (1996) (requiring prosecutor to specifically move for a downward departure under § 3553(e) in order for a court to have authority to impose a sentence below the statutory mandatory minimum penalty, holding that the mere filing of a request for downward departure from the applicable guideline range pursuant to USSG §5K1.1 does not authorize a departure below the statutory minimum).

86      These five criteria are:

        (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

        (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

        (3) the offense did not result in death or serious bodily injury to any person;

        (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines, and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

        (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that

35  

§12   Federal Sentencing Guidelines · 2018

the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

87    See USSG §2D1.1(b)(18).

88    USSG §2D1.1, comment. (n.21).

89    See 18 U.S.C. §§ 3572 (fines), 3663-3664A (restitution), & 3013 (special assessment).

90    United States v. Elliot, 971 F.2d 620, 622 (10th Cir. 1992).

91    See 18 U.S.C. § 3571(b) (generally providing that, for felonies, the maximum fine amount is $250,000, and for Class A misdemeanors the maximum fine amount is $100,000); but cf., e.g., 21 U.S.C. § 841(b)(1)(A) (providing for a maximum fine of $10,000,000 for a defendant convicted of certain drug-trafficking offenses).

92    See United States v. Amato, 540 F.3d 153, 156 (2d Cir. 2008)

93    A special assessment goes into a crime victim compensation fund.  See United States v. Munoz-Flores, 495 U.S. 385, 398 (1990).

94    See 18 U.S.C. §§ 3663A (providing for mandatory restitution in some types of cases) & 3013 (providing for mandatory special assessments).

95    18 U.S.C.A. § 3571.

96    Jennison v. United States, 529 U.S. 694, 696-97 (2000).

97    Id.

98    U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release 1-2 (2010)

99    United States v. Vallejo, 69 F.3d 992, 994 (9th Cir. 1995) (quoting USSG §5D1.1, comment. (n.2) (1992))

100   Some penal statutes specify that terms of supervised release are mandatory and also specify the minimum length of such terms.  See, e.g., 21 U.S.C. § 841(b)(1)(A) (mandating a minimum 5-year term of supervised release for certain drug-trafficking offenses).

101   Johnson, 529 U.S. at 709.  In cases where supervised release is not mandatory, the relevant statutes set forth maximum terms only.  See 18 U.S.C. § 3583(b) (setting forth authorized terms of supervised release for federal offenses according to the class of the offense, unless otherwise provided in a different statute, for a Class A or Class B felony, a term not more than five years; for a Class C or Class D felony, a term of not more than three years; and for a Class E felony, or for a misdemeanor (other than a petty offense), a term of not more than one year)

102   See 18 U.S.C. § 3583(d).

103   530 U.S. 466 (2000).

104   United States v. Booker, 543 U.S. 220 (2005); see also Blakely v. Washington, 542 U.S. 296 (2004)

§12   33

United States Sentencing Commission    41

105    *Apprendi*, 530 U.S. at 489. A defendant's prior conviction may be found by a sentencing judge by a preponderance of the evidence as a basis to enhance the defendant's statutory maximum. *See* Almendarez-Torres v. United States, 528 U.S. 224 (1998).

106    *See* 18 U.S.C. § 2114(b) (25-year maximum term of imprisonment for a bank robbery with a "dangerous weapon or device" compared to 20-year maximum for bank robbery without a dangerous weapon, or device). 21 U.S.C. § 841(b)(1)(A)-(D) (increased drug quantities can raise statutory maximum from 5 years to life without parole depending on the drug type).

107    Alleyne v. United States, 570 U.S. 99 (2013).

108    Southern Union Co. v. United States, 567 U.S. 343 (2012).

109    USSG § 1B1.1, comment. (backg'd).

110    Kimbrough v. United States, 552 U.S. 85, 101 (2007).

111    *See* Gall v. United States, 552 U.S. 38, 50 n.6 (2007) ("The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.").

112    *See* William W. Wilkins, Jr. & John R. Steer *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L. REV. 495 (1990). The authors were the Chair and General Counsel of the Commission at the time.

113    *See* USSG §1B1.3.

114    Wilkins & Steer, *supra*, at 497; *see also id.* at 502 ("The parameters of ... 'Relevant Conduct' ... are potentially much broader than the minimum necessary to satisfy the elements of the convicted offense."); *see generally* USSG, Ch. 1, Pt. A-4(a) ("Real Offense vs. Charge Offense Sentencing").

115    *See, e.g.*, United States v. Brock, 211 F.3d 88, 92 n.4 (4th Cir. 2000) ("The use of relevant conduct mirrors pre-guidelines practice, in which a sentencing judge could consider all factors relevant to a sentence.").

116    *See* Ilene H. Nagel & Stephen J. Schulhofer, *A Tale of Three Cities: An Empirical Study of Charging and Bargaining Practices Under the Federal Sentencing Guidelines*, 66 S. CAL. L. REV. 501, 518 (1992). ("By not adopting a pure offense-of-conviction charge system, the guidelines prevent the system from the unintended transfer of discretion from courts to prosecutors.")

117    *See* USSG §1B1.3(a). The formal definition of "relevant conduct" includes:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

> (2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above

USCA4 Appeal: 22-1198    Doc: 59    Filed: 05/25/2023    Pg: 258 of 300
Case 2:19-cv-00236 Document 950-2 Filed 06/21/21 Page 40 of 52 PageID #: 16222

⚖️  Felony Sentencing: The Border   20-8

that were part of the same course of conduct or common scheme or plan as the offense of
conviction; [and]

(3) all harm that resulted from the acts and omissions specified in subsections
(a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions . . . .

USSG §1B1.3(a)

118    See USSG §6A1.3, comment.

119    See USSG §2B3.1(b)(2).

120    See USSG §2B1.1(b)(1)(J).

121    See USSG §2D1.1(a)(5) (and the corresponding Drug Quantity Table).

122    See USSG §2K2.1(b)(6)

123    The Commission created the CHC based in significant part on their ability to predict recidivism
on the part of offenders.  See U.S. Sentencing Comm'n, A Comparison of the Federal Sentencing Guidelines
Criminal History Category and the U.S. Parole Commission's Salient Factor Score (2005), available at
http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2005/20054104_
Recidivism_Salient_Factor_Computation.pdf.

124    See USSG §§5B1.1, 5C1.1 (defendants in Zone A and B may receive a probationary sentence, or
a sentence of incarceration, in the court's discretion; defendants in Zone C may receive a "split" sentence
of incarceration followed by community confinement or a sentence of incarceration only, at the court's
discretion; and defendants in Zone D may only receive a sentence of imprisonment absent a downward
departure or variance from that zone).

125    See USSG §1B1.1(a)(6).

126    18 U.S.C. § 3553(a)(4)(A)(ii).

127    See Peugh v. United States, 569 U.S. 530 (2013)

128    USSG §1B1.11(b)(1).

129    USSG §1B1.11(b)(2).

130    The commentary is generally "authoritative."  See Stinson v. United States, 508 U.S. 36, 42 (1993).

131    See USSG §2B3.1, comment. (n.1) (referencing USSG §1B1.1, comment. (n.1(D)).

132    See USSG §1B1.3(a) (relevant conduct provision)

133    See USSG §2B3.1, comment. (n.3) (emphasis added).

134    Section 3B1.1 provides for a 2-level enhancement "[i]f the defendant was an organizer, leader,
manager, or supervisor in any criminal activity" involving less than five participants. USSG §3B1.1(c).

135    Sect on 3B1.4 provides for a 2-level enhancement "[i]f the defendant used or attempted to
use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or
apprehension for, the offense . . . ." USSG §3B1.4.

⚖️  35

United States Sentencing Commission ⚖

136    See USSG §4A1.1(a)-(c) (providing for 3 criminal history points for each prior conviction receiving a sentence of incarceration exceeding 13 months, 2 points for each prior conviction receiving a sentence of incarceration of at least 60 days but no more than 13 months, and 1 point for any other prior conviction). Note that, although prior local, state, and federal convictions (including some military convictions) can count, tribal convictions and foreign convictions are categorically excluded. See USSG §4A1.2(g)-(i).

137    See USSG §4A1.1(d).

138    See USSG §4A1.2(e) (providing that any prior conviction for which a sentence of more than 13 months was imposed receives criminal history points only if it was imposed or if the defendant was released from imprisonment "within fifteen years of the defendant's commencement of the instant offense," and any prior conviction for which any other sentence was imposed receives criminal history points only if it was imposed "within ten years of the defendant's commencement of the instant offense").

139    See USSG §4A1.2(c) (list of excluded offenses).

140    See USSG §4A1.2(d)(2). If a defendant (when a juvenile) was prosecuted as an adult and received a prison sentence exceeding one year and one month, a court should treat that prior conviction in the same manner as it would treat such a conviction involving an adult. See United States v. Gipson, 46 F.3d 472, 475 (5th Cir. 1995).

141    See USSG §4A1.2(c).

142    See USSG § 1A1.1(c) & (d).

143    See USSG §5G1.1. For instance, assuming a bank robbery defendant had a guideline range (before consideration of the 20-year (240-month)) statutory maximum) of 210-262 months, the defendant's guideline range would be 210-240 months under §5G1.1(c)(1).

144    See USSG §5C1.1(f).

145    See, e.g., USSG §§2B1.1, comment (n 21) (listing possible bases for upward and downward departures in fraud and theft cases); 2D1.1, comment. (n.27) (listing possible bases for upward and downward departures in drug cases); and 2L1.2, comment. (nn 6-8) (listing possible basis for upward and downward departures in illegal reentry investigation cases).

146    See USSG §4A1.3.

147    See, e.g., USSG §§5H1.1 (downward departure based on defendant's age in some circumstances); 5H1.3 (downward departure based on defendant's mental or emotional condition in some circumstances); & 5K2.8 (upward departure based on defendant's extreme conduct toward a victim that was unusually heinous, cruel, brutal, or degrading).

148    Koon v. United States, 518 U.S. 81, 94 (1996).

149    See, e.g., USSG §5H1.10 (providing that offender's race, sex, national origin, creed, religion, and socio-economic status are not proper bases for departure).

150    There are two varieties of "substantial assistance" motions filed by the prosecution — the first seeks a downward departure below the applicable guideline range, and the second seeks a downward departure below a statutory mandatory minimum sentence. Compare USSG §5K1.1, with 18 U.S.C § 3553(e). Substantial assistance motions permitting a sentencing court to depart below a statutory mandatory minimum penalty are discussed in Part IV.A.4.

 ⚖

⚖️  Federal Sentencing: The Basics – 2018

151    See, e.g., 2017 Sourcebook at S-63 (Table N) (19.6% of cases – 10.8% substantial assistance departures and 8.8% fast-track departures).

152    See USSG §1B1.1(d).  The factors in section 3553(a) are set forth supra at page 8

153    Gall v. United States, 552 U.S. 38, 60 n 6 (2007).

154    18 U.S.C. § 3553(a).

155    See United States v. Narvaez Soto, 773 F.3d 282, 289 (1st Cir. 2013).

156    See USSG §5H1.2(a).

157    See USSG §5H1.2(c).

158    USSG §5C1.1, comment. (n.2).

159    USSG §5B1.2, comment. (n 1)

160    See USSG §5D1.1.

161    See USSG §5D1.2(a) (providing for "[a]t least two years but not more than five years for a defendant convicted of a Class A or B felony"; "[a]t least one year but not more than three years for a defendant convicted of a Class C or D felony"; and "[o]ne year for a defendant convicted of a Class E felony or a Class A misdemeanor").

162    See USSG §5D1.1(c).  As the Commission noted in the commentary to this guideline: "Unless such a defendant legally returns to the United States, supervised release is unnecessary.  If such a defendant illegally returns to the United States, the need to afford adequate deterrence and protect the public ordinarily is adequately served by a new prosecution [for illegal reentry by previously deported alien under 8 U.S.C. § 1326]." USSG §5D1.1, comment. (n.5).

163    See USSG §5D1.2(b); see also 18 U.S.C § 3583(j).

164    See Dorszynski v. United States, 418 U.S. 424, 431 (1974) (in the pre-SRA era, stating "the general proposition that once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end").

165    18 U.S.C. § 3742(a) & (b); see also Mistretta v. United States, 488 U.S. 361, 368 (1988) ("[The SRA] permits a defendant to appeal a sentence that is above the [guideline] range, and it permits the Government to appeal a sentence that is below that range.  It also permits either side to appeal an incorrect application of the guidelines.").

166    In 2017, appeals of original sentences by defendants occurred in 3,410 cases, while government appeals of original sentences occurred in only 31 cases.  See 2017 Sourcebook at S 147 & S 148 (Tables 57 & 58).

167    Booker, 543 U.S. at 261-62.

168    Gall, 522 U.S. at 51.

169    See, e.g., United States v. Krutsi, 437 F.3d 1050, 1054 (10th Cir. 2006).

170    Rita v. United States, 551 U.S. 338, 357 (2007).

⚖️  37

United States Sentencing Commission

171     See Rosales-Mireles v. United States, 138 S. Ct. 1897 (2018) (holding that miscalculation of guideline range that was determined to be plain error and to affect defendant's substantial rights would, in the ordinary case, seriously affect the fairness, integrity, or public reputation of judicial proceedings, and thus would call for the Court of Appeals to exercise its discretion to vacate defendant's sentence); Molina-Martinez v. United States, 136 S. Ct. 1338 (2016) (holding that, when a defendant is sentenced under an incorrect guideline range, whether or not the defendant's ultimate sentence falls within the correct range, the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error).

172     Rita, 551 U.S. at 350-56. Seven out of the 12 circuits (the 4th, 5th, 6th, 7th, 8th, 10th, and D.C. Circuits) employ such a presumption of reasonableness, while five (the 1st, 2nd, 3rd, 9th, and 11th) do not. See United States v. Carty, 520 F.3d 984, 993-94 & nn. 9 & 10 (9th Cir. 2008) (en banc) (collecting cases).

173     Rita, 551 U.S. at 347.

174     Nelson v. United States, 555 U.S. 350, 352 (2009) (per curiam).

175     Rita, 551 U.S. at 354-55.

176     Kimbrough, 552 U.S. at 109.

177     Chapter Seven recommends revocation for Grade A and Grade B violations as well as for repeated Grade C violations where an offender has not been revoked after a court's finding of the initial Grade C violation. See USSG §7B1.3 & comment. (n.1).

178     See USSG §§7B1.1, 7B1.2 & 7B1.4. Grade A violations include new felony drug-trafficking offenses or crimes of violence committed by offenders on supervision, as well as any other new felony offense punishable by more than 20 years of imprisonment. Grade B violations include all other felony offenses committed on supervision. Grade C violations include misdemeanor offenses committed on supervision and "technical" violations (such as failure to report to the supervising probation officer as directed by the court or willful failure to pay a fine). See USSG §7B1.1.

179     See USSG §7B1.1.

180     See USSG §7B1.1, comment. (n.1.).

181     In probation revocation cases, the court must consider all of the § 3553(a) factors (just as at an original sentencing). Conversely, in a supervised release revocation proceeding, the court should consider all of the factors except § 3553(a)(2)(A) (which requires courts at original sentencing hearings to consider imposing a sentence in order to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"). See 18 U.S.C. §§ 3565(a) & 3583(e).

182     See 18 U.S.C. §§ 3565 (probation revocation) & 3583(e), (g) (supervised release revocation).

183     18 U.S.C. §§ 3565(b) & 3583(g). There is a limited exception to the requirement that a court incarcerate an offender for possessing drugs if a failed drug test constitutes the sole evidence of drug possession, and if the court finds that an offender would benefit from "an appropriate substance abuse treatment program," the court may substitute drug abuse treatment for imprisonment. 18 U.S.C. §§ 3565(b) & 3583(d).

184     See 18 U.S.C. § 3583(e)(3) (for a Class A felony, the maximum term of imprisonment is 5 years upon revocation; for a Class B felony, the maximum is three years upon revocation; for a Class C or Class D felony, the maximum is two years upon revocation; and for a Class E felony, or for a misdemeanor (other than a

38

⚖ Federal Sentencing: The Basics · 2019

petty offenses), the max term is one year upon revocation).

185     18 U.S.C. § 3565(a)(2).

186     The Courts of Appeal vary in their characterizations of the applicable standard of review in revocation cases. Some apply the *Booker* "reasonableness" standard of review while others will reverse only if a district court was "plainly unreasonable" in revoking. See United States v. Flagg, 481 F.3d 946, 949 (7th Cir. 2007) (discussing the approaches of different circuits).

187     See, e.g., United States v. Silva, 443 F.3d 795, 798 (11th Cir. 2006).

188     See 28 U.S.C. § 994 (o), (p) & (u); see also *Rita*, 551 U.S. at 350 ("The statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and courts of appeals in that process.")

189     The amendments are contained in Appendix C to the *Guidelines Manual*. As of November 1, 2018, there were 813 amendments.

190     Although the Commission refers to such amendments as "proposed," they should not be considered as finalized amendments being proposed to Congress for their consideration pursuant to 28 U.S.C. § 994(p). Rather, they are prepared for public consideration only, so as to inform the Commission's decision of whether to adopt such possible amendments.

191     See generally U.S. SENTENCING COMM'N, RULES OF PRACTICE AND PROCEDURE, Pts. 4 & 5, https://www.ussc.gov/sites/default/files/pdf/amendment-process/Practice_Procedure_Rules.pdf

192     See Federal Sentencing Guidelines, Amendment, Disapproval, Pub. L. No. 104-38, 109 Stat. 334 (1995) (rejecting amendments related to the crack cocaine and money laundering guidelines).

193     28 U.S.C. § 994 (o); see also U.S. SENT. COMM. Rule 4.1, RULES OF PRAC. & PROC.

194     See 18 U.S.C. § 3582 ("In the case of a defendant who has been sentenced to a term of imprisonment based on a sentence range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o) . . . the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."); USSG §1B1.10 (setting forth the procedure for considering an offender's petition for resentencing under a retroactive guideline amendment).

195     Dillon v. United States, 560 U.S. 817 (2010).

196     See USSG §1B1.10(c) (listing the retroactive amendments). Sometimes an amendment to the guidelines is merely intended to be "clarifying" rather than to work a "substantive" change. In such a case, the amendment would be given effect to a defendant whose case is still pending on direct appeal, even if the Commission does not vote to apply the amendment retroactively. Such a clarifying amendment, however, may not be given retroactive effect to a defendant who already has concluded his direct appeal or who did not file a direct appeal, unless the Commission has voted to give retroactive effect to that amendment. See, e.g., United States v. Armstrong, 347 F.3d 905, 908 (11th Cir. 2003); United States v. Diaz, 89 F.3d 316, 217-18 (6th Cir. 1996).

197     28 U.S.C. § 995(a)(12)-(16).

198     Such publications are available on the Commission's website at http://www.ussc.gov/research-and-publications.

199     See 28 U.S.C. § 994(w).

United States Sentencing Commission ⚖

200    *See* Christine Kitchens, *Federal Sentencing Data and Analyses Issues* (U.S. Sent. Comm'n Aug. 2019), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190825_Federal_Sentencing_Data_Analyses.pdf.

201    In recent years, the number of federal offenders sentenced under the guidelines has ranged from 86,201 (in 2011) to 80,873 (in 2017). *See* 2017 Sourcebook at S-6 (Table 2); 2011 Sourcebook at S0 (Table 2).

202    2017 Sourcebook at S-14 (Table 3); *see generally* U.S. Sentencing Comm'n, Overview of Federal Criminal Cases Fiscal Year 2016, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/FY16_Overview_Federal_Criminal_Cases.pdf.

203    2017 Sourcebook at S-60 (Figure D).

204    *Id.* at S-33 (Table 14).

205    2017 Mandatory Minimum Report, *supra*, at 43 (Fig. 15). With respect to offenders convicted of an offense carrying a mandatory minimum penalty, the average prison sentence for offenders who received relief from the mandatory minimum sentence (in the form of the safety valve or motion for downward departure for substantial assistance) was 67 months, while the average prison sentence for offenders who did not receive such relief was 133 months. *Id.*

206    *See* Federal Bureau of Prisons, *Total Federal Inmates*, http://www.bop.gov/about/statistics/population_statistics.jsp (last visited November 1, 2018; reporting 181,227 Total Federal Inmates)"; *see also* Bureau of Justice Statistics, *Prisoners in 2016*, at 2 (2018) (noting total number of all federal and state prisoners at end of 2016 was 1,505,400).

207    SOURCE: Commission's FY2017 Datafile.

208    *See* Matthew G. Rowland, *The Rising Going Back, Not Enough Getting Out: Supervision Violators, Probation Supervision, and Overcrowding in the Federal Bureau of Prisons*, Fed. Prob. (Sept. 2013).

209    *See* U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release 61-63 (2010).

210    2017 Sourcebook at S-16 - S-21 (Tables 4-9).

211    *Id.* at S-46 (Table 20).

Federal Sentencing: The Basics - 2018

United States Sentencing Commission 

## Attachment A

Ch. 5 Pt. A

### SENTENCING TABLE
### (in months of imprisonment)

| | Offense Level | Criminal History Category (Criminal History Points) | | | | | |
|---|---|---|---|---|---|---|---|
| | | I (0 or 1) | II (2 or 3) | III (4, 5, 6) | IV (7, 8, 9) | V (10, 11, 12) | VI (13 or more) |
| Zone A | 1 | 0–6 | 0–6 | 0–6 | 0–6 | 0–6 | 0–6 |
| | 2 | 0–6 | 0–6 | 0–6 | 0–6 | 0–6 | 1–7 |
| | 3 | 0–6 | 0–6 | 0–6 | 0–6 | 2–8 | 3–9 |
| | 4 | 0–6 | 0–6 | 0–6 | 2–8 | 4–10 | 6–12 |
| | 5 | 0–6 | 0–6 | 1–7 | 4–10 | 6–12 | 9–15 |
| | 6 | 0–6 | 1–7 | 2–8 | 6–12 | 9–15 | 12–18 |
| | 7 | 0–6 | 2–8 | 4–10 | 8–14 | 12–18 | 15–21 |
| | 8 | 0–6 | 4–10 | 6–12 | 10–16 | 15–21 | 18–24 |
| Zone B | 9 | 4–10 | 6–12 | 8–14 | 12–18 | 18–24 | 21–27 |
| | 10 | 6–12 | 8–14 | 10–16 | 15–21 | 21–27 | 24–30 |
| | 11 | 8–14 | 10–16 | 12–18 | 18–24 | 24–30 | 27–33 |
| Zone C | 12 | 10–16 | 12–18 | 15–21 | 21–27 | 27–33 | 30–37 |
| | 13 | 12–18 | 15–21 | 18–24 | 24–30 | 30–37 | 33–41 |
| Zone D | 14 | 15–21 | 18–24 | 21–27 | 27–33 | 33–41 | 37–46 |
| | 15 | 18–24 | 21–27 | 24–30 | 30–37 | 37–46 | 41–51 |
| | 16 | 21–27 | 24–30 | 27–33 | 33–41 | 41–51 | 46–57 |
| | 17 | 24–30 | 27–33 | 30–37 | 37–46 | 46–57 | 51–63 |
| | 18 | 27–33 | 30–37 | 33–41 | 41–51 | 51–63 | 57–71 |
| | 19 | 30–37 | 33–41 | 37–46 | 46–57 | 57–71 | 63–78 |
| | 20 | 33–41 | 37–46 | 41–51 | 51–63 | 63–78 | 70–87 |
| | 21 | 37–46 | 41–51 | 46–57 | 57–71 | 70–87 | 77–96 |
| | 22 | 41–51 | 46–57 | 51–63 | 63–78 | 77–96 | 84–105 |
| | 23 | 46–57 | 51–63 | 57–71 | 70–87 | 84–105 | 92–115 |
| | 24 | 51–63 | 57–71 | 63–78 | 77–96 | 92–115 | 100–125 |
| | 25 | 57–71 | 63–78 | 70–87 | 84–105 | 100–125 | 110–137 |
| | 26 | 63–78 | 70–87 | 78–97 | 92–115 | 110–137 | 120–150 |
| | 27 | 70–87 | 78–97 | 87–108 | 100–125 | 120–150 | 130–162 |
| | 28 | 78–97 | 87–108 | 97–121 | 110–137 | 130–162 | 140–175 |
| | 29 | 87–108 | 97–121 | 108–135 | 121–151 | 140–175 | 151–188 |
| | 30 | 97–121 | 108–135 | 121–151 | 135–168 | 151–188 | 168–210 |
| | 31 | 108–135 | 121–151 | 135–168 | 151–188 | 168–210 | 188–235 |
| | 32 | 121–151 | 135–168 | 151–188 | 168–210 | 188–235 | 210–262 |
| | 33 | 135–168 | 151–188 | 168–210 | 188–235 | 210–262 | 235–293 |
| | 34 | 151–188 | 168–210 | 188–235 | 210–262 | 235–293 | 262–327 |
| | 35 | 168–210 | 188–235 | 210–262 | 235–293 | 262–327 | 292–365 |
| | 36 | 188–235 | 210–262 | 235–293 | 262–327 | 292–365 | 324–405 |
| | 37 | 210–262 | 235–293 | 262–327 | 292–365 | 324–405 | 360–life |
| | 38 | 235–293 | 262–327 | 292–365 | 324–405 | 360–life | 360–life |
| | 39 | 262–327 | 292–365 | 324–405 | 360–life | 360–life | 360–life |
| | 40 | 292–365 | 324–405 | 360–life | 360–life | 360–life | 360–life |
| | 41 | 324–405 | 360–life | 360–life | 360–life | 360–life | 360–life |
| | 42 | 360–life | 360–life | 360–life | 360–life | 360–life | 360–life |
| | 43 | life | life | life | life | life | life |

42

⚖ Federal Sentencing: The Basics – 2018

# Attachment B

§2B3.1

\* \* \* \* \*

## §2B3.1.   Robbery

(a)   Base Offense Level: **20**

(b)   Specific Offense Characteristics

    (1)   If the property of a financial institution or post office was taken, or if the taking of such property was an object of the offense, increase by 2 levels.

    (2)   (A) If a firearm was discharged, increase by **7** levels; (B) if a firearm was otherwise used, increase by **6** levels; (C) if a firearm was brandished or possessed, increase by **5** levels; (D) if a dangerous weapon was otherwise used, increase by **4** levels; (E) if a dangerous weapon was brandished or possessed, increase by **3** levels; or (F) if a threat of death was made, increase by **2** levels.

    (3)   If any victim sustained bodily injury, increase the offense level according to the seriousness of the injury:

| | DEGREE OF BODILY INJURY | INCREASE IN LEVEL |
|---|---|---|
| (A) | Bodily Injury | add 2 |
| (B) | Serious Bodily Injury | add 4 |
| (C) | Permanent or Life-Threatening Bodily Injury | add 6 |
| (D) | If the degree of injury is between that specified in subdivisions (A) and (B), | add 3 levels; or |
| (E) | If the degree of injury is between that specified in subdivisions (B) and (C), | add 5 levels. |

    *Provided,* however, that the cumulative adjustments from (2) and (3) shall not exceed **11** levels.

    (4)   (A) If any person was abducted to facilitate commission of the offense or to facilitate escape, increase by **4** levels; or (B) if any person was physically restrained to facilitate commission of the offense or to facilitate escape, increase by **2** levels.

    (5)   If the offense involved carjacking, increase by **2** levels.

    (6)   If a firearm, destructive device, or controlled substance was taken, or if the taking of such item was an object of the offense, increase by **1** level.

    (7)   If the loss exceeded $20,000, increase the offense level as follows:

⚖ 43

United States Sentencing Commission ⚖️

## §2B3.1

| LOSS (APPLY THE GREATEST) | INCREASE IN LEVEL |
| --- | --- |
| (A) $20,000 or less | no increase |
| (B) More than $20,000 | add 1 |
| (C) More than $95,000 | add 2 |
| (D) More than $500,000 | add 3 |
| (E) More than $1,500,000 | add 4 |
| (F) More than $3,000,000 | add 5 |
| (G) More than $5,000,000 | add 6 |
| (H) More than $9,000,000 | add 7 |

(c)   Cross Reference

(1)   If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply §2A1.1 (First Degree Murder).

### Commentary

**Statutory Provisions:** 18 U.S.C. §§ 1951, 2113, 2114, 2118(a), 2119. For additional statutory provision(s), see Appendix A (Statutory Index).

**Application Notes:**

1.   *"Firearm," "destructive device," "dangerous weapon," "otherwise used," "brandished," "bodily injury," "serious bodily injury," "permanent or life-threatening bodily injury," "abducted," and "physically restrained"* are defined in the Commentary to §1B1.1 (Application Instructions).

   *"Carjacking"* means the taking or attempted taking of a motor vehicle from the person or presence of another by force and violence or by intimidation.

2.   Consistent with Application Note 1(E)(ii) of §1B1.1 (Application Instructions), an object shall be considered to be a dangerous weapon (for purposes of subsection (b)(2)(E)) if (A) the object closely resembles an instrument capable of inflicting death or serious bodily injury; or (B) the defendant used the object in a manner that created the impression that the object was an instrument capable of inflicting death or serious bodily injury (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

⚖️  Federal Sentencing: The Basics  2018

§2B3.2

3.  "*Loss*" means the value of the property taken, damaged, or destroyed.

4.  The combined adjustments for weapon involvement and money are limited to a maximum enhancement of 11 levels.

5.  If the defendant intended to murder the victim, an upward departure may be warranted; *see* §2A2.1 (Assault with Intent to Commit Murder, Attempted Murder).

6.  "A threat of death," as used in subsection (b)(2)(F), may be in the form of an oral or written statement, act, gesture, or combination thereof. Accordingly, the defendant does not have to state expressly his intent to kill the victim in order for the enhancement to apply. For example, an oral or written demand using words such as "Give me the money or I will kill you", "Give me the money or I will pull the pin on the grenade I have in my pocket", "Give me the money or I will shoot you", "Give me your money or else (where the defendant draws his hand across his throat in a slashing motion)", or "Give me the money or you are dead" would constitute a threat of death. The court should consider that the intent of this provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is a victim of the offense, a fear of death.

**Background:** Possession or use of a weapon, physical injury, and unlawful restraint sometimes occur during a robbery. The guidelines provide for a range of enhancements where these factors are present.

Although in pre-guidelines practice the amount of money taken in robbery cases affected sentence length, its importance was small compared to that of the other harm involved. Moreover, because of the relatively high base offense level for robbery, an increase of 1 or 2 levels brings about a considerable increase in sentence length in absolute terms. Accordingly, the gradations for property loss increase more slowly than for simple property offenses.

The guideline provides an enhancement for robberies where a victim was forced to accompany the defendant to another location, or was physically restrained by being tied, bound, or locked up.

*Historical Note:* Effective November 1, 1987 (amendment effective June 15, 1988; amended effective November 1, 1989 (amendments 261 and 262); November 1, 1990 (amendment 310); November 1, 1991 (amendments 365 and 366); November 1, 1993 (amendment 479); November 1, 1997 (amendment 552); November 2000 (amendment 601); November 1, 2001 (amendment 612); November 1, 2009 (amendment 735); November 1, 2010 (amendment 725); November 1, 2011 (amendment 750); November 1, 2018 (amendment 802).

⚖️  45

United States Sentencing Commission ⚖️

⁴⁶ ⚖️

# EXHIBIT #3

# SEG

## Smith Economics Group, Ltd.

A Division of Corporate Financial Group

*Economics / Finance / Litigation Support*

Stan V. Smith, Ph.D.
President

February 1, 2021

Mr. Eric P. Early
Early Sullivan Wright Gizer & McRae
6420 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048

Re:  Blankenship v. Fox News Network LLC

Dear Mr. Early:

You have asked me to assess the damages to Don Blankenship based on the allegations against the various media defendants ("Media Defendants") described in the operative First Amended Complaint.

## I.  ASSIGNMENT

Based on the allegations against the Media Defendants described in the First Amended Complaint, I have been asked to assess the loss of earnings suffered by Mr. Blankenship.

## II.  QUALIFICATIONS AND EXPERIENCE

I am President of Smith Economics Group, Ltd., headquartered in Chicago, IL, which provides economic and financial consulting nationwide.  I have worked as an economic and financial consultant since 1974, after completing a Research Internship at the Federal Reserve, Board of Governors, in Washington, D.C.

I received my Bachelor's Degree from Cornell University.  I received a Master's Degree and my Ph.D. in Economics from the University of Chicago; Gary S. Becker, Nobel Laureate 1992, was my Ph.D. thesis advisor.  The University of Chicago is one of the world's preeminent institutions for the study of economics, and the home of renowned research in the law and economics movement.

# SEG

As President of Smith Economics, I have performed economic analyses in a great variety of engagements, including damages analysis in personal injury and wrongful death cases, business valuation, financial analysis, antitrust, contract losses, a wide range of class action matters, employment discrimination, defamation, and intellectual property valuations including evaluations of reasonable royalty.

*1163 N. Clark Street ■ Suite 600 ■ Chicago, IL 60610 ■ Fax 312-943-1016 ■ Tel 312-943-1551*
*www.SmithEconomics.com*

I have more than 40 years of experience in the field of economics. I am a member of various economic associations and served for three years as Vice President of the National Association of Forensic Economics (NAFE) which is the principal association in the field. I was also on the Board of Editors of the peer-reviewed journal, the Journal of Forensic Economics, for over a decade; I have also published scholarly articles in this journal. The JFE is the leading academic journal in the field of Forensic Economics.

I wrote the first textbook on Forensic Economic Damages that has been used in university courses such as the University of Wisconsin, Penn State University, and in various other states. As an adjunct professor, I created and taught the first course in Forensic Economics nationwide, at DePaul University in Chicago.

I am the creator and founder of Ibbotson Associates' Stock, Bonds, Bills, and Inflation (SBBI) Yearbook, Quarterly, Monthly, and SBBI/PC Services. SBBI is generally regarded by academics in the field of finance as the most widely accepted source of statistics on the rates of return on investment securities. SBBI was originally published by Ibbotson Associates, then by Morningstar, Inc., and is now currently published by Duff & Phelps. The original SBBI series generated what became a six-book set universally used for business valuation, and currently available on an online platform. These data series are widely relied upon and regarded as the most accepted and definitive scholarly references by the academic, actuarial and investment community, and in courts of law. All three publishers of the SBBI series acknowledge me as the founder in 1983, for my "invaluable role" as having "originated the idea" of SBBI, which I then implemented while Managing Director at Ibbotson Associates.

My estimate of the real discount rate is 1.25 percent per year. This discount rate is based on the rate of return on short-term U.S. Treasury investments. The data is from the statistical series H.15 Selected Interest Rates, published by the Board of Governors of the Federal Reserve System found at www.federalreserve.gov. This data is also published in the Economic Report of the President Table for "Bond yields and interest rates" for the real return on U.S. Treasury investments primarily for the last 20 years.

I have performed economic analysis in many thousands of cases in almost every state and federal jurisdiction since the early 1980s.

2

# SEG

My curriculum vita is attached, listing all my publications in the last 10 years and beyond. My hourly rate in this case is $525 per hour. The list of all cases in which I have testified in the last 4 years is also attached.

## III. INFORMATION REVIEWED

1. Plaintiff's First Amended Complaint;
2. The informational interview with Mr. Blankenship dated September 8, 2020.

## IV. BACKGROUND AND DISCUSSION

Don Blankenship became a leader in the coal industry after a meteoric rise at Massey Energy. Mr. Blankenship began working for Massey Energy in 1982, and within two years, he was President of RAWL Sales, which was a subsidiary of Massey Energy. He was put in charge of all of Massey's mining operations four years later. In 1992, he was named President and CEO of the company, and his compensation rose to almost $18,000,000 in 2009 as a result of his success with the company and the phenomenal growth in the company's value from $150,000,000 to $7,800,000,000.

On April 5, 2010, tragedy struck Raleigh County at the Upper Big Branch Mine. Only a few hours after ventilation changes required by the Obama Administration were completed, cutting the mine's airflow in half, flammable gas deep in the mine ignited, causing an explosion which took the lives of twenty-nine miners. Eight months after the disaster, on December 6, 2010, MSHA concluded that a coal bed methane build-up ignited and created an explosion. In April 2014, Mr. Blankenship released a documentary which refuted MSHA's findings and challenged the inherent conflict of having a regulatory agency investigate an explosion where the agency itself was likely at fault. Among other things, the documentary identified powerful scientific evidence which refuted MSHA's conclusion that the explosion was caused by an influx of methane.

On or about November 13, 2014, federal prosecutors from the Obama Justice Department charged Mr. Blankenship with three felonies, including conspiracy to defraud the Federal mine regulators. He was also charged with a misdemeanor, conspiring to violate mine safety laws. Mr. Blankenship was not charged with causing any of the twenty-nine deaths in the April 5, 2010 Upper Big Branch Mine disaster. The Federal Government brought the full weight of its infinite resources to bear on Mr. Blankenship. The matter went to trial in October 2015 and lasted about two months. Following lengthy deliberations, the West Virginia jury found Mr. Blankenship innocent on all felony charges on December 3, 2015. The jury convicted him of the misdemeanor offense. Notably, at that time, many media outlets accurately reported that Mr. Blankenship was convicted only of a misdemeanor and not for any of the felony counts he was facing.

3

# SEG

The Department of Justice Office of Professional Responsibility has since investigated the conduct of the United States Attorneys who prosecuted Mr. Blankenship -- Booth Goodwin and Steve Ruby. The OPR found that massive prosecutorial misconduct had occurred in the prosecution of Mr. Blankenship, stating among other things that, "because Ruby and Goodwin recklessly violated the Department's discovery policies regarding the disclosure of discoverable statements, they committed professional misconduct." Mr. Blankenship's verdict is still under appeal.

In January 2018, Mr. Blankenship formally announced his plans to run as a Republican for the U.S. Senate seat held by Senator Joe Manchin, a Democrat. The Republican primary was scheduled for May 8, 2018. Beginning at about the end of March 2018 the Media Defendants falsely called Mr. Blankenship a felon in order to injure his reputation and discredit his candidacy. Mr. Blankenship's senatorial run was his chance to increase his reputation, but following the defamatory statements by the Media Defendants on national media, he failed to receive the Republican nomination. Achieving the Republican nomination in a senatorial race would have undoubtedly added to Mr. Blankenship's reputation and provided him with business opportunities, as well as a national podium to further establish himself.

## V. OPINION

Lost Earnings

Mr. Blankenship would have had great opportunities to earn income from multiple sources but for the actions of the Media Defendants. I have illustrated Mr. Blankenship's loss of earnings in five categories:

1.) CEO in the Mining/Construction Industry;
2.) Strategic Consultant;
3.) Board of Directors;
4.) Coal Broker/Entrepreneur; and
5.) Author.

All of the above opportunities would have been available for Mr. Blankenship, but it is unlikely that he would have been a CEO and a Strategic Consultant at the same time. He could have been a CEO or a Strategic Consultant and entertained the other opportunities.

## A. CEO in the Mining/Construction Industry

Tables 1 and 2 show Mr. Blankenship's loss of earnings as a CEO in the Mining/Construction industry. Mr. Blankenship's earning capacity has been established by his track record of success

4

# SEG

as a President and CEO in the mining industry. Mr. Blankenship's compensation in as Chairman of the Board and President of Massey Energy was $5,328,422 in 2006, $9,929,125 in 2007, $11,226,717, plus non-qualified deferred compensation of $26,530,954, totaling $37,757,671 in 2008, and $17,835,837 in 2009. Adjusting Mr. Blankenship's earnings for inflation, Mr. Blankenship earned $6,900,337 in year 2020 dollars in 2006, $12,601,153 in year 2020 dollars in 2007, $13,955,811, plus non-qualified deferred compensation of $32,980,343 in years 2020 dollars, totaling $46,936,154 in year 2020 dollars in 2008, and $21,584,160 in year 2020 dollars in 2009.

While at Massey Energy, Mr. Blankenship received multiple employment offers from other companies. Mr. Blankenship states that he received an offer from Carl Smith, the former owner of Fola Coal, which was equivalent to $15 million in year 2020 dollars. He states that Massey Energy then matched and exceeded that offer to retain him. He states that he was named to the Board of Directors of Fluor, a global engineering and construction company, in 1997. In 1999, Mr. Blankenship was asked to manage Fluor while its Chairman, Les McGraw, battled cancer. Mr. Blankenship was approached to become the President of Fluor, but he declined, as he wanted to remain in West Virginia. Mr. Blankenship was contacted by a headhunter to become the President of Raytheon in approximately 2000, but he again declined to remain at Massey Energy.

According to the Economic Research institute, the salary for new hire CEOs in the mining industry is $5,048,242 in year 2020 dollars.[1]

I have illustrated Mr. Blankenship's loss of earnings as a CEO in two scenarios. Table 1 shows the loss of earnings for Scenario 1. In Scenario 1, I have illustrated the lost earning to begin in 2019 at $22,005,451 in year 2020 dollars based on Mr. Blankenship's average real income from 2006 through 2009. Future earnings are illustrated to grow at inflation.

**Based on the above assumption, my opinion of the lost earnings as a CEO through 2030 are $254,647,877 ≻ Table 1.**

Table 2 shows the loss of earnings for Scenario 2. In Scenario 2, I have illustrated the lost earning to begin in 2019 at $5,048,242 in year 2020 dollars based on the salary for new hire CEOs in the mining industry. Mr. Blankenship's earnings are grown in 2024 to $21,584,160 in year 2020 dollars based on his actual income in 2009. Future earnings are illustrated to grow at inflation.

**Based on the above assumption, my opinion of the lost earnings as a CEO through 2030 are $197,218,122 ≻ Table 2.**

---

[1] https://online.erieri.com/SS/ExecutiveSurvey/

5

# SEG

## B. Strategic Consultant

Tables 3 through 5 show the lost earnings for Mr. Blankenship as a Strategic Consultant in three scenarios. Under Mr. Blankenship's leadership, and his implementation of systems that cut costs and increased efficiency, Massey Energy grew from a valuation of $150,000,000 to $7,800,000,000

Mr. Blankenship gained an expertise in cost accounting following his exposure to standard cost practices in the food industry while working for Keebler Company earlier in his career. Mr. Blankenship was able to grow Massey Energy in a time when the coal industry was in decline based on his ingenuity and groundbreaking methods. The metrics that he implemented to assess mines and make them profitable are now used universally in the mining industry. This approach has now become broad and has been applied to other industries as well, including the banking industry. Mr. Blankenship stated he cut costs by $400 million per year while at Massey Energy. Mr. Blankenship's ingenuity reduced Massey Energy's costs by 30 percent compared to similar coal mines.

Mr. Blankenship states that the harm to his reputation following the election has limited his ability to engage in business opportunities as a Strategic Consultant. He states that he would have been able to bring his expertise to companies across multiple industries, including mining, banking, and construction, in order to assist with cutting costs. Mr. Blankenship states that he would have been able to put together a team to assess companies and negotiate a percentage of

the savings as compensation, and 10 percent would be a reasonable fee. Mr. Blankenship states that based upon his experience as a CEO, he would be willing to pay an outside consultant 10 percent of the realized cost savings.

I have illustrated Mr. Blankenship's loss of earnings as a strategic consultant in three scenarios. In Scenario 1, I have illustrated Mr. Blankenship to earn $5,000,000 per year beginning in 2019, which assumes that he would provide cost savings of approximately $50,000,000 to various companies. Mr. Blankenship's Scenario 1 earnings are illustrated to grow in 2024 to $20,000,000, which assumes that he would increase the amount of cost savings provided to $200,000,000, or half of what he did at Massey Energy.

**Based on the above assumptions for Scenario 1, my opinion of the lost earnings as a Strategic Consultant through 2030 is $175,394,301 ➢ Table 3.**

I have illustrated Mr. Blankenship's loss of earnings as a strategic consultant in three scenarios. In Scenario 2, I have illustrated Mr. Blankenship to earn $5,000,000 per year beginning in 2019, which assumes that he would provide cost savings of approximately $50,000,000 to various companies. Mr. Blankenship's Scenario 2 earnings are illustrated to grow in 2024 to

6

# SEG

$15,000,000, which assumes that he would increase the amount of cost savings provided to $150,000,000.

**Based on the above assumptions for Scenario 2, my opinion of the lost earnings as a Strategic Consultant through 2030 is $136,982,590 ➢ Table 4.**

I have illustrated Mr. Blankenship's loss of earnings as a strategic consultant in three scenarios. In Scenario 3, I have illustrated Mr. Blankenship to earn $5,000,000 per year beginning in 2019, which assumes that he would provide cost savings of approximately $50,000,000 to various companies. Mr. Blankenship's Scenario 2 earnings are illustrated to grow in 2024 to $10,000,000, which assumes that he would increase the amount of cost savings provided to $100,000,000, or one-quarter of what he did at Massey Energy.

**Based on the above assumptions for Scenario 3, my opinion of the lost earnings as a Strategic Consultant through 2030 is $97,766,336 ➢ Table 5.**

C. Board of Directors

Tables 6 and 7 show the lost earnings for Mr. Blankenship from seats on Board of Directors. Mr. Blankenship states that he had seats on three boards while he was CEO at Massey Energy, and he believes that he could have been up to five boards if he was not engaged in other businesses, and three boards if he was engaged in other businesses.

I have illustrated Mr. Blankenship's loss of earnings as a member of a Board of Directors in two scenarios. The 90th percentile earnings for members of a Board of Directors is $290,000 in year 2020 dollars[2]. In Scenario 1, I have illustrated Mr. Blankenship as a member of five Boards of Directors and earning $290,000 per seat, which yields estimated annual earnings of $1,450,000 in year 2019 dollars beginning in 2019. Mr. Blankenship's Scenario 1 earnings are adjusted by inflation.

**Based on the above assumptions for Scenario 1, my opinion of the lost earnings as member of a Board of Directors through 2030 is $17,115,042 ➢ Table 6.**

In Scenario 2, I have illustrated Mr. Blankenship as a member of three Boards of Directors and earning $290,000 per seat, which yields estimated annual earnings of $870,000 in 2019 dollars beginning in 2019. Mr. Blankenship's Scenario 2 earnings are adjusted by national average wage growth of 4.29 percent in 2019, and 3.00 percent in 2020. Future earnings are illustrated to grow at 1.00 percent real.

---

[2] https://www.payscale.com/research/US/Job=Member_of_the_Board_of_Directors/Salary

Smith Economics Group, Ltd. ▪ 312-943-1551

# SEG

**Based on the above assumptions for Scenario 2, my opinion of the lost earnings as member of a Board of Directors through 2030 is $10,269,025 ➢ Table 7.**

### D. Coal Broker

Tables 8 and 9 show the lost earnings for Mr. Blankenship from working as a Coal Broker. Mr. Blankenship states that had a relationship with the steel industry, and while he was at Massey Energy he had wanted to become a coal broker or start his own mining company later in his life. Mr. Blankenship states that there have been several successful coal brokers, including Chris Cline, Ernie Thrasher, and Joseph Craft III, and he believes that he could have gone down a similar path.  He states that in the 1990s, as well as after leaving Massey Energy in 2011, Chris Cline reached out to him about becoming the President of Cline Resource and Development Co. Mr. Blankenship states that he advised Mr. Cline on his large purchase of mines in Illinois, which earned Mr. Cline a fortune.

Chris Cline, another West Virginia native got his start working in coal mines at age 15 and later bet big on high-sulfur coal reserves in Illinois.  He took coal mining firm Foresight Energy public in 2014, and sold a controlling stake in 2015 for $1.4 billion cash.  His net worth was estimated at $1,800,000,000 in 2019.[3]

Ernie Thrasher is the Founder, CEO and CMO of Xcoal Energy and Resources.  Thrasher held various positions in mine operations and mine management through 1981. Prior to forming Xcoal Energy & Resources in 2003, Thrasher spent twenty-two (22) years in various global marketing positions at Primary Coal and AMCI. Xcoal is the largest exporter of U.S. origin coal. In addition to marketing U.S. origin coal to customers throughout the world, Xcoal activities include the financing and development of mining projects and related infrastructure projects. Thrasher founded XLNG Energy & Resources in 2015, which plans to market LNG originating from natural gas reserves in the Marcellus and Utica Shale basins in the U.S., to customers in

South America, Europe, and Asia. Thrasher serves on the Board of Directors of Barrick Gold Corporation, the President's Leadership Council-Boy Scouts of America, is a member of the Council on Foreign Relations, serves as a Director on the National Committee on U.S. China Relations, and serves as a Director of the U.S.-India Strategic Partnership Forum.[4]

Joseph Craft III became a lawyer, and then joined diversified coal company MAPCO as an assistant general counsel in 1980. He became president in 1987. Craft was rewarded with a big stake for leading the firm's LBO and conversion into a tax-efficient public master limited partnership in 1996; it was renamed Alliance Resource Partners three years later. He has been

---

[3] https://www.forbes.com/profile/christopher-cline/#4bba4fbf9a1d

[4] https://usispf.org/team/ernie-thrasher/

8

# SEG

chief executive since and overseen subsequent expansion across Appalachia and the Midwest as revenue increased to $390 million. His net worth was an estimated $1,400,000,000 in 2012.[5]

The average net worth for Joseph Craft III and Chris Cline, whose net worth is publicly available, is $1,730,675,739. Assuming a 30-year career yields an estimated annual income of $56,558,030 in year 2019 dollars.

I have illustrated Mr. Blankenship's loss of earnings as a coal broker or entrepreneur in two scenarios. In Scenario 1, I have illustrated Mr. Blankenship's earnings to begin in 2019 at $56,558,030 in year 2020 dollars. Future earnings are illustrated to grow at inflation.

**Based on the above assumptions for Scenario 1, my opinion of the lost earnings as a coal broker or entrepreneur through 2030 is $667,581,406 ➤ Table 8.**

In Scenario 2, I have illustrated Mr. Blankenship's earnings to begin in 2019 at 50 percent of $56,558,030, or $28,279,015 in year 2020 dollars. Future earnings are illustrated to grow at inflation.

**Based on the above assumptions for Scenario 2, my opinion of the lost earnings as a coal broker or entrepreneur through 2030 is $333,790,703 ➤ Table 9.**

E. Author

Tables 10 and 11 show the lost earnings for Mr. Blankenship from being an author in two scenarios. Mr. Blankenship states that he planned to author several books over the remainder of his career. He states that he also planned to adapt his story into a screenplay.

I have illustrated Mr. Blankenship's loss of book revenue in two scenarios. In Scenario 1, I have illustrated Mr. Blankenship receiving a benchmark of $100,000 advances every 3 years.

**Based on the above assumptions for Scenario 1, my opinion of the lost earnings as member of a Board of Directors through 2030 is $383,816 ➤ Table 10.**

---

In Scenario 1, I have illustrated Mr. Blankenship receiving a benchmark of $250,000 advances every 3 years.

**Based on the above assumptions for Scenario 1, my opinion of the lost earnings as member of a Board of Directors through 2030 is $959,539 ➤ Table 11.**

---

[5] https://www.forbes.com/profile/joseph-craft/#6a4b02ab712a

9

# SEG

---------------------------------------------

All opinions expressed in this report are clearly labeled as such. They are rendered in accordance with generally accepted standards within the field of economics and are expressed to a reasonable degree of economic certainty. Estimates, assumptions, illustrations and the use of benchmarks, which are not opinions, but which can be viewed as hypothetical in nature, are also clearly disclosed and identified herein.

In my opinion, it is reasonable for experts in the field of economics and finance to rely on the materials and information I reviewed in this case, for the formulation of my substantive opinions herein.

If additional information is provided to me, which could alter my opinions, I may incorporate any such information into an update, revision, addendum, or supplement of the opinions expressed in this report.

It is my opinion, based upon the foregoing, that the Plaintiff has suffered concrete, tangible, economic harm.

If you have any questions, please do not hesitate to call me.

Sincerely,

Stan V. Smith, Ph.D.
President

10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

DON BLANKENSHIP,                          *

      Plaintiff,                         *

v.                                        *          Civil Action No.: 2:19-cv-00236

HONORABLE ANDREW                          *
NAPOLITANO (RET.), *et al.*
                                          *
      Defendants.                        *

                                 *

*   *   *   *   *   *   *   *   *   *   *   *   *

**DEFENDANT ELI LEHRER'S REPLY TO OPPOSITION TO**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

<table>
<tr><td>

Joseph S.D. Christof, Esq. (WV#6277)
Melvin F. O'Brien, Esq. (WV# 6797)
BreiAnne Varner Redd, Esq. (WV# 10894)
DICKIE, MCCAMEY & CHILCOTE, L.L.C.
2001 Main Street, Suite 501
Wheeling, WEV 26003
Phone: 304-233-1022
bredd@dmclaw.com

</td><td>

Jennifer S. Jackman, Esq.
*Admitted Pro Hac Vice*
Whiteford, Taylor & Preston, LLP
1800 M. Street N.W., Suite 401
Washington, D.C. 20036
202-659-6800
jjackman@wtplaw.com

</td></tr>
</table>

*Counsel for Defendant, Eli Lehrer*

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. PLAINTIFF DID NOT MEET HIS BURDEN (NOR CAN HE)……………………………...1

    A.  Plaintiff did not dispute a single fact……………………………………………………...2

    B.  The Undisputed Facts require entry of summary judgment in favor of Mr. Lehrer………3

    C.  Plaintiff has not and cannot establish actual malice………………………………………4

        1.  Summary Judgment IS appropriate when a plaintiff fails to produce evidence of actual malice………………………………………………………………………..5

        2.  Plaintiff has not produced any evidence of actual malice……………………………6

    D.  Plaintiff has not and cannot establish damages…………………………………………7

    E.  Plaintiff's False Light Claim also fails…………………………………………....8

III. CONCLUSION………………………………………………………………9

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
    47 U.S. 242 (1986) ............................................................................2

*Baumback v. American Broadcasting Cos.,*
    161 F.3d 1 (4th Cir. 1998) ...............................................................5

*Barwick v. Celotex,*
    736 F.2d 946(4th Cir. 1984) ...........................................................1

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .....................................................................1, 2

*Denny v. Seaboard Lacquer, Inc.,*
    487 F.2d 485 (4th Cir. 1973) ...........................................................5

*Dobkin v. Johns Hopkins University,*
    172 F.3d 43 (4th Cir. 1999) .............................................................5

*Nat'l Life Ins. Co. v. Phillips Publ'g., Inc.,*
    793 F. Supp. 627(D. Md. 1992) ...................................................5, 6

*New Life Ctr., Inc. v. Fessio,*
    229 F.3d 1143 (4th Cir.  2000) ...............................................4, 5, 7

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) .........................................................................4

*St. Amant v. Thompson,*
    390 U.S. 727 (1968) .........................................................................4

**RULES**

Fed. R. Civ. P. 56(a)-(e) .................................................................1, 2, 3

## I.    INTRODUCTION

The Opposition filed by Plaintiff, Don Blankenship ("Plaintiff") proves only one thing –
Plaintiff has absolutely <u>no</u> evidence to establish actual malice against Defendant Eli Lehrer, let
alone clear and convincing evidence.  In his Motion for Summary Judgment, Mr. Lehrer provided
an Affidavit setting facts, under oath, that reflect the complete absence of malice on his part.
Although Plaintiff attempts to create a genuine issue of fact by claiming he "disputes" Mr. Lehrer's
facts, he provides no support by affidavit or from the record, and thus, has not actually disputed
anything.  Despite having nearly one year to conduct discovery, <u>Plaintiff chose not to depose Mr.</u>
<u>Lehrer</u>.  Had Plaintiff believed he could establish actual malice, he would have taken discovery to
support this claim.  He did not.  As a result, Plaintiff's Opposition lacks any facts, supported by
the record, that establish actual malice by clear and convincing damages.  In addition, Plaintiff has
not identified any damages he sustained that were caused by Mr. Lehrer.  Accordingly, judgment
should be entered in favor of Mr. Lehrer on all claims.

## II.    PLAINTIFF DID NOT MEET HIS BURDEN (NOR CAN HE).

The Supreme Court has held that "Rule 56(c) mandates the entry of summary judgment,
after adequate time for discovery and upon motion, against a party who fails to make a showing
sufficient to establish the existence of an element essential to that Party's case, and on which that
party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).
Despite having had nearly one year to conduct discovery, Plaintiff did not meet his burden of proof
and has not produced any evidence to show that Mr. Lehrer acted with actual malice, an essential
element of his case that must be proven through clear and convincing evidence.

In Mr. Lehrer's opening brief, he identified multiple facts not in dispute that require the entry of summary judgment, explaining that Plaintiff could not meet his burden of establishing actual malice by clear and convincing evidence. These facts were supported by answers to interrogatories, depositions and affidavits as required under FRCP 56. *Barwick v. Celotex,* 736 F.2d 946, 958 (4th Cir. 1984) (The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production of documents.") Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp*, 477 U.S. at 322. If a party fails to make a sufficient showing on one element of their case, the failure of proffer "necessarily renders all other facts immaterial." *Id.* at 323. Plaintiff did not contest a single fact through evidence.

A. **Plaintiff did not dispute a single fact**.

Although Plaintiff's Opposition includes a section titled "Statement of Disputed Material Facts," the section does not, in fact, dispute a single fact set forth by Mr. Lehrer in his opening brief. Mr. Lehrer set forth his statement of undisputed facts and cited to the record and to Affidavits in support of these facts. Plaintiff correctly notes in his Opposition that "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." [Doc. 950, Plaintiff's Opposition, p. 5 citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).] In order to "dispute" these facts under F.C.P.R. 56(c), Plaintiff had the burden to show the existence of a dispute by citing to the record:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) Citing to the parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answer, or other materials; or

(B) Showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Plaintiff has done neither.  Instead, Plaintiff simply stated that he "disputes" the facts, without providing the requisite support to actually create an issue of fact. Because Plaintiff did not dispute any facts, through means required under FRCP 56, the Court should consider the facts undisputed for purposes of this motion and grant summary judgment to Mr. Lehrer.  FRCP 56(e).

**B.** **The Undisputed Facts Require Entry of Summary Judgment in Favor of Mr. Lehrer.**

There is no genuine issue of fact that prevents entry of judgment in favor of Mr. Lehrer and the facts that are undisputed require that judgment be entered in favor of Mr. Lehrer.  The following facts remain uncontroverted:

- Before Mr. Lehrer wrote his op-ed, there were more than 50 publications by major media outlets referring to Plaintiff as a convicted felon.

- Before writing his op-ed, Mr. Lehrer read, saw and heard multiple major media outlets reference Plaintiff as a convicted felon and believed this information to be true and accurate.

- Plaintiff lost the primary election for U.S. Senate *before* Mr. Lehrer authored the op-ed.

- Mr. Lehrer does not live in West Virginia, has never been employed by *The Charleston Gazette*, and never read *The Charleston Gazette*.

- *After* Plaintiff lost the primary election, Mr. Lehrer wrote an op-ed arguing that the West Virginia Sore Loser Law should be repealed and that Plaintiff should be allowed to run in the General Election.

- Before publishing the op-ed, Mr. Lehrer's article was peer reviewed. No one raised the issue of his characterization of Plaintiff as a "convicted felon."

- Within 24 hours of publication, Mr. Lehrer's op-ed was corrected and reflected that Plaintiff was actually a misdemeanant.

- Plaintiff cannot identify a single person who read Mr. Lehrer's op-ed before it was corrected, let alone a person whose opinion about Plaintiff changed after reading Mr. Lehrer's article.

- Plaintiff concedes that he does not have any evidence of what Mr. Lehrer knew at the time he wrote the op-ed.

- Mr. Lehrer did not intend to cause harm to Plaintiff.

- Plaintiff has not sought any employment opportunities since he left Massey Coal after the tragic mine explosion killed dozens of men.

The foregoing facts require entry of summary judgment because Plaintiff has not and cannot meet his burden of proving an essential element to his claims: actual malice.

## C. Plaintiff Has Not and Cannot Establish Actual Malice.

Although Plaintiff correctly notes that he has the burden of establishing actual malice by "clear and convincing evidence," he has not provided *any* evidence to support a finding of actual malice. Actual malice exists if a defamatory statement is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan,* 376 U.S. 254, 280 (1964). "Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his

publication." *New Life Ctr., Inc. v. Fessio,* 229 F.3d 1143 (Table), at *8 (4th Cir. 2000) (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)). Here, there is none.

    1.  <u>Summary Judgment IS appropriate when a Plaintiff fails to produce evidence of actual malice.</u>

Summary judgment is entirely appropriate where a Plaintiff fails to produce sufficient evidence of actual malice and the fact that a determination of "state of mind" needs to be made does not prevent summary judgment. Indeed, courts routinely grant summary judgment in defamation cases to defendants when plaintiffs fail to meet their burden in establishing actual malice. *See e.g.*, *New Life, 229 F.3d at *9* (Court affirmed District Court entry of summary judgment where plaintiff "failed to present evidence tending to show that the Article was published with actual malice"); *Dobkin v. Johns Hopkins University,* 172 F.3d 43 (Table), at *3 (4th Cir. 1999) ("The District Court properly granted summary judgment since there was insufficient evidence of actual malice to create a jury question"); *Baumback v. American Broadcasting Cos.,* 161 F.3d 1 (Table), at *6 (4th Cir. 1998) (Court affirmed grant of summary judgment where public official failed to demonstrate actual malice).

Plaintiff attempts to argue that because Mr. Lehrer's state of mind is at issue, summary judgment is inappropriate. There is no support for this theory and indeed, the cases Plaintiff relies upon either do not apply here, where Plaintiff failed to contest Mr. Lehrer's affidavit, or actually undermine his argument. For example, Plaintiff relies on *Denny v. Seaboard Lacquer, Inc.* 487 F.2d 485, 491 (4th Cir. 1973) for the notion that "where state of mind is at issue, summary disposition should be used sparingly." Unlike *Denny*, where there were conflicting affidavits produced by the parties regarding the defendant's state of mind, state of mind is not an issue here because there is no conflicting evidence as to Mr. Lehrer's state of mind – Plaintiff produced no

evidence of the same.  Plaintiff's reliance on *Nat'l Life Ins. Co. v. Phillips Publ'g., Inc.,* 793 F.

Supp. 627, 632 (D. Md. 1992) is similarly misplaced since the Court in *Nat'l Life* squarely held

that "considering Defendants' arguments that Plaintiff cannot demonstrate that Defendants acted

with malice, are appropriate for Court review." *Id.* at 632-633.  Indeed, in *Nat'l Life*, the Court

granted summary judgment in favor of Defendants holding:

> As malice is the standard, Plaintiff's case fails, because it cannot
> demonstrate by clear and convincing evidence that Defendants acted
> with malice.

*Id.* at 649.  Thus, Plaintiff's argument that the Court should refrain from determining state of mind

at the summary judgment stage is belied by the very cases he cites in support of his argument –

cases that <u>granted</u> summary judgment for defendants where actual malice was part of the claim to

be proven.

    2.    <u>Plaintiff has not produced any evidence of actual malice.</u>

Plaintiff has not produced *any* evidence of actual malice, let alone clear and convincing

evidence.  Notably, Plaintiff has not and cannot identify (1) any journalistic standards that were

violated (nor has he retained an expert on this point), (2) any evidence that Mr. Lehrer knew that

the reference to Plaintiff as a "convicted felon" was false or entertained serious doubts; or (3) any

evidence that Mr. Lehrer intended to harm him.  Instead, Plaintiff argues that Mr. Lehrer should

not have relied on the 50 media reports that referenced Plaintiff as a convicted felon and that

instead Mr. Lehrer, who has never lived in or worked in West Virginia, should have conducted his

research regarding Mr. Lehrer through *The Charleston Gazette,* a local West Virginia newspaper Mr. Lehrer had never read.[1]

As Mr. Lehrer testified, he understood that Plaintiff was a convicted felon based on news reports he heard from multiple media sources he relied upon and trusted.  Indeed, by the time Mr. Lehrer published his article – an article that advocated that Plaintiff be allowed to run in the general election – more than 50 publications in major media outlets had occurred referencing Plaintiff as a "felon."  Plaintiff's "displeasure over the manner in which the [op-ed] was investigated simply cannot be equated with evidence of actual malice." *New Life, 229 F.3d at \*9.*

### D.  <u>Plaintiff Has Not and Cannot Establish Damages</u>.

Plaintiff has not and cannot establish any damage that he sustained as a result of Mr. Lehrer's reference to his being a "convicted felon", <u>after</u> he lost the primary election, <u>after</u> more than 50 other publications of this fact had occurred, which was immediately corrected.  Indeed, Plaintiff has not identified a single person who read Mr. Lehrer's article, let alone read the article before it was corrected, let alone read the article before it was corrected **and** changed their opinion of Plaintiff – the self-described "most hated man in Mingo County."  Since Plaintiff cannot establish causation, his claims fail.

In an attempt to defeat summary judgment, Plaintiff attempts to rely upon his expert's "report."  Plaintiff's reliance on his purported expert's report (as opposed to his sworn testimony) is improper because the "report" is not part of the record before this Court.  Further, the

---

[1] This argument defies logic since Plaintiff is also suing *The Charleston Gazette* for defamation in this case.  On the one hand, Plaintiff argues it was a reputable source that Mr. Lehrer should have used and relied upon.  On the other hand, he argues that *The Charleston Gazette* knowingly published false statements about him.  Plaintiff cannot have it both ways.

inadmissible report focused on the damages allegedly sustained as a result of the primary election

loss – damages that are inapplicable to Mr. Lehrer, whose op-ed was published after that defeat.[2]

Moreover, neither the report, nor Plaintiff's purported expert establish causation – that is, that Mr.

Lehrer's conduct caused any damages.  It is undisputed that Plaintiff did not work between the

time he resigned from Massey Coal in December 2010 through the date of Mr. Lehrer's

publication. It is also undisputed that he already lost the primary election before Mr. Lehrer's

publication.  Simply put, Plaintiff cannot establish damages arising from Mr. Lehrer's conduct and

thus, his claims fail and judgment should be entered in favor of Mr. Lehrer on all claims.

### E.  Plaintiff's False Light Claim Also Fails.

For all of the reasons Plaintiff's defamation claim fails, so too does his false light claim.

Further, Plaintiff has not established the additional element required for false light claims:  that is,

that Mr. Lehrer gave publicity to a matter.  Mr. Lehrer did not "give publicity" let alone widespread

publicity to Plaintiff's alleged status as a convicted felon because that misstatement had already

been widely publicized before his op-ed was published.  Plaintiff has not identified a single person

who read the op-ed and instead attempts to rely upon a link to an internet article that purports to

---

[2] Though the report should not be considered since it is not evidence, it also should not be considered as support for Plaintiff's purported damages against Mr. Lehrer because it premises the damages upon the following:

> In January 2018, Mr. Blankenship formally announced his plans to run as a Republican for the U.S. Senate seat held by Senator Joe Manchin, a Democrat.  The Republican primary was scheduled for May 8, 2018.  Beginning at or about the end of March 2018 the Media Defendants falsely called Mr. Blankenship a felon in order to injure his reputation and discredit his candidacy.  Mr. Blankenship's senatorial run was his chance to increase his reputation, but following the defamatory statements by the Media Defendants on national media, he failed to receive the Republican nomination. Achieving the Republican nomination in a senatorial race would have undoubtedly added to Mr. Blankenship's reputation and provided him with business opportunities, as well as a national podium to further establish himself.

rank the top ten West Virginia newspapers.  Clearly, this is not "evidence", it is not properly before the Court, and it must not be considered.  As a result, Plaintiff's claim for false light invasion of privacy fails as a matter of law and must be dismissed.

## III.    <u>CONCLUSION</u>

For the reasons stated above, Defendant respectfully requests that this Court grant Defendant's Motion for Summary Judgment and enter judgment in favor of Eli Lehrer on all claims asserted against him with prejudice and for such other relief this Court deems appropriate.

Dated:  June 28, 2021

<div align="right">

Respectfully submitted,

/s/ *BreiAnne Varner Redd*
Joseph S.D. Christof, Esq. (WV#6277)
Melvin F. O'Brien, Esq. (WV#6797)
BreiAnne Varner Redd, Esq.  (WV #10894)
DICKIE, MCCAMEY & CHILCOTE, L.C.
2001 Main Street, Suite 501
Wheeling, WV  26003
Phone: 304-233-1022/Fax: 888-811-7144
bredd@dmclaw.com
*Counsel for Defendant, Eli Lehrer*

/s/ *Jennifer S. Jackman*
Jennifer S. Jackman
*Admitted Pro Hac Vice*
Whiteford, Taylor & Preston, LLP
1800 M. Street N.W., Suite 401
Washington, D.C. 20036
202-659-6800
jjackman@wtplaw.com

</div>

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

| | |
|---|---|
| **DON BLANKENSHIP,** | * |
| **Plaintiff,** | * |
| v. | *      **Civil Action No.: 2:19-cv-00236** |
| **HONORABLE ANDREW NAPOLITANO (RET.),** *et al.* | * |
| | * |
| **Defendants.** | * |
| | * |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Defendant Eli Lehrer's Reply to Opposition to Motion for Summary Judgment* was served on all counsel of record on this 28th day of June, 2021, via the Court's electronic filing system.

Respectfully submitted,

/s/ *BreiAnne Varner Redd*
Joseph S.D. Christof, Esq. (WV#6277)
Melvin F. O'Brien, Esq. (WV#6797)
BreiAnne Varner Redd, Esq.  (WV #10894)
DICKIE, MCCAMEY & CHILCOTE, L.C.
2001 Main Street, Suite 501
Wheeling, WV  26003
Phone: 304-233-1022/Fax: 888-811-7144
E-mail: mobrien@dmclaw.com
          bredd@dmclaw.com

*Counsel for Defendant, Eli Lehrer*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

DON BLANKENSHIP,                                    CIVIL ACTION NO. 2:19-cv-00236

                              Plaintiff,

        v.

FOX NEWS NETWORK, LLC et al.,
                              Defendants.

### DEFENDANTS MEDIAITE, LLC AND TAMAR AUBER'S
### MOTION FOR SUMMARY JUDGMENT

Defendants Mediaite, LLC and Tamar Auber ("Mediaite Defendants"), pursuant to Federal

Rule of Civil Procedure 56, respectfully moves for summary judgment in favor and dismissing all

claims brought against them in this matter, together with such further relief as this Court may deem

just and proper

In support of its Motion, Defendants submit and rely upon the accompanying

Memorandum of Law in Support of Defendants Mediaite, LLC and Tamar Auber's Motion for

Summary Judgment and exhibits attached hereto.

Dated: June 7, 2021                        Respectfully submitted,

                                           MEDIAITE, LLC and TAMAR AUBER,
                                           Defendants

                                           By counsel:

                                           /s/ Andrew Eisbrouch
                                           Andrew Eisbrouch, Esq. (*pro hac vice*)
                                           NY Bar No. 5515598
                                           Mediaite, LLC

1261 Broadway, Suite 606
New York, New York 10001
Tel: (201) 452-3990

*Attorney for Defendants*
*Mediaite, LLC & Tamar Auber*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

DON BLANKENSHIP,                              CIVIL ACTION NO. 2:19-cv-00236

             Plaintiff,

      v.

FOX NEWS NETWORK, LLC et al.,
             Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2021 a true and correct copy of the foregoing was served

via CM/ECF on all counsel of record in this action registered to receive CM/ECF notification.

/s/ Andrew Eisbrouch
Andrew Eisbrouch, Esq. (*pro hac vice*)
NY Bar No. 5515598

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

DON BLANKENSHIP,                              CIVIL ACTION NO. 2:19-cv-00236

                Plaintiff,

   v.

FOX NEWS NETWORK, LLC et al.,
              Defendants.

**[PROPOSED] ORDER GRANTING DEFENDANTS
MEDIATE, LLC AND TAMAR AUBER'S
MOTION FOR SUMMARY JUDGMENT**

IT IS HERBY ORDERED that Defendants Mediaite, LLC and Tamar Auber's Motion

for Summary Judgment is GRANTED.

Dated: _____, 2021

                                      _____
                                      Hon. John T. Copenhaver, Jr.
                                      United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

DON BLANKENSHIP,                                    CIVIL ACTION NO. 2:19-cv-00236

                         Plaintiff,

    v.

FOX NEWS NETWORK, LLC et al.,
                         Defendants.

## AFFIDAVIT OF TAMAR AUBER

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

I, Tamar Auber, being duly sworn, deposes and says under penalty of perjury:

1)      I am a resident of the State of New York and I am over 18 years of age, of sound mind, and aver the facts herein on my own personal knowledge. I could, if called as a witness, testify competently to each fact set forth herein.

2)      I worked as a writer for Mediaite, LLC ("Mediaite").

3)      On May 3, 2018, I wrote an article titled: *"WV Senate Candidate Defends Horrifying Campaign Ad: 'There's No Mention of a Race' Like 'Negro'"*(the "Article").

4)      As of the date of the Article, I was not aware that Plaintiff's conviction relating to the mine explosion at the Upper Big Brand technically amounted to a misdemeanor but I was aware that Plaintiff was convicted of a serious crime and sent to prison.

5)      I recall reading news articles and posts on social media describing Plaintiff having been a felon as a result of his criminal conviction. I do not expressly recall which particular

1

articles I read, but they were the types of articles in newspapers and other media sources that I would have found in a Google search or that would have been shared by others across social media.

6)    I am not a lawyer and I did not fully review the court pleadings in connection with Plaintiff's criminal case.

7)    I had no knowledge that Plaintiff's criminal conviction may not have classified Plaintiff as a "felon" for purposes of how that term is defined under federal and West Virginia law and I had no doubt or reason to doubt that my statements in the Article were accurate.

8)    Mediaite did not maintain any internal policies relating to reporting on criminal activity or charges.

9)    Neither myself nor Mediaite intends to harm or cause injury to any individual or entity on which we reports.

10)    At no point during the 2018 West Virginia State Senate campaign did I or Mediaite engage in conspiracy with the NRSC, Kevin McLaughlin, or any other person or organization to defame Plaintiff or to engage in false light invasion of privacy.

11)    At no point, to the best of my knowledge, did Plaintiff contact myself or Mediaite to issue a correction for the Article.

State of Texas   County of Dallas
Sworn to me before this 5th of June ,2021

by Tamar Auber



Notary Public

Tamar Auber

Kaneisha R Curtis
ID NUMBER
13248981-3
COMMISSION EXPIRES
May 21, 2024

Notarized online using audio-video communication   2